## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED FARM WORKERS               )
                                  )
                and               )
                                  )
FARMWORKER JUSTICE,               )
                                  )    C.A. No. 07-2241 (HHK)
                Plaintiffs,       )
                                  )
        v.                        )
                                  )
DEPARTMENT OF LABOR,              )
                                  )
                Defendant.        )
_____   )

### PLAINTIFFS' CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56, plaintiffs United Farm Workers and

Farmworker Justice move for summary judgment on the grounds that no genuine issue of material

fact exists and plaintiffs are entitled to judgment as a matter of law.  In support of this motion,

plaintiffs submit a memorandum of law; a statement of undisputed material facts with Exhibits AA-

HH; the declaration of Virginia Ruiz with Exhibits 1-4; and a proposed order.


                                Respectfully submitted,


                                 /s/ Michael T. Kirkpatrick_____
                                Michael T. Kirkpatrick (DC Bar #486293)
                                Adina H. Rosenbaum (DC Bar #490928)
                                PUBLIC CITIZEN LITIGATION GROUP
                                1600 20th Street, NW
                                Washington, DC 20009
                                (202) 588-1000

Bruce Goldstein (DC Bar #446848)
Virginia Ruiz (DC Bar #483800)
Marni Willenson (Bar # IL0011)
FARMWORKER JUSTICE
1126 16th Street, NW, Suite 270
Washington, DC  20036
(202) 293-5420

Dated: April 11, 2008                    Attorneys for Plaintiffs

2

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED FARM WORKERS<br><br>and<br><br>FARMWORKER JUSTICE,<br><br>Plaintiffs,<br><br>v.<br><br>DEPARTMENT OF LABOR,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)  C.A. No. 07-2241 (HHK)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## PLAINTIFFS' MEMORANDUM IN OPPOSITION TO
## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT
## AND IN SUPPORT OF PLAINTIFFS' CROSS-MOTION
## FOR SUMMARY JUDGMENT

Plaintiffs United Farm Workers (UFW) and Farmworker Justice (FJ) brought this action under the Freedom of Information Act (FOIA), 5 U.S.C. § 552 *et seq.*, seeking a declaratory judgment that defendant U.S. Department of Labor (DOL) violated FOIA by failing to produce requested records and by failing to waive the fees associated with plaintiffs' requests.[1] The requested documents are employer applications for certification to hire temporary foreign agricultural workers through the H-2A guestworker program, 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) & 1188, and all related documents. Plaintiff FJ, a national advocacy organization for migrant and seasonal farmworkers, and plaintiff UFW, the agricultural labor union founded by Cesar Chavez, engage in numerous

---

[1]Plaintiffs' Complaint (Doc. 1) and Amended Complaint (Doc. 7) also sought a declaratory judgment that DOL violated FOIA by failing to expedite the processing of plaintiffs' sixth and seventh requests. DOL has now responded to plaintiffs' sixth and seventh requests and, although DOL has not produced all responsive records, the issue of whether plaintiffs are entitled to expedited processing is moot. *See* 5 U.S.C. § 552(a)(6)(E)(iv).

activities regarding the H-2A program, including monitoring its operations in the U.S. and abroad; disseminating information to the public and specific groups such as farmworker organizations through written reports, websites, and conferences; and advocating for and otherwise representing workers, both foreign and domestic, affected by the H-2A program in the courts, Congress, and before administrative agencies. As explained in detail below, DOL's motion for summary judgment should be denied and plaintiffs' cross-motion for summary judgment should be granted.

With regard to fee waiver, DOL asserts that disclosure of the requested records will not contribute to public understanding of the H-2A program because, according to DOL, "almost all of the information provided in the requested documents is publicly available" through other sources, and "the small amount of information that is not already publicly disclosed would not enhance the public's understanding of the subject in question to a significant extent." Def. Mem. at 8-9. DOL is wrong. It is not true that "almost all" of the requested information is publicly available through the two sources identified by DOL; rather, those sources contain only a small fraction of the information in the requested records. Moreover, the two information sources identified by DOL are incapable of providing an adequate substitute for the requested records, because the information is either not gathered in a central location or is not available in a timely manner.

With regard to DOL's failure to produce all the requested records, DOL has not asserted, much less shown, that the redacted portions of the documents it produced are exempt from disclosure under FOIA. Further, although DOL claims that it produced all documents responsive to plaintiffs' sixth request, DOL did not produce a single document related to H-2A applications in Louisiana, even though the sixth request sought all applications seeking certification for H-2A workers in Louisiana that were in effect or would commence between October 23, 2007 and April 30, 2008.

2

DOL should be ordered to grant plaintiffs a fee waiver and to produce all the requested documents.

## FACTS

### 1.    The H-2A Program

The H-2A program permits agricultural employers to obtain temporary work visas for foreign citizens and hire them to perform temporary or seasonal agricultural work in the United States, but only if DOL certifies that the employer is experiencing a bona fide labor shortage and the wages and working conditions offered to the H-2A workers will not adversely affect the wages and working conditions of farmworkers who are U.S. citizens or lawful permanent immigrants. *See* 8 U.S.C. §§ 1101(a)(15)(H)(ii)(a) & 1188; 20 C.F.R. § 655.101 *et seq.* DOL may grant an employer's petition for H-2A certification only if the employer has actively recruited U.S. workers and offered them employment that includes specified terms such as certain transportation expenses, adequate housing, and workers' compensation insurance. These requirements are intended to protect the jobs, wages, and working conditions of U.S. workers and to prevent the exploitation of vulnerable guestworkers.

An employer seeking permission to import H-2A workers must file an application with DOL's Office of Foreign Labor Certification (OFLC). Within seven days of receipt of the application, DOL must notify the employer whether the application is accepted or rejected. If the application is accepted, the employer is instructed to engage in efforts to recruit U.S. workers, and the State Workforce Agency (SWA) serving the area of intended employment is instructed to circulate the employer's job offer. DOL notifies the employer in writing of its decision to grant or deny certification. After DOL issues a labor certification, the Department of Homeland Security

(DHS) allots the employer a number of temporary work visas to bring in foreign laborers. The H-2A employers then arrange for the U.S. consulates in a foreign country to issue the visas to individual workers recruited by the employers.

The H-2A program, and DOL's administration of it, has been the subject of considerable controversy. *See, e.g.,* Exs. GG & HH (congressional testimony and newspaper articles describing controversy); Andrew J. Elmore, *Egalitarianism and Exclusion: U.S. Guest Worker Programs and a Non-subordination Approach to the Labor-based Admission of Nonprofessional Foreign Nationals*, 21 Geo. Immigr. L.J. 521 (2007); Southern Poverty Law Center, *Close to Slavery: Guestworker Programs in the United States* (2007), http://www.splcenter.org/ pdf/static/SPLCguestworker.pdf. The controversy surrounding the H-2A program has been part of the broader public debate over immigration reform, and guestworker programs in particular. There is significant disagreement as to whether sufficient U.S. workers are available to meet the labor demands of agricultural employers and whether guestworkers are treated fairly. The substantial public interest in the H-2A program is reflected in pending proposals by DOL and DHS to make major changes to the H-2A program regulations. *See* 73 Fed. Reg. 8538 (Feb. 13, 2008) (DOL notice of proposed rulemaking); 73 Fed. Reg. 8230 (Feb. 13, 2008) (DHS notice of proposed rulemaking). Thus, the public has a strong interest in knowing how DOL handles employer applications for H-2A certification.

4

2.      **The Requested Records**

Plaintiff UFW made seven separate FOIA requests.  Exs. A, E, I, K, N, S, and T.  Plaintiff

FJ joined with UFW in the sixth and seventh requests.  Each request sought all records related to

applications for H-2A certification and was limited by geography and time period.  The first and

second requests sought documents based on the date of the application; the other five requests sought

documents based on the dates that the requested certification would be in effect.[2]

DOL has identified records responsive to plaintiffs' requests.  The volume of documents is

substantial:

| Request | Pages of Responsive Material | |
|---------|------|----|
| First | 700 | (Ex. B) |
| Second | 0[3] | (Exs. F & G) |
| Third | 1,400 | (Ex. J) |
| Fourth | 550 | (Exs. L & M) |
| Fifth | 480 | (Ex. P) |
| Sixth | 8,297 | (Ex. Y) |
| Seventh | 513 | (Ruiz Decl. ¶ 2) |

On February 29, 2008, DOL produced records responsive to plaintiffs' sixth and seventh

requests after plaintiffs deposited funds in the Court's registry to secure release of those documents

pending resolution of the fee waiver issue.  Each H-2A application and its related documents

---

[2]In its memorandum and its statement of undisputed facts, DOL repeatedly errs by characterizing the third through seventh requests as seeking documents related to applications *submitted* between certain dates, rather than documents related to applications for certifications that would be *in effect* between certain dates.

[3]Despite an 8.5 hour search, DOL was unable to locate any documents responsive to the second request other than a single spreadsheet listing the names and addresses of 172 employers, which DOL produced on CD Rom.  Exs. F & G.

5

averages about 68 pages.[4]  An example of an H-2A application file is attached as Exhibit 1 to the

Ruiz declaration.  Although no two application files are entirely the same, in general, the file for each

application includes the following categories of documents:

1)  **ETA 750 Form**.  The ETA 750 is the Application for Alien Employment Certification.  It includes basic information such as the employer name and address; location of work; type of job; wage rate and work schedule; educational and experiential requirements; ETA certification date (if applicable); number of openings; dates of need; description of recruitment efforts; employer certifications and signature; and agent's name (if applicable).

2)  **ETA Certification or Denial Letter**.  The certification letter grants H-2A temporary alien labor certification.  The certification letter includes the employer's name; the number and title of job opportunities certified; the crop and activity; the area of employment; and the period covered by the certification.  If certification is denied, the letter outlines the application's deficiencies and the reasons certification was denied.

3)  **ETA 790 Form and Attachments**.  The ETA 790 is the Agricultural and Food Processing Clearance Order.  It elaborates on the basic information contained in the ETA 750 and includes location and directions to the work site; location, directions to and description of the housing; board arrangements; referral instructions; anticipated hours of work per day; wage rates, special pay information and deductions, including hourly wage rate or piece rate, bonus systems, minimum guarantees, and payroll periods; transportation arrangements and advance subsistence payments; terms for termination; employer furnished tools and equipment; training and time allowed to reach the production standards, and other assurances.  The ETA 790 is used by SWAs to prepare job orders to refer applicants to H-2A employers.

4)  **Summary of Insurance Coverage**.

5)  **Correspondence**.  Correspondence between the employer or employer's agent and DOL or other government agencies and the SWA, often regarding deficiencies in the job order or H-2A application; information about employer efforts to recruit U.S. workers interested in the job and DOL's oversight of this process; and information about housing inspections and DOL's oversight of this process.

---

[4]In response to the sixth request, DOL produced 118 application files totaling 8,297 pages. In response to the seventh request, DOL produced 11 application files totaling 513 pages.  Thus, an H-2A application file averages about 68 pages.

6)     **Housing Inspection Reports and Checklists**.

7)     **Advertising Evidence**.  Documents showing the extent of any employer efforts to recruit U.S. workers.

8)     **ETA Acceptance Letter**.  The acceptance letter acknowledges receipt of the initial H-2A application and contains an initial determination to grant certification subject to certain conditions being met.  The acceptance letter includes the employer's name; the number of job openings and the job title; and the period of employment; and the requirements that must be met to receive certification.

*See, e.g.,* Ruiz Decl., Ex. 1.

With regard to all seven requests, plaintiffs sought a fee waiver on the basis that "disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii).  Plaintiffs explained that it is necessary to review all of the various documents in the H-2A application file to determine how the H-2A program is operated.  Plaintiffs further explained that the requested information would be used to inform U.S. workers and their advocates of the existence of pending labor certifications, the terms and conditions of those certifications, and the potential availability of work for U.S. workers with employers to whom those certifications have been granted.  Plaintiffs explained that they would analyze the requested information to determine whether the certifications that have been granted contain terms consistent with the local prevailing practices and the mandates of the H-2A program, and would use that information to ensure that both U.S. and foreign workers are provided the protections afforded them under the H-2A program.  Plaintiffs also explained the methods by which they intend to communicate the requested information to farmworkers, supporters, collaborating farmworker organizations, and the general public.  Exs. C, G, I, K, N, O, S, T, and V.

7

In letters dated January 31, 2008, DOL denied all seven fee waiver requests on the ground that the requested information is already available to the public through sources other than FOIA. Exs. D, H, J, L, R, and X.

**3.    Sources of H-2A Application Information Other Than the Requested Records**

According to DOL, there are two sources of H-2A application information other than the records plaintiffs requested under FOIA—job orders prepared and circulated by SWAs, and OFLC's annual report.

DOL regulations require that employers file a duplicate application with the SWA serving the area of intended employment and, if OFLC accepts the application, the SWA is required to "prepare a local job order to recruit U.S. workers in the area of intended employment," Def. Mem. at 9. Although the SWA may have access to all information in the employer's application, the job orders prepared and circulated by SWAs contain very little of that information. For example, the job order may not even list the employer's name and will not provide the detailed information found in the ETA 790 form and attachments, such as location and directions to the work site; location, directions to and description of the housing; board arrangements; special pay information and deductions, including bonus systems and minimum guarantees; transportation arrangements and advance subsistence payments; terms for termination; employer furnished tools and equipment; training and time allowed to reach the production standards, and other assurances. *See* Ruiz Decl. Ex. 4; Carlson Decl. Ex. 1. Job orders are intended to be posted and circulated after DOL's acceptance of an H-2A application but most are removed as soon as the H-2A workers leave their home country to travel to the job site. Thus, job orders are available for a very limited time.

8

OFLC's annual report is issued once a year and consists of a database file available at www.flcdatacenter.com/CaseH2A.aspx. The database file includes applications submitted during a particular fiscal year (October-September). Because the annual report is not made available until about five months after the close of the fiscal year, information regarding an H-2A application received early in the fiscal year will not be available from OFLC's annual report until more than a year after it is submitted.[5]  Indeed, of the 129 application files produced by DOL in response to the sixth and seventh requests, only *seven* are in the latest OFLC annual report.  Ruiz Decl. ¶ 5. The OFLC annual report includes only a single row of information regarding each H-2A application. *See* Carlson Decl. Ex. 4.  Thus, the annual report cannot begin to include the volume of information available from the requested records, which, as noted,  average about 68 pages per application.

**4.      Requested Documents Not Produced**

DOL has failed to produce all documents responsive to plaintiffs' sixth request, even though plaintiffs deposited funds to the Court's registry pending resolution of the fee-waiver issue.   First, the documents that DOL produced were riddled with redactions, even though DOL never asserted that any of the requested materials are exempt from disclosure under FOIA.  *See* Ruiz Decl. Ex. 3 (providing a sample of pages produced with material redacted).  Second, the documents produced by DOL in response to the sixth request contain no documents related to H-2A applications in Louisiana.  Based on the history of H-2A certifications for Louisiana and a review of the most recent OFLC annual report, it is very likely that, at the time it conducted its search for documents responsive to the sixth request, DOL had applications seeking certification for H-2A workers in

---

[5]The H2A data for FY 2006 was posted on January 28, 2007.  The H2A data for FY 2007 was posted in February 2008.

Louisiana that were in effect or would commence between October 23, 2007 and April 30, 2008, but no such documents were produced.  Ruiz Decl. ¶ 9.

## ARGUMENT

### I.    Plaintiffs Are Entitled to a Fee Waiver.

"Intended to ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed, . . . the Freedom of Information Act requires federal agencies to disclose information upon request unless the statute expressly exempts the information from disclosure." *Judicial Watch, Inc. v. Rossotti*, 326 F.3d 1309, 1310 (D.C. Cir. 2003) (citations and internal quotation marks omitted).  FOIA further requires that agencies waive fees "if disclosure of the information is in the public interest because it is likely to contribute significantly to public understanding of the operations or activities of the government and is not primarily in the commercial interest of the requester."  5 U.S.C. § 552(a)(4)(A)(iii).  Judicial review "[i]n any action by a requester regarding the waiver of fees" is *de novo* and "limited to the record before the agency."  5 U.S.C. § 552(a)(4)(A)(vii).  Although the requester bears the initial burden of showing that the fee waiver requirements have been met, Congress intended that FOIA "be liberally construed in favor of waivers for noncommercial requesters."  *Rossotti*, 326 F.3d at 1312 (quoting *McClellan Ecological Seepage Situation v. Carlucci*, 835 F.2d 1282, 1284 (9th Cir. 1987)) (internal quotation marks omitted).

DOL concedes that disclosure of the requested information is not primarily in the commercial interest of UFW or FJ.  Def. Mem. at 5.  Thus, the fee waiver issue turns on whether disclosure of the requested information "is likely to contribute significantly to public understanding of the

operations or activities of the government." 5 U.S.C. § 552(a)(4)(A)(iii); Def. Mem. at 6. DOL has

issued a regulation listing four factors that it uses to assess fee waiver requests:

> (i) The subject of the request: Whether the subject of the requested records concerns "the operations or activities of the government." The subject of the requested records must concern identifiable operations or activities of the federal government, with a connection that is direct and clear, not remote or attenuated.

> (ii) The informative value of the information to be disclosed: Whether the disclosure is "likely to contribute" to an understanding of government operations or activities. The disclosable portions of the requested records must be meaningfully informative about government operations or activities in order to be "likely to contribute" to an increased public understanding of those operations or activities. The disclosure of information that already is in the public domain, in either a duplicative or a substantially identical form, would not be as likely to contribute to such understanding where nothing new would be added to the public's understanding.

> (iii) The contribution to an understanding of the subject by the public likely to result from disclosure: Whether disclosure of the requested information will contribute to "public understanding." The disclosure must contribute to the understanding of a reasonably broad audience of persons interested in the subject, as opposed to the individual understanding of the requester. A requester's expertise in the subject area and ability and intention to effectively convey information to the public will be considered. It will be presumed that a representative of the news media will satisfy this consideration.

> (iv) The significance of the contribution to public understanding: Whether the disclosure is likely to contribute "significantly" to public understanding of government operations or activities. The public's understanding of the subject in question must be enhanced by the disclosure to a significant extent.

29 C.F.R. § 70.41(2)(i)-(iv).

DOL does not dispute that UFW and FJ have satisfied the first and third factors. Def. Mem.

at 7. Indeed, because the requested records relate directly to DOL's operation of the H-2A program,

it is beyond dispute that "the subject of the requested records concerns 'the operations or activities

of the government.'" 29 C.F.R. § 70.41(2)(i). Similarly, UFW and FJ have demonstrated expertise

in agricultural labor issues and have the "ability and intention to effectively convey information to

11

the public," 29 C.F.R. § 70.41(2)(iii), because both organizations have an extensive record of providing information about the H-2A program to a broad audience.  *See, e.g.,* Exs.S, T, GG, and HH.

> **A.    The requested records are meaningfully informative about the H-2A program and are not redundant with material already in the public domain.**

With respect to the second factor, DOL does not dispute that the requested records are meaningfully informative about DOL's operation of the H-2A program, but DOL argues that the information is not "'likely to contribute' to [] increased public understanding" because the information "already is in the public domain, in either a duplicative or a substantially identical form."  29 C.F.R. § 70.41(2)(ii); Def. Mem. at 13.  Thus, according to DOL, the requested information can add nothing new to the public's understanding of the H-2A program.

An agency that denies a fee waiver based on a claim that the requested information is already in the public domain must substantiate that claim by demonstrating where in the public domain the requested information resides.  *Campbell v. U.S. Dep't of Justice*, 164 F.3d 20, 36 (D.C. Cir. 1998). But "the mere fact that material is in the public domain does not justify denying a fee waiver; only material that has met a threshold level of public dissemination will not further 'public understanding' within the meaning of the fee waiver provisions."  *Id.* (citing *Carney v. U.S. Dep't of Justice*, 19 F.3d 807, 815-16 (2d Cir. 1994); *Schrecker v. Dep't of Justice*, 970 F. Supp. 49, 50-51 (D.D.C. 1997); *Fitzgibbon v. Agency for Int'l Dev.*, 724 F. Supp. 1048, 1051 (D.D.C. 1989)).  DOL cannot substantiate its claim that the requested information is redundant with material already in the public domain because the two information sources DOL identifies—SWA job orders and OFLC's annual report—are inadequate substitutes for the requested records.

### 1. The requested records contain considerably more information than the SWA job orders and the OFLC annual report.

The H-2A application files requested by UFW and FJ contain an average of 68 pages of material. The file relating to each H-2A application typically includes the application form; certification letter; agricultural and food processing clearance order with detailed information about the work, housing, wages, transportation, production standards, and guarantees; insurance information, correspondence, housing inspection information, recruitment information, and the acceptance letter. *See* Ruiz Decl. Ex. 2. This detailed information is crucial to understanding how the H-2A program operates.

Although DOL is well-aware of the contents of its H-2A application files, it claims that "the information Plaintiffs seek has been publicly disseminated" through SWA job orders and the OFLC annual report. Def. Mem. at 19. DOL's claim is demonstrably incorrect. A two-page job order or a single row from a spreadsheet in an annual report cannot encompass all of the information set forth in an H-2A application file. *Compare* Carlson Decl. Exs. 1 and 4 *with* Ruiz Decl. Ex. 2.

Throughout its memorandum, DOL ignores the existence of any requested document other than the acceptance or denial letter from DOL to each employer.[6] DOL has conceded that plaintiffs are entitled to a fee waiver for the requested records that relate to denied applications (Def. Mem.

---

[6] *See, e.g.*, Def. Mem. at 11 ("While the acceptance and denial letters from DOL to each employer are not automatically disseminated to the public, information regarding which applications are accepted, rejected, certified or denied is annually reported by OFLC to the public."); *id.* at 12 ("Notably, the acceptance letters do not contain any substantive information that is not publicly available."); *id.* at 20 ("DOL's acceptance letters provide no further meaningful information, above and beyond what is publicly disseminated."); *id.* at 21 ("A comparison of the information provided in the acceptance letters attached as Exhibit 2 to the Carlson declaration, with the information available from the FY 2007 H-2A Report on ETA's website, Exhibit 4 to the Carlson declaration, reveals that the significant information from these acceptance letters is publicly available.").

13

at 9 n.5; 11 n.8; 15 n.14), but claims that information in the acceptance letters "is readily available to the public . . . and therefore dissemination of these letters would not be meaningfully informative about DOL's operations or activities." *Id.* at 12. Because the requested records contain far more information than the acceptance letters, DOL's argument fails. *See Rossotti*, 326 F.3d at 1315 (finding entitlement to fee waiver where requester sought "considerably more" than the information already public); *Citizens for Responsibility and Ethics in Washington (CREW) v. U.S. Dep't of Health and Human Services*, 481 F. Supp. 2d 99, 113 (D.D.C. 2006) (finding entitlement to fee waiver where "nothing in the record suggests that the specific content of the requested documents is redundant such that those documents would not reveal new information"); *Judicial Watch v. U.S. Dep't of Trans.*, Civ. No. 02-566, 2005 WL 1606915 at *5 (D.D.C. July 7, 2005) (same).

> **2.    Even if SWA job orders and the OFLC annual report contain some of the requested information, those sources are not an adequate substitute for the requested records.**

In its memorandum, DOL explains that its regulations require SWAs to prepare and circulate a job order for each accepted application and argues that, because the job order should contain some of the same information as the acceptance letter, the SWA job orders are an adequate source of the information that UFW and FJ seek to disseminate. Def. Mem. at 9-10. DOL's argument fails for three reasons. First, DOL has not demonstrated where the relevant job orders can be found. *See Campbell*, 164 F.3d at 36 (holding that an agency must identify where in the public domain the requested materials reside); *CREW*, 481 F. Supp. 2d at 111 (same). DOL's failure to show where the relevant job orders can be found is particularly problematic in this case, because DOL assumes that the SWAs have complied with DOL's job order regulations. Indeed, DOL has not submitted even a single example of a job order that relates to any of the requested documents. DOL's sole

14

example of a job order, attached as Exhibit 1 to the Carlson Declaration, relates to an application for H-2A workers in the state of Washington.

Second, DOL fails to acknowledge that job orders are typically removed from circulation after the work period has begun. Thus, even if a SWA had circulated a job order containing some of the requested information, that job would have been available for only a short window of time.

Third, even if the relevant SWA job orders were available, the fact that they are not collected in a central location shows that "that they are not available in a manner which would further public understanding." *Prison Legal News v. Lappin*, 436 F. Supp. 2d 17, 24 (D.D.C. 2006). In *Prison Legal News*, the court held that the requester was entitled to a fee waiver even though the government claimed that the requested information was available in the public domain through either the internet or by conducting a search of court records, because "[t]here is a significant difference between locating the requested information in courthouses around the country and on the internet, as opposed to having access to the information in a single document." *Id.* at 25 (citation omitted). For the same reason, DOL's assertion that some of the requested information may be in the public domain by virtue of SWA job orders scattered about the country is insufficient to show that the information "has met a threshold level of public dissemination" such that the requested records will not contribute to increased public understanding. *Campbell*, 164 F.3d at 36.

DOL also claims that the requested records cannot contribute to increased public understanding because some of the requested information is available through OFLC's annual report. This argument fails because the OFLC annual report is not released until well after UFW and FJ would disseminate the requested information to the public. For example, the FY 2007 report was not released until February 2008, and it contains information relating to only *seven* of the 129 H-2A

15

applications that DOL produced in response to the sixth and seventh requests.  Information relating to the other 122 applications will not be available until OFLC releases its FY 2008 annual report in early 2009.  Thus, it is not true that, by virtue of the OFLC annual report, the requested information "already is in the public domain."  29 C.F.R. § 70.41(2)(ii).  Indeed, by the time most of the information responsive to the sixth and seventh requests becomes available through the OFLC annual report, it will be too late for FJ and UFW to use that information to inform U.S. workers of available jobs or to request modifications of labor certifications that contain unlawful job terms.  Even if some of the H-2A applications responsive to the first through fifth requests are included in the FY 2007 annual report—and DOL has not shown that they are—DOL denied fee waivers for the first through fifth requests well before the FY 2007 report was issued.  *See* Exs. B, F, J, L, and P.

           **3.**     **The informative value of the requested records is clear from the administrative record and the circumstances of the requests.**

In its memorandum, DOL states that it "will grant Plaintiffs a fee waiver for those documents that are responsive to their requests that are not encompassed in the most recent [OFLC annual] report."  Def. Mem. at 12 n.9.  Thus, DOL does not dispute that the requested documents are meaningfully informative about DOL's operation of the H-2A program.  Indeed, DOL bases its denial of a fee waiver on the claim that the requested documents are redundant of materials already in the public domain.  Nevertheless, DOL asserts that "Plaintiffs failed to fully substantiate their claim that the information they sought would be meaningfully informative about DOL's activities or operations."  *Id.* at 13.

To the extent DOL is complaining that plaintiffs did not describe with sufficient specificity the informative value of the requested records—even though DOL agrees that the records have

informative value—DOL places form over substance. Because DOL recognized the informative value of the requested documents, the point of the request was clear from the circumstances, and nothing more is required. *See, e.g., Fitzgibbon*, 724 F. Supp. at 1050 ("The requester of a fee waiver bears the initial burden of identifying, with reasonable specificity, the public interest to be served, although circumstances may clarify the point of the request.") (citations omitted).

In any event, a review of the administrative record shows that plaintiffs explained the public interest in disclosure of the requested documents with reasonable specificity. In appealing DOL's denial of a fee waiver with respect to the first request, UFW explained that "[i]t is necessary to review the employers' H-2A applications and DOL's responses to determine how the program is operating." Ex. C. Plaintiffs further explained that

> The information requested will be used to inform U.S. workers and their advocates of the existence of pending labor certifications, the terms and conditions of those certifications and the potential availability of work for U.S. workers with employers to whom those certifications have been granted. Additionally, it will be used to determine whether the certifications that have been granted contain terms consistent with the local prevailing practices and the mandates of the H-2A program. This information will also be used for the purpose of ensuring that both U.S. and foreign workers are provided the protections afforded them under federal statute and regulation.

*Id.* UFW went on to explain the methods by which it would communicate the requested information to farmworkers, supporters, collaborating farmworker organizations, and the general public. *Id.* DOL acknowledged that UFW "provided a substantial amount of additional information to support [its] request for a fee waiver." Ex. D. Plaintiffs provided similar explanations with regard to the second through seventh requests. *See* Exs. G, I, K, N, O, S, T, and V. These explanations were at least as fulsome as the descriptions found to be sufficiently specific in *Rossotti*, 326 F.3d at 1313-14, *CREW*, 481 F. Supp. 2d at 112, and *Prison Legal News*, 436 F. Supp. 2d at 25-26.

**B.    The requested records are likely to contribute significantly to the public's understanding of the H-2A program.**

With regard to the fourth factor DOL uses to assess fee waiver requests—"[w]hether the disclosure is likely to contribute 'significantly' to public understanding of government operations or activities"—DOL repeats the same arguments it made with regard to the second factor. 29 C.F.R. § 70.41(2)(iv); Def. Mem. at 21.  Specifically, DOL claims that the requested information is already in the public domain and, therefore, release of the information to UFW and FJ will do nothing to enhance public understanding of the operation of the H-2A program.  As explained above, the requested records contain far more information than the SWA job orders and the OFLC annual report, and, accordingly, those sources are an inadequate substitute for the records that UFW and FJ have requested under FOIA.  Thus, for the same reasons that the requested records are "meaningfully informative" about the H-2A program, they are "likely to contribute 'significantly' to public understanding" of the H-2A program.    29 C.F.R. § 70.41(2)(ii) and (iv).

Indeed, the second and fourth factors that DOL uses to guide its fee waiver analysis are closely intertwined. *See Project on Military Procurement v. Dep't of the Navy*, 710 F. Supp. 362, 365 n.8 (D.D.C. 1989) (finding similar second and fourth factors "hopelessly intertwined" and addressing them jointly).  To the extent the second and fourth factors differ in any meaningful way, it is only because the fourth factor may incorporate an aspect of the third—whether the requester has the intent and ability to disseminate the requested information to the public.  That aspect of the fourth factor is not at issue here, and, in fact DOL has never disputed that UFW and FJ have the expertise, experience, and ability to effectively disseminate the requested information to a broad audience.

## II.    DOL Has Not Produced All of the Requested Records Responsive to the Sixth Request and Has Failed to Justify its Redactions to the Documents it has Produced.

An agency that withholds requested records under one of FOIA's exemptions has the burden to justify the withholding. *See U.S. Dep't of State v. Ray*, 502 U.S. 164, 173 (1991); 5 U.S.C. § 552(a)(4)(B). If the government does not "carry its burden of convincing the court that one of the statutory exemptions apply," the requested records must be disclosed. *Goldberg v. U.S. Dep't of State*, 818 F.2d 71, 76 (D.C. Cir. 1987).

DOL has failed to produce all documents responsive to plaintiffs' sixth request. First, the documents that DOL provided to plaintiffs in response to the sixth FOIA request contain numerous redactions, *see* Ruiz Decl. ¶ 8 and Ex. 3, but DOL has been silent as to the reason for the redactions. Although DOL's motion for summary judgment was due March 11, 2008, DOL has not moved for a judgment that portions of the requested records are exempt from disclosure, and DOL has made no claim that the redacted portions of the records are covered by one of FOIA's narrowly-construed exemptions. Because DOL has not carried its burden of showing the redacted portions of the records are exempt from disclosure, DOL should be ordered to release the requested records in their entirety.

Second, the documents produced by DOL in response to the sixth request contain no documents related to H-2A applications in Louisiana. Based on the history of H-2A certifications for Louisiana and a review of the most recent OFLC annual report, it is very likely that, at the time it conducted its search for documents responsive to the sixth request, DOL had applications seeking certification for H-2A workers in Louisiana that were in effect or would commence between October 23, 2007 and April 30, 2008, but no such documents were produced. Ruiz Decl. ¶ 9. Because DOL

has not shown that the documents related to H-2A applications in Louisiana are exempt from disclosure, DOL should be ordered to produce them.

## CONCLUSION

For the foregoing reasons, the Court should deny defendant's motion for summary judgment, grant plaintiffs' motion for summary judgment, and order DOL to grant plaintiffs a fee waiver and produce all the requested records without redaction.

Respectfully submitted,


   /s/ Michael T. Kirkpatrick
Michael T. Kirkpatrick (DC Bar #486293)
Adina H. Rosenbaum (DC Bar #490928)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
(202) 588-1000

Bruce Goldstein (DC Bar #446848)
Virginia Ruiz (DC Bar #483800)
Marni Willenson (Bar # IL0011)
FARMWORKER JUSTICE
1126 16th Street, NW, Suite 270
Washington, DC  20036
(202) 293-5420

Dated: April 11, 2008                    Attorneys for Plaintiffs

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| UNITED FARM WORKERS | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FARMWORKER JUSTICE, | ) | |
| | ) | C.A. No. 07-2241 (HHK) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

**PLAINTIFFS' STATEMENT OF UNDISPUTED MATERIAL FACTS**
**AND RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS**

Pursuant to Local Rules 7(h) and 56.1, and in support of plaintiffs' Cross-Motion for Summary Judgment, plaintiffs United Farm Workers (UFW) and Farmworker Justice (FJ) submit this statement of material facts as to which there is no genuine issue, and plaintiffs respond to defendant's statement of material facts (Docket No. 12-11). Paragraph numbers 1-36 below correspond to the paragraph numbering of defendant's statement of material facts, and references to Exs. A-Y are to the exhibits filed with defendant's statement. Paragraphs 37-69 set forth additional material facts that are not in dispute. Exhibits AA through HH are submitted with this statement.

## I.  RESPONSE TO DEFENDANT'S STATEMENT OF MATERIAL FACTS

1.      Undisputed, except that Ex. A does not include "H-2A" between "All" and "applications/petitions[,]" and does not have a comma following "Clearance Orders[.]"

2.      Undisputed.

3.      Undisputed, except that Ex. B does not include periods in its citation to the Code of Federal Regulations.  Plaintiffs note that Ex. B contains the same text as the letter received by UFW, but the letter received by UFW is formatted differently and contains a letterhead, date stamp, and signature.  *See* Ex. AA.

4-5.    Undisputed, but plaintiffs note that Ex. C includes information and explanation in addition to that described by DOL, and plaintiffs further note that Ex. C was accompanied by attachments.  *See* Ex. BB.

6.      Undisputed, except that the emphasis in the quoted material appears in the original.

7.      Undisputed.

8-9.    Undisputed.

10.     Undisputed, except that Ex. F does not include periods in its citation to the Code of Federal Regulations.  Plaintiffs note that Ex. F contains the same text as the letter received by UFW, but the letter received by UFW is formatted differently and contains a letterhead, date stamp, and signature.  *See* Ex. CC.

11.     Undisputed, but plaintiffs note that Ex. G was accompanied by attachments.  *See* Ex. DD.

12.     Undisputed.

13.     Undisputed, except that UFW's June 20, 2007 FOIA request related to Arizona H-2A applications did not seek documents *submitted* between June 20, 2007 and December 31, 2007; rather, UFW sought documents related to applications for H-2A *certifications* that were *in effect* on June 20, 2007, or that *would commence* at any time between June 20, 2007 and December 31, 2007.  Ex. I.

14.    Undisputed, except that the fourth paragraph of Ex. I has "opening" between "job" and

"announcements." Plaintiffs note that Ex. I includes information and explanation in support

of UFW's fee waiver request in addition to that described by DOL.

15.    Undisputed.

16.    Undisputed, except that DOL calculated reproduction and search fees for 1,400 pages of

material DOL identified as responsive to the request, rather than "for the items produced."

17.    Undisputed, except that UFW's June 20, 2007 FOIA request related to Hawaii H-2A

applications did not seek documents *submitted* between June 20, 2007 and December 31,

2007; rather, UFW sought documents related to applications for H-2A *certifications* that

were *in effect* on June 20, 2007, or that *would commence* at any time between June 20, 2007

and December 31, 2007.  Ex. K.

18.    Undisputed, except that DOL calculated reproduction and search fees for 550 pages of

material DOL identified as responsive to the request, rather than "for the items produced."

19.    Undisputed, except that UFW's June 20, 2007 FOIA request related to Kentucky H-2A

applications did not seek documents *submitted* between June 20, 2007 and December 31,

2007; rather, UFW sought documents related to applications for H-2A *certifications* that

were *in effect* on June 20, 2007, or that *would commence* at any time between June 20, 2007

and December 31, 2007.  Ex. N.

20.    Undisputed, but plaintiffs note that Ex. O was accompanied by attachments.  *See* Ex. EE.

21.    Undisputed, except that Ex. P is a letter dated December 11, 2007, not May 19, 2007.

22.    Undisputed.

3

23.     Undisputed, except that the quoted portion of Ex. Q does not begin "[to] the extent DOL's December 11, 2007 letter requires . . . ."  Rather, the quoted portion of Ex. Q begins: "To the extent DOL believes that its letter of December 11, 2007 requires . . . ."  Plaintiffs further note that Ex. Q enclosed a copy of Ex. O.

24.     Undisputed.

25.     Undisputed, except that sixth and seventh requests did not seek documents *submitted* between October 23, 2007 and April 30, 2008; rather, the requests sought documents related to applications for H-2A *certifications* that were *in effect* on October 23, 2007, or that *would commence* at any time between October 23, 2007 and April 30, 2008.  Plaintiffs note that Exs. S and T were accompanied by attachments.  *See* Exs. GG and HH.

26-27.  Undisputed, but plaintiffs note that Exs. S and T, and the related attachments, include far more information and explanation in support of plaintiffs' fee waiver request than is described by DOL.

28.     Undisputed.

29-30.  Undisputed, but plaintiffs note that Ex. V includes far more information and explanation in support of plaintiffs' request for expedited processing than is described by DOL.

31.     It is undisputed that Ex. W is a letter signed by Mr. Thompson, but the letter is dated December 10, 2007, not January 31, 2008.  By letter dated December 10, 2007, DOL denied UFW's and FJ's *appeal* from the denial of their requests for expedited processing.  DOL denied UFW's and FJ's *requests* for expedited processing by letter of October 30, 2007.  Ex. U.

4

32.  Undisputed, except that DOL's request for an assurance of payment was directed to both UFW and FJ.

33.  Undisputed.

34.  Undisputed that the Court granted plaintiffs' motion in an Order signed February 20, 2008, and filed on February 22, 2008.

35.  Undisputed.

36.  Undisputed that, on February 29, 2008, DOL sent plaintiffs documents responsive to the October 23, 2007 requests, but plaintiffs dispute that the response is complete. First, a significant amount of material has been redacted from the documents responsive to the sixth request. Second, DOL did not produce any documents related to H-2A applications for the state of Louisiana. Moreover, plaintiffs are unable to confirm that DOL sent all of the documents it possessed that were responsive to the requests for the states of Florida, Virginia, and Hawaii. Plaintiffs note that DOL's transmittal letter refers to documents "submitted" between October 23, 2007 and April 30, 2008, but the requests sought documents related to applications for H-2A *certifications* that were *in effect* on October 23, 2007, or that *would commence* at any time between October 23, 2007 and April 30, 2008.

## II.  PLAINTIFFS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE ISSUE

37.  Ex. A is a copy of UFW's January 24, 2007 FOIA request to DOL's Chicago National Processing Center ("the first request").

38.  Ex. B is a copy of the text of DOL's response to the first request. Ex. AA is a copy of the letter DOL sent to UFW in response to the first request.

39.    Ex. C is a copy of UFW's appeal of DOL's denial of a fee waiver in connection with the first request.  Ex. BB is a copy of the attachments sent to DOL with Ex. C.

40.    Ex. D is a copy of DOL's response to UFW's appeal of DOL's denial of a fee waiver in connection with the first request.

41.    Ex. E is a copy of UFW's January 24, 2007 FOIA request to DOL's Atlanta National Processing Center ("the second request").

42.    Ex. F is a copy of the text of DOL's response to the second request.  Ex. CC is a copy of the letter DOL sent to UFW in response to the second request.

43.    Ex. G is a copy of UFW's appeal of DOL's denial of a fee waiver in connection with the second request.  Ex. DD is a copy of the attachments sent to DOL with Ex. G.

44.    Ex. H is a copy of DOL's response to UFW's appeal of DOL's denial of a fee waiver in connection with the second request.

45.    Ex. I is a copy of UFW's June 20, 2007 FOIA request to DOL's Chicago National Processing Center requesting documents related to Arizona H-2A applications ("the third request").

46.    Ex. J is a copy of DOL's response to the third request.

47.    Ex. K is a copy of UFW's June 20, 2007 FOIA request to DOL's Chicago National Processing Center requesting documents related to Hawaii H-2A applications ("the fourth request").

48.    Ex. L, with Ex. M substituted for page 3 of Ex. L, is a copy of DOL's response to the fourth request.

49.    Ex. N is a copy of UFW's June 20, 2007 FOIA request to DOL's Atlanta National Processing Center requesting documents related to Kentucky H-2A applications ("the fifth request").

6

50.    Ex. O is a copy of UFW's appeal of DOL's telephonic denial of a fee waiver in connection

with the fifth request.  Ex. EE is a copy of the attachments sent to DOL with Ex. O.  Ex. FF

is a copy of DOL's acknowledgment of Ex. O.

51.    Ex. P is a copy of DOL's written response to the fifth request.

52.    Ex. Q is a copy of UFW's response to Ex. P.

53.    Ex. R is a copy of DOL's response to UFW's appeal of DOL's denial of a fee waiver in

connection with the fifth request.

54.    Ex. S is a copy of UFW's and FJ's October 23, 2007 FOIA request to DOL's Atlanta

National Processing Center requesting documents related to Florida, Louisiana, and Virginia

H-2A applications ("the sixth request").  Ex. GG is a copy of the attachments submitted with

Ex. S.

55.    Ex. T is a copy of UFW's and FJ's October 23, 2007 FOIA request to DOL's Chicago

National Processing Center requesting documents related to Hawaii H-2A applications ("the

seventh request").  Ex. HH is a copy of the attachments submitted with Ex. T.

56.    Ex. U is a copy of DOL's response to the request for expedited processing in the sixth and

seventh requests.

57.    Ex. V is a copy of UFW's and FJ's appeal of DOL's denial of expedited processing in

connection with the sixth and seventh requests.

58.    Ex. W is a copy of DOL's response to UFW's and FJ's appeal of DOL's denial of expedited

processing in connection with the sixth and seventh requests.

59.    Ex. X is a copy of DOL's response to the sixth and seventh requests.

60.   Ex. Y is a copy of the transmittal letter that accompanied the documents DOL produced in response to the sixth and seventh requests.

61.   According to DOL, it produced 8,297 pages of material responsive to the sixth request.  Ex. Y.

62.   The materials produced by DOL in response to the sixth request consist of 118 H-2A application files: 72 for Florida, 46 for Virginia, and 0 for Louisiana. Ruiz Decl. ¶ 4.

63.   None of the 118 application files produced by DOL in response to the sixth request are included in the OFLC annual report for FY 2007.  Ruiz Decl. ¶ 5.

64.   The documents produced by DOL in response to the sixth request contain substantial redactions.  Ruiz Decl. ¶ 8.

65.   The documents produced by DOL in response to the sixth request contain no documents related to H-2A applications in Louisiana.  At the time it conducted its search for documents responsive to the sixth request, DOL had documents related to applications seeking certification for H-2A workers in Louisiana that were in effect or would commence between October 23, 2007 and April 30, 2008.  Ruiz Decl. ¶ 9.

66.   DOL produced 513 pages of material responsive to the seventh request.  Ruiz Decl. ¶ 2.

67.   The materials produced by DOL in response to the seventh request consist of 11 H-2A application files for Hawaii.  Ruiz Decl. ¶ 4.

68.   Seven of the eleven application files produced by DOL in response to the seventh request are included in the OFLC annual report for FY 2007.  Ruiz Decl. ¶ 5.

69.   In general, H-2A application files include the following categories of documents:

a) **ETA 750 Form**.  The ETA 750 is the Application for Alien Employment Certification.  It includes basic information such as the employer name and address; location of work; type of job; wage rate and work schedule; educational and experiential requirements; ETA certification date (if applicable); number of openings; dates of need; description of recruitment efforts; employer certifications and signature; and agent's name (if applicable).

b) **ETA Certification or Denial Letter**.  The certification letter grants H-2A temporary alien labor certification.  The certification letter includes the employer's name; the number and title of job opportunities certified; the crop and activity; the area of employment; and the period covered by the certification.  If certification is denied, the letter outline's the application's deficiencies and the reasons certification was denied.

c) **ETA 790 Form and Attachments**.  The ETA 790 is the Agricultural and Food Processing Clearance Order.  It elaborates on the basic information contained in the ETA 750 and includes location and directions to the work site; location, directions to and description of the housing; board arrangements; referral instructions; anticipated hours of work per day; wage rates, special pay information and deductions, including hourly wage rate or piece rate, bonus systems, minimum guarantees, and payroll periods; transportation arrangements and advance subsistence payments; terms for termination; employer furnished tools and equipment; training and time allowed to reach the production standards, and other assurances.

d) **Summary of Insurance Coverage**.

9

e) **Correspondence**.  Correspondence between the employer or employer's agent and DOL or other government agencies and the SWA, often regarding deficiencies in the job order or H-2A application; information about employer efforts to recruit U.S. workers interested in the job and DOL's oversight of this process; and information about housing inspections and DOL's oversight of this process.

f) **Housing Inspection Reports and Checklists**.

g) **Advertising Evidence**.  Documents showing the extent of any employer efforts to recruit U.S. workers.

h) **ETA Acceptance Letter**.  The acceptance letter acknowledges receipt of the initial H-2A application and contains an initial determination to grant certification subject to certain conditions being met.  The acceptance letter includes the employer's name, the number of job openings and the job title, and the period employment, and it lists the requirements that must be met to receive certification.  Ruiz Decl. ¶ 6.

Respectfully submitted,

*/s/ Michael T. Kirkpatrick*
Michael T. Kirkpatrick (DC Bar #486293)
Adina H. Rosenbaum (DC Bar #490928)
PUBLIC CITIZEN LITIGATION GROUP
1600 20th Street, NW
Washington, DC 20009
(202) 588-1000

Bruce Goldstein (DC Bar #446848)
Virginia Ruiz (DC Bar #483800)
Marni Willenson (Bar # IL0011)
FARMWORKER JUSTICE
1126 16th Street, NW, Suite 270
Washington, DC  20036
(202) 293-5420

Dated: April 11, 2008                          Attorneys for Plaintiffs

# EXHIBIT AA

U.S. Department of Labor

Employment and Training Administration
200 Constitution Avenue, N.W.
Washington, D.C. 20210



JUN 11 2007

Mr. Erik Nicholson
United Farm Workers of America, AFL-CIO
P.O. Box 8337
Tacoma, Washington 98418

Dear Mr. Nicholson:

This responds to your Freedom of Information Act (FOIA) request of January 24, 2007, which our Chicago National Processing Center (NPC) referred to this office for response. You requested copies of any and all applications and petitions seeking a temporary foreign labor certification for H-2A workers in California submitted on or after November 1, 2006.

Per 29 CFR 70.20(f), the Department is required to respond with only those records available as of the date of the request. The Chicago National Processing Center has completed its search and review of the records you requested and the documents are enclosed.

We are unable to approve your request for a fee waiver because it does not meet the criteria at 29 CFR 70.41 with regard to contributing significantly to public understanding of the operations or activities of the government. 29 CFR 70.40(c)(1) states that charges assessed for the production of records for non-commercial requestors may be for search and reproduction costs. There is no charge for the production of the first 100 pages of material, and a fee of 15 cents per page thereafter. There is no charge for the first two hours of search and review time, and a subsequent charge of $5.00 per quarter hour of clerical search time, and $10.00 per quarter hour for the professional or supervisory search time. Therefore, the amount due has been estimated as follows:

1. There is a charge of $90.00 for the reproduction of an estimated 700 pages of material. However, there is no charge for the reproduction of the first 100 pages.

2. Clerical search time totaled 4 ½ hours. There is no charge for the first two hours, and a charge of $25.00 for 2 ½ hours of clerical search time.

3. Therefore, the total owing is $115.00.

# EXHIBIT BB

## Ag rivals unite for workers program
**Immigration policy reform brings together growers and UFW.**

By Dennis Pollock
The Fresno Bee
Sunday, January 29, 2006

The debate over the necessity of a guest-worker program has made for some strange bedfellows.

One of the most unusual coalitions is that among the United Farm Workers, the Nisei Farmers League in Fresno and the Western Growers Association in Irvine.

The alliance between the UFW and grower groups would have been unthinkable 30 years ago. It exemplifies how dire some view the need for significant reform of the nation's immigration policy.

"If the UFW and growers can put aside decades of bitter conflict, there should be some way to get a bipartisan solution to this," said Marc Grossman, a UFW spokesman.

The Nisei Farmers League traces its very beginnings to the fields in 1970 when the UFW sought to unionize workers as the union and farmers clashed.

It was formed to fight the union.

As recently as September 2002, San Joaquin Valley farm leaders gathered at Nisei offices to oppose UFW-backed bills in the state Legislature.

Harry Kubo, the league's founder, showed up with a "proud to be a farmer" button and some UFW bumper stickers from the early 1970s, a time when growers and union activists squared off.

Two years later, the heads of both organizations — Manuel Cunha Jr., president of the Nisei Farmers League, and Arturo Rodriguez, UFW president — stood together behind a lectern at a Fresno luncheon for the first time to talk of the need for the AgJobs bill they helped craft.

That bill, backed by many Valley members of Congress, is favored in the U.S. Senate but faces opposition in the House. The bill is a proposal that would grant legal status to laborers who comply with certain criteria for continued work in farming.

Upon the bill's enactment, workers would have to show that they had worked at least 100 days in farming in the 18 previous months.

They would also have to work at least 70 days in farming per year for three years and could receive "an earned adjustment of status" — U.S. citizenship — six years after the law's enactment.

The Border Protection, Antiterrorism and Illegal Immigration Control Act, which has no guest-worker provision, has the backing of at least two California congressmen who said they expect a more comprehensive bill to emerge.

Gold River Republican Dan Lungren said a "comprehensive approach" is necessary. He has floated some proposals that include granting legal residency to immigrants who agree to perform national community service.

Palm Springs Republican Mary Bono pointed out that the state, and the area she represents, "has a huge agricultural base that depends on a strong labor force," and any comprehensive immigration reform "must be paired with a guest-worker program."

Cunha said relying solely on a border security bill "would just shut down the country."

Pat Ricchiuti, president of the Fresno County Farm Bureau, said only tightening the border means "we're almost biting the hand that feeds us, shooting ourselves in the foot."

Tim Chelling, spokesman for the growers association, said the shortage of labor in agriculture "may be the first symptom of a very sick immigration policy."

The reporter can be reached at dpollock@fresnobee.comor (559) 441-6364.

Immigration interests look to new ways to satisfy concerns
By Jim Snyder
The Hill
July 11, 2007

Mirna Vasquez first came to the United States to work in 1986. She toiled, "without papers," in farm fields throughout the Southwest, picking oranges, walnuts, or grapes, sometimes in 10-hour stretches and in constant fear federal agents would send her back to Mexico and away from her family.

Now a U.S. citizen with a son who wants to join the Marines, Vasquez was part of a group of 50 farm workers who came to Washington last month to lobby in support of immigration by sharing their own experiences.

The broad immigration measure failed, despite that effort. But Vasquez remains hopeful that one critical component may still pass.

"I'm sad, but I have a lot of faith something can happen," she said.

The something is the AgJobs Act, a compromise worked out by agribusiness and the United Farm Workers of America years ago that would streamline the visa process for farm workers and provide them a path to legal status.

It is one piece of the "grand bargain" that lawmakers are now breaking up and promoting separately. Agribusinesses, farm labor unions, and the high-tech community in particular are at the forefront of the effort.

Disappointment that the broader bill died isn't universal among businesses, which in general backed comprehensive immigration reform to ensure a steady labor supply. In some quarters, however, that support was undercut by "heavy lift" provisions such as the requirement that companies certify their workforce consists entirely of legal workers.

"The status quo is OK for some people in the business community," said Ralph Hellmann, senior vice president of government relations at the Information Technology Institute Council.

"The high tech and agriculture communities are different. Status quo doesn't work for us."

Microsoft, for example, has announced plans to open up a facility in Canada in part because of access to foreign workers.
The software maker and other tech companies want a big boost in the number of H-1B visas, which provide temporary work status to foreign workers. Now capped at 65,000 workers, the visas are typically snapped up the day they are offered.

An additional 20,000 foreign-born graduates with advanced degrees from American universities are allowed in. But the industry contends that the total still isn't sufficient to meet demand.

The industry is also pushing for a higher number of green cards, which grant permanent residency. Under current policy, trained workers on H-1B visas have to go home because the backlog for green cards is so extensive, Hellmann said.

Sen. Maria Cantwell, a Washington state Democrat and former software executive, had planned to introduce an amendment to increase the number of H-1B visas to 130,000, with an escalator provision that could raise the total to 180,000. The amendment would have also allowed more green cards to be issued each year to handle the years-long backlog.

But the broader bill died on a cloture vote before the amendment was offered.

Some members of Congress believe that companies want cheaper foreign labor at the expense of American engineers and software designers. But increasing the number of high-tech workers enjoys support even among the most hardened opponents of comprehensive immigration reform.

Rep. Lamar Smith (R-Texas), for example, introduced a bill yesterday to increase the number of H-1B visas to 195,000 in 2007.

Agriculture groups, meanwhile, are encouraged by Sen. Dianne Feinstein's (D-Calif.) stated intention of attaching AgJobs to the farm bill, which is up for reauthorization this year.

Farm workers' unions and agribusiness giants were among the strongest backers of the immigration measure, but in some ways they may face a tougher push than high-tech lobbyists do. The comprehensive bill failed principally because of opposition to a plan to give an estimated 12 million illegal immigrants a path to citizenship.

AgJobs would affect a far smaller pool of workers, an estimated 1.5 million farm workers, but the amnesty issue remains an obstacle.

"This is not forgiveness. This is earned legalization," said Bruce Goldstein, executive director of Farmworkers Justice.

AgJobs would have allowed farm workers who had worked in agriculture for at least 150 days over the previous two years to apply for a Z-A visa. Workers who had obtained the visa could then earn a green card, or permanent resident status, if they worked at least 100 days per year for five years or 150 days each year for three years and paid a $400 fine.

The workers would come to the United States at federal wage rates set at 2003 levels, and then frozen for three years — a concession labor made to agribusinesses that complained the current visa system is too expensive.

As many as 55 to 70 percent of the farm workers who work in fields are here illegally, said Goldstein.

"Most are undocumented and have very little bargaining power with their employer. They are too afraid to come forward," he said.

As they redouble their lobbying efforts, agribusiness and high-tech interests are also seeking to shore up ties to Democrats by reversing past campaign giving trends.

Agribusinesses, for example, gave roughly two-thirds of their $18.3 million in donations during the 2006 cycle to Republican candidates. So far this cycle, they have given $1.27 million to Democrats and $1.16 million to Republicans, according to PoliticalMoneyLine, which tracks political spending.

Industries defined as communications and technology-sector have given $1.49 million to Democrats and just over $1 million to Republicans so far. In 2006, Republicans received about 62 percent of the contributions.

http://thehill.com/business--lobby/immigration-interests-look-to-new-ways-to-satisfy-concerns-2007-07-11.html

## Roots of a dilemma
**Out in the fields, farmers sweat out immigration issue**

**Sacramento Bee**
**July 2, 2006**
**By Susan Ferriss**

VISALIA -- Deep in the heart of California farm country, 425 Mexican workers fan out through David Jackson's peach and plum trees, not far from the "Under God" banner and the American flag he flies over his orchards.

Wearing work shoes he's not afraid to get muddy, Jackson hops from his pickup and wades out among his workers, taking care not to jostle their ladders.

"See that? Look how professional he is on that ladder," he said, pointing proudly at a man deftly picking only the unblemished, ripe fruit strong enough to survive overnight air shipment to points as distant as Taiwan and England.

The admiration this farmer has for a good hired hand is not diminished by his knowledge that many of his workers are illegal immigrants -- even if that seems to contradict his conservative political views.

But Jackson believes there is a better way and, just a month ago, thought Congress would agree to legalize undocumented farmworkers and start a new guest worker program under a proposal called AgJOBS, the Agricultural Job Opportunities, Benefits and Security Act of 2006.

Now the plan is in limbo, and Jackson feels betrayed by the very Republican politicians and pundits he has long backed with his vote and his money.

"Not even my buddy Rush Limbaugh understands this issue," he said.

### Loyalties clash
Up and down the state that produces much of America's food -- half the country's fruits and vegetables, most of its milk -- and most U.S. farm exports, farmers like Jackson are finding their core values and political loyalties tested by what they consider a disconnect between the realities of politics and of the fields.

"I have never seen a larger base of Republican constituents more enraged or dismayed with their own party," said Luawanna Hallstrom, a Republican tomato grower in San Diego County who has worked on agricultural reform for two decades.

Using her own farm as a case in point, Hallstrom said years of experience has taught her that Americans are not interested in doing the painstaking, backbreaking work needed to hand-harvest her salad tomatoes.

With immigration enforcement never a real threat in the fields, agriculture has come to rely more on undocumented workers than any other U.S. industry. Unauthorized workers could number up to 1.5 million, by some estimates -- more than half of all people on farm payrolls. In some crops and regions, employers say, they represent up to nine in 10 workers.

Manuel Reyes, one of the laborers at Jackson's Family Tree Farms, wiped sweat from his brow as he gently slipped peaches into a bin and talked about his high hopes for AgJOBS. On his crew were people who speak four Mexican Indian languages and hail from some of Mexico's poorest regions.

"I think the majority here would be more than happy to be legal and be free to come and go," Reyes said. "Everybody is talking about it."

Without scorn or judgment, simply because he knows most Americans' skills and ambitions took them beyond fieldwork long ago, the 27-year-old said: "Imagine an American working in here, doing this?"

The $7 an hour Jackson pays is a small fortune for an illegal Mexican immigrant with an eighth-grade education, especially compared with the $7 a day he might make back home.

As workers heated meat and tortillas under a tree canopy nearby, Jackson said, "I don't see them as any different from my father who came from Tennessee." Their children progress, too, Jackson said, like those of a trusted foreman who was an illegal immigrant until a 1986 amnesty for undocumented workers. Now, the foreman's daughter is a pre-med student.

Jackson hires his workers through a labor contractor, who in turn has the responsibility of viewing and recording workers' documents. This common arrangement tends to obscure farmers' reliance on undocumented labor.

## Alliances sprout

Growers knew trouble might mushroom one day, though. In the 1990s, they began to receive letters from the Social Security Administration about employees with mismatched numbers and names, likely from the use of fake numbers. Farmers estimated the employees involved represented an estimated 50 percent to 70 percent of workers on their payrolls.

Furthermore, while California farmers generally have been shielded from labor shortages by the ready flow of immigrants from Mexico and Central America, the recent escalation of public outcry over illegal immigration -- coupled with government crackdowns at the border -- have intensified farmers' interest in the AgJOBS proposal.

One of agribusiness' traditional adversaries, the United Farm Workers union, also backs AgJOBS, and has worked for six years with farmers in an unlikely alliance to design and lobby for it. The UFW and other labor advocates view the reform as a sensible solution for employees, especially if the alternative is offshore migration of farms and jobs.

"We felt that things would never get better for farmworkers unless we changed their status -- again," said UFW President Arturo Rodriguez, referring to the 1986 amnesty program.

AgJOBS would offer a one-time path to legal permanent residency only to those farmworkers who can prove they've worked at least 150 days on U.S. farms before 2006 -- and only if they remain employed in agriculture three to five more years. That would give farmers a stable work force while they transition from undocumented labor.

AgJOBs would also reform the existing H-2A guest worker program, rarely used by farmers who find its regulations too onerous. Under H-2A, the government not only requires employers to provide housing and meals, but has been too slow, critics charge, to certify employers' evidence that domestic workers could not be found for the jobs -- the required first step. AgJOBS would speed up the process and reduce a 300-page application to a single page.

The U.S. Senate included the AgJOBS reforms in an immigration bill approved in May, pairing it with more enforcement at the border and in workplaces. But with fall elections in sight, the House rejected the measure, with some members of Congress vowing instead to stick to legislation passed in December that calls for enforcement alone.

"I have seen a hardening in this place," acknowledged Rep. Dan Lungren, R-Gold River, a guest worker supporter who had hoped to be a key player in now-stymied negotiations between the House and Senate.

For those who have worked longest and hardest on the compromise, optimism is giving way to cynicism.
"For us to be able to sit down with the UFW and the other (worker) advocates, doesn't the Congress see what an accomplishment that is?" asked Manuel Cunha, a citrus grower in the Fresno area who spearheaded farm industry negotiations with the UFW.

Cunha, president of the Fresno-based Nisei Farmers League, is sputtering mad at GOP House Speaker Dennis Hastert of Illinois, whom he accused of tossing aside carefully crafted proposals in order to pander to conservative voters. Cunha, a devoted Republican, claims some GOP farmers might even vote Democratic because they are so upset by what's happening.

"You have people who are afraid of losing the United States heritage, the born-and-bred here, whatever you want to call it," said Cunha, who is of Portuguese descent. "We have become so anti-brown. … That's a terrible message to send to our children. That's not what America is about."

With the summer harvest well under way, AgJOBS suddenly looks as doomed as a vineyard of ripe wine grapes with no one to pick them.

**Unrealistic options?**
That fear is precisely what has driven Salinas Valley wine grape grower Scott Scheid to spend the past five years traveling to Washington, D.C., to lobby for AgJOBS on behalf of vineyards.

Scheid Vineyards is one of the biggest in California, growing thousands of acres of grapes in a region famous for a cornucopia of grapes, broccoli, lettuce, strawberries and other crops.

The company employs about 270 workers, many nearly year round, paying them more than $9 an hour plus health and vacation benefits. The workers prune vines and harvest grapes under a negotiated UFW contract. But that doesn't mean all of them are legal.

"If everyone was gone from here, would others take these jobs?" Scheid asked. "Would people drive 100 miles to come here? Or do we shut it all down and wait for people to come here? That's unrealistic."

Joining an exodus of men from his hometown in Mexico at the age of 17, Scheid worker Miguel Garcia arrived six years ago in the Salinas Valley. "I don't mind continuing to work in the fields," he said, especially if the tradeoff is legal residency. "Farmwork is the kind of knowledge I've developed since I was a child."

As evidence that reform is needed, farmers delivered to Congress reports on their experience during a 1998 labor shortage, when Cunha's group organized farmers to advertise job openings in 10 California counties. Even with opportunities to earn up to $15 an hour, he said, it was next to impossible to find legal workers.

Out of 137,000 able-bodied candidates identified by welfare agencies on the Central Coast and in the San Joaquin Valley, only 503 applied for work. "You know how many actually came to work?" Cunha asked. "Three."

After the Sept. 11, 2001, terrorist attacks, tomato grower Hallstrom participated in her own, unexpected hiring experiment.

Her company, Harry Singh & Sons, leases land on Camp Pendleton, a U.S. Marine base. Hallstrom lost most of her work force when a post-Sept. 11 security check of military installations found 75 percent of her workers were undocumented.

Desperate for workers she could be sure were legal, Hallstrom advertised. Nobody came. She turned to the H-2A program, which was so slow in authorizing workers, she said, $2.5 million worth of tomatoes rotted on the vine.

"It really shed a light on the fact that there were not enough legally documented farmworkers to do this," she said. "It wasn't us crying wolf."

Since then, however, Hallstrom has successfully brought in guest workers under the H-2A program, and she's paid the price. Not only must housing, meals and transportation be provided to workers, but wages must meet the prevailing rate, this year about $9 an hour for Hallstrom.

Though a minuscule 2 percent of farmers use H-2A, many consider it an important option if the U.S. government succeeds in sealing the border and begins requiring employers to check workers' legal status through national databases. If shortages develop, farmers may find housing requirements and other provisions less of an obstacle.

Americans' general ignorance of how their food and drink are produced, farmers say, has allowed immigration hard-liners to attack policies that make perfect sense to the agriculture industry.

"Anybody who says they'll pay $10 for a head of lettuce so workers don't have to be here is just talking big," Cunha said. "How will they buy those DVDs they want, eat in those nice restaurants and go to hotels?"

He fumed about claims on talk shows that do not match his reality, including one assertion that labor costs are only 10 percent of farm production. To produce fruits and vegetables in California, labor is more than 30 percent of cost, according to federal agricultural officials.

To lessen the need for field workers, one option mentioned in Washington these days is mechanization.

"You can only change a diaper on a baby by hand," Cunha said, adding that if consumers want fresh produce like delicate berries and salad tomatoes, then they should welcome the workers willing to pick them by hand.

**'Fantasyland' solution**

The views of one particularly outspoken conservative congressman from Orange County elicit snorts, eye rolls and sighs in California's farm country.

"I say let the prisoners pick the fruit," Rep. Dana Rohrbacher, R-Huntington Beach, said in May at a Capitol news conference to denounce the Senate bill.

In a recent interview, Rohrabacher said his suggestion was serious, not sardonic.
"It is not in the interest of our country to legalize the status of anyone who is in the country illegally," he said. "We should see if there's a way to do this without having a guest worker program," because of the "horrible side effects" of relying on foreign workers.

To fill farm jobs, Rohrabacher said, "We have a massive resource with prisoners. Prisons quite often are near agricultural areas." The prisoners could keep half their earnings and prisons could keep the rest, he said.

Rohrbacher accused agribusiness of going "down the wrong strategic road" and said that, "as the Senate proposal goes down in flames, they are going to be looking for alternatives."

Out in the orchards of Family Tree Farms, however, the idea of prisoners picking peaches under armed guard doesn't fly.

The Jacksons consider it risky to trust a revolving group of felons with the fruits of their multimillion-dollar enterprise, where hired hands must not only be willing to endure sweltering heat, but also able to master the use of special tools and proper growing techniques.

To them, it seems particularly foolish for an enterprise with standards so high that fruit is inspected in person by retail buyers and foreign government officials.

In fact, the prisoner idea, said Jackson's son, Rick, is something out of "Fantasyland… It's not going to happen. It's so crazy, I can't even comment on it."

**The march toward AgJOBS**

**1986:** Immigration Reform and Control Act legalizes farmworkers and many other illegal immigrants. IRCA imposes new penalties for hiring illegal immigrants and requires employers to view and file documents that prove a right to work.

**1990s:** Legal workers leave farmwork for other jobs, increasing the flow of undocumented workers. Few employers use an existing H-2A seasonal farmworker program. Growers say it is too slow and costly and labor advocates denounce it for limiting workers' rights. While growers later lobby to change H-2A, labor argues their proposals still limit rights, including to sue or to earn legal permanent residency and citizenship.

**December 1999:** Rep. Howard Berman, D-North Hollywood, urges the United Farm Workers president to sit down with the farm industry to design a new H-2A and legalization program with more rights for workers.

**March- September 2000:** The UFW and national farm industry representatives negotiate. Florida Legal Services and plant nursery groups also are involved. September 2000: Both sides compromise on a proposal to allow undocumented farm workers and their immediate families to earn legal permanent status if workers continue in agriculture. Agreement is reached to streamline H-2A approval procedures in periods of shortage. The compromise preserves wage protections, and for the first time, allows H-2A workers to sue in federal court.

**December 2000:** Lame duck Congress adjourns before approving a bill, even though leaders of both parties in the House of Representatives support the idea. Mexican President Vicente Fox takes office and becomes the first Mexican president to call, with President Bush, for guest worker visas.

**May-June 2001:** UFW and the farm industry come up with separate Senate bills for reforms sponsored by Sens. Edward Kennedy, D-Mass, and Larry Craig, R-Idaho.

**2001-2003:** After Sept. 11 attacks, immigration reform stalls. Labor and industry return to talks, but disagreements again develop.

**Summer 2004:** The earlier compromise is revived and the resulting program, dubbed AgJOBS, is co-sponsored by 63 senators, half Republican. The White House blocks a floor vote.

**February 2005:** AgJOBS is introduced to a new Congress by bipartisan House legislators, bolstered by joint public appearances by UFW and growers.

**December 2005:** The House votes for more border security, and making illegal immigration a felony. It rejects legalization, including AgJOBS.

**April 2006:** UFW President Arturo Rodriguez signs a contract with Global Horizons, one of the biggest suppliers of H-2A workers to U.S. companies.

**May 2006:** A Senate majority approves tougher enforcement at the border and in the workplace, but also includes AgJOBS, which would legalize up to 1.5 million and offer an earned legalization option for millions of other illegal immigrants. The Senate bill also expands the supply of visas for future nonfarm guest workers, with a long path to legal residency. Most H-2A workers still would be barred from earning legal residency, a compromise by labor.

**June 2006:** With November's election looming, the House declines to negotiate with the Senate and calls for town hall meetings this summer on illegal immigration

**On Labor Day**
**More for farmers? Not unless farmworkers are considered**

Arturo S. Rodriguez
San Francisco Chronicle
Monday, September 3, 2007

Margarita Gonzalez, 47, dreads summer and picking table grapes in the hot sun. California heat regulations are supposed to protect her and other farmworkers from heat exposure, but too often, those laws are not enforced.

"We sweat a lot and feel like fainting," she said. "We want to sit in the shade, but we know, if we sit down, we will get fired."

Margarita is not alone. In as little as six weeks and with very limited resources, the UFW has been able to document hundreds of violations at dozens of farms statewide that employ more than 45,000 farmworkers. Farmworkers, like Margarita, are suffering daily and being denied shade, clean water and rest breaks.

For more than 40 years, the UFW has worked with legislators from both parties to write laws to protect farmworkers. However, the scale of the agricultural industry - with more than 400,000 farmworkers moving between 80,000 farms - has meant that good laws are ignored.

At a legislative hearing in July that focused on the state's heat laws not being enforced in farm-working fields, the Department of Occupational Safety and Health's Acting Chief of the Division Len Welsh said inspectors were still adjusting to last summer's regulations:

"We're still ramping up to be honest, to get the word out, to do the enforcement, to hone our approach," he said.

Farmworkers know what happens when it gets too hot and they have no water or shade. We remember the three farmworkers who died last summer due to heat. This is nearly as many deaths as there were the summer before the heat regulations were put in place. The UFW and farmworkers know there isn't time to "hone approaches" when lives are at stake.

At the same hearing, a representative for the Western Growers Association said farmers are working to learn and follow the state's heat rules. Is it that difficult for those not complying to comprehend providing clean water, shade and rest breaks during the hottest time of the year? After all, farmers are able to juggle volatile market prices, equipment costs and control animal and plant diseases.

We know the agricultural industry needs water to thrive. And as the Legislature and governor return to work, the farmers are pushing to ensure water bonds are on the agenda.More water for farmers, but only thirst for farmworkers? This is not acceptable public policy for California. Not when thousands are suffering daily. The UFW calls upon California's voters to remind their representatives in the Legislature of the reality in the fields and that they should not give more to farmers without remembering the farmworkers.

We cannot continue to give more to farmers - more time to comply with existing laws or more water through bonds. Farmers should not get more until farmworkers get at least dignity and human rights.

*Arturo S. Rodriguez is the president of the United Farm Workers.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/09/03/EDA4RRMGA.DTL

This article appeared on page **D - 5** of the San Francisco Chronicle

Testimony of Marcos Camacho
General Counsel, United Farm Workers
Bakersfield, California
Before the Committee on the Judiciary
U.S. House of Representatives
May 24, 2007

Thank you to the Chair and the Members of this Committee for the opportunity to testify on behalf of the United Farm Workers regarding the labor movement and immigration policy. I am Marcos Camacho, an attorney in Bakersfield, California, and the General Counsel of the United Farm Workers, the labor union founded by Cesar Chavez.

Agricultural workers have confronted difficulties in immigration policy since the founding of this nation. Our government policies and enforcement efforts have often contributed to an imbalance in power that has subjected farmworkers to poor wages and working conditions.

The Bracero guestworker program became known for its abusive treatment of Mexican workers, despite the existence of protections for wages and benefits, and was finally ended in 1964. When, the farmworkers finally became free to demand better treatment, Cesar Chavez and the United Farm Workers provided a vehicle to dramatically improve the status and treatment of farmworkers in this country.

More recently, the H-2A guestworker program often has provided agricultural employers with workers whose restricted, nonimmigrant status ensures that they will not challenge unfair or illegal conduct. Generally, our guestworker programs have tied workers to a particular employer; if the job ends, the worker may not look for another job and must leave the United States immediately. The guestworker who wishes for a visa in the next year must hope that the employer will request one, because the employers control access to visas. Such workers are often fearful of deportation or not being hired in the following year, and are therefore reluctant to demand improvements. They work very hard for low wages. U.S. workers often recognize that they are not wanted by the employers who use the guestworker system. Currently, there are about 50,000 H-2A jobs approved annually, out of an agricultural work force of 2.5 million.

There are many abuses under the H-2A program ranging from minor to very serious trafficking in human beings. Unfortunately, our government has rarely enforced the protections in the H-2A program. In recent years, the United Farm Workers and the Farm Labor Organizing Committee have been asked by guestworkers from several nationsto help them improve  conditions at their jobs in Washington State, Hawaii and North Carolina. We believe that unionization is the best hope that guestworkers have for better treatment and the best hope the government has of removing the H-2A program's reputation for abuse.

Today, we have reached a situation in agriculture that demands urgent action. There are about 2.5 million farmworkers in this country, not including their family members. More than 80% of them are foreign-born, mostly but not all from Mexico. Virtually all of the newest entrants to the farm labor force lack authorized immigration status. The helpful reports from the National Agricultural Workers Survey by the U.S. Department of Labor state that about 53% of farmworkers are undocumented. But most observers believe the figure is 60% or 70%, and much higher in specific locations. Many employers now hire farm labor contractors in the hope that they can shield themselves from liability for hiring undocumented workers in violation of our immigration law and from liability for labor law violations. The labor contractors compete against one another by offering to do a job for less money, and the cut-throat competition means that the workers must take lower wages. When one labor contractor is prosecuted for violating labor laws, he is easily replaced. Our current immigration system is causing employers to attempt to evade responsibility for their employees, while undocumented workers are too fearful of being deported to demand changes. In many cases, due to inadequate enforcement of labor laws, employers take advantage of undocumented workers by subjecting them to illegal wages and working conditions.

When the majority of workers in an economic sector are living in the shadows of society something must be done. The current situation is not good for farmworkers who want to be able to work legally and earn a decent living to support their families. It is not good for employers who want to hire people without worrying that they will be raided by the immigration service at the peak of the harvest of their perishable fruits and vegetables. It is not good for the government, which needs to know who is working in our economy and living among us. But it is no answer to say we will deport them and start again. The growers need these experienced workers to cultivate and harvest their crops. In fact, many growers contend that there are labor shortages in some areas because undocumented workers are too fearful of immigration raids to come to the open fields.

The United Farm Workers recognized several years ago that the status quo needed to be remedied. We also recognized that some of our long-held beliefs would need to be modified if we were to achieve any sort of reform. During the late 1990's, we strenuously and successfully opposed efforts in the House and Senate by agricultural employers to weaken H-2A protections and procedures and transform most farmworkers into vulnerable guestworkers with no path to citizenship. Our successful opposition led to a stalemate since we did not have the legislative support needed to enact our ideas about immigration and labor reform.

With the help of our good friend, Rep. Howard Berman, and other members of Congress, we entered into arduous negotiations with key leaders of the agricultural employers in the United States and other members of Congress, particularly Senator Larry Craig, Senator Edward Kennedy, and Rep. Chris Cannon. In 2000, we reached agreement on the Agricultural Job Opportunities, Benefits and Security Act, or "AgJOBS." AgJOBS has undergone several revisions over the years to build greater support for passage. Sen. Dianne Feinstein is now a strong supporter of AgJOBS. We

remain strong partners with agricultural employers to win passage of this important legislation despite many other differences between us. In 2006, the Senate included AgJOBS in the comprehensive immigration reform it passed. We are now seeking to pass AgJOBS as part of comprehensive immigration reform in 2007. We have been working with the White House and several Senators to bring AgJOBS to a conclusion.

AgJOBS would provide agricultural employers and the nation with a legal, stable, productive workforce while ensuring that basic labor protections would apply to farmworkers. AgJOBS has two parts. First AgJOBS would create an "earned adjustment" program, allowing many undocumented farmworkers to obtain temporary resident status based on past work experience with the possibility of becoming permanent residents through continued agricultural work. Second, it would revise the existing H-2A agricultural guestworker program.

The earned legalization program certainly should not be called "amnesty." It is a difficult two-step process. The applicants for earned legalization will have to show that they have worked at least 150 days in U.S. agriculture during the past two years, and then must work at least 150 days per year in each of three years or at least 100 days per year in each of five years. Farmworkers will also have to show that they have not been convicted of a felony or serious misdemeanors. Spouses and minor children of the farmworkers will be eligible for a temporary status, too.

If they fulfill their obligations, they will be granted a green card for permanent resident status. They will have to pay substantial fees and fines at both steps. (Under the compromise worked out with the White House, farmworkers also will have to learn English, demonstrate that they have paid taxes during their prospective work period, return to their homeland to file the application for a green card with a U.S. consulate in their home country, and wait for the green card for 3 to 5 more years until backlogs in immigration applications have been cleared.). We expect that roughly 800,000 farmworkers will be eligible for this program, although such predictions are mere guesses. Through this multiyear process, the United States will have a stable, legal farm labor force that is highly productive.

This is a tough program. Farm work is dangerous, difficult, seasonal and low-paid. This truly will be an *earned* legalization.

AgJOBS also would revise the H-2A guestworker program. We feel that we made painful concessions to achieve this compromise. The program's application process will be streamlined to become a "labor attestation" program similar to the H-1B program, rather than the current "labor certification" program. This change reduces paperwork for employers and limits the government's oversight of the employer's application. AgJOBS would retain both the "prevailing wage" and "adverse effect wage rates," but would effectively lower the H-2A wage rates by about $1.00 per year (to the 2003 adverse effect wage rates, which are issued by state), and freeze them for three years. The Government Accountability Office and a special commission would make recommendations to Congress about the wage rates within 3 years. If Congress has not

acted within 3 years, then the wage rates will be adjusted by the previous years' inflation rate. In addition, for the first time, farmworkers would have a right to file a federal lawsuit to enforce their H-2A job terms. AgJOBS also would allow some flexibility in the minimum wages and benefits when the workers at an H-2A employer are represented by a bona fide labor union under a collective bargaining agreement.

We believe that AgJOBS is a reasonable compromise under the circumstances. To conclude, we recommend the following: (1) We encourage you to pass AgJOBS. (2) Congress and the Administration should be vigilant about abuses under guestworker programs. Strong enforcement of the labor protections for guestworkers will prevent guestworkers from being exploited, prevent the wages and working conditions of United States workers from being undermined, and will take away the incentive that employers have to hire guestworkers rather than U.S. workers, including those who would earn legal immigration status under the AgJOBS earned legalization program. (3) Congress needs to adopt protections against abuses associated with foreign labor contracting. The U.S. Government is refusing to look at the abuses that occur during the recruitment of guestworkers in the foreign country. Yet, those abuses abroad, including payment of high recruitment fees, result in mistreatment of guestworkers on the job in the U.S., because the guestworkers must work to the limits of human endurance and avoid deportation at all costs to pay back those fees. The labor contractors' interest in such recruitment fees may have led to the murder earlier this year in Monterrey, Mexico, of Santiago Rafael Cruz, who was helping Mexican citizens employed as guestworker for North Carolina growers under a collective bargaining agreement with the Farm Labor Organizing Committee, AFL-CIO. (4) We also ask you to recognize that the best protection workers – both U.S. and foreign -- have at an employer that participates in a guestworker program is a labor union. Government policy should promote collective bargaining to reduce abuses under guestworker programs and give workers a meaningful voice at work.

Thank you for this opportunity to testify before the Committee on these important and timely issues.

# EXHIBIT CC

MAY 19 2007

Mr. Erik Nicholson
United Farm Workers of America, AFL-CIO
Tacoma Office
P.O. Box 8337
Tacoma, Washington  98418

Dear Mr. Nicholson:

This responds to your Freedom of Information Act (FOIA) request of January 24, 2007, which our Atlanta National Processing Center referred to this office for response.  You requested copies of all documents filed for H-2A temporary foreign labor applications for H-2A workers in Florida and Georgia submitted on or after November 1, 2006.

Per 29 CFR 70.20(f), the Department is required to respond with only those records available as of the date of the request.  The Atlanta National Processing Center has completed its search and review of the records you requested, and the documents are enclosed.

We are unable to approve your request for a fee waiver because it does not meet the criteria at 29 CFR 70.41 with regard to contributing significantly to public understanding of the operations or activities of the government.  29 CFR 70.40(c)(1) states that charges assessed for the production of records for non-commercial requestors may be for search and review costs, and reproduction costs.  There is no charge for the production of the first 100 pages of material, and a fee of 15 cents per page thereafter.  There is no charge for the first two hours of search and review time, and a subsequent charge of $2.50 per quarter hour of clerical search time, and $5.00 per quarter hour for the professional or supervisory review time.  Therefore, the amount due has been calculated as follows:

1. There is a charge of $0.25 for the CD Rom.

2. Clerical search and review time totaled 8.5 hours.  There is no charge for the first two hours, and a charge of $65.00 for 6.5 hours of clerical search and review time.

3. Therefore, the total owing is $65.25.

Per 31 U.S.C. 3717 an interest charge of 4.0 percent, will accrue after 30 days of the billing date. A check or money order for $65.25, made payable to the United States Treasury, should be mailed to Mr. Mark Grobman, OFLC National FOIA Coordinator, at

the following address:

United States Department of Labor
Employment and Training Administration
Office of Foreign Labor Certification
200 Constitution Avenue, NW
Room C-4312
Washington, D.C. 20210

While this office has not denied access to any records, per 29 CFR 70.22, you may appeal any action or decision made by this office in response to this request. You must file the appeal within 90 days from the date of this letter. To facilitate processing, you may wish to fax your appeal to (202) 693-5538. The appeal must state in writing the grounds for appeal, including any supporting statements or arguments. To facilitate processing, the appeal should include a copy of your initial request and a copy of this letter. Clearly indicate on the envelope and on the appeal itself the following: "FOIA Appeal." The appeal should be addressed to the following:

Office of the Solicitor
United States Department of Labor
200 Constitution Avenue, NW
Washington, D.C. 20210

I hope this information is helpful.

Sincerely,

William L. Carlson, Ph.D.
Administrator
Office of Foreign Labor Certification

Enclosure

# EXHIBIT DD

## Ag rivals unite for workers program
**Immigration policy reform brings together growers and UFW.**

By Dennis Pollock
The Fresno Bee
Sunday, January 29, 2006

The debate over the necessity of a guest-worker program has made for some strange bedfellows.

One of the most unusual coalitions is that among the United Farm Workers, the Nisei Farmers League in Fresno and the Western Growers Association in Irvine.

The alliance between the UFW and grower groups would have been unthinkable 30 years ago. It exemplifies how dire some view the need for significant reform of the nation's immigration policy.

"If the UFW and growers can put aside decades of bitter conflict, there should be some way to get a bipartisan solution to this," said Marc Grossman, a UFW spokesman.

The Nisei Farmers League traces its very beginnings to the fields in 1970 when the UFW sought to unionize workers as the union and farmers clashed.

It was formed to fight the union.

As recently as September 2002, San Joaquin Valley farm leaders gathered at Nisei offices to oppose UFW-backed bills in the state Legislature.

Harry Kubo, the league's founder, showed up with a "proud to be a farmer" button and some UFW bumper stickers from the early 1970s, a time when growers and union activists squared off.

Two years later, the heads of both organizations — Manuel Cunha Jr., president of the Nisei Farmers League, and Arturo Rodriguez, UFW president — stood together behind a lectern at a Fresno luncheon for the first time to talk of the need for the AgJobs bill they helped craft.

That bill, backed by many Valley members of Congress, is favored in the U.S. Senate but faces opposition in the House. The bill is a proposal that would grant legal status to laborers who comply with certain criteria for continued work in farming.

Upon the bill's enactment, workers would have to show that they had worked at least 100 days in farming in the 18 previous months.

They would also have to work at least 70 days in farming per year for three years and could receive "an earned adjustment of status" — U.S. citizenship — six years after the law's enactment.

The Border Protection, Antiterrorism and Illegal Immigration Control Act, which has no guest-worker provision, has the backing of at least two California congressmen who said they expect a more comprehensive bill to emerge.

Gold River Republican Dan Lungren said a "comprehensive approach" is necessary. He has floated some proposals that include granting legal residency to immigrants who agree to perform national community service.

Palm Springs Republican Mary Bono pointed out that the state, and the area she represents, "has a huge agricultural base that depends on a strong labor force," and any comprehensive immigration reform "must be paired with a guest-worker program."

Cunha said relying solely on a border security bill "would just shut down the country."

Pat Ricchiuti, president of the Fresno County Farm Bureau, said only tightening the border means "we're almost biting the hand that feeds us, shooting ourselves in the foot."

Tim Chelling, spokesman for the growers association, said the shortage of labor in agriculture "may be the first symptom of a very sick immigration policy."

The reporter can be reached at dpollock@fresnobee.comor (559) 441-6364.

Immigration interests look to new ways to satisfy concerns
By Jim Snyder
The Hill
July 11, 2007

Mirna Vasquez first came to the United States to work in 1986. She toiled, "without papers," in farm fields throughout the Southwest, picking oranges, walnuts, or grapes, sometimes in 10-hour stretches and in constant fear federal agents would send her back to Mexico and away from her family.

Now a U.S. citizen with a son who wants to join the Marines, Vasquez was part of a group of 50 farm workers who came to Washington last month to lobby in support of immigration by sharing their own experiences.

The broad immigration measure failed, despite that effort. But Vasquez remains hopeful that one critical component may still pass.

"I'm sad, but I have a lot of faith something can happen," she said.

The something is the AgJobs Act, a compromise worked out by agribusiness and the United Farm Workers of America years ago that would streamline the visa process for farm workers and provide them a path to legal status.

It is one piece of the "grand bargain" that lawmakers are now breaking up and promoting separately. Agribusinesses, farm labor unions, and the high-tech community in particular are at the forefront of the effort.

Disappointment that the broader bill died isn't universal among businesses, which in general backed comprehensive immigration reform to ensure a steady labor supply. In some quarters, however, that support was undercut by "heavy lift" provisions such as the requirement that companies certify their workforce consists entirely of legal workers.

"The status quo is OK for some people in the business community," said Ralph Hellmann, senior vice president of government relations at the Information Technology Institute Council.

"The high tech and agriculture communities are different. Status quo doesn't work for us."

Microsoft, for example, has announced plans to open up a facility in Canada in part because of access to foreign workers.
The software maker and other tech companies want a big boost in the number of H-1B visas, which provide temporary work status to foreign workers. Now capped at 65,000 workers, the visas are typically snapped up the day they are offered.

An additional 20,000 foreign-born graduates with advanced degrees from American universities are allowed in. But the industry contends that the total still isn't sufficient to meet demand.

The industry is also pushing for a higher number of green cards, which grant permanent residency. Under current policy, trained workers on H-1B visas have to go home because the backlog for green cards is so extensive, Hellmann said.

Sen. Maria Cantwell, a Washington state Democrat and former software executive, had planned to introduce an amendment to increase the number of H-1B visas to 130,000, with an escalator provision that could raise the total to 180,000. The amendment would have also allowed more green cards to be issued each year to handle the years-long backlog.

But the broader bill died on a cloture vote before the amendment was offered.

Some members of Congress believe that companies want cheaper foreign labor at the expense of American engineers and software designers. But increasing the number of high-tech workers enjoys support even among the most hardened opponents of comprehensive immigration reform.

Rep. Lamar Smith (R-Texas), for example, introduced a bill yesterday to increase the number of H-1B visas to 195,000 in 2007.

Agriculture groups, meanwhile, are encouraged by Sen. Dianne Feinstein's (D-Calif.) stated intention of attaching AgJobs to the farm bill, which is up for reauthorization this year.

Farm workers' unions and agribusiness giants were among the strongest backers of the immigration measure, but in some ways they may face a tougher push than high-tech lobbyists do. The comprehensive bill failed principally because of opposition to a plan to give an estimated 12 million illegal immigrants a path to citizenship.

AgJobs would affect a far smaller pool of workers, an estimated 1.5 million farm workers, but the amnesty issue remains an obstacle.

"This is not forgiveness. This is earned legalization," said Bruce Goldstein, executive director of Farmworkers Justice.

AgJobs would have allowed farm workers who had worked in agriculture for at least 150 days over the previous two years to apply for a Z-A visa. Workers who had obtained the visa could then earn a green card, or permanent resident status, if they worked at least 100 days per year for five years or 150 days each year for three years and paid a $400 fine.

The workers would come to the United States at federal wage rates set at 2003 levels, and then frozen for three years — a concession labor made to agribusinesses that complained the current visa system is too expensive.

As many as 55 to 70 percent of the farm workers who work in fields are here illegally, said Goldstein.

"Most are undocumented and have very little bargaining power with their employer. They are too afraid to come forward," he said.

As they redouble their lobbying efforts, agribusiness and high-tech interests are also seeking to shore up ties to Democrats by reversing past campaign giving trends.

Agribusinesses, for example, gave roughly two-thirds of their $18.3 million in donations during the 2006 cycle to Republican candidates. So far this cycle, they have given $1.27 million to Democrats and $1.16 million to Republicans, according to PoliticalMoneyLine, which tracks political spending.

Industries defined as communications and technology-sector have given $1.49 million to Democrats and just over $1 million to Republicans so far. In 2006, Republicans received about 62 percent of the contributions.

http://thehill.com/business--lobby/immigration-interests-look-to-new-ways-to-satisfy-concerns-2007-07-11.html

# Roots of a dilemma
**Out in the fields, farmers sweat out immigration issue**

**Sacramento Bee**
**July 2, 2006**
**By Susan Ferriss**

VISALIA -- Deep in the heart of California farm country, 425 Mexican workers fan out through David Jackson's peach and plum trees, not far from the "Under God" banner and the American flag he flies over his orchards.

Wearing work shoes he's not afraid to get muddy, Jackson hops from his pickup and wades out among his workers, taking care not to jostle their ladders.

"See that? Look how professional he is on that ladder," he said, pointing proudly at a man deftly picking only the unblemished, ripe fruit strong enough to survive overnight air shipment to points as distant as Taiwan and England.

The admiration this farmer has for a good hired hand is not diminished by his knowledge that many of his workers are illegal immigrants -- even if that seems to contradict his conservative political views.

But Jackson believes there is a better way and, just a month ago, thought Congress would agree to legalize undocumented farmworkers and start a new guest worker program under a proposal called AgJOBS, the Agricultural Job Opportunities, Benefits and Security Act of 2006.

Now the plan is in limbo, and Jackson feels betrayed by the very Republican politicians and pundits he has long backed with his vote and his money.

"Not even my buddy Rush Limbaugh understands this issue," he said.

## Loyalties clash
Up and down the state that produces much of America's food -- half the country's fruits and vegetables, most of its milk -- and most U.S. farm exports, farmers like Jackson are finding their core values and political loyalties tested by what they consider a disconnect between the realities of politics and of the fields.

"I have never seen a larger base of Republican constituents more enraged or dismayed with their own party," said Luawanna Hallstrom, a Republican tomato grower in San Diego County who has worked on agricultural reform for two decades.

Using her own farm as a case in point, Hallstrom said years of experience has taught her that Americans are not interested in doing the painstaking, backbreaking work needed to hand-harvest her salad tomatoes.

With immigration enforcement never a real threat in the fields, agriculture has come to rely more on undocumented workers than any other U.S. industry. Unauthorized workers could number up to 1.5 million, by some estimates -- more than half of all people on farm payrolls. In some crops and regions, employers say, they represent up to nine in 10 workers.

Manuel Reyes, one of the laborers at Jackson's Family Tree Farms, wiped sweat from his brow as he gently slipped peaches into a bin and talked about his high hopes for AgJOBS. On his crew were people who speak four Mexican Indian languages and hail from some of Mexico's poorest regions.

"I think the majority here would be more than happy to be legal and be free to come and go," Reyes said. "Everybody is talking about it."

Without scorn or judgment, simply because he knows most Americans' skills and ambitions took them beyond fieldwork long ago, the 27-year-old said: "Imagine an American working in here, doing this?"

The $7 an hour Jackson pays is a small fortune for an illegal Mexican immigrant with an eighth-grade education, especially compared with the $7 a day he might make back home.

As workers heated meat and tortillas under a tree canopy nearby, Jackson said, "I don't see them as any different from my father who came from Tennessee." Their children progress, too, Jackson said, like those of a trusted foreman who was an illegal immigrant until a 1986 amnesty for undocumented workers. Now, the foreman's daughter is a pre-med student.

Jackson hires his workers through a labor contractor, who in turn has the responsibility of viewing and recording workers' documents. This common arrangement tends to obscure farmers' reliance on undocumented labor.

**Alliances sprout**
Growers knew trouble might mushroom one day, though. In the 1990s, they began to receive letters from the Social Security Administration about employees with mismatched numbers and names, likely from the use of fake numbers. Farmers estimated the employees involved represented an estimated 50 percent to 70 percent of workers on their payrolls.

Furthermore, while California farmers generally have been shielded from labor shortages by the ready flow of immigrants from Mexico and Central America, the recent escalation of public outcry over illegal immigration -- coupled with government crackdowns at the border -- have intensified farmers' interest in the AgJOBS proposal.

One of agribusiness' traditional adversaries, the United Farm Workers union, also backs AgJOBS, and has worked for six years with farmers in an unlikely alliance to design and lobby for it. The UFW and other labor advocates view the reform as a sensible solution for employees, especially if the alternative is offshore migration of farms and jobs.

"We felt that things would never get better for farmworkers unless we changed their status -- again," said UFW President Arturo Rodriguez, referring to the 1986 amnesty program.

AgJOBS would offer a one-time path to legal permanent residency only to those farmworkers who can prove they've worked at least 150 days on U.S. farms before 2006 -- and only if they remain employed in agriculture three to five more years. That would give farmers a stable work force while they transition from undocumented labor.

AgJOBs would also reform the existing H-2A guest worker program, rarely used by farmers who find its regulations too onerous. Under H-2A, the government not only requires employers to provide housing and meals, but has been too slow, critics charge, to certify employers' evidence that domestic workers could not be found for the jobs -- the required first step. AgJOBS would speed up the process and reduce a 300-page application to a single page.

The U.S. Senate included the AgJOBS reforms in an immigration bill approved in May, pairing it with more enforcement at the border and in workplaces. But with fall elections in sight, the House rejected the measure, with some members of Congress vowing instead to stick to legislation passed in December that calls for enforcement alone.

"I have seen a hardening in this place," acknowledged Rep. Dan Lungren, R-Gold River, a guest worker supporter who had hoped to be a key player in now-stymied negotiations between the House and Senate.

For those who have worked longest and hardest on the compromise, optimism is giving way to cynicism.
"For us to be able to sit down with the UFW and the other (worker) advocates, doesn't the Congress see what an accomplishment that is?" asked Manuel Cunha, a citrus grower in the Fresno area who spearheaded farm industry negotiations with the UFW.

Cunha, president of the Fresno-based Nisei Farmers League, is sputtering mad at GOP House Speaker Dennis Hastert of Illinois, whom he accused of tossing aside carefully crafted proposals in order to pander to conservative voters. Cunha, a devoted Republican, claims some GOP farmers might even vote Democratic because they are so upset by what's happening.

"You have people who are afraid of losing the United States heritage, the born-and-bred here, whatever you want to call it," said Cunha, who is of Portuguese descent. "We have become so anti-brown. … That's a terrible message to send to our children. That's not what America is about."

With the summer harvest well under way, AgJOBS suddenly looks as doomed as a vineyard of ripe wine grapes with no one to pick them.

**Unrealistic options?**
That fear is precisely what has driven Salinas Valley wine grape grower Scott Scheid to spend the past five years traveling to Washington, D.C., to lobby for AgJOBS on behalf of vineyards.

Scheid Vineyards is one of the biggest in California, growing thousands of acres of grapes in a region famous for a cornucopia of grapes, broccoli, lettuce, strawberries and other crops.

The company employs about 270 workers, many nearly year round, paying them more than $9 an hour plus health and vacation benefits. The workers prune vines and harvest grapes under a negotiated UFW contract. But that doesn't mean all of them are legal.

"If everyone was gone from here, would others take these jobs?" Scheid asked. "Would people drive 100 miles to come here? Or do we shut it all down and wait for people to come here? That's unrealistic."

Joining an exodus of men from his hometown in Mexico at the age of 17, Scheid worker Miguel Garcia arrived six years ago in the Salinas Valley. "I don't mind continuing to work in the fields," he said, especially if the tradeoff is legal residency. "Farmwork is the kind of knowledge I've developed since I was a child."

As evidence that reform is needed, farmers delivered to Congress reports on their experience during a 1998 labor shortage, when Cunha's group organized farmers to advertise job openings in 10 California counties. Even with opportunities to earn up to $15 an hour, he said, it was next to impossible to find legal workers.

Out of 137,000 able-bodied candidates identified by welfare agencies on the Central Coast and in the San Joaquin Valley, only 503 applied for work. "You know how many actually came to work?" Cunha asked. "Three."

After the Sept. 11, 2001, terrorist attacks, tomato grower Hallstrom participated in her own, unexpected hiring experiment.

Her company, Harry Singh & Sons, leases land on Camp Pendleton, a U.S. Marine base. Hallstrom lost most of her work force when a post-Sept. 11 security check of military installations found 75 percent of her workers were undocumented.

Desperate for workers she could be sure were legal, Hallstrom advertised. Nobody came. She turned to the H-2A program, which was so slow in authorizing workers, she said, $2.5 million worth of tomatoes rotted on the vine.

"It really shed a light on the fact that there were not enough legally documented farmworkers to do this," she said. "It wasn't us crying wolf."

Since then, however, Hallstrom has successfully brought in guest workers under the H-2A program, and she's paid the price. Not only must housing, meals and transportation be provided to workers, but wages must meet the prevailing rate, this year about $9 an hour for Hallstrom.

Though a minuscule 2 percent of farmers use H-2A, many consider it an important option if the U.S. government succeeds in sealing the border and begins requiring employers to check workers' legal status through national databases. If shortages develop, farmers may find housing requirements and other provisions less of an obstacle.

Americans' general ignorance of how their food and drink are produced, farmers say, has allowed immigration hard-liners to attack policies that make perfect sense to the agriculture industry.

"Anybody who says they'll pay $10 for a head of lettuce so workers don't have to be here is just talking big," Cunha said. "How will they buy those DVDs they want, eat in those nice restaurants and go to hotels?"

He fumed about claims on talk shows that do not match his reality, including one assertion that labor costs are only 10 percent of farm production. To produce fruits and vegetables in California, labor is more than 30 percent of cost, according to federal agricultural officials.

To lessen the need for field workers, one option mentioned in Washington these days is mechanization.

"You can only change a diaper on a baby by hand," Cunha said, adding that if consumers want fresh produce like delicate berries and salad tomatoes, then they should welcome the workers willing to pick them by hand.

**'Fantasyland' solution**

The views of one particularly outspoken conservative congressman from Orange County elicit snorts, eye rolls and sighs in California's farm country.

"I say let the prisoners pick the fruit," Rep. Dana Rohrbacher, R-Huntington Beach, said in May at a Capitol news conference to denounce the Senate bill.

In a recent interview, Rohrabacher said his suggestion was serious, not sardonic.
"It is not in the interest of our country to legalize the status of anyone who is in the country illegally," he said. "We should see if there's a way to do this without having a guest worker program," because of the "horrible side effects" of relying on foreign workers.

To fill farm jobs, Rohrabacher said, "We have a massive resource with prisoners. Prisons quite often are near agricultural areas." The prisoners could keep half their earnings and prisons could keep the rest, he said.

Rohrbacher accused agribusiness of going "down the wrong strategic road" and said that, "as the Senate proposal goes down in flames, they are going to be looking for alternatives."

Out in the orchards of Family Tree Farms, however, the idea of prisoners picking peaches under armed guard doesn't fly.

The Jacksons consider it risky to trust a revolving group of felons with the fruits of their multimillion-dollar enterprise, where hired hands must not only be willing to endure sweltering heat, but also able to master the use of special tools and proper growing techniques.

To them, it seems particularly foolish for an enterprise with standards so high that fruit is inspected in person by retail buyers and foreign government officials.

In fact, the prisoner idea, said Jackson's son, Rick, is something out of "Fantasyland… It's not going to happen. It's so crazy, I can't even comment on it."

**The march toward AgJOBS**

**1986:** Immigration Reform and Control Act legalizes farmworkers and many other illegal immigrants. IRCA imposes new penalties for hiring illegal immigrants and requires employers to view and file documents that prove a right to work.

**1990s:** Legal workers leave farmwork for other jobs, increasing the flow of undocumented workers. Few employers use an existing H-2A seasonal farmworker program. Growers say it is too slow and costly and labor advocates denounce it for limiting workers' rights. While growers later lobby to change H-2A, labor argues their proposals still limit rights, including to sue or to earn legal permanent residency and citizenship.

**December 1999:** Rep. Howard Berman, D-North Hollywood, urges the United Farm Workers president to sit down with the farm industry to design a new H-2A and legalization program with more rights for workers.

**March- September 2000:** The UFW and national farm industry representatives negotiate. Florida Legal Services and plant nursery groups also are involved. September 2000: Both sides compromise on a proposal to allow undocumented farm workers and their immediate families to earn legal permanent status if workers continue in agriculture. Agreement is reached to streamline H-2A approval procedures in periods of shortage. The compromise preserves wage protections, and for the first time, allows H-2A workers to sue in federal court.

**December 2000:** Lame duck Congress adjourns before approving a bill, even though leaders of both parties in the House of Representatives support the idea. Mexican President Vicente Fox takes office and becomes the first Mexican president to call, with President Bush, for guest worker visas.

**May-June 2001:** UFW and the farm industry come up with separate Senate bills for reforms sponsored by Sens. Edward Kennedy, D-Mass, and Larry Craig, R-Idaho.

**2001-2003:** After Sept. 11 attacks, immigration reform stalls. Labor and industry return to talks, but disagreements again develop.

**Summer 2004:** The earlier compromise is revived and the resulting program, dubbed AgJOBS, is co-sponsored by 63 senators, half Republican. The White House blocks a floor vote.

**February 2005:** AgJOBS is introduced to a new Congress by bipartisan House legislators, bolstered by joint public appearances by UFW and growers.

**December 2005:** The House votes for more border security, and making illegal immigration a felony. It rejects legalization, including AgJOBS.

**April 2006:** UFW President Arturo Rodriguez signs a contract with Global Horizons, one of the biggest suppliers of H-2A workers to U.S. companies.

**May 2006:** A Senate majority approves tougher enforcement at the border and in the workplace, but also includes AgJOBS, which would legalize up to 1.5 million and offer an earned legalization option for millions of other illegal immigrants. The Senate bill also expands the supply of visas for future nonfarm guest workers, with a long path to legal residency. Most H-2A workers still would be barred from earning legal residency, a compromise by labor.

**June 2006:** With November's election looming, the House declines to negotiate with the Senate and calls for town hall meetings this summer on illegal immigration

**On Labor Day**
**More for farmers? Not unless farmworkers are considered**

Arturo S. Rodriguez
San Francisco Chronicle
Monday, September 3, 2007

Margarita Gonzalez, 47, dreads summer and picking table grapes in the hot sun. California heat regulations are supposed to protect her and other farmworkers from heat exposure, but too often, those laws are not enforced.

"We sweat a lot and feel like fainting," she said. "We want to sit in the shade, but we know, if we sit down, we will get fired."

Margarita is not alone. In as little as six weeks and with very limited resources, the UFW has been able to document hundreds of violations at dozens of farms statewide that employ more than 45,000 farmworkers. Farmworkers, like Margarita, are suffering daily and being denied shade, clean water and rest breaks.

For more than 40 years, the UFW has worked with legislators from both parties to write laws to protect farmworkers. However, the scale of the agricultural industry - with more than 400,000 farmworkers moving between 80,000 farms - has meant that good laws are ignored.

At a legislative hearing in July that focused on the state's heat laws not being enforced in farm-working fields, the Department of Occupational Safety and Health's Acting Chief of the Division Len Welsh said inspectors were still adjusting to last summer's regulations:

"We're still ramping up to be honest, to get the word out, to do the enforcement, to hone our approach," he said.

Farmworkers know what happens when it gets too hot and they have no water or shade. We remember the three farmworkers who died last summer due to heat. This is nearly as many deaths as there were the summer before the heat regulations were put in place. The UFW and farmworkers know there isn't time to "hone approaches" when lives are at stake.

At the same hearing, a representative for the Western Growers Association said farmers are working to learn and follow the state's heat rules. Is it that difficult for those not complying to comprehend providing clean water, shade and rest breaks during the hottest time of the year? After all, farmers are able to juggle volatile market prices, equipment costs and control animal and plant diseases.

We know the agricultural industry needs water to thrive. And as the Legislature and governor return to work, the farmers are pushing to ensure water bonds are on the agenda.More water for farmers, but only thirst for farmworkers? This is not acceptable public policy for California. Not when thousands are suffering daily. The UFW calls upon California's voters to remind their representatives in the Legislature of the reality in the fields and that they should not give more to farmers without remembering the farmworkers.

We cannot continue to give more to farmers - more time to comply with existing laws or more water through bonds. Farmers should not get more until farmworkers get at least dignity and human rights.

*Arturo S. Rodriguez is the president of the United Farm Workers.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/09/03/EDA4RRMGA.DTL

This article appeared on page **D - 5** of the San Francisco Chronicle

Testimony of Marcos Camacho
General Counsel, United Farm Workers
Bakersfield, California
Before the Committee on the Judiciary
U.S. House of Representatives
May 24, 2007

Thank you to the Chair and the Members of this Committee for the opportunity to testify on behalf of the United Farm Workers regarding the labor movement and immigration policy.  I am Marcos Camacho, an attorney in Bakersfield, California, and the General Counsel of the United Farm Workers, the labor union founded by Cesar Chavez.

Agricultural workers have confronted difficulties in immigration policy since the founding of this nation.  Our government policies and enforcement efforts have often contributed to an imbalance in power that has subjected farmworkers to poor wages and working conditions.

The Bracero guestworker program became known for its abusive treatment of Mexican workers, despite the existence of protections for wages and benefits, and was finally ended in 1964.  When, the farmworkers finally became free to demand better treatment,  Cesar Chavez and the United Farm Workers provided a vehicle to dramatically improve the status and treatment of farmworkers in this country.

More recently, the H-2A guestworker program often has provided agricultural employers with workers whose restricted, nonimmigrant status ensures that they will not challenge unfair or illegal conduct.  Generally, our guestworker programs have tied workers to a particular employer; if the job ends, the worker may not look for another job and must leave the United States immediately.  The guestworker who wishes for a visa in the next year must hope that the employer will request one, because the employers control access to visas.  Such workers are often fearful of deportation or not being hired in the following year, and are therefore reluctant to demand improvements.  They work very hard for low wages.  U.S. workers often recognize that they are not wanted by the employers who use the guestworker system.  Currently, there are about 50,000 H-2A jobs approved annually, out of an agricultural work force of 2.5 million.

There are many abuses under the H-2A program ranging from minor to very serious trafficking in human beings.  Unfortunately, our government has rarely enforced the protections in the H-2A program.  In recent years, the United Farm Workers and the Farm Labor Organizing Committee have been asked by guestworkers from several nationsto help them improve  conditions at their jobs in Washington State, Hawaii and North Carolina.  We believe that unionization is the best hope that guestworkers have for better treatment and the best hope the government has of removing the H-2A program's reputation for abuse.

Today, we have reached a situation in agriculture that demands urgent action. There are about 2.5 million farmworkers in this country, not including their family members. More than 80% of them are foreign-born, mostly but not all from Mexico. Virtually all of the newest entrants to the farm labor force lack authorized immigration status. The helpful reports from the National Agricultural Workers Survey by the U.S. Department of Labor state that about 53% of farmworkers are undocumented. But most observers believe the figure is 60% or 70%, and much higher in specific locations. Many employers now hire farm labor contractors in the hope that they can shield themselves from liability for hiring undocumented workers in violation of our immigration law and from liability for labor law violations. The labor contractors compete against one another by offering to do a job for less money, and the cut-throat competition means that the workers must take lower wages. When one labor contractor is prosecuted for violating labor laws, he is easily replaced. Our current immigration system is causing employers to attempt to evade responsibility for their employees, while undocumented workers are too fearful of being deported to demand changes. In many cases, due to inadequate enforcement of labor laws, employers take advantage of undocumented workers by subjecting them to illegal wages and working conditions.

When the majority of workers in an economic sector are living in the shadows of society something must be done. The current situation is not good for farmworkers who want to be able to work legally and earn a decent living to support their families. It is not good for employers who want to hire people without worrying that they will be raided by the immigration service at the peak of the harvest of their perishable fruits and vegetables. It is not good for the government, which needs to know who is working in our economy and living among us. But it is no answer to say we will deport them and start again. The growers need these experienced workers to cultivate and harvest their crops. In fact, many growers contend that there are labor shortages in some areas because undocumented workers are too fearful of immigration raids to come to the open fields.

The United Farm Workers recognized several years ago that the status quo needed to be remedied. We also recognized that some of our long-held beliefs would need to be modified if we were to achieve any sort of reform. During the late 1990's, we strenuously and successfully opposed efforts in the House and Senate by agricultural employers to weaken H-2A protections and procedures and transform most farmworkers into vulnerable guestworkers with no path to citizenship. Our successful opposition led to a stalemate since we did not have the legislative support needed to enact our ideas about immigration and labor reform.

With the help of our good friend, Rep. Howard Berman, and other members of Congress, we entered into arduous negotiations with key leaders of the agricultural employers in the United States and other members of Congress, particularly Senator Larry Craig, Senator Edward Kennedy, and Rep. Chris Cannon. In 2000, we reached agreement on the Agricultural Job Opportunities, Benefits and Security Act, or "AgJOBS." AgJOBS has undergone several revisions over the years to build greater support for passage. Sen. Dianne Feinstein is now a strong supporter of AgJOBS. We

remain strong partners with agricultural employers to win passage of this important legislation despite many other differences between us. In 2006, the Senate included AgJOBS in the comprehensive immigration reform it passed. We are now seeking to pass AgJOBS as part of comprehensive immigration reform in 2007. We have been working with the White House and several Senators to bring AgJOBS to a conclusion.

AgJOBS would provide agricultural employers and the nation with a legal, stable, productive workforce while ensuring that basic labor protections would apply to farmworkers. AgJOBS has two parts. First AgJOBS would create an "earned adjustment" program, allowing many undocumented farmworkers to obtain temporary resident status based on past work experience with the possibility of becoming permanent residents through continued agricultural work. Second, it would revise the existing H-2A agricultural guestworker program.

The earned legalization program certainly should not be called "amnesty." It is a difficult two-step process. The applicants for earned legalization will have to show that they have worked at least 150 days in U.S. agriculture during the past two years, and then must work at least 150 days per year in each of three years or at least 100 days per year in each of five years. Farmworkers will also have to show that they have not been convicted of a felony or serious misdemeanors. Spouses and minor children of the farmworkers will be eligible for a temporary status, too.

If they fulfill their obligations, they will be granted a green card for permanent resident status. They will have to pay substantial fees and fines at both steps. (Under the compromise worked out with the White House, farmworkers also will have to learn English, demonstrate that they have paid taxes during their prospective work period, return to their homeland to file the application for a green card with a U.S. consulate in their home country, and wait for the green card for 3 to 5 more years until backlogs in immigration applications have been cleared.). We expect that roughly 800,000 farmworkers will be eligible for this program, although such predictions are mere guesses. Through this multiyear process, the United States will have a stable, legal farm labor force that is highly productive.

This is a tough program. Farm work is dangerous, difficult, seasonal and low-paid. This truly will be an *earned* legalization.

AgJOBS also would revise the H-2A guestworker program. We feel that we made painful concessions to achieve this compromise. The program's application process will be streamlined to become a "labor attestation" program similar to the H-1B program, rather than the current "labor certification" program. This change reduces paperwork for employers and limits the government's oversight of the employer's application. AgJOBS would retain both the "prevailing wage" and "adverse effect wage rates," but would effectively lower the H-2A wage rates by about $1.00 per year (to the 2003 adverse effect wage rates, which are issued by state), and freeze them for three years. The Government Accountability Office and a special commission would make recommendations to Congress about the wage rates within 3 years. If Congress has not

acted within 3 years, then the wage rates will be adjusted by the previous years' inflation rate. In addition, for the first time, farmworkers would have a right to file a federal lawsuit to enforce their H-2A job terms. AgJOBS also would allow some flexibility in the minimum wages and benefits when the workers at an H-2A employer are represented by a bona fide labor union under a collective bargaining agreement.

We believe that AgJOBS is a reasonable compromise under the circumstances. To conclude, we recommend the following: (1) We encourage you to pass AgJOBS. (2) Congress and the Administration should be vigilant about abuses under guestworker programs. Strong enforcement of the labor protections for guestworkers will prevent guestworkers from being exploited, prevent the wages and working conditions of United States workers from being undermined, and will take away the incentive that employers have to hire guestworkers rather than U.S. workers, including those who would earn legal immigration status under the AgJOBS earned legalization program. (3) Congress needs to adopt protections against abuses associated with foreign labor contracting. The U.S. Government is refusing to look at the abuses that occur during the recruitment of guestworkers in the foreign country. Yet, those abuses abroad, including payment of high recruitment fees, result in mistreatment of guestworkers on the job in the U.S., because the guestworkers must work to the limits of human endurance and avoid deportation at all costs to pay back those fees. The labor contractors' interest in such recruitment fees may have led to the murder earlier this year in Monterrey, Mexico, of Santiago Rafael Cruz, who was helping Mexican citizens employed as guestworker for North Carolina growers under a collective bargaining agreement with the Farm Labor Organizing Committee, AFL-CIO. (4) We also ask you to recognize that the best protection workers – both U.S. and foreign -- have at an employer that participates in a guestworker program is a labor union. Government policy should promote collective bargaining to reduce abuses under guestworker programs and give workers a meaningful voice at work.

Thank you for this opportunity to testify before the Committee on these important and timely issues.

# EXHIBIT EE

## Ag rivals unite for workers program
**Immigration policy reform brings together growers and UFW.**

By Dennis Pollock
The Fresno Bee
Sunday, January 29, 2006

The debate over the necessity of a guest-worker program has made for some strange bedfellows.

One of the most unusual coalitions is that among the United Farm Workers, the Nisei Farmers League in Fresno and the Western Growers Association in Irvine.

The alliance between the UFW and grower groups would have been unthinkable 30 years ago. It exemplifies how dire some view the need for significant reform of the nation's immigration policy.

"If the UFW and growers can put aside decades of bitter conflict, there should be some way to get a bipartisan solution to this," said Marc Grossman, a UFW spokesman.

The Nisei Farmers League traces its very beginnings to the fields in 1970 when the UFW sought to unionize workers as the union and farmers clashed.

It was formed to fight the union.

As recently as September 2002, San Joaquin Valley farm leaders gathered at Nisei offices to oppose UFW-backed bills in the state Legislature.

Harry Kubo, the league's founder, showed up with a "proud to be a farmer" button and some UFW bumper stickers from the early 1970s, a time when growers and union activists squared off.

Two years later, the heads of both organizations — Manuel Cunha Jr., president of the Nisei Farmers League, and Arturo Rodriguez, UFW president — stood together behind a lectern at a Fresno luncheon for the first time to talk of the need for the AgJobs bill they helped craft.

That bill, backed by many Valley members of Congress, is favored in the U.S. Senate but faces opposition in the House. The bill is a proposal that would grant legal status to laborers who comply with certain criteria for continued work in farming.

Upon the bill's enactment, workers would have to show that they had worked at least 100 days in farming in the 18 previous months.

They would also have to work at least 70 days in farming per year for three years and could receive "an earned adjustment of status" — U.S. citizenship — six years after the law's enactment.

The Border Protection, Antiterrorism and Illegal Immigration Control Act, which has no guest-worker provision, has the backing of at least two California congressmen who said they expect a more comprehensive bill to emerge.

Gold River Republican Dan Lungren said a "comprehensive approach" is necessary. He has floated some proposals that include granting legal residency to immigrants who agree to perform national community service.

Palm Springs Republican Mary Bono pointed out that the state, and the area she represents, "has a huge agricultural base that depends on a strong labor force," and any comprehensive immigration reform "must be paired with a guest-worker program."

Cunha said relying solely on a border security bill "would just shut down the country."

Pat Ricchiuti, president of the Fresno County Farm Bureau, said only tightening the border means "we're almost biting the hand that feeds us, shooting ourselves in the foot."

Tim Chelling, spokesman for the growers association, said the shortage of labor in agriculture "may be the first symptom of a very sick immigration policy."

The reporter can be reached at dpollock@fresnobee.comor (559) 441-6364.

Immigration interests look to new ways to satisfy concerns
By Jim Snyder
The Hill
July 11, 2007

Mirna Vasquez first came to the United States to work in 1986. She toiled, "without papers," in farm fields throughout the Southwest, picking oranges, walnuts, or grapes, sometimes in 10-hour stretches and in constant fear federal agents would send her back to Mexico and away from her family.

Now a U.S. citizen with a son who wants to join the Marines, Vasquez was part of a group of 50 farm workers who came to Washington last month to lobby in support of immigration by sharing their own experiences.

The broad immigration measure failed, despite that effort. But Vasquez remains hopeful that one critical component may still pass.

"I'm sad, but I have a lot of faith something can happen," she said.

The something is the AgJobs Act, a compromise worked out by agribusiness and the United Farm Workers of America years ago that would streamline the visa process for farm workers and provide them a path to legal status.

It is one piece of the "grand bargain" that lawmakers are now breaking up and promoting separately. Agribusinesses, farm labor unions, and the high-tech community in particular are at the forefront of the effort.

Disappointment that the broader bill died isn't universal among businesses, which in general backed comprehensive immigration reform to ensure a steady labor supply. In some quarters, however, that support was undercut by "heavy lift" provisions such as the requirement that companies certify their workforce consists entirely of legal workers.

"The status quo is OK for some people in the business community," said Ralph Hellmann, senior vice president of government relations at the Information Technology Institute Council.

"The high tech and agriculture communities are different. Status quo doesn't work for us."

Microsoft, for example, has announced plans to open up a facility in Canada in part because of access to foreign workers.
The software maker and other tech companies want a big boost in the number of H-1B visas, which provide temporary work status to foreign workers. Now capped at 65,000 workers, the visas are typically snapped up the day they are offered.

An additional 20,000 foreign-born graduates with advanced degrees from American universities are allowed in. But the industry contends that the total still isn't sufficient to meet demand.

The industry is also pushing for a higher number of green cards, which grant permanent residency. Under current policy, trained workers on H-1B visas have to go home because the backlog for green cards is so extensive, Hellmann said.

Sen. Maria Cantwell, a Washington state Democrat and former software executive, had planned to introduce an amendment to increase the number of H-1B visas to 130,000, with an escalator provision that could raise the total to 180,000. The amendment would have also allowed more green cards to be issued each year to handle the years-long backlog.

But the broader bill died on a cloture vote before the amendment was offered.

Some members of Congress believe that companies want cheaper foreign labor at the expense of American engineers and software designers. But increasing the number of high-tech workers enjoys support even among the most hardened opponents of comprehensive immigration reform.

Rep. Lamar Smith (R-Texas), for example, introduced a bill yesterday to increase the number of H-1B visas to 195,000 in 2007.

Agriculture groups, meanwhile, are encouraged by Sen. Dianne Feinstein's (D-Calif.) stated intention of attaching AgJobs to the farm bill, which is up for reauthorization this year.

Farm workers' unions and agribusiness giants were among the strongest backers of the immigration measure, but in some ways they may face a tougher push than high-tech lobbyists do. The comprehensive bill failed principally because of opposition to a plan to give an estimated 12 million illegal immigrants a path to citizenship.

AgJobs would affect a far smaller pool of workers, an estimated 1.5 million farm workers, but the amnesty issue remains an obstacle.

"This is not forgiveness. This is earned legalization," said Bruce Goldstein, executive director of Farmworkers Justice.

AgJobs would have allowed farm workers who had worked in agriculture for at least 150 days over the previous two years to apply for a Z-A visa. Workers who had obtained the visa could then earn a green card, or permanent resident status, if they worked at least 100 days per year for five years or 150 days each year for three years and paid a $400 fine.

The workers would come to the United States at federal wage rates set at 2003 levels, and then frozen for three years — a concession labor made to agribusinesses that complained the current visa system is too expensive.

As many as 55 to 70 percent of the farm workers who work in fields are here illegally, said Goldstein.

"Most are undocumented and have very little bargaining power with their employer. They are too afraid to come forward," he said.

As they redouble their lobbying efforts, agribusiness and high-tech interests are also seeking to shore up ties to Democrats by reversing past campaign giving trends.

Agribusinesses, for example, gave roughly two-thirds of their $18.3 million in donations during the 2006 cycle to Republican candidates. So far this cycle, they have given $1.27 million to Democrats and $1.16 million to Republicans, according to PoliticalMoneyLine, which tracks political spending.

Industries defined as communications and technology-sector have given $1.49 million to Democrats and just over $1 million to Republicans so far. In 2006, Republicans received about 62 percent of the contributions.

http://thehill.com/business--lobby/immigration-interests-look-to-new-ways-to-satisfy-concerns-2007-07-11.html

# Roots of a dilemma
## Out in the fields, farmers sweat out immigration issue

**Sacramento Bee**
**July 2, 2006**
**By Susan Ferriss**

VISALIA -- Deep in the heart of California farm country, 425 Mexican workers fan out through David Jackson's peach and plum trees, not far from the "Under God" banner and the American flag he flies over his orchards.

Wearing work shoes he's not afraid to get muddy, Jackson hops from his pickup and wades out among his workers, taking care not to jostle their ladders.

"See that? Look how professional he is on that ladder," he said, pointing proudly at a man deftly picking only the unblemished, ripe fruit strong enough to survive overnight air shipment to points as distant as Taiwan and England.

The admiration this farmer has for a good hired hand is not diminished by his knowledge that many of his workers are illegal immigrants -- even if that seems to contradict his conservative political views.

But Jackson believes there is a better way and, just a month ago, thought Congress would agree to legalize undocumented farmworkers and start a new guest worker program under a proposal called AgJOBS, the Agricultural Job Opportunities, Benefits and Security Act of 2006.

Now the plan is in limbo, and Jackson feels betrayed by the very Republican politicians and pundits he has long backed with his vote and his money.

"Not even my buddy Rush Limbaugh understands this issue," he said.

### Loyalties clash
Up and down the state that produces much of America's food -- half the country's fruits and vegetables, most of its milk -- and most U.S. farm exports, farmers like Jackson are finding their core values and political loyalties tested by what they consider a disconnect between the realities of politics and of the fields.

"I have never seen a larger base of Republican constituents more enraged or dismayed with their own party," said Luawanna Hallstrom, a Republican tomato grower in San Diego County who has worked on agricultural reform for two decades.

Using her own farm as a case in point, Hallstrom said years of experience has taught her that Americans are not interested in doing the painstaking, backbreaking work needed to hand-harvest her salad tomatoes.

With immigration enforcement never a real threat in the fields, agriculture has come to rely more on undocumented workers than any other U.S. industry. Unauthorized workers could number up to 1.5 million, by some estimates -- more than half of all people on farm payrolls. In some crops and regions, employers say, they represent up to nine in 10 workers.

Manuel Reyes, one of the laborers at Jackson's Family Tree Farms, wiped sweat from his brow as he gently slipped peaches into a bin and talked about his high hopes for AgJOBS. On his crew were people who speak four Mexican Indian languages and hail from some of Mexico's poorest regions.

"I think the majority here would be more than happy to be legal and be free to come and go," Reyes said. "Everybody is talking about it."

Without scorn or judgment, simply because he knows most Americans' skills and ambitions took them beyond fieldwork long ago, the 27-year-old said: "Imagine an American working in here, doing this?"

The $7 an hour Jackson pays is a small fortune for an illegal Mexican immigrant with an eighth-grade education, especially compared with the $7 a day he might make back home.

As workers heated meat and tortillas under a tree canopy nearby, Jackson said, "I don't see them as any different from my father who came from Tennessee." Their children progress, too, Jackson said, like those of a trusted foreman who was an illegal immigrant until a 1986 amnesty for undocumented workers. Now, the foreman's daughter is a pre-med student.

Jackson hires his workers through a labor contractor, who in turn has the responsibility of viewing and recording workers' documents. This common arrangement tends to obscure farmers' reliance on undocumented labor.

**Alliances sprout**

Growers knew trouble might mushroom one day, though. In the 1990s, they began to receive letters from the Social Security Administration about employees with mismatched numbers and names, likely from the use of fake numbers. Farmers estimated the employees involved represented an estimated 50 percent to 70 percent of workers on their payrolls.

Furthermore, while California farmers generally have been shielded from labor shortages by the ready flow of immigrants from Mexico and Central America, the recent escalation of public outcry over illegal immigration -- coupled with government crackdowns at the border -- have intensified farmers' interest in the AgJOBS proposal.

One of agribusiness' traditional adversaries, the United Farm Workers union, also backs AgJOBS, and has worked for six years with farmers in an unlikely alliance to design and lobby for it. The UFW and other labor advocates view the reform as a sensible solution for employees, especially if the alternative is offshore migration of farms and jobs.

"We felt that things would never get better for farmworkers unless we changed their status -- again," said UFW President Arturo Rodriguez, referring to the 1986 amnesty program.

AgJOBS would offer a one-time path to legal permanent residency only to those farmworkers who can prove they've worked at least 150 days on U.S. farms before 2006 -- and only if they remain employed in agriculture three to five more years. That would give farmers a stable work force while they transition from undocumented labor.

AgJOBs would also reform the existing H-2A guest worker program, rarely used by farmers who find its regulations too onerous. Under H-2A, the government not only requires employers to provide housing and meals, but has been too slow, critics charge, to certify employers' evidence that domestic workers could not be found for the jobs -- the required first step. AgJOBS would speed up the process and reduce a 300-page application to a single page.

The U.S. Senate included the AgJOBS reforms in an immigration bill approved in May, pairing it with more enforcement at the border and in workplaces. But with fall elections in sight, the House rejected the measure, with some members of Congress vowing instead to stick to legislation passed in December that calls for enforcement alone.

"I have seen a hardening in this place," acknowledged Rep. Dan Lungren, R-Gold River, a guest worker supporter who had hoped to be a key player in now-stymied negotiations between the House and Senate.

For those who have worked longest and hardest on the compromise, optimism is giving way to cynicism.
"For us to be able to sit down with the UFW and the other (worker) advocates, doesn't the Congress see what an accomplishment that is?" asked Manuel Cunha, a citrus grower in the Fresno area who spearheaded farm industry negotiations with the UFW.

Cunha, president of the Fresno-based Nisei Farmers League, is sputtering mad at GOP House Speaker Dennis Hastert of Illinois, whom he accused of tossing aside carefully crafted proposals in order to pander to conservative voters. Cunha, a devoted Republican, claims some GOP farmers might even vote Democratic because they are so upset by what's happening.

"You have people who are afraid of losing the United States heritage, the born-and-bred here, whatever you want to call it," said Cunha, who is of Portuguese descent. "We have become so anti-brown. … That's a terrible message to send to our children. That's not what America is about."

With the summer harvest well under way, AgJOBS suddenly looks as doomed as a vineyard of ripe wine grapes with no one to pick them.

**Unrealistic options?**
That fear is precisely what has driven Salinas Valley wine grape grower Scott Scheid to spend the past five years traveling to Washington, D.C., to lobby for AgJOBS on behalf of vineyards.

Scheid Vineyards is one of the biggest in California, growing thousands of acres of grapes in a region famous for a cornucopia of grapes, broccoli, lettuce, strawberries and other crops.

The company employs about 270 workers, many nearly year round, paying them more than $9 an hour plus health and vacation benefits. The workers prune vines and harvest grapes under a negotiated UFW contract. But that doesn't mean all of them are legal.

"If everyone was gone from here, would others take these jobs?" Scheid asked. "Would people drive 100 miles to come here? Or do we shut it all down and wait for people to come here? That's unrealistic."

Joining an exodus of men from his hometown in Mexico at the age of 17, Scheid worker Miguel Garcia arrived six years ago in the Salinas Valley. "I don't mind continuing to work in the fields," he said, especially if the tradeoff is legal residency. "Farmwork is the kind of knowledge I've developed since I was a child."

As evidence that reform is needed, farmers delivered to Congress reports on their experience during a 1998 labor shortage, when Cunha's group organized farmers to advertise job openings in 10 California counties. Even with opportunities to earn up to $15 an hour, he said, it was next to impossible to find legal workers.

Out of 137,000 able-bodied candidates identified by welfare agencies on the Central Coast and in the San Joaquin Valley, only 503 applied for work. "You know how many actually came to work?" Cunha asked. "Three."

After the Sept. 11, 2001, terrorist attacks, tomato grower Hallstrom participated in her own, unexpected hiring experiment.

Her company, Harry Singh & Sons, leases land on Camp Pendleton, a U.S. Marine base. Hallstrom lost most of her work force when a post-Sept. 11 security check of military installations found 75 percent of her workers were undocumented.

Desperate for workers she could be sure were legal, Hallstrom advertised. Nobody came. She turned to the H-2A program, which was so slow in authorizing workers, she said, $2.5 million worth of tomatoes rotted on the vine.

"It really shed a light on the fact that there were not enough legally documented farmworkers to do this," she said. "It wasn't us crying wolf."

Since then, however, Hallstrom has successfully brought in guest workers under the H-2A program, and she's paid the price. Not only must housing, meals and transportation be provided to workers, but wages must meet the prevailing rate, this year about $9 an hour for Hallstrom.

Though a minuscule 2 percent of farmers use H-2A, many consider it an important option if the U.S. government succeeds in sealing the border and begins requiring employers to check workers' legal status through national databases. If shortages develop, farmers may find housing requirements and other provisions less of an obstacle.

Americans' general ignorance of how their food and drink are produced, farmers say, has allowed immigration hard-liners to attack policies that make perfect sense to the agriculture industry.

"Anybody who says they'll pay $10 for a head of lettuce so workers don't have to be here is just talking big," Cunha said. "How will they buy those DVDs they want, eat in those nice restaurants and go to hotels?"

He fumed about claims on talk shows that do not match his reality, including one assertion that labor costs are only 10 percent of farm production. To produce fruits and vegetables in California, labor is more than 30 percent of cost, according to federal agricultural officials.

To lessen the need for field workers, one option mentioned in Washington these days is mechanization.

"You can only change a diaper on a baby by hand," Cunha said, adding that if consumers want fresh produce like delicate berries and salad tomatoes, then they should welcome the workers willing to pick them by hand.

**'Fantasyland' solution**

The views of one particularly outspoken conservative congressman from Orange County elicit snorts, eye rolls and sighs in California's farm country.

"I say let the prisoners pick the fruit," Rep. Dana Rohrbacher, R-Huntington Beach, said in May at a Capitol news conference to denounce the Senate bill.

In a recent interview, Rohrabacher said his suggestion was serious, not sardonic.
"It is not in the interest of our country to legalize the status of anyone who is in the country illegally," he said. "We should see if there's a way to do this without having a guest worker program," because of the "horrible side effects" of relying on foreign workers.

To fill farm jobs, Rohrabacher said, "We have a massive resource with prisoners. Prisons quite often are near agricultural areas." The prisoners could keep half their earnings and prisons could keep the rest, he said.

Rohrbacher accused agribusiness of going "down the wrong strategic road" and said that, "as the Senate proposal goes down in flames, they are going to be looking for alternatives."

Out in the orchards of Family Tree Farms, however, the idea of prisoners picking peaches under armed guard doesn't fly.

The Jacksons consider it risky to trust a revolving group of felons with the fruits of their multimillion-dollar enterprise, where hired hands must not only be willing to endure sweltering heat, but also able to master the use of special tools and proper growing techniques.

To them, it seems particularly foolish for an enterprise with standards so high that fruit is inspected in person by retail buyers and foreign government officials.

In fact, the prisoner idea, said Jackson's son, Rick, is something out of "Fantasyland… It's not going to happen. It's so crazy, I can't even comment on it."

**The march toward AgJOBS**

**1986:** Immigration Reform and Control Act legalizes farmworkers and many other illegal immigrants. IRCA imposes new penalties for hiring illegal immigrants and requires employers to view and file documents that prove a right to work.

**1990s:** Legal workers leave farmwork for other jobs, increasing the flow of undocumented workers. Few employers use an existing H-2A seasonal farmworker program. Growers say it is too slow and costly and labor advocates denounce it for limiting workers' rights. While growers later lobby to change H-2A, labor argues their proposals still limit rights, including to sue or to earn legal permanent residency and citizenship.

**December 1999:** Rep. Howard Berman, D-North Hollywood, urges the United Farm Workers president to sit down with the farm industry to design a new H-2A and legalization program with more rights for workers.

**March- September 2000:** The UFW and national farm industry representatives negotiate. Florida Legal Services and plant nursery groups also are involved. September 2000: Both sides compromise on a proposal to allow undocumented farm workers and their immediate families to earn legal permanent status if workers continue in agriculture. Agreement is reached to streamline H-2A approval procedures in periods of shortage. The compromise preserves wage protections, and for the first time, allows H-2A workers to sue in federal court.

**December 2000:** Lame duck Congress adjourns before approving a bill, even though leaders of both parties in the House of Representatives support the idea. Mexican President Vicente Fox takes office and becomes the first Mexican president to call, with President Bush, for guest worker visas.

**May-June 2001:** UFW and the farm industry come up with separate Senate bills for reforms sponsored by Sens. Edward Kennedy, D-Mass, and Larry Craig, R-Idaho.

**2001-2003:** After Sept. 11 attacks, immigration reform stalls. Labor and industry return to talks, but disagreements again develop.

**Summer 2004:** The earlier compromise is revived and the resulting program, dubbed AgJOBS, is co-sponsored by 63 senators, half Republican. The White House blocks a floor vote.

**February 2005:** AgJOBS is introduced to a new Congress by bipartisan House legislators, bolstered by joint public appearances by UFW and growers.

**December 2005:** The House votes for more border security, and making illegal immigration a felony. It rejects legalization, including AgJOBS.

**April 2006:** UFW President Arturo Rodriguez signs a contract with Global Horizons, one of the biggest suppliers of H-2A workers to U.S. companies.

**May 2006:** A Senate majority approves tougher enforcement at the border and in the workplace, but also includes AgJOBS, which would legalize up to 1.5 million and offer an earned legalization option for millions of other illegal immigrants. The Senate bill also expands the supply of visas for future nonfarm guest workers, with a long path to legal residency. Most H-2A workers still would be barred from earning legal residency, a compromise by labor.

**June 2006:** With November's election looming, the House declines to negotiate with the Senate and calls for town hall meetings this summer on illegal immigration

**On Labor Day**
**More for farmers? Not unless farmworkers are considered**

Arturo S. Rodriguez
San Francisco Chronicle
Monday, September 3, 2007

Margarita Gonzalez, 47, dreads summer and picking table grapes in the hot sun. California heat regulations are supposed to protect her and other farmworkers from heat exposure, but too often, those laws are not enforced.

"We sweat a lot and feel like fainting," she said. "We want to sit in the shade, but we know, if we sit down, we will get fired."

Margarita is not alone. In as little as six weeks and with very limited resources, the UFW has been able to document hundreds of violations at dozens of farms statewide that employ more than 45,000 farmworkers. Farmworkers, like Margarita, are suffering daily and being denied shade, clean water and rest breaks.

For more than 40 years, the UFW has worked with legislators from both parties to write laws to protect farmworkers. However, the scale of the agricultural industry - with more than 400,000 farmworkers moving between 80,000 farms - has meant that good laws are ignored.

At a legislative hearing in July that focused on the state's heat laws not being enforced in farm-working fields, the Department of Occupational Safety and Health's Acting Chief of the Division Len Welsh said inspectors were still adjusting to last summer's regulations:

"We're still ramping up to be honest, to get the word out, to do the enforcement, to hone our approach," he said.

Farmworkers know what happens when it gets too hot and they have no water or shade. We remember the three farmworkers who died last summer due to heat. This is nearly as many deaths as there were the summer before the heat regulations were put in place. The UFW and farmworkers know there isn't time to "hone approaches" when lives are at stake.

At the same hearing, a representative for the Western Growers Association said farmers are working to learn and follow the state's heat rules. Is it that difficult for those not complying to comprehend providing clean water, shade and rest breaks during the hottest time of the year? After all, farmers are able to juggle volatile market prices, equipment costs and control animal and plant diseases.

We know the agricultural industry needs water to thrive. And as the Legislature and governor return to work, the farmers are pushing to ensure water bonds are on the agenda.More water for farmers, but only thirst for farmworkers? This is not acceptable public policy for California. Not when thousands are suffering daily. The UFW calls upon California's voters to remind their representatives in the Legislature of the reality in the fields and that they should not give more to farmers without remembering the farmworkers.

We cannot continue to give more to farmers - more time to comply with existing laws or more water through bonds. Farmers should not get more until farmworkers get at least dignity and human rights.

*Arturo S. Rodriguez is the president of the United Farm Workers.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/09/03/EDA4RRMGA.DTL

This article appeared on page **D - 5** of the San Francisco Chronicle

Testimony of Marcos Camacho
General Counsel, United Farm Workers
Bakersfield, California
Before the Committee on the Judiciary
U.S. House of Representatives
May 24, 2007


Thank you to the Chair and the Members of this Committee for the opportunity to testify on behalf of the United Farm Workers regarding the labor movement and immigration policy.  I am Marcos Camacho, an attorney in Bakersfield, California, and the General Counsel of the United Farm Workers, the labor union founded by Cesar Chavez.

Agricultural workers have confronted difficulties in immigration policy since the founding of this nation.  Our government policies and enforcement efforts have often contributed to an imbalance in power that has subjected farmworkers to poor wages and working conditions.

The Bracero guestworker program became known for its abusive treatment of Mexican workers, despite the existence of protections for wages and benefits, and was finally ended in 1964.  When, the farmworkers finally became free to demand better treatment,  Cesar Chavez and the United Farm Workers provided a vehicle to dramatically improve the status and treatment of farmworkers in this country.

More recently, the H-2A guestworker program often has provided agricultural employers with workers whose restricted, nonimmigrant status ensures that they will not challenge unfair or illegal conduct.  Generally, our guestworker programs have tied workers to a particular employer; if the job ends, the worker may not look for another job and must leave the United States immediately.  The guestworker who wishes for a visa in the next year must hope that the employer will request one, because the employers control access to visas.  Such workers are often fearful of deportation or not being hired in the following year, and are therefore reluctant to demand improvements.  They work very hard for low wages.  U.S. workers often recognize that they are not wanted by the employers who use the guestworker system.  Currently, there are about 50,000 H-2A jobs approved annually, out of an agricultural work force of 2.5 million.

There are many abuses under the H-2A program ranging from minor to very serious trafficking in human beings.  Unfortunately, our government has rarely enforced the protections in the H-2A program.  In recent years, the United Farm Workers and the Farm Labor Organizing Committee have been asked by guestworkers from several nationsto help them improve  conditions at their jobs in Washington State, Hawaii and North Carolina.  We believe that unionization is the best hope that guestworkers have for better treatment and the best hope the government has of removing the H-2A program's reputation for abuse.

Today, we have reached a situation in agriculture that demands urgent action. There are about 2.5 million farmworkers in this country, not including their family members. More than 80% of them are foreign-born, mostly but not all from Mexico. Virtually all of the newest entrants to the farm labor force lack authorized immigration status. The helpful reports from the National Agricultural Workers Survey by the U.S. Department of Labor state that about 53% of farmworkers are undocumented. But most observers believe the figure is 60% or 70%, and much higher in specific locations. Many employers now hire farm labor contractors in the hope that they can shield themselves from liability for hiring undocumented workers in violation of our immigration law and from liability for labor law violations. The labor contractors compete against one another by offering to do a job for less money, and the cut-throat competition means that the workers must take lower wages. When one labor contractor is prosecuted for violating labor laws, he is easily replaced. Our current immigration system is causing employers to attempt to evade responsibility for their employees, while undocumented workers are too fearful of being deported to demand changes. In many cases, due to inadequate enforcement of labor laws, employers take advantage of undocumented workers by subjecting them to illegal wages and working conditions.

When the majority of workers in an economic sector are living in the shadows of society something must be done. The current situation is not good for farmworkers who want to be able to work legally and earn a decent living to support their families. It is not good for employers who want to hire people without worrying that they will be raided by the immigration service at the peak of the harvest of their perishable fruits and vegetables. It is not good for the government, which needs to know who is working in our economy and living among us. But it is no answer to say we will deport them and start again. The growers need these experienced workers to cultivate and harvest their crops. In fact, many growers contend that there are labor shortages in some areas because undocumented workers are too fearful of immigration raids to come to the open fields.

The United Farm Workers recognized several years ago that the status quo needed to be remedied. We also recognized that some of our long-held beliefs would need to be modified if we were to achieve any sort of reform. During the late 1990's, we strenuously and successfully opposed efforts in the House and Senate by agricultural employers to weaken H-2A protections and procedures and transform most farmworkers into vulnerable guestworkers with no path to citizenship. Our successful opposition led to a stalemate since we did not have the legislative support needed to enact our ideas about immigration and labor reform.

With the help of our good friend, Rep. Howard Berman, and other members of Congress, we entered into arduous negotiations with key leaders of the agricultural employers in the United States and other members of Congress, particularly Senator Larry Craig, Senator Edward Kennedy, and Rep. Chris Cannon. In 2000, we reached agreement on the Agricultural Job Opportunities, Benefits and Security Act, or "AgJOBS." AgJOBS has undergone several revisions over the years to build greater support for passage. Sen. Dianne Feinstein is now a strong supporter of AgJOBS. We

remain strong partners with agricultural employers to win passage of this important legislation despite many other differences between us. In 2006, the Senate included AgJOBS in the comprehensive immigration reform it passed. We are now seeking to pass AgJOBS as part of comprehensive immigration reform in 2007. We have been working with the White House and several Senators to bring AgJOBS to a conclusion.

AgJOBS would provide agricultural employers and the nation with a legal, stable, productive workforce while ensuring that basic labor protections would apply to farmworkers. AgJOBS has two parts. First AgJOBS would create an "earned adjustment" program, allowing many undocumented farmworkers to obtain temporary resident status based on past work experience with the possibility of becoming permanent residents through continued agricultural work. Second, it would revise the existing H-2A agricultural guestworker program.

The earned legalization program certainly should not be called "amnesty." It is a difficult two-step process. The applicants for earned legalization will have to show that they have worked at least 150 days in U.S. agriculture during the past two years, and then must work at least 150 days per year in each of three years or at least 100 days per year in each of five years. Farmworkers will also have to show that they have not been convicted of a felony or serious misdemeanors. Spouses and minor children of the farmworkers will be eligible for a temporary status, too.

If they fulfill their obligations, they will be granted a green card for permanent resident status. They will have to pay substantial fees and fines at both steps. (Under the compromise worked out with the White House, farmworkers also will have to learn English, demonstrate that they have paid taxes during their prospective work period, return to their homeland to file the application for a green card with a U.S. consulate in their home country, and wait for the green card for 3 to 5 more years until backlogs in immigration applications have been cleared.). We expect that roughly 800,000 farmworkers will be eligible for this program, although such predictions are mere guesses. Through this multiyear process, the United States will have a stable, legal farm labor force that is highly productive.

This is a tough program. Farm work is dangerous, difficult, seasonal and low-paid. This truly will be an *earned* legalization.

AgJOBS also would revise the H-2A guestworker program. We feel that we made painful concessions to achieve this compromise. The program's application process will be streamlined to become a "labor attestation" program similar to the H-1B program, rather than the current "labor certification" program. This change reduces paperwork for employers and limits the government's oversight of the employer's application. AgJOBS would retain both the "prevailing wage" and "adverse effect wage rates," but would effectively lower the H-2A wage rates by about $1.00 per year (to the 2003 adverse effect wage rates, which are issued by state), and freeze them for three years. The Government Accountability Office and a special commission would make recommendations to Congress about the wage rates within 3 years. If Congress has not

acted within 3 years, then the wage rates will be adjusted by the previous years' inflation rate. In addition, for the first time, farmworkers would have a right to file a federal lawsuit to enforce their H-2A job terms. AgJOBS also would allow some flexibility in the minimum wages and benefits when the workers at an H-2A employer are represented by a bona fide labor union under a collective bargaining agreement.

We believe that AgJOBS is a reasonable compromise under the circumstances. To conclude, we recommend the following: (1) We encourage you to pass AgJOBS. (2) Congress and the Administration should be vigilant about abuses under guestworker programs. Strong enforcement of the labor protections for guestworkers will prevent guestworkers from being exploited, prevent the wages and working conditions of United States workers from being undermined, and will take away the incentive that employers have to hire guestworkers rather than U.S. workers, including those who would earn legal immigration status under the AgJOBS earned legalization program. (3) Congress needs to adopt protections against abuses associated with foreign labor contracting. The U.S. Government is refusing to look at the abuses that occur during the recruitment of guestworkers in the foreign country. Yet, those abuses abroad, including payment of high recruitment fees, result in mistreatment of guestworkers on the job in the U.S., because the guestworkers must work to the limits of human endurance and avoid deportation at all costs to pay back those fees. The labor contractors' interest in such recruitment fees may have led to the murder earlier this year in Monterrey, Mexico, of Santiago Rafael Cruz, who was helping Mexican citizens employed as guestworker for North Carolina growers under a collective bargaining agreement with the Farm Labor Organizing Committee, AFL-CIO. (4) We also ask you to recognize that the best protection workers – both U.S. and foreign -- have at an employer that participates in a guestworker program is a labor union. Government policy should promote collective bargaining to reduce abuses under guestworker programs and give workers a meaningful voice at work.

Thank you for this opportunity to testify before the Committee on these important and timely issues.

# EXHIBIT FF

**U.S. Department of Labor**

Office of the Solicitor
Washington, D.C. 20210



Appeals Unit
Freedom of Information Act / Privacy Act
200 Constitution Ave., N.W., Rm. N-2428
Phone: 202-693-5503
Fax: 202-693-5538

December 06, 2007

| | |
|---|---|
| To: | ANNA REYNOSO
P.O. BOX 62
KEENE, CA  93531 |
| From: | Raymond E. Mitten Jr.
Director, FOIA Appeals Unit |
| Re: | Your Appeal to the Solicitor of Labor under the Freedom
of Information Act and/or Privacy Act
COPIES OF ALL H-2A APPLICATIONS & CLEARANCE ORDERS |

Date of your letter:    12/6/2007

Appeal Reference No.:    080068

This is to acknowledge receipt of your letter appealing a denial of information by a Department of Labor official.  Your appeal is being processed.

The law generally requires that appeals be sequenced for action on a first-in first-out basis, consistent with the guidance provided by the courts.  *See Open America v. Watergate Special Prosecution Force,* 547 F.2d 605 (D.C. Cir. 1976).  You should be aware that the number of appeals currently awaiting review and decision is very substantial.  We are authorized, however, to schedule for faster action those appeals which require limited staff time -- i.e., those that involve limited scope or complexity.

Should you have any questions about the status of your appeal, have any additional information which you believe should be brought to our attention, or wish to limit or withdraw your appeal, please contact this office at the phone or address listed above.

To help us serve you, please direct your inquiries to Linda Robinson at the number noted above, and use our appeal reference number.  Thank you.

# EXHIBIT GG

## UFW Offices

NATIONAL HEADQUARTERS
P.O. Box 62
29700 Woodford-Tehachapi Road
Keene, CA 93531
(661) 823-6250

DELANO
P.O. Box 130
30168 Garces Hwy
Delano, California 93216
(661) 725-9730
Fax: (661) 725-2135

OXNARD
920 South "A" Street
Oxnard, California 93030
(805) 486-9674
Fax: (805) 486-7224

WATSONVILLE
519 Main Street
P.O. Box 2515
Watsonville, California 95076
(831) 763-4820
Fax: (831) 728-4590

GREENFIELD
293 El Camino Real
P.O. Box 3006
Greenfield, California 93927
(831) 674-0270
Fax: (831) 674-0955

NORTH COAST
1700-D Corby Avenue
Santa Rosa, California 95407
(707) 528-3039
Fax: (707) 573-3726

QUINCY
14 Jefferson Street
Quincy, FL, 32351
Office: (850) 627-2028
Fax: (850) 627-4639

SUNNYSIDE
821 Yakima Valley Highway
Sunnyside, WA
Office: (509) 839-4903
Fax: (509) 839-3870

Testimony of Marcos Camacho
General Counsel, United Farm Workers
Bakersfield, California
Before the Committee on the Judiciary
U.S. House of Representatives
May 24, 2007

Thank you to the Chair and the Members of this Committee for the opportunity to testify on behalf of the United Farm Workers regarding the labor movement and immigration policy. I am Marcos Camacho, an attorney in Bakersfield, California, and the General Counsel of the United Farm Workers, the labor union founded by Cesar Chavez.

Agricultural workers have confronted difficulties in immigration policy since the founding of this nation. Our government policies and enforcement efforts have often contributed to an imbalance in power that has subjected farmworkers to poor wages and working conditions.

The Bracero guestworker program became known for its abusive treatment of Mexican workers, despite the existence of protections for wages and benefits, and was finally ended in 1964. When, the farmworkers finally became free to demand better treatment, Cesar Chavez and the United Farm Workers provided a vehicle to dramatically improve the status and treatment of farmworkers in this country.

More recently, the H-2A guestworker program often has provided agricultural employers with workers whose restricted, nonimmigrant status ensures that they will not challenge unfair or illegal conduct. Generally, our guestworker programs have tied workers to a particular employer; if the job ends, the worker may not look for another job and must leave the United States immediately. The guestworker who wishes for a visa in the next year must hope that the employer will request one, because the employers control access to visas. Such workers are often fearful of deportation or not being hired in the following year, and are therefore reluctant to demand improvements. They work very hard for low wages. U.S. workers often recognize that they are not wanted by the employers who use the guestworker system. Currently, there are about 50,000 H-2A jobs approved annually, out of an agricultural work force of 2.5 million.

There are many abuses under the H-2A program ranging from minor to very serious trafficking in human beings. Unfortunately, our government has rarely enforced the protections in the H-2A program. In recent years, the United Farm Workers and the Farm Labor Organizing Committee have been asked by guestworkers from several nationsto help them improve conditions at their jobs in Washington State, Hawaii and North Carolina. We believe that unionization is the best hope that guestworkers have for better treatment and the best hope the government has of removing the H-2A program's reputation for abuse.

Today, we have reached a situation in agriculture that demands urgent action. There are about 2.5 million farmworkers in this country, not including their family members. More than 80% of them are foreign-born, mostly but not all from Mexico. Virtually all of the newest entrants to the farm labor force lack authorized immigration status. The helpful reports from the National Agricultural Workers Survey by the U.S. Department of Labor state that about 53% of farmworkers are undocumented. But most observers believe the figure is 60% or 70%, and much higher in specific locations. Many employers now hire farm labor contractors in the hope that they can shield themselves from liability for hiring undocumented workers in violation of our immigration law and from liability for labor law violations. The labor contractors compete against one another by offering to do a job for less money, and the cut-throat competition means that the workers must take lower wages. When one labor contractor is prosecuted for violating labor laws, he is easily replaced. Our current immigration system is causing employers to attempt to evade responsibility for their employees, while undocumented workers are too fearful of being deported to demand changes. In many cases, due to inadequate enforcement of labor laws, employers take advantage of undocumented workers by subjecting them to illegal wages and working conditions.

When the majority of workers in an economic sector are living in the shadows of society something must be done. The current situation is not good for farmworkers who want to be able to work legally and earn a decent living to support their families. It is not good for employers who want to hire people without worrying that they will be raided by the immigration service at the peak of the harvest of their perishable fruits and vegetables. It is not good for the government, which needs to know who is working in our economy and living among us. But it is no answer to say we will deport them and start again. The growers need these experienced workers to cultivate and harvest their crops. In fact, many growers contend that there are labor shortages in some areas because undocumented workers are too fearful of immigration raids to come to the open fields.

The United Farm Workers recognized several years ago that the status quo needed to be remedied. We also recognized that some of our long-held beliefs would need to be modified if we were to achieve any sort of reform. During the late 1990's, we strenuously and successfully opposed efforts in the House and Senate by agricultural employers to weaken H-2A protections and procedures and transform most farmworkers into vulnerable guestworkers with no path to citizenship. Our successful opposition led to a stalemate since we did not have the legislative support needed to enact our ideas about immigration and labor reform.

With the help of our good friend, Rep. Howard Berman, and other members of Congress, we entered into arduous negotiations with key leaders of the agricultural employers in the United States and other members of Congress, particularly Senator Larry Craig, Senator Edward Kennedy, and Rep. Chris Cannon. In 2000, we reached agreement on the Agricultural Job Opportunities, Benefits and Security Act, or "AgJOBS." AgJOBS has undergone several revisions over the years to build greater support for passage. Sen. Dianne Feinstein is now a strong supporter of AgJOBS. We

2

remain strong partners with agricultural employers to win passage of this important legislation despite many other differences between us. In 2006, the Senate included AgJOBS in the comprehensive immigration reform it passed. We are now seeking to pass AgJOBS as part of comprehensive immigration reform in 2007. We have been working with the White House and several Senators to bring AgJOBS to a conclusion.

AgJOBS would provide agricultural employers and the nation with a legal, stable, productive workforce while ensuring that basic labor protections would apply to farmworkers. AgJOBS has two parts. First AgJOBS would create an "earned adjustment" program, allowing many undocumented farmworkers to obtain temporary resident status based on past work experience with the possibility of becoming permanent residents through continued agricultural work. Second, it would revise the existing H-2A agricultural guestworker program.

The earned legalization program certainly should not be called "amnesty." It is a difficult two-step process. The applicants for earned legalization will have to show that they have worked at least 150 days in U.S. agriculture during the past two years, and then must work at least 150 days per year in each of three years or at least 100 days per year in each of five years. Farmworkers will also have to show that they have not been convicted of a felony or serious misdemeanors. Spouses and minor children of the farmworkers will be eligible for a temporary status, too.

If they fulfill their obligations, they will be granted a green card for permanent resident status. They will have to pay substantial fees and fines at both steps. (Under the compromise worked out with the White House, farmworkers also will have to learn English, demonstrate that they have paid taxes during their prospective work period, return to their homeland to file the application for a green card with a U.S. consulate in their home country, and wait for the green card for 3 to 5 more years until backlogs in immigration applications have been cleared.). We expect that roughly 800,000 farmworkers will be eligible for this program, although such predictions are mere guesses. Through this multiyear process, the United States will have a stable, legal farm labor force that is highly productive.

This is a tough program. Farm work is dangerous, difficult, seasonal and low-paid. This truly will be an *earned* legalization.

AgJOBS also would revise the H-2A guestworker program. We feel that we made painful concessions to achieve this compromise. The program's application process will be streamlined to become a "labor attestation" program similar to the H-1B program, rather than the current "labor certification" program. This change reduces paperwork for employers and limits the government's oversight of the employer's application. AgJOBS would retain both the "prevailing wage" and "adverse effect wage rates," but would effectively lower the H-2A wage rates by about $1.00 per year (to the 2003 adverse effect wage rates, which are issued by state), and freeze them for three years. The Government Accountability Office and a special commission would make recommendations to Congress about the wage rates within 3 years. If Congress has not

acted within 3 years, then the wage rates will be adjusted by the previous years' inflation rate. In addition, for the first time, farmworkers would have a right to file a federal lawsuit to enforce their H-2A job terms. AgJOBS also would allow some flexibility in the minimum wages and benefits when the workers at an H-2A employer are represented by a bona fide labor union under a collective bargaining agreement.

We believe that AgJOBS is a reasonable compromise under the circumstances. To conclude, we recommend the following: (1) We encourage you to pass AgJOBS. (2) Congress and the Administration should be vigilant about abuses under guestworker programs. Strong enforcement of the labor protections for guestworkers will prevent guestworkers from being exploited, prevent the wages and working conditions of United States workers from being undermined, and will take away the incentive that employers have to hire guestworkers rather than U.S. workers, including those who would earn legal immigration status under the AgJOBS earned legalization program. (3) Congress needs to adopt protections against abuses associated with foreign labor contracting. The U.S. Government is refusing to look at the abuses that occur during the recruitment of guestworkers in the foreign country. Yet, those abuses abroad, including payment of high recruitment fees, result in mistreatment of guestworkers on the job in the U.S., because the guestworkers must work to the limits of human endurance and avoid deportation at all costs to pay back those fees. The labor contractors' interest in such recruitment fees may have led to the murder earlier this year in Monterrey, Mexico, of Santiago Rafael Cruz, who was helping Mexican citizens employed as guestworker for North Carolina growers under a collective bargaining agreement with the Farm Labor Organizing Committee, AFL-CIO. (4) We also ask you to recognize that the best protection workers – both U.S. and foreign -- have at an employer that participates in a guestworker program is a labor union. Government policy should promote collective bargaining to reduce abuses under guestworker programs and give workers a meaningful voice at work.

Thank you for this opportunity to testify before the Committee on these important and timely issues.

**On Labor Day**
**More for farmers? Not unless farmworkers are considered**

Arturo S. Rodriguez
San Francisco Chronicle
Monday, September 3, 2007

Margarita Gonzalez, 47, dreads summer and picking table grapes in the hot sun. California heat regulations are supposed to protect her and other farmworkers from heat exposure, but too often, those laws are not enforced.

"We sweat a lot and feel like fainting," she said. "We want to sit in the shade, but we know, if we sit down, we will get fired."

Margarita is not alone. In as little as six weeks and with very limited resources, the UFW has been able to document hundreds of violations at dozens of farms statewide that employ more than 45,000 farmworkers. Farmworkers, like Margarita, are suffering daily and being denied shade, clean water and rest breaks.

For more than 40 years, the UFW has worked with legislators from both parties to write laws to protect farmworkers. However, the scale of the agricultural industry - with more than 400,000 farmworkers moving between 80,000 farms - has meant that good laws are ignored.

At a legislative hearing in July that focused on the state's heat laws not being enforced in farm-working fields, the Department of Occupational Safety and Health's Acting Chief of the Division Len Welsh said inspectors were still adjusting to last summer's regulations:

"We're still ramping up to be honest, to get the word out, to do the enforcement, to hone our approach," he said.

Farmworkers know what happens when it gets too hot and they have no water or shade. We remember the three farmworkers who died last summer due to heat. This is nearly as many deaths as there were the summer before the heat regulations were put in place. The UFW and farmworkers know there isn't time to "hone approaches" when lives are at stake.

At the same hearing, a representative for the Western Growers Association said farmers are working to learn and follow the state's heat rules. Is it that difficult for those not complying to comprehend providing clean water, shade and rest breaks during the hottest time of the year? After all, farmers are able to juggle volatile market prices, equipment costs and control animal and plant diseases.

We know the agricultural industry needs water to thrive. And as the Legislature and governor return to work, the farmers are pushing to ensure water bonds are on the agenda. More water for farmers, but only thirst for farmworkers? This is not acceptable public policy for California. Not when thousands are suffering daily. The UFW calls upon California's voters to remind their representatives in the Legislature of the reality in the fields and that they should not give more to farmers without remembering the farmworkers.

We cannot continue to give more to farmers - more time to comply with existing laws or more water through bonds. Farmers should not get more until farmworkers get at least dignity and human rights.

*Arturo S. Rodriguez is the president of the United Farm Workers.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/09/03/EDA4RRMGA.DTL

This article appeared on page **D - 5** of the San Francisco Chronicle

## Roots of a dilemma
### Out in the fields, farmers sweat out immigration issue

**Sacramento Bee**
**July 2, 2006**
**By Susan Ferriss**

VISALIA -- Deep in the heart of California farm country, 425 Mexican workers fan out through David Jackson's peach and plum trees, not far from the "Under God" banner and the American flag he flies over his orchards.

Wearing work shoes he's not afraid to get muddy, Jackson hops from his pickup and wades out among his workers, taking care not to jostle their ladders.

"See that? Look how professional he is on that ladder," he said, pointing proudly at a man deftly picking only the unblemished, ripe fruit strong enough to survive overnight air shipment to points as distant as Taiwan and England.

The admiration this farmer has for a good hired hand is not diminished by his knowledge that many of his workers are illegal immigrants -- even if that seems to contradict his conservative political views.

But Jackson believes there is a better way and, just a month ago, thought Congress would agree to legalize undocumented farmworkers and start a new guest worker program under a proposal called AgJOBS, the Agricultural Job Opportunities, Benefits and Security Act of 2006.

Now the plan is in limbo, and Jackson feels betrayed by the very Republican politicians and pundits he has long backed with his vote and his money.

"Not even my buddy Rush Limbaugh understands this issue," he said.

### Loyalties clash

Up and down the state that produces much of America's food -- half the country's fruits and vegetables, most of its milk -- and most U.S. farm exports, farmers like Jackson are finding their core values and political loyalties tested by what they consider a disconnect between the realities of politics and of the fields.

"I have never seen a larger base of Republican constituents more enraged or dismayed with their own party," said Luawanna Hallstrom, a Republican tomato grower in San Diego County who has worked on agricultural reform for two decades.

Using her own farm as a case in point, Hallstrom said years of experience has taught her that Americans are not interested in doing the painstaking, backbreaking work needed to hand-harvest her salad tomatoes.

With immigration enforcement never a real threat in the fields, agriculture has come to rely more on undocumented workers than any other U.S. industry. Unauthorized workers could number up to 1.5 million, by some estimates -- more than half of all people on farm payrolls. In some crops and regions, employers say, they represent up to nine in 10 workers.

Manuel Reyes, one of the laborers at Jackson's Family Tree Farms, wiped sweat from his brow as he gently slipped peaches into a bin and talked about his high hopes for AgJOBS. On his crew were people who speak four Mexican Indian languages and hail from some of Mexico's poorest regions.

"I think the majority here would be more than happy to be legal and be free to come and go," Reyes said. "Everybody is talking about it."

Without scorn or judgment, simply because he knows most Americans' skills and ambitions took them beyond fieldwork long ago, the 27-year-old said: "Imagine an American working in here, doing this?"

The $7 an hour Jackson pays is a small fortune for an illegal Mexican immigrant with an eighth-grade education, especially compared with the $7 a day he might make back home.

As workers heated meat and tortillas under a tree canopy nearby, Jackson said, "I don't see them as any different from my father who came from Tennessee." Their children progress, too, Jackson said, like those of a trusted foreman who was an illegal immigrant until a 1986 amnesty for undocumented workers. Now, the foreman's daughter is a pre-med student.

Jackson hires his workers through a labor contractor, who in turn has the responsibility of viewing and recording workers' documents. This common arrangement tends to obscure farmers' reliance on undocumented labor.

**Alliances sprout**
Growers knew trouble might mushroom one day, though. In the 1990s, they began to receive letters from the Social Security Administration about employees with mismatched numbers and names, likely from the use of fake numbers. Farmers estimated the employees involved represented an estimated 50 percent to 70 percent of workers on their payrolls.

Furthermore, while California farmers generally have been shielded from labor shortages by the ready flow of immigrants from Mexico and Central America, the recent escalation of public outcry over illegal immigration -- coupled with government crackdowns at the border -- have intensified farmers' interest in the AgJOBS proposal.

One of agribusiness' traditional adversaries, the United Farm Workers union, also backs AgJOBS, and has worked for six years with farmers in an unlikely alliance to design and lobby for it. The UFW and other labor advocates view the reform as a sensible solution for employees, especially if the alternative is offshore migration of farms and jobs.

"We felt that things would never get better for farmworkers unless we changed their status -- again," said UFW President Arturo Rodriguez, referring to the 1986 amnesty program.

AgJOBS would offer a one-time path to legal permanent residency only to those farmworkers who can prove they've worked at least 150 days on U.S. farms before 2006 -- and only if they remain employed in agriculture three to five more years. That would give farmers a stable work force while they transition from undocumented labor.

AgJOBs would also reform the existing H-2A guest worker program, rarely used by farmers who find its regulations too onerous. Under H-2A, the government not only requires employers to provide housing and meals, but has been too slow, critics charge, to certify employers' evidence that domestic workers could not be found for the jobs -- the required first step. AgJOBS would speed up the process and reduce a 300-page application to a single page.

The U.S. Senate included the AgJOBS reforms in an immigration bill approved in May, pairing it with more enforcement at the border and in workplaces. But with fall elections in sight, the House rejected the measure, with some members of Congress vowing instead to stick to legislation passed in December that calls for enforcement alone.

"I have seen a hardening in this place," acknowledged Rep. Dan Lungren, R-Gold River, a guest worker supporter who had hoped to be a key player in now-stymied negotiations between the House and Senate.

For those who have worked longest and hardest on the compromise, optimism is giving way to cynicism.
"For us to be able to sit down with the UFW and the other (worker) advocates, doesn't the Congress see what an accomplishment that is?" asked Manuel Cunha, a citrus grower in the Fresno area who spearheaded farm industry negotiations with the UFW.

Cunha, president of the Fresno-based Nisei Farmers League, is sputtering mad at GOP House Speaker Dennis Hastert of Illinois, whom he accused of tossing aside carefully crafted proposals in order to pander to conservative voters. Cunha, a devoted Republican, claims some GOP farmers might even vote Democratic because they are so upset by what's happening.

"You have people who are afraid of losing the United States heritage, the born-and-bred here, whatever you want to call it," said Cunha, who is of Portuguese descent. "We have become so anti-brown. ... That's a terrible message to send to our children. That's not what America is about."

With the summer harvest well under way, AgJOBS suddenly looks as doomed as a vineyard of ripe wine grapes with no one to pick them.

**Unrealistic options?**
That fear is precisely what has driven Salinas Valley wine grape grower Scott Scheid to spend the past five years traveling to Washington, D.C., to lobby for AgJOBS on behalf of vineyards.

Scheid Vineyards is one of the biggest in California, growing thousands of acres of grapes in a region famous for a cornucopia of grapes, broccoli, lettuce, strawberries and other crops.

The company employs about 270 workers, many nearly year round, paying them more than $9 an hour plus health and vacation benefits. The workers prune vines and harvest grapes under a negotiated UFW contract. But that doesn't mean all of them are legal.

"If everyone was gone from here, would others take these jobs?" Scheid asked. "Would people drive 100 miles to come here? Or do we shut it all down and wait for people to come here? That's unrealistic."

Joining an exodus of men from his hometown in Mexico at the age of 17, Scheid worker Miguel Garcia arrived six years ago in the Salinas Valley. "I don't mind continuing to work in the fields," he said, especially if the tradeoff is legal residency. "Farmwork is the kind of knowledge I've developed since I was a child."

As evidence that reform is needed, farmers delivered to Congress reports on their experience during a 1998 labor shortage, when Cunha's group organized farmers to advertise job openings in 10 California counties. Even with opportunities to earn up to $15 an hour, he said, it was next to impossible to find legal workers.

Out of 137,000 able-bodied candidates identified by welfare agencies on the Central Coast and in the San Joaquin Valley, only 503 applied for work. "You know how many actually came to work?" Cunha asked. "Three."

After the Sept. 11, 2001, terrorist attacks, tomato grower Hallstrom participated in her own, unexpected hiring experiment.

Her company, Harry Singh & Sons, leases land on Camp Pendleton, a U.S. Marine base. Hallstrom lost most of her work force when a post-Sept. 11 security check of military installations found 75 percent of her workers were undocumented.

Desperate for workers she could be sure were legal, Hallstrom advertised. Nobody came. She turned to the H-2A program, which was so slow in authorizing workers, she said, $2.5 million worth of tomatoes rotted on the vine.

"It really shed a light on the fact that there were not enough legally documented farmworkers to do this," she said. "It wasn't us crying wolf."

Since then, however, Hallstrom has successfully brought in guest workers under the H-2A program, and she's paid the price. Not only must housing, meals and transportation be provided to workers, but wages must meet the prevailing rate, this year about $9 an hour for Hallstrom.

Though a minuscule 2 percent of farmers use H-2A, many consider it an important option if the U.S. government succeeds in sealing the border and begins requiring employers to check workers' legal status through national databases. If shortages develop, farmers may find housing requirements and other provisions less of an obstacle.

Americans' general ignorance of how their food and drink are produced, farmers say, has allowed immigration hard-liners to attack policies that make perfect sense to the agriculture industry.

"Anybody who says they'll pay $10 for a head of lettuce so workers don't have to be here is just talking big," Cunha said. "How will they buy those DVDs they want, eat in those nice restaurants and go to hotels?"

He fumed about claims on talk shows that do not match his reality, including one assertion that labor costs are only 10 percent of farm production. To produce fruits and vegetables in California, labor is more than 30 percent of cost, according to federal agricultural officials.

To lessen the need for field workers, one option mentioned in Washington these days is mechanization.

"You can only change a diaper on a baby by hand," Cunha said, adding that if consumers want fresh produce like delicate berries and salad tomatoes, then they should welcome the workers willing to pick them by hand.

**'Fantasyland' solution**
The views of one particularly outspoken conservative congressman from Orange County elicit snorts, eye rolls and sighs in California's farm country.

"I say let the prisoners pick the fruit," Rep. Dana Rohrabacher, R-Huntington Beach, said in May at a Capitol news conference to denounce the Senate bill.

In a recent interview, Rohrabacher said his suggestion was serious, not sardonic.
"It is not in the interest of our country to legalize the status of anyone who is in the country illegally," he said. "We should see if there's a way to do this without having a guest worker program," because of the "horrible side effects" of relying on foreign workers.

To fill farm jobs, Rohrabacher said, "We have a massive resource with prisoners. Prisons quite often are near agricultural areas." The prisoners could keep half their earnings and prisons could keep the rest, he said.

Rohrbacher accused agribusiness of going "down the wrong strategic road" and said that, "as the Senate proposal goes down in flames, they are going to be looking for alternatives."

Out in the orchards of Family Tree Farms, however, the idea of prisoners picking peaches under armed guard doesn't fly.

The Jacksons consider it risky to trust a revolving group of felons with the fruits of their multimillion-dollar enterprise, where hired hands must not only be willing to endure sweltering heat, but also able to master the use of special tools and proper growing techniques.

To them, it seems particularly foolish for an enterprise with standards so high that fruit is inspected in person by retail buyers and foreign government officials.

In fact, the prisoner idea, said Jackson's son, Rick, is something out of "Fantasyland… It's not going to happen. It's so crazy, I can't even comment on it."

**The march toward AgJOBS**
**1986:** Immigration Reform and Control Act legalizes farmworkers and many other illegal immigrants. IRCA imposes new penalties for hiring illegal immigrants and requires employers to view and file documents that prove a right to work.

**1990s:** Legal workers leave farmwork for other jobs, increasing the flow of undocumented workers. Few employers use an existing H-2A seasonal farmworker program. Growers say it is too slow and costly and labor advocates denounce it for limiting workers' rights. While growers later lobby to change H-2A, labor argues their proposals still limit rights, including to sue or to earn legal permanent residency and citizenship.

**December 1999:** Rep. Howard Berman, D-North Hollywood, urges the United Farm Workers president to sit down with the farm industry to design a new H-2A and legalization program with more rights for workers.

**March- September 2000:** The UFW and national farm industry representatives negotiate. Florida Legal Services and plant nursery groups also are involved. September 2000: Both sides compromise on a proposal to allow undocumented farm workers and their immediate families to earn legal permanent status if workers continue in agriculture. Agreement is reached to streamline H-2A approval procedures in periods of shortage. The compromise preserves wage protections, and for the first time, allows H-2A workers to sue in federal court.

**December 2000:** Lame duck Congress adjourns before approving a bill, even though leaders of both parties in the House of Representatives support the idea. Mexican President Vicente Fox takes office and becomes the first Mexican president to call, with President Bush, for guest worker visas.

**May-June 2001:** UFW and the farm industry come up with separate Senate bills for reforms sponsored by Sens. Edward Kennedy, D-Mass, and Larry Craig, R-Idaho.

**2001-2003:** After Sept. 11 attacks, immigration reform stalls. Labor and industry return to talks, but disagreements again develop.

**Summer 2004:** The earlier compromise is revived and the resulting program, dubbed AgJOBS, is co-sponsored by 63 senators, half Republican. The White House blocks a floor vote.

**February 2005:** AgJOBS is introduced to a new Congress by bipartisan House legislators, bolstered by joint public appearances by UFW and growers.

**December 2005:** The House votes for more border security, and making illegal immigration a felony. It rejects legalization, including AgJOBS.

**April 2006:** UFW President Arturo Rodriguez signs a contract with Global Horizons, one of the biggest suppliers of H-2A workers to U.S. companies.

**May 2006:** A Senate majority approves tougher enforcement at the border and in the workplace, but also includes AgJOBS, which would legalize up to 1.5 million and offer an earned legalization option for millions of other illegal immigrants. The Senate bill also expands the supply of visas for future nonfarm guest workers, with a long path to legal residency. Most H-2A workers still would be barred from earning legal residency, a compromise by labor.

**June 2006:** With November's election looming, the House declines to negotiate with the Senate and calls for town hall meetings this summer on illegal immigration

## Ag rivals unite for workers program
**Immigration policy reform brings together growers and UFW.**

By Dennis Pollock
The Fresno Bee
Sunday, January 29, 2006

The debate over the necessity of a guest-worker program has made for some strange bedfellows.

One of the most unusual coalitions is that among the United Farm Workers, the Nisei Farmers League in Fresno and the Western Growers Association in Irvine.

The alliance between the UFW and grower groups would have been unthinkable 30 years ago. It exemplifies how dire some view the need for significant reform of the nation's immigration policy.

"If the UFW and growers can put aside decades of bitter conflict, there should be some way to get a bipartisan solution to this," said Marc Grossman, a UFW spokesman.

The Nisei Farmers League traces its very beginnings to the fields in 1970 when the UFW sought to unionize workers as the union and farmers clashed.

It was formed to fight the union.

As recently as September 2002, San Joaquin Valley farm leaders gathered at Nisei offices to oppose UFW-backed bills in the state Legislature.

Harry Kubo, the league's founder, showed up with a "proud to be a farmer" button and some UFW bumper stickers from the early 1970s, a time when growers and union activists squared off.

Two years later, the heads of both organizations — Manuel Cunha Jr., president of the Nisei Farmers League, and Arturo Rodriguez, UFW president — stood together behind a lectern at a Fresno luncheon for the first time to talk of the need for the AgJobs bill they helped craft.

That bill, backed by many Valley members of Congress, is favored in the U.S. Senate but faces opposition in the House. The bill is a proposal that would grant legal status to laborers who comply with certain criteria for continued work in farming.

Upon the bill's enactment, workers would have to show that they had worked at least 100 days in farming in the 18 previous months.

They would also have to work at least 70 days in farming per year for three years and could receive "an earned adjustment of status" — U.S. citizenship — six years after the law's enactment.

The Border Protection, Antiterrorism and Illegal Immigration Control Act, which has no guest-worker provision, has the backing of at least two California congressmen who said they expect a more comprehensive bill to emerge.

Gold River Republican Dan Lungren said a "comprehensive approach" is necessary. He has floated some proposals that include granting legal residency to immigrants who agree to perform national community service.

Palm Springs Republican Mary Bono pointed out that the state, and the area she represents, "has a huge agricultural base that depends on a strong labor force," and any comprehensive immigration reform "must be paired with a guest-worker program."

Cunha said relying solely on a border security bill "would just shut down the country."

Pat Ricchiuti, president of the Fresno County Farm Bureau, said only tightening the border means "we're almost biting the hand that feeds us, shooting ourselves in the foot."

Tim Chelling, spokesman for the growers association, said the shortage of labor in agriculture "may be the first symptom of a very sick immigration policy."

The reporter can be reached at dpollock@fresnobee.comor (559) 441-6364.



Published October 14, 2007

## Brasher: Immigration issue threatens legislation
### Immigration proposal for farm bill highlights predicament
### WASHINGTON FARM REPORT

By PHILIP BRASHER
REGISTER WASHINGTON BUREAU

Washington, D.C. - The Senate has had enough trouble trying to write a farm bill as it stands, but there's one issue that could complicate matters further - immigration.

Senate Majority Leader Harry Reid, D-Nev., pledged in June to try to add provisions for farm workers who are here illegally to the farm bill.

Now, backers of the farm worker legislation, known as the AgJOBS bill, are trying to round up the 60 votes needed to overcome a filibuster.

The legislation could benefit produce growers and dairy farms as well as custom harvesters and seed companies, who rely on foreign workers to detassel corn.

Under the bill, immigrants could obtain legal status if they have been working on farms for at least two years. More than 800,000 workers, plus their spouses and minor children, could qualify. The legislation also would overhaul a visa system that farmers say is too restrictive and costly.

"It would provide American agriculture with a stable work force that is treated fairly and ensure a productive agricultural sector," says Bruce Goldstein, executive director of Farmworker Justice, an advocacy group.

But Reid's promise, which he made to Sen. Dianne Feinstein, D-Calif., on the Senate floor, won't be easy to fulfill.

Farmers have been warning that crops will rot in the fields if they don't get more workers, or some production is going to move out of the country entirely.

But immigration is a toxic issue for many in Congress after the failure of the Bush administration's broader overhaul.

Republicans have warned that the farm worker bill would need major changes.

And a federal judge last week took some heat off farmers and other employers by temporarily blocking a rule that they fire workers whose names don't match their Social Security numbers.

The Senate Agriculture Committee is set to take up the farm bill the week of Oct. 22, three months after the House passed its version of the bill.

The committee's chairman, Sen. Tom Harkin, is a co-sponsor of the farm worker legislation. But he already has been struggling for weeks to get agreement on a range of issues, from subsidy levels to conservation and rural development, and he has no plans to include immigration in his draft legislation, according to his staff.

The American Farm Bureau Federation supports the farm worker legislation, but doesn't want it added to the farm bill.

"The issue of immigration itself is problematic. The farm bill, given its own difficulties with the budget and other things, we don't think lends itself being a vehicle to resolve that issue," said Paul Schlegel, who follows the issue for the Farm Bureau.

But there aren't many other options for AgJOBS advocates, who argue that it only makes sense to address farm worker issues in a farm bill. "The farm bill establishes our policies for the agricultural sector. Farm workers should be included in the farm bill," said Goldstein.

Craig Regelbrugge, who co-chairs a coalition of agribusiness groups pushing for the farm worker provisions, puts it this way: "While we're worrying about finding money for (agricultural) disasters, we've got a labor disaster under way."

If the farm worker legislation "has the votes, it doesn't kill the farm bill," he said. "If it doesn't have the votes, it falls away."

**U.S. Seeks Rules to Allow Increase in Guest Workers**
By Steven Greenhouse
The New York Times
October 10, 2007

Bush administration officials said yesterday that they were developing new rules so the nation's farmers could bring in more foreign guest workers to prevent a recurrence of problems like growers' letting their fruit rot because there were not enough laborers for the harvest.

Farm groups have long pressed the administration to eliminate hurdles that make it hard to bring in guest workers, saying they face a crisis because stepped-up federal immigration enforcement has reduced the number of farm workers. By many estimates, more than half of the nation's 2.5 million farm workers are illegal immigrants.

Administration officials said they saw a need to make procedural changes and larger regulatory changes in the guest worker program after Congress killed an immigration overhaul last summer.

"The current temporary agricultural worker program has become too antiquated and too cumbersome to be used effectively by producers," said a White House spokesman, Scott Stanzel. "The program needs to be updated to reflect today's economy and to utilize technological and other advances."

Under the H-2A program, farmers can bring in temporary workers after demonstrating that American workers are not interested in the jobs and after going through a lengthy application process. Currently, they bring in about 50,000 such workers a year.

After President Bush called for changes in the program on Aug. 10, the White House, the Department of Labor and the Department of Homeland Security solicited recommendations from farm groups on how to streamline the program.

The administration is pressing ahead on that effort, first reported in The Los Angeles Times, after some growers in the Northwest let their cherries and apples rot because of a shortage of workers and after some growers in North Carolina did not plant cucumbers this year because they feared not having enough workers for the harvest.

The National Council of Agricultural Employers has written to the administration to urge changes like speeding up the H-2A application process, easing housing requirements for guest workers, reducing the required wage for these workers and increasing the types of work they are allowed to do — poultry processing might be included, for instance. Grower groups have also urged the administration to ease requirements that they run newspaper advertisements to determine whether American workers want the jobs.

The council's executive vice president, Sharon M. Hughes, said the application process often took so long that by the time some farmers obtained guest workers the harvest was over. Ms. Hughes said the number of farm workers available was down about 200,000, or nearly 10 percent, from last year because of more aggressive border enforcement.

"Right now," she said, "the H-2A program provides about 2 percent of the farm work force and for us to try to double that number with the current government infrastructure would cause it to collapse on itself unless we have these reforms."

The executive vice president of the Western Growers Association, Jasper Hempel, said: "We're caught in a vise. When labor isn't available, we have a legal program using H-2A, but many farmers can't use that program because there are so many impediments. They throw up double requirements. They don't process papers when they say they will. There isn't enough staff."

Grower groups say that even more than administrative changes, they would prefer enacting stalled legislation that would greatly streamline the H-2A program and create a path to citizenship for many undocumented farm workers.

A Labor Department spokesman, David James, said the administration was mindful of the farmers' concerns.

"The Department of Labor," Mr. James said, "is now in the process of identifying ways the program can be improved to provide farmers with an orderly and timely flow of legal workers while protecting the rights of both U.S. workers and foreign temporary workers."

Advocates for farm workers have voiced dismay about the administration's plans and the industry's recommendations.

"The industry's demands would amount to a cheap foreign labor policy," said Bruce Goldstein, executive director of Farmworker Justice. "They would make it easier for employers to bring in guest workers and slash wage rates and other labor protections."

The administration also faces criticism from conservative groups that dislike bringing in more immigrants.

"If there is a demonstrable need for the workers, we have no objection to bringing them in," said Ira Mehlman, a spokesman for the Federation for American Immigration Reform, which opposes liberalizing immigration rules. "But here they're trying to tip the balance in favor of employers. The administration wants not just to cut down on administrative procedures, but to bypass the whole process that has been put in place to protect American workers."

**U.S. lets in more immigrants for farms**
The administration is quietly relaxing visa regulations because farmworkers are in critically short supply.

By Nicole Gaouette
Los Angeles Times
October 7, 2007

WASHINGTON - With a nationwide farmworker shortage threatening to leave unharvested fruits and vegetables rotting in fields, the Bush administration has begun quietly rewriting federal regulations to eliminate barriers that restrict how foreign laborers can legally be brought into the country.

The effort, urgently underway at the departments of Homeland Security, State and Labor, is meant to rescue farm owners caught in a vise between a complex process to hire legal guest workers and stepped-up enforcement that has reduced the number of illegal planters, pickers and middle managers crossing the border.

"It is important for the farm sector to have access to labor to stay competitive," said White House spokesman Scott Stanzel. "As the southern border has tightened, some producers have a more difficult time finding a workforce, and that is a factor of what is going on today."

The push to speedily rewrite the regulations is also the Bush administration's attempt to step into a breach left when Congress did not pass an immigration overhaul in June that might have helped American farms. Almost three-quarters of farmworkers are thought to be illegal immigrants.

On all sides of the farm industry, the administration's behind-the-scenes initiative to revamp H-2A farmworker visas is fraught with anxiety. Advocates for immigrants fear the changes will come at the expense of worker protections because the administration has received and is reportedly acting on extensive input from farm lobbyists. And farmers in areas such as the San Joaquin Valley, which is experiencing a 20% labor shortfall, worry the administration's changes will not happen soon enough for the 2008 growing season.

"It's like a ticking time bomb that's going to go off," said Luawanna Hallstrom, chief operating officer of Harry Singh & Sons, a third-generation family farm in Oceanside that grows tomatoes. "I'm looking at my fellow farmers and saying, 'Oh my God, what's going on?' "

Officials at the three federal agencies are scrutinizing the regulations to see whether they can adjust the farmworker program, an unwieldy system used by less than 2% of American farms to bring in foreign workers. They are considering a series of changes, including lengthening the time workers can stay, expanding the types of work they can do, simplifying how their applications are processed, and redefining terms such as "temporary."

Administration sources said they were moving aggressively. They declined to discuss details of the proposals.

The agencies are also working on possible changes to a separate visa program, H-2B, which brings in seasonal workers for resorts, clam-shucking operations and horse stables, among other businesses.

The administration has pursued the project discreetly. The issue of immigration has generated friction between President Bush and the conservative wing of the Republican Party, which has strongly opposed many of the initiatives that Bush has pursued.

The changes to the H-2A visa program comprise one of more than two dozen initiatives the administration announced in August. Most of the initiatives dealt with increased enforcement, the most prominent being a measure that would force employers to either fire workers for whom they've received "no match" notification (indicating their W-2 data don't match Social Security Administration records) or face punitive action from the Department of Homeland Security. When Homeland Security Secretary Michael Chertoff announced the enforcement push, he also acknowledged the problems that agriculture reported.

"Even putting aside no-match letters, just our increased work at the border was actually causing a drop in the number of workers coming across," Chertoff said.

David James, an assistant secretary of Labor, said Bush asked his department, which has jurisdiction over most H-2A rules, to review the entire program. The agency "is now in the process of identifying ways the program can be improved to provide farmers with an orderly and timely flow of legal workers while protecting the rights of both U.S. workers and foreign temporary workers," James said.

The current program, managed by all three agencies, is famously dysfunctional.

Farmers have to apply for workers about a month in advance, but the agencies often fail to coordinate their response in time for the harvest, which farmers can't always predict. At Hallstrom's farm, where tidy rows of tomato plants run almost to the ocean's edge, half of the 1,000 workers are in the H-2A program. (Nationally, about 60,000 H-2A applications a year are usually filed, compared with more than 3 million farm jobs to be filled. There is no cap on the number of H-2A workers allowed into the U.S.)

She remembers submitting an emergency request for H-2A workers one year and getting the visas 60 days later. She said the laborers spent two weeks pulling rotten fruit off the vines, and the farm lost $2.5 million. "Devastating," Hallstrom said.

Growers also complain about paying for workers' housing, transportation, visas and other fees. Harry Yates, a North Carolina Christmas-tree grower, estimates that his labor costs for H-2A workers are $14 an hour, compared with a competitor whose illegal laborers cost about $7.50 an hour. Like other farmers, Yates said using the H-2A program was an invitation to lawsuits from worker advocates and frequent government investigations.

"I understand why so many growers are afraid to use this program. It is too expensive, too complicated, too slow and too likely to land you in court," Yates said.

Some advocates for workers fiercely dispute this. They say farmers just want to keep wages low.

"The employers want to be free of government oversight, legal-services representation for the guest workers, and other efforts to enforce the modest H-2A worker protections," said Bruce Goldstein, executive director of the advocacy group Farmworker Justice, which is affiliated with the nonprofit National Council of La Raza.

Industry lobbyists have sent the Bush administration a set of detailed suggestions for overhauling the H-2A program through administrative changes, which could take weeks to put in place, and through changes in the regulations, a process that takes months.

Some of the suggestions under consideration include changing the procedures farmers must use to try to hire U.S. citizens first. Currently farmers have to advertise the jobs, then submit applications to Labor and Homeland Security to bring in foreign workers. Growers would prefer to move to a system in which they pledged that they had done all they could to recruit U.S. workers, but no longer had to submit an application to Labor.

Other changes under consideration would simplify the detailed H-2A housing requirements, extend the definition of "temporary" beyond 10 months, and expand the definition of "agricultural" workers to include such industries as meatpacking and poultry processing.

nicole.gaouette@latimes.com <mailto:nicole.gaouette@latimes.com>

Times staff writer Walter F. Roche Jr. contributed to this report.

# COMPREHENSIVE IMMIGRATION REFORM: LABOR MOVEMENT PERSPECTIVES

# HEARING

BEFORE THE

## SUBCOMMITTEE ON IMMIGRATION, CITIZENSHIP, REFUGEES, BORDER SECURITY, AND INTERNATIONAL LAW

OF THE

# COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

MAY 24, 2007

## Serial No. 110–40

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://judiciary.house.gov

U.S. GOVERNMENT PRINTING OFFICE

36–605 PDF                WASHINGTON : 2007

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

Ms. LOFGREN. Mr. Goldstein.

## TESTIMONY OF BRUCE GOLDSTEIN, EXECUTIVE DIRECTOR, FARMWORKER JUSTICE, ON BEHALF OF MR. MARCOS CAMACHO, GENERAL COUNSEL, UNITED FARM WORKERS OF AMERICA.

Mr. GOLDSTEIN. Thank you to the Chair and to the Members of this Committee for the opportunity to testify on behalf of the United Farm Workers regarding the labor movement and immigration policy.

Agricultural workers have confronted difficulties in immigration policy since the founding of this Nation. Our government policies and enforcement efforts have often contributed to an imbalance in power that has subjected farm workers to poor wages and working conditions. The Bracero program became known for its abusive treatment of Mexican workers despite the existence of protections

for wages and benefits, and was finally ended in 1964. When the farm workers became free to demand better treatment, Cesar Chavez and the United Farm Workers provided a vehicle to dramatically improve the status and treatment of farm workers in this country.

Now we have the H-2A guest worker program, which was created at the same time as the Bracero program, and it is quite similar to it. Generally, our guest worker programs have tied workers to a particular employer. If the job ends, the worker may not look for another job and must leave the United States immediately. The guest worker who wishes for a visa the next year must hope that the employer will request one because the employers control access to visas. Such workers are often fearful of deportation or of not being hired in the following year, and are therefore reluctant to demand improvements. They work very hard for low wages. U.S. workers often recognize that they are not wanted by employers who use the guest worker system. Currently, there are about 50,000 H-2A jobs approved annually out of an agricultural workforce of about 2.5 million.

There are many abuses under the H-2A program, ranging from very minor to very serious trafficking in human beings. Unfortunately, our government has rarely enforced the protections in the H-2A program. Today, on page 3 of *The New York Times*, there is a report about the visas and the H-2A program, including the murder of an organizer of the Farm Labor Organizing Committee, AFL-CIO, while organizing in Mexico.

In recent years, the United Farm Workers Union and the Farm Labor Organizing Committee have been asked by guest workers from several nations to help them improve conditions at their jobs in Washington State, Hawaii, and North Carolina. We believe that unionization is the best hope that guest workers have for better treatment and the best hope that the government has of removing the H-2A program's reputation for abuse.

Today, we have reached a situation in agriculture that demands urgent action. Between 53 and 70 percent of farm workers are undocumented. In some crops, it is 80 percent. Many employers now hire farm labor contractors in the hope that they can shield themselves from liability for hiring undocumented workers in violation of the immigration law and from liability for labor law violations. In many cases, due to inadequate enforcement of labor laws, employers take advantage of undocumented workers by subjecting them to illegal wages and working conditions.

When the majority of workers in an economic sector are living in the shadows of society, something must be done. The current situation is not good for farm workers who want to be able to work legally and earn a decent living to support their families. It is not good for employers who want to hire people without worrying that they will be raided by the Immigration Service at the peak of their harvest of their perishable fruits and vegetables. It is not good for the government, either.

The United Farm Workers Union recognized several years ago that the status quo needed to be remedied. We prevented legislation from being passed that would have transformed agriculture into a harsh guest worker program with no path to citizenship, but

38

we were unable to pass the kind of legislation that we preferred. With the help of Representative Berman and other Members of Congress, we entered into arduous negotiations with key leaders of agricultural employers in the United States and other Members of the Congress. The result was AgJOBS. The "AgJOBS," the Agricultural Job Opportunities, Benefits and Security Act, would provide agricultural employers and the Nation with a legal, stable, productive workforce while ensuring that basic labor protections would apply to farm workers. AgJOBS has two parts.

First, AgJOBS would create an earned adjustment program, allowing many undocumented farm workers to obtain temporary resident status based on past work experience with the possibility of becoming permanent residents through continued agricultural work. Second, it would revise the existing H-2A program. The Earned Legalization program certainly should not be called "amnesty." This is a tough program. Farm work is dangerous, difficult, seasonal, and low-paid. This truly will be an earned legalization. Applicants will have to work 3 to 5 additional more years in agriculture to earn their green cards.

To conclude, we recommend the following. We encourage you to pass AgJOBS. Congress and the Administration should also be vigilant about abuses under guest worker programs. Strong enforcement of labor protections is needed. Congress also needs to adopt protections against abuses associated with foreign labor contracting. The U.S. Government should be looking to the recruitment systems abroad that bring workers into the United States.

Thank you very much for the opportunity to testify today.

Ms. LOFGREN. Thank you very much.

U.S. House of Representatives
Committee on Agriculture

Hearing on the Labor Needs of American Agriculture

October 4, 2007

Bruce Goldstein
Executive Director
Farmworker Justice

Mr. Chairman and Members of the Agriculture Committee, thank you for the opportunity to testify today on the labor needs of American agriculture. My organization, Farmworker Justice, is a 26-year old national advocacy group that seeks to empower migrant and seasonal farmworkers to improve labor rights, immigration policy, and occupational safety and health. We have numerous publications on the issues the Committee is considering; I invite Members to visit our website, www.farmworkerjustice.org, to take advantage of these resources.

Congress needs to address the farm labor problem in this country now. A conflict over policy has been festering since 1995. A remarkable compromise endorsed by farmworker unions, agricultural employers, and a wide array of other constituencies has won substantial support from Republicans and Democrats across the ideological spectrum. The majority of responsible legislators should assert themselves and end the stalemate.

The principal farm labor problem is that the majority of farm workers in the United States are undocumented. Out of about 2.5 million agricultural employees in the U.S., probably 60% or 1.5 million, possibly more, are immigrants who are not authorized to work.

The presence of so many undocumented workers in an occupation translates into weak bargaining power for all farmworkers. Most are too fearful of deportation to challenge unfair or illegal conduct or join a labor union. Even the citizens and authorized immigrants are reluctant to make demands on their employers if they won't have the support of their exploitable co-workers. The consequences of this untenable situation are serious. Farmworkers' incomes are very low, usually less than $13,000 a year. Housing is scarce and often decrepit. Very few farmworkers receive even basic fringe benefits, such as paid sick leave or holidays. Health care is rarely offered to farmworkers by their employers, and the undocumented and even new authorized immigrants to the U.S. are not eligible for Medicaid or other public benefits. Agriculture is ranked among the three most dangerous jobs in the United States. Without a legal immigration status, farmworkers find it difficult to win better job terms or government policy..

Employers who hire farmworkers now face a greater threat of immigration raids, border control and other immigration enforcement that can deprive them of an adequate labor force. Many growers have sought to evade immigration law sanctions by using farm labor contractors to recruit and supervise workers in the fields. Some growers frivolously claim that they are not the "employer" of the farmworkers in their fields and that only the labor contractor is liable for violations of immigration and labor laws.

Of course, agricultural employers should end labor contracting abuses and improve wages and working conditions to attract job applicants and retain them. Congress should end the discrimination in overtime pay, safety and health regulations, and other laws that deprive of farmworkers of needed labor protections that other employees enjoy. The government also needs to increase its labor law enforcement efforts drastically.

The reality is, however, that if we deported a substantial number of undocumented farmworkers there would be a tremendous labor shortage. Robots and other machines are not yet available to replace human beings in harvesting many of the fresh fruits and vegetables we consume.

America needs its farmworkers. We are eating healthier and are buying more fruits and vegetables. In fact, the U.S. Department of Agriculture has good news for us on trade: we are exporting more and more fruits and vegetables to consumers in other nations. The people who create this bounty and place the food on the world's dining tables should be treated with dignity.

We as a nation are concerned about security. We should want to know who is living and working in this country, but we don't really know who is performing more than half the farm work in this country. A responsible solution to this farm labor problem would allow our law enforcement agencies to focus on finding criminals and terrorists, rather than on deporting poor immigrants simply seeking to support their families by producing America's food.

For years, there had been a stalemate in Congress that had three main warring positions. First, we farmworker advocates wanted Congress to follow the precedent of the 1986 immigration law that permitted undocumented farmworkers, after proving their recent agricultural work in the U.S. and complying with other immigration law obligations, to obtain a temporary immigration status and later a permanent status with a path to citizenship. Our argument being that if we need workers in America to perform jobs, we should invite people in as immigrants, rather than as exploitable indentured servants. This country experimented with the massive Bracero guestworker program for 22 years, ending in 1964. Despite significant labor protections in the Bracero program, it was widely recognized as abusive and a national embarrassment. We farmworker advocates had not been successful in our legislative advocacy for a replay of the 1986 legalization program.

Second, many agribusiness groups lobbied heavily in the 1990's for changes to the H-2A agricultural guestworker program. They sought to make it easier for employers to hire guestworkers on temporary work visas with no path to immigration status (or citizenship), lower the program's wage rates dramatically, minimize U.S. workers' opportunities to obtain jobs, weaken housing requirements, prevent guestworkers from obtaining legal aid, and reduce government oversight. The growers sought to transform the farm labor system into a system of exploitable guestworkers and set their wages and other job terms at unconscionably low levels. H-2A workers have little bargaining power: they may not switch employers; they must leave the country when their job ends; if they wish to return the following season they must hope that their employer will apply for a visa for them. Thus, guestworkers lack the economic freedoms and democratic rights that this country prides itself on. The grower groups failed to pass their bill and most eventually began to discuss a compromise. However, some legislators, egged on by

2

some employer organizations and others, have continued efforts to pass similar legislation that also have failed.

Third, there is a group that seeks to do nothing except perhaps allow the problem to worsen as immigration enforcement expands and both farmworkers and employers suffer the consequences.

Doing nothing, in our view, is extraordinarily irresponsible. Congress should end its stalemate. A vocal minority of opponents should not be permitted to perpetuate this absurd status quo. There is a reasonable solution that has widespread support. AgJOBS is the nickname for the Agricultural Job Opportunity, Benefits and Security Act. The United Farm Workers played the leading role in negotiating on behalf of farmworkers with major agribusiness groups to resolve years of harsh conflict. A bipartisan group of legislators in the House and the Senate spent many, many hours ironing out the settlement of hard-fought positions among organizations that had traditionally refused to negotiate with one another.

The bill contains two parts. First, it would create an "earned legalization" program. Applicants could obtain a temporary immigration status by proving that they been employed in U.S. agriculture in the past two years, either as a legal guestworker or as an undocumented worker. If the temporary resident then performs a specified amount of agricultural work, during a three to five year period, he or she could convert to lawful permanent resident status and receive a "green card." Security checks would prevent terrorists, criminals and other unwanted individuals from using the program. During the three to five years of the future work requirement, the participants would be permitted to work for any employer and in any occupation as long as the agricultural work was performed. The farmworker's spouse and minor children also would eventually become eligible to be immigrants. Several hundred thousand current farmworkers would be eligible for this program.

Second, AgJOBS would revise the existing H-2A agricultural guestworker program, which allows employers to hire foreign citizens on temporary, nonimmigrant work visas. The H-2A program's history of abuses made negotiations by farmworker advocates with employers difficult. The reforms would benefit employers by making the program easier and quicker to use and lowering the wage rates. The compromise would retain important wage protections that employers had sought to eliminate. AgJOBS also retains or expands other important labor standards to prevent job losses and wage cuts among U.S. workers (including the participants in the new earned legalization program) and protect foreign workers from exploitation. Regrettably, the compromise would not permit H-2A workers to earn a path to citizenship.

The compromise is win-win-win solution even though (or, perhaps, because) it required painful concessions all around. Farmworkers who earn immigration status would increase their bargaining power with employers. Businesses would obtain a legal, stable labor supply of experienced farmworkers. If labor shortages were to occur in the future, the H-2A program would be available. Moreover, the U.S. government would know who resides within our borders and would be better able to enforce immigration and labor laws in agriculture.

Some object to AgJOBS saying that it's not a good enough deal for agricultural employers; they want the H-2A wage rates lowered even further, the housing requirement stripped out, the

elimination of the job preference for U.S. workers, and other changes. These selfish demands were made in earlier legislation and failed. Congress needs to move forward.

Some opponents argue that people who crossed our borders illegally should not be rewarded with an "amnesty." AgJOBS is not an "amnesty." It contains tough, multi-year work requirements, financial costs, and other obstacles to earn immigration status.

The opponents would preserve the current unacceptable situation. They have no reasonable solution. They certainly have no legislation that could pass Congress. In the meantime, farmworkers face terrible choices, employers risk losing their businesses and this nation continues to allow a situation in which a majority of the employees of an entire economic sector lack authorized immigration status.

We need solutions, not hollow rhetoric or more ideological stalemate. AgJOBS is not perfect but it is a responsible, balanced approach to meet the needs of American agriculture.

Thank you for the opportunity to present testimony on behalf of farmworkers.

# EXHIBIT HH

**UFW Offices**

NATIONAL HEADQUARTERS
P.O. Box 62
29700 Woodford-Tehachapi Road
Keene, CA 93531
(661) 823-6250

DELANO
P.O. Box 130
30168 Garces Hwy
Delano, California 93216
(661) 725-9730
Fax: (661) 725-2135

OXNARD
920 South "A" Street
Oxnard, California 93030
(805) 486-9674
Fax: (805) 486-7224

WATSONVILLE
519 Main Street
P.O. Box 2515
Watsonville, California 95076
(831) 763-4820
Fax: (831) 728-4590

GREENFIELD
293 El Camino Real
P.O. Box 3006
Greenfield, California 93927
(831) 674-0270
Fax: (831) 674-0955

NORTH COAST
1700-D Corby Avenue
Santa Rosa, California 95407
(707) 528-3039
Fax: (707) 573-3726

QUINCY
14 Jefferson Street
Quincy, FL, 32351
Office: (850) 627-2028
Fax: (850) 627-4639

SUNNYSIDE
821 Yakima Valley Highway
Sunnyside, WA
Office: (509) 839-4903
Fax: (509) 839-3870

Testimony of Marcos Camacho
General Counsel, United Farm Workers
Bakersfield, California
Before the Committee on the Judiciary
U.S. House of Representatives
May 24, 2007


Thank you to the Chair and the Members of this Committee for the opportunity to testify on behalf of the United Farm Workers regarding the labor movement and immigration policy. I am Marcos Camacho, an attorney in Bakersfield, California, and the General Counsel of the United Farm Workers, the labor union founded by Cesar Chavez.

Agricultural workers have confronted difficulties in immigration policy since the founding of this nation. Our government policies and enforcement efforts have often contributed to an imbalance in power that has subjected farmworkers to poor wages and working conditions.

The Bracero guestworker program became known for its abusive treatment of Mexican workers, despite the existence of protections for wages and benefits, and was finally ended in 1964. When, the farmworkers finally became free to demand better treatment, Cesar Chavez and the United Farm Workers provided a vehicle to dramatically improve the status and treatment of farmworkers in this country.

More recently, the H-2A guestworker program often has provided agricultural employers with workers whose restricted, nonimmigrant status ensures that they will not challenge unfair or illegal conduct. Generally, our guestworker programs have tied workers to a particular employer; if the job ends, the worker may not look for another job and must leave the United States immediately. The guestworker who wishes for a visa in the next year must hope that the employer will request one, because the employers control access to visas. Such workers are often fearful of deportation or not being hired in the following year, and are therefore reluctant to demand improvements. They work very hard for low wages. U.S. workers often recognize that they are not wanted by the employers who use the guestworker system. Currently, there are about 50,000 H-2A jobs approved annually, out of an agricultural work force of 2.5 million.

There are many abuses under the H-2A program ranging from minor to very serious trafficking in human beings. Unfortunately, our government has rarely enforced the protections in the H-2A program. In recent years, the United Farm Workers and the Farm Labor Organizing Committee have been asked by guestworkers from several nationsto help them improve conditions at their jobs in Washington State, Hawaii and North Carolina. We believe that unionization is the best hope that guestworkers have for better treatment and the best hope the government has of removing the H-2A program's reputation for abuse.

Today, we have reached a situation in agriculture that demands urgent action. There are about 2.5 million farmworkers in this country, not including their family members. More than 80% of them are foreign-born, mostly but not all from Mexico. Virtually all of the newest entrants to the farm labor force lack authorized immigration status. The helpful reports from the National Agricultural Workers Survey by the U.S. Department of Labor state that about 53% of farmworkers are undocumented. But most observers believe the figure is 60% or 70%, and much higher in specific locations. Many employers now hire farm labor contractors in the hope that they can shield themselves from liability for hiring undocumented workers in violation of our immigration law and from liability for labor law violations. The labor contractors compete against one another by offering to do a job for less money, and the cut-throat competition means that the workers must take lower wages. When one labor contractor is prosecuted for violating labor laws, he is easily replaced. Our current immigration system is causing employers to attempt to evade responsibility for their employees, while undocumented workers are too fearful of being deported to demand changes. In many cases, due to inadequate enforcement of labor laws, employers take advantage of undocumented workers by subjecting them to illegal wages and working conditions.

When the majority of workers in an economic sector are living in the shadows of society something must be done. The current situation is not good for farmworkers who want to be able to work legally and earn a decent living to support their families. It is not good for employers who want to hire people without worrying that they will be raided by the immigration service at the peak of the harvest of their perishable fruits and vegetables. It is not good for the government, which needs to know who is working in our economy and living among us. But it is no answer to say we will deport them and start again. The growers need these experienced workers to cultivate and harvest their crops. In fact, many growers contend that there are labor shortages in some areas because undocumented workers are too fearful of immigration raids to come to the open fields.

The United Farm Workers recognized several years ago that the status quo needed to be remedied. We also recognized that some of our long-held beliefs would need to be modified if we were to achieve any sort of reform. During the late 1990's, we strenuously and successfully opposed efforts in the House and Senate by agricultural employers to weaken H-2A protections and procedures and transform most farmworkers into vulnerable guestworkers with no path to citizenship. Our successful opposition led to a stalemate since we did not have the legislative support needed to enact our ideas about immigration and labor reform.

With the help of our good friend, Rep. Howard Berman, and other members of Congress, we entered into arduous negotiations with key leaders of the agricultural employers in the United States and other members of Congress, particularly Senator Larry Craig, Senator Edward Kennedy, and Rep. Chris Cannon. In 2000, we reached agreement on the Agricultural Job Opportunities, Benefits and Security Act, or "AgJOBS." AgJOBS has undergone several revisions over the years to build greater support for passage. Sen. Dianne Feinstein is now a strong supporter of AgJOBS. We

remain strong partners with agricultural employers to win passage of this important legislation despite many other differences between us. In 2006, the Senate included AgJOBS in the comprehensive immigration reform it passed. We are now seeking to pass AgJOBS as part of comprehensive immigration reform in 2007. We have been working with the White House and several Senators to bring AgJOBS to a conclusion.

AgJOBS would provide agricultural employers and the nation with a legal, stable, productive workforce while ensuring that basic labor protections would apply to farmworkers. AgJOBS has two parts. First AgJOBS would create an "earned adjustment" program, allowing many undocumented farmworkers to obtain temporary resident status based on past work experience with the possibility of becoming permanent residents through continued agricultural work. Second, it would revise the existing H-2A agricultural guestworker program.

The earned legalization program certainly should not be called "amnesty." It is a difficult two-step process. The applicants for earned legalization will have to show that they have worked at least 150 days in U.S. agriculture during the past two years, and then must work at least 150 days per year in each of three years or at least 100 days per year in each of five years. Farmworkers will also have to show that they have not been convicted of a felony or serious misdemeanors. Spouses and minor children of the farmworkers will be eligible for a temporary status, too.

If they fulfill their obligations, they will be granted a green card for permanent resident status. They will have to pay substantial fees and fines at both steps. (Under the compromise worked out with the White House, farmworkers also will have to learn English, demonstrate that they have paid taxes during their prospective work period, return to their homeland to file the application for a green card with a U.S. consulate in their home country, and wait for the green card for 3 to 5 more years until backlogs in immigration applications have been cleared.). We expect that roughly 800,000 farmworkers will be eligible for this program, although such predictions are mere guesses. Through this multiyear process, the United States will have a stable, legal farm labor force that is highly productive.

This is a tough program. Farm work is dangerous, difficult, seasonal and low-paid. This truly will be an *earned* legalization.

AgJOBS also would revise the H-2A guestworker program. We feel that we made painful concessions to achieve this compromise. The program's application process will be streamlined to become a "labor attestation" program similar to the H-1B program, rather than the current "labor certification" program. This change reduces paperwork for employers and limits the government's oversight of the employer's application. AgJOBS would retain both the "prevailing wage" and "adverse effect wage rates," but would effectively lower the H-2A wage rates by about $1.00 per year (to the 2003 adverse effect wage rates, which are issued by state), and freeze them for three years. The Government Accountability Office and a special commission would make recommendations to Congress about the wage rates within 3 years. If Congress has not

3

acted within 3 years, then the wage rates will be adjusted by the previous years' inflation rate. In addition, for the first time, farmworkers would have a right to file a federal lawsuit to enforce their H-2A job terms. AgJOBS also would allow some flexibility in the minimum wages and benefits when the workers at an H-2A employer are represented by a bona fide labor union under a collective bargaining agreement.

We believe that AgJOBS is a reasonable compromise under the circumstances. To conclude, we recommend the following: (1) We encourage you to pass AgJOBS. (2) Congress and the Administration should be vigilant about abuses under guestworker programs. Strong enforcement of the labor protections for guestworkers will prevent guestworkers from being exploited, prevent the wages and working conditions of United States workers from being undermined, and will take away the incentive that employers have to hire guestworkers rather than U.S. workers, including those who would earn legal immigration status under the AgJOBS earned legalization program. (3) Congress needs to adopt protections against abuses associated with foreign labor contracting. The U.S. Government is refusing to look at the abuses that occur during the recruitment of guestworkers in the foreign country. Yet, those abuses abroad, including payment of high recruitment fees, result in mistreatment of guestworkers on the job in the U.S., because the guestworkers must work to the limits of human endurance and avoid deportation at all costs to pay back those fees. The labor contractors' interest in such recruitment fees may have led to the murder earlier this year in Monterrey, Mexico, of Santiago Rafael Cruz, who was helping Mexican citizens employed as guestworker for North Carolina growers under a collective bargaining agreement with the Farm Labor Organizing Committee, AFL-CIO. (4) We also ask you to recognize that the best protection workers – both U.S. and foreign -- have at an employer that participates in a guestworker program is a labor union. Government policy should promote collective bargaining to reduce abuses under guestworker programs and give workers a meaningful voice at work.

Thank you for this opportunity to testify before the Committee on these important and timely issues.

**On Labor Day**
**More for farmers? Not unless farmworkers are considered**

Arturo S. Rodriguez
San Francisco Chronicle
Monday, September 3, 2007

Margarita Gonzalez, 47, dreads summer and picking table grapes in the hot sun. California heat regulations are supposed to protect her and other farmworkers from heat exposure, but too often, those laws are not enforced.

"We sweat a lot and feel like fainting," she said. "We want to sit in the shade, but we know, if we sit down, we will get fired."

Margarita is not alone. In as little as six weeks and with very limited resources, the UFW has been able to document hundreds of violations at dozens of farms statewide that employ more than 45,000 farmworkers. Farmworkers, like Margarita, are suffering daily and being denied shade, clean water and rest breaks.

For more than 40 years, the UFW has worked with legislators from both parties to write laws to protect farmworkers. However, the scale of the agricultural industry - with more than 400,000 farmworkers moving between 80,000 farms - has meant that good laws are ignored.

At a legislative hearing in July that focused on the state's heat laws not being enforced in farm-working fields, the Department of Occupational Safety and Health's Acting Chief of the Division Len Welsh said inspectors were still adjusting to last summer's regulations:

"We're still ramping up to be honest, to get the word out, to do the enforcement, to hone our approach," he said.

Farmworkers know what happens when it gets too hot and they have no water or shade. We remember the three farmworkers who died last summer due to heat. This is nearly as many deaths as there were the summer before the heat regulations were put in place. The UFW and farmworkers know there isn't time to "hone approaches" when lives are at stake.

At the same hearing, a representative for the Western Growers Association said farmers are working to learn and follow the state's heat rules. Is it that difficult for those not complying to comprehend providing clean water, shade and rest breaks during the hottest time of the year? After all, farmers are able to juggle volatile market prices, equipment costs and control animal and plant diseases.

We know the agricultural industry needs water to thrive. And as the Legislature and governor return to work, the farmers are pushing to ensure water bonds are on the agenda.More water for farmers, but only thirst for farmworkers? This is not acceptable public policy for California. Not when thousands are suffering daily. The UFW calls upon California's voters to remind their representatives in the Legislature of the reality in the fields and that they should not give more to farmers without remembering the farmworkers.

We cannot continue to give more to farmers - more time to comply with existing laws or more water through bonds. Farmers should not get more until farmworkers get at least dignity and human rights.

*Arturo S. Rodriguez is the president of the United Farm Workers.*

http://sfgate.com/cgi-bin/article.cgi?f=/c/a/2007/09/03/EDA4RRMGA.DTL

This article appeared on page **D - 5** of the San Francisco Chronicle

**Roots of a dilemma**
**Out in the fields, farmers sweat out immigration issue**

**Sacramento Bee**
**July 2, 2006**
**By Susan Ferriss**

VISALIA -- Deep in the heart of California farm country, 425 Mexican workers fan out through David Jackson's peach and plum trees, not far from the "Under God" banner and the American flag he flies over his orchards.

Wearing work shoes he's not afraid to get muddy, Jackson hops from his pickup and wades out among his workers, taking care not to jostle their ladders.

"See that? Look how professional he is on that ladder," he said, pointing proudly at a man deftly picking only the unblemished, ripe fruit strong enough to survive overnight air shipment to points as distant as Taiwan and England.

The admiration this farmer has for a good hired hand is not diminished by his knowledge that many of his workers are illegal immigrants -- even if that seems to contradict his conservative political views.

But Jackson believes there is a better way and, just a month ago, thought Congress would agree to legalize undocumented farmworkers and start a new guest worker program under a proposal called AgJOBS, the Agricultural Job Opportunities, Benefits and Security Act of 2006.

Now the plan is in limbo, and Jackson feels betrayed by the very Republican politicians and pundits he has long backed with his vote and his money.

"Not even my buddy Rush Limbaugh understands this issue," he said.

**Loyalties clash**
Up and down the state that produces much of America's food -- half the country's fruits and vegetables, most of its milk -- and most U.S. farm exports, farmers like Jackson are finding their core values and political loyalties tested by what they consider a disconnect between the realities of politics and of the fields.

"I have never seen a larger base of Republican constituents more enraged or dismayed with their own party," said Luawanna Hallstrom, a Republican tomato grower in San Diego County who has worked on agricultural reform for two decades.

Using her own farm as a case in point, Hallstrom said years of experience has taught her that Americans are not interested in doing the painstaking, backbreaking work needed to hand-harvest her salad tomatoes.

With immigration enforcement never a real threat in the fields, agriculture has come to rely more on undocumented workers than any other U.S. industry. Unauthorized workers could number up to 1.5 million, by some estimates -- more than half of all people on farm payrolls. In some crops and regions, employers say, they represent up to nine in 10 workers.

Manuel Reyes, one of the laborers at Jackson's Family Tree Farms, wiped sweat from his brow as he gently slipped peaches into a bin and talked about his high hopes for AgJOBS. On his crew were people who speak four Mexican Indian languages and hail from some of Mexico's poorest regions.

"I think the majority here would be more than happy to be legal and be free to come and go," Reyes said. "Everybody is talking about it."

Without scorn or judgment, simply because he knows most Americans' skills and ambitions took them beyond fieldwork long ago, the 27-year-old said: "Imagine an American working in here, doing this?"

The $7 an hour Jackson pays is a small fortune for an illegal Mexican immigrant with an eighth-grade education, especially compared with the $7 a day he might make back home.

As workers heated meat and tortillas under a tree canopy nearby, Jackson said, "I don't see them as any different from my father who came from Tennessee." Their children progress, too, Jackson said, like those of a trusted foreman who was an illegal immigrant until a 1986 amnesty for undocumented workers. Now, the foreman's daughter is a pre-med student.

Jackson hires his workers through a labor contractor, who in turn has the responsibility of viewing and recording workers' documents. This common arrangement tends to obscure farmers' reliance on undocumented labor.

### Alliances sprout
Growers knew trouble might mushroom one day, though. In the 1990s, they began to receive letters from the Social Security Administration about employees with mismatched numbers and names, likely from the use of fake numbers. Farmers estimated the employees involved represented an estimated 50 percent to 70 percent of workers on their payrolls.

Furthermore, while California farmers generally have been shielded from labor shortages by the ready flow of immigrants from Mexico and Central America, the recent escalation of public outcry over illegal immigration -- coupled with government crackdowns at the border -- have intensified farmers' interest in the AgJOBS proposal.

One of agribusiness' traditional adversaries, the United Farm Workers union, also backs AgJOBS, and has worked for six years with farmers in an unlikely alliance to design and lobby for it. The UFW and other labor advocates view the reform as a sensible solution for employees, especially if the alternative is offshore migration of farms and jobs.

"We felt that things would never get better for farmworkers unless we changed their status -- again," said UFW President Arturo Rodriguez, referring to the 1986 amnesty program.

AgJOBS would offer a one-time path to legal permanent residency only to those farmworkers who can prove they've worked at least 150 days on U.S. farms before 2006 -- and only if they remain employed in agriculture three to five more years. That would give farmers a stable work force while they transition from undocumented labor.

AgJOBs would also reform the existing H-2A guest worker program, rarely used by farmers who find its regulations too onerous. Under H-2A, the government not only requires employers to provide housing and meals, but has been too slow, critics charge, to certify employers' evidence that domestic workers could not be found for the jobs -- the required first step. AgJOBS would speed up the process and reduce a 300-page application to a single page.

The U.S. Senate included the AgJOBS reforms in an immigration bill approved in May, pairing it with more enforcement at the border and in workplaces. But with fall elections in sight, the House rejected the measure, with some members of Congress vowing instead to stick to legislation passed in December that calls for enforcement alone.

"I have seen a hardening in this place," acknowledged Rep. Dan Lungren, R-Gold River, a guest worker supporter who had hoped to be a key player in now-stymied negotiations between the House and Senate.

For those who have worked longest and hardest on the compromise, optimism is giving way to cynicism.
"For us to be able to sit down with the UFW and the other (worker) advocates, doesn't the Congress see what an accomplishment that is?" asked Manuel Cunha, a citrus grower in the Fresno area who spearheaded farm industry negotiations with the UFW.

Cunha, president of the Fresno-based Nisei Farmers League, is sputtering mad at GOP House Speaker Dennis Hastert of Illinois, whom he accused of tossing aside carefully crafted proposals in order to pander to conservative voters. Cunha, a devoted Republican, claims some GOP farmers might even vote Democratic because they are so upset by what's happening.

"You have people who are afraid of losing the United States heritage, the born-and-bred here, whatever you want to call it," said Cunha, who is of Portuguese descent. "We have become so anti-brown. … That's a terrible message to send to our children. That's not what America is about."

With the summer harvest well under way, AgJOBS suddenly looks as doomed as a vineyard of ripe wine grapes with no one to pick them.

## Unrealistic options?
That fear is precisely what has driven Salinas Valley wine grape grower Scott Scheid to spend the past five years traveling to Washington, D.C., to lobby for AgJOBS on behalf of vineyards.

Scheid Vineyards is one of the biggest in California, growing thousands of acres of grapes in a region famous for a cornucopia of grapes, broccoli, lettuce, strawberries and other crops.

The company employs about 270 workers, many nearly year round, paying them more than $9 an hour plus health and vacation benefits. The workers prune vines and harvest grapes under a negotiated UFW contract. But that doesn't mean all of them are legal.

"If everyone was gone from here, would others take these jobs?" Scheid asked. "Would people drive 100 miles to come here? Or do we shut it all down and wait for people to come here? That's unrealistic."

Joining an exodus of men from his hometown in Mexico at the age of 17, Scheid worker Miguel Garcia arrived six years ago in the Salinas Valley. "I don't mind continuing to work in the fields," he said, especially if the tradeoff is legal residency. "Farmwork is the kind of knowledge I've developed since I was a child."

As evidence that reform is needed, farmers delivered to Congress reports on their experience during a 1998 labor shortage, when Cunha's group organized farmers to advertise job openings in 10 California counties. Even with opportunities to earn up to $15 an hour, he said, it was next to impossible to find legal workers.

Out of 137,000 able-bodied candidates identified by welfare agencies on the Central Coast and in the San Joaquin Valley, only 503 applied for work. "You know how many actually came to work?" Cunha asked. "Three."

After the Sept. 11, 2001, terrorist attacks, tomato grower Hallstrom participated in her own, unexpected hiring experiment.

Her company, Harry Singh & Sons, leases land on Camp Pendleton, a U.S. Marine base. Hallstrom lost most of her work force when a post-Sept. 11 security check of military installations found 75 percent of her workers were undocumented.

Desperate for workers she could be sure were legal, Hallstrom advertised. Nobody came. She turned to the H-2A program, which was so slow in authorizing workers, she said, $2.5 million worth of tomatoes rotted on the vine.

"It really shed a light on the fact that there were not enough legally documented farmworkers to do this," she said. "It wasn't us crying wolf."

Since then, however, Hallstrom has successfully brought in guest workers under the H-2A program, and she's paid the price. Not only must housing, meals and transportation be provided to workers, but wages must meet the prevailing rate, this year about $9 an hour for Hallstrom.

Though a minuscule 2 percent of farmers use H-2A, many consider it an important option if the U.S. government succeeds in sealing the border and begins requiring employers to check workers' legal status through national databases. If shortages develop, farmers may find housing requirements and other provisions less of an obstacle.

Americans' general ignorance of how their food and drink are produced, farmers say, has allowed immigration hard-liners to attack policies that make perfect sense to the agriculture industry.

"Anybody who says they'll pay $10 for a head of lettuce so workers don't have to be here is just talking big," Cunha said. "How will they buy those DVDs they want, eat in those nice restaurants and go to hotels?"

He fumed about claims on talk shows that do not match his reality, including one assertion that labor costs are only 10 percent of farm production. To produce fruits and vegetables in California, labor is more than 30 percent of cost, according to federal agricultural officials.

To lessen the need for field workers, one option mentioned in Washington these days is mechanization.

"You can only change a diaper on a baby by hand," Cunha said, adding that if consumers want fresh produce like delicate berries and salad tomatoes, then they should welcome the workers willing to pick them by hand.

**'Fantasyland' solution**
The views of one particularly outspoken conservative congressman from Orange County elicit snorts, eye rolls and sighs in California's farm country.

"I say let the prisoners pick the fruit," Rep. Dana Rohrabacher, R-Huntington Beach, said in May at a Capitol news conference to denounce the Senate bill.

In a recent interview, Rohrabacher said his suggestion was serious, not sardonic.
"It is not in the interest of our country to legalize the status of anyone who is in the country illegally," he said. "We should see if there's a way to do this without having a guest worker program," because of the "horrible side effects" of relying on foreign workers.

To fill farm jobs, Rohrabacher said, "We have a massive resource with prisoners. Prisons quite often are near agricultural areas." The prisoners could keep half their earnings and prisons could keep the rest, he said.

Rohrbacher accused agribusiness of going "down the wrong strategic road" and said that, "as the Senate proposal goes down in flames, they are going to be looking for alternatives."

Out in the orchards of Family Tree Farms, however, the idea of prisoners picking peaches under armed guard doesn't fly.

The Jacksons consider it risky to trust a revolving group of felons with the fruits of their multimillion-dollar enterprise, where hired hands must not only be willing to endure sweltering heat, but also able to master the use of special tools and proper growing techniques.

To them, it seems particularly foolish for an enterprise with standards so high that fruit is inspected in person by retail buyers and foreign government officials.

In fact, the prisoner idea, said Jackson's son, Rick, is something out of "Fantasyland... It's not going to happen. It's so crazy, I can't even comment on it."

**The march toward AgJOBS**
**1986:** Immigration Reform and Control Act legalizes farmworkers and many other illegal immigrants. IRCA imposes new penalties for hiring illegal immigrants and requires employers to view and file documents that prove a right to work.

**1990s:** Legal workers leave farmwork for other jobs, increasing the flow of undocumented workers. Few employers use an existing H-2A seasonal farmworker program. Growers say it is too slow and costly and labor advocates denounce it for limiting workers' rights. While growers later lobby to change H-2A, labor argues their proposals still limit rights, including to sue or to earn legal permanent residency and citizenship.

**December 1999:** Rep. Howard Berman, D-North Hollywood, urges the United Farm Workers president to sit down with the farm industry to design a new H-2A and legalization program with more rights for workers.

**March- September 2000:** The UFW and national farm industry representatives negotiate. Florida Legal Services and plant nursery groups also are involved. September 2000: Both sides compromise on a proposal to allow undocumented farm workers and their immediate families to earn legal permanent status if workers continue in agriculture. Agreement is reached to streamline H-2A approval procedures in periods of shortage. The compromise preserves wage protections, and for the first time, allows H-2A workers to sue in federal court.

**December 2000:** Lame duck Congress adjourns before approving a bill, even though leaders of both parties in the House of Representatives support the idea. Mexican President Vicente Fox takes office and becomes the first Mexican president to call, with President Bush, for guest worker visas.

**May-June 2001:** UFW and the farm industry come up with separate Senate bills for reforms sponsored by Sens. Edward Kennedy, D-Mass, and Larry Craig, R-Idaho.

**2001-2003:** After Sept. 11 attacks, immigration reform stalls. Labor and industry return to talks, but disagreements again develop.

**Summer 2004:** The earlier compromise is revived and the resulting program, dubbed AgJOBS, is co-sponsored by 63 senators, half Republican. The White House blocks a floor vote.

**February 2005:** AgJOBS is introduced to a new Congress by bipartisan House legislators, bolstered by joint public appearances by UFW and growers.

**December 2005:** The House votes for more border security, and making illegal immigration a felony. It rejects legalization, including AgJOBS.

**April 2006:** UFW President Arturo Rodriguez signs a contract with Global Horizons, one of the biggest suppliers of H-2A workers to U.S. companies.

**May 2006:** A Senate majority approves tougher enforcement at the border and in the workplace, but also includes AgJOBS, which would legalize up to 1.5 million and offer an earned legalization option for millions of other illegal immigrants. The Senate bill also expands the supply of visas for future nonfarm guest workers, with a long path to legal residency. Most H-2A workers still would be barred from earning legal residency, a compromise by labor.

**June 2006:** With November's election looming, the House declines to negotiate with the Senate and calls for town hall meetings this summer on illegal immigration

## Ag rivals unite for workers program
**Immigration policy reform brings together growers and UFW.**

By Dennis Pollock
The Fresno Bee
Sunday, January 29, 2006

The debate over the necessity of a guest-worker program has made for some strange bedfellows.

One of the most unusual coalitions is that among the United Farm Workers, the Nisei Farmers League in Fresno and the Western Growers Association in Irvine.

The alliance between the UFW and grower groups would have been unthinkable 30 years ago. It exemplifies how dire some view the need for significant reform of the nation's immigration policy.

"If the UFW and growers can put aside decades of bitter conflict, there should be some way to get a bipartisan solution to this," said Marc Grossman, a UFW spokesman.

The Nisei Farmers League traces its very beginnings to the fields in 1970 when the UFW sought to unionize workers as the union and farmers clashed.

It was formed to fight the union.

As recently as September 2002, San Joaquin Valley farm leaders gathered at Nisei offices to oppose UFW-backed bills in the state Legislature.

Harry Kubo, the league's founder, showed up with a "proud to be a farmer" button and some UFW bumper stickers from the early 1970s, a time when growers and union activists squared off.

Two years later, the heads of both organizations — Manuel Cunha Jr., president of the Nisei Farmers League, and Arturo Rodriguez, UFW president — stood together behind a lectern at a Fresno luncheon for the first time to talk of the need for the AgJobs bill they helped craft.

That bill, backed by many Valley members of Congress, is favored in the U.S. Senate but faces opposition in the House. The bill is a proposal that would grant legal status to laborers who comply with certain criteria for continued work in farming.

Upon the bill's enactment, workers would have to show that they had worked at least 100 days in farming in the 18 previous months.

They would also have to work at least 70 days in farming per year for three years and could receive "an earned adjustment of status" — U.S. citizenship — six years after the law's enactment.

The Border Protection, Antiterrorism and Illegal Immigration Control Act, which has no guest-worker provision, has the backing of at least two California congressmen who said they expect a more comprehensive bill to emerge.

Gold River Republican Dan Lungren said a "comprehensive approach" is necessary. He has floated some proposals that include granting legal residency to immigrants who agree to perform national community service.

Palm Springs Republican Mary Bono pointed out that the state, and the area she represents, "has a huge agricultural base that depends on a strong labor force," and any comprehensive immigration reform "must be paired with a guest-worker program."

Cunha said relying solely on a border security bill "would just shut down the country."

Pat Ricchiuti, president of the Fresno County Farm Bureau, said only tightening the border means "we're almost biting the hand that feeds us, shooting ourselves in the foot."

Tim Chelling, spokesman for the growers association, said the shortage of labor in agriculture "may be the first symptom of a very sick immigration policy."

The reporter can be reached at dpollock@fresnobee.comor (559) 441-6364.



Published October 14, 2007

## Brasher: Immigration issue threatens legislation
**Immigration proposal for farm bill highlights predicament**
**WASHINGTON FARM REPORT**
By PHILIP BRASHER
REGISTER WASHINGTON BUREAU

Washington, D.C. - The Senate has had enough trouble trying to write a farm bill as it stands, but there's one issue that could complicate matters further - immigration.

Senate Majority Leader Harry Reid, D-Nev., pledged in June to try to add provisions for farm workers who are here illegally to the farm bill.

Now, backers of the farm worker legislation, known as the AgJOBS bill, are trying to round up the 60 votes needed to overcome a filibuster.

The legislation could benefit produce growers and dairy farms as well as custom harvesters and seed companies, who rely on foreign workers to detassel corn.

Under the bill, immigrants could obtain legal status if they have been working on farms for at least two years. More than 800,000 workers, plus their spouses and minor children, could qualify. The legislation also would overhaul a visa system that farmers say is too restrictive and costly.

"It would provide American agriculture with a stable work force that is treated fairly and ensure a productive agricultural sector," says Bruce Goldstein, executive director of Farmworker Justice, an advocacy group.

But Reid's promise, which he made to Sen. Dianne Feinstein, D-Calif., on the Senate floor, won't be easy to fulfill.

Farmers have been warning that crops will rot in the fields if they don't get more workers, or some production is going to move out of the country entirely.

But immigration is a toxic issue for many in Congress after the failure of the Bush administration's broader overhaul.

Republicans have warned that the farm worker bill would need major changes.

And a federal judge last week took some heat off farmers and other employers by temporarily blocking a rule that they fire workers whose names don't match their Social Security numbers.

The Senate Agriculture Committee is set to take up the farm bill the week of Oct. 22, three months after the House passed its version of the bill.

The committee's chairman, Sen. Tom Harkin, is a co-sponsor of the farm worker legislation. But he already has been struggling for weeks to get agreement on a range of issues, from subsidy levels to conservation and rural development, and he has no plans to include immigration in his draft legislation, according to his staff.

The American Farm Bureau Federation supports the farm worker legislation, but doesn't want it added to the farm bill.

"The issue of immigration itself is problematic. The farm bill, given its own difficulties with the budget and other things, we don't think lends itself being a vehicle to resolve that issue," said Paul Schlegel, who follows the issue for the Farm Bureau.

But there aren't many other options for AgJOBS advocates, who argue that it only makes sense to address farm worker issues in a farm bill. "The farm bill establishes our policies for the agricultural sector. Farm workers should be included in the farm bill," said Goldstein.

Craig Regelbrugge, who co-chairs a coalition of agribusiness groups pushing for the farm worker provisions, puts it this way: "While we're worrying about finding money for (agricultural) disasters, we've got a labor disaster under way."

If the farm worker legislation "has the votes, it doesn't kill the farm bill," he said. "If it doesn't have the votes, it falls away."

**U.S. Seeks Rules to Allow Increase in Guest Workers**
By Steven Greenhouse
The New York Times
October 10, 2007

Bush administration officials said yesterday that they were developing new rules so the nation's farmers could bring in more foreign guest workers to prevent a recurrence of problems like growers' letting their fruit rot because there were not enough laborers for the harvest.

Farm groups have long pressed the administration to eliminate hurdles that make it hard to bring in guest workers, saying they face a crisis because stepped-up federal immigration enforcement has reduced the number of farm workers. By many estimates, more than half of the nation's 2.5 million farm workers are illegal immigrants.

Administration officials said they saw a need to make procedural changes and larger regulatory changes in the guest worker program after Congress killed an immigration overhaul last summer.

"The current temporary agricultural worker program has become too antiquated and too cumbersome to be used effectively by producers," said a White House spokesman, Scott Stanzel. "The program needs to be updated to reflect today's economy and to utilize technological and other advances."

Under the H-2A program, farmers can bring in temporary workers after demonstrating that American workers are not interested in the jobs and after going through a lengthy application process. Currently, they bring in about 50,000 such workers a year.

After President Bush called for changes in the program on Aug. 10, the White House, the Department of Labor and the Department of Homeland Security solicited recommendations from farm groups on how to streamline the program.

The administration is pressing ahead on that effort, first reported in The Los Angeles Times, after some growers in the Northwest let their cherries and apples rot because of a shortage of workers and after some growers in North Carolina did not plant cucumbers this year because they feared not having enough workers for the harvest.

The National Council of Agricultural Employers has written to the administration to urge changes like speeding up the H-2A application process, easing housing requirements for guest workers, reducing the required wage for these workers and increasing the types of work they are allowed to do — poultry processing might be included, for instance. Grower groups have also urged the administration to ease requirements that they run newspaper advertisements to determine whether American workers want the jobs.

The council's executive vice president, Sharon M. Hughes, said the application process often took so long that by the time some farmers obtained guest workers the harvest was over. Ms. Hughes said the number of farm workers available was down about 200,000, or nearly 10 percent, from last year because of more aggressive border enforcement.

"Right now," she said, "the H-2A program provides about 2 percent of the farm work force and for us to try to double that number with the current government infrastructure would cause it to collapse on itself unless we have these reforms."

The executive vice president of the Western Growers Association, Jasper Hempel, said: "We're caught in a vise. When labor isn't available, we have a legal program using H-2A, but many farmers can't use that program because there are so many impediments. They throw up double requirements. They don't process papers when they say they will. There isn't enough staff."

Grower groups say that even more than administrative changes, they would prefer enacting stalled legislation that would greatly streamline the H-2A program and create a path to citizenship for many undocumented farm workers.

A Labor Department spokesman, David James, said the administration was mindful of the farmers' concerns.

"The Department of Labor," Mr. James said, "is now in the process of identifying ways the program can be improved to provide farmers with an orderly and timely flow of legal workers while protecting the rights of both U.S. workers and foreign temporary workers."

Advocates for farm workers have voiced dismay about the administration's plans and the industry's recommendations.

"The industry's demands would amount to a cheap foreign labor policy," said Bruce Goldstein, executive director of Farmworker Justice. "They would make it easier for employers to bring in guest workers and slash wage rates and other labor protections."

The administration also faces criticism from conservative groups that dislike bringing in more immigrants.

"If there is a demonstrable need for the workers, we have no objection to bringing them in," said Ira Mehlman, a spokesman for the Federation for American Immigration Reform, which opposes liberalizing immigration rules. "But here they're trying to tip the balance in favor of employers. The administration wants not just to cut down on administrative procedures, but to bypass the whole process that has been put in place to protect American workers."

**U.S. lets in more immigrants for farms**
The administration is quietly relaxing visa regulations because farmworkers are in critically short supply.

By Nicole Gaouette
Los Angeles Times
October 7, 2007

WASHINGTON - With a nationwide farmworker shortage threatening to leave unharvested fruits and vegetables rotting in fields, the Bush administration has begun quietly rewriting federal regulations to eliminate barriers that restrict how foreign laborers can legally be brought into the country.

The effort, urgently underway at the departments of Homeland Security, State and Labor, is meant to rescue farm owners caught in a vise between a complex process to hire legal guest workers and stepped-up enforcement that has reduced the number of illegal planters, pickers and middle managers crossing the border.

"It is important for the farm sector to have access to labor to stay competitive," said White House spokesman Scott Stanzel. "As the southern border has tightened, some producers have a more difficult time finding a workforce, and that is a factor of what is going on today."

The push to speedily rewrite the regulations is also the Bush administration's attempt to step into a breach left when Congress did not pass an immigration overhaul in June that might have helped American farms. Almost three-quarters of farmworkers are thought to be illegal immigrants.

On all sides of the farm industry, the administration's behind-the-scenes initiative to revamp H-2A farmworker visas is fraught with anxiety. Advocates for immigrants fear the changes will come at the expense of worker protections because the administration has received and is reportedly acting on extensive input from farm lobbyists. And farmers in areas such as the San Joaquin Valley, which is experiencing a 20% labor shortfall, worry the administration's changes will not happen soon enough for the 2008 growing season.

"It's like a ticking time bomb that's going to go off," said Luawanna Hallstrom, chief operating officer of Harry Singh & Sons, a third-generation family farm in Oceanside that grows tomatoes. "I'm looking at my fellow farmers and saying, 'Oh my God, what's going on?' "

Officials at the three federal agencies are scrutinizing the regulations to see whether they can adjust the farmworker program, an unwieldy system used by less than 2% of American farms to bring in foreign workers. They are considering a series of changes, including lengthening the time workers can stay, expanding the types of work they can do, simplifying how their applications are processed, and redefining terms such as "temporary."

Administration sources said they were moving aggressively. They declined to discuss details of the proposals.

The agencies are also working on possible changes to a separate visa program, H-2B, which brings in seasonal workers for resorts, clam-shucking operations and horse stables, among other businesses.

The administration has pursued the project discreetly. The issue of immigration has generated friction between President Bush and the conservative wing of the Republican Party, which has strongly opposed many of the initiatives that Bush has pursued.

The changes to the H-2A visa program comprise one of more than two dozen initiatives the administration announced in August. Most of the initiatives dealt with increased enforcement, the most prominent being a measure that would force employers to either fire workers for whom they've received "no match" notification (indicating their W-2 data don't match Social Security Administration records) or face punitive action from the Department of Homeland Security. When Homeland Security Secretary Michael Chertoff announced the enforcement push, he also acknowledged the problems that agriculture reported.

"Even putting aside no-match letters, just our increased work at the border was actually causing a drop in the number of workers coming across," Chertoff said.

David James, an assistant secretary of Labor, said Bush asked his department, which has jurisdiction over most H-2A rules, to review the entire program. The agency "is now in the process of identifying ways the program can be improved to provide farmers with an orderly and timely flow of legal workers while protecting the rights of both U.S. workers and foreign temporary workers," James said.

The current program, managed by all three agencies, is famously dysfunctional.

Farmers have to apply for workers about a month in advance, but the agencies often fail to coordinate their response in time for the harvest, which farmers can't always predict. At Hallstrom's farm, where tidy rows of tomato plants run almost to the ocean's edge, half of the 1,000 workers are in the H-2A program. (Nationally, about 60,000 H-2A applications a year are usually filed, compared with more than 3 million farm jobs to be filled. There is no cap on the number of H-2A workers allowed into the U.S.)

She remembers submitting an emergency request for H-2A workers one year and getting the visas 60 days later. She said the laborers spent two weeks pulling rotten fruit off the vines, and the farm lost $2.5 million. "Devastating," Hallstrom said.

Growers also complain about paying for workers' housing, transportation, visas and other fees. Harry Yates, a North Carolina Christmas-tree grower, estimates that his labor costs for H-2A workers are $14 an hour, compared with a competitor whose illegal laborers cost about $7.50 an hour. Like other farmers, Yates said using the H-2A program was an invitation to lawsuits from worker advocates and frequent government investigations.

"I understand why so many growers are afraid to use this program. It is too expensive, too complicated, too slow and too likely to land you in court," Yates said.

Some advocates for workers fiercely dispute this. They say farmers just want to keep wages low.

"The employers want to be free of government oversight, legal-services representation for the guest workers, and other efforts to enforce the modest H-2A worker protections," said Bruce Goldstein, executive director of the advocacy group Farmworker Justice, which is affiliated with the nonprofit National Council of La Raza.

Industry lobbyists have sent the Bush administration a set of detailed suggestions for overhauling the H-2A program through administrative changes, which could take weeks to put in place, and through changes in the regulations, a process that takes months.

Some of the suggestions under consideration include changing the procedures farmers must use to try to hire U.S. citizens first. Currently farmers have to advertise the jobs, then submit applications to Labor and Homeland Security to bring in foreign workers. Growers would prefer to move to a system in which they pledged that they had done all they could to recruit U.S. workers, but no longer had to submit an application to Labor.

Other changes under consideration would simplify the detailed H-2A housing requirements, extend the definition of "temporary" beyond 10 months, and expand the definition of "agricultural" workers to include such industries as meatpacking and poultry processing.

nicole.gaouette@latimes.com <mailto:nicole.gaouette@latimes.com>

Times staff writer Walter F. Roche Jr. contributed to this report.

# COMPREHENSIVE IMMIGRATION REFORM: LABOR MOVEMENT PERSPECTIVES

# HEARING

BEFORE THE

## SUBCOMMITTEE ON IMMIGRATION, CITIZENSHIP, REFUGEES, BORDER SECURITY, AND INTERNATIONAL LAW

OF THE

## COMMITTEE ON THE JUDICIARY HOUSE OF REPRESENTATIVES

ONE HUNDRED TENTH CONGRESS

FIRST SESSION

MAY 24, 2007

## Serial No. 110–40

Printed for the use of the Committee on the Judiciary



Available via the World Wide Web: http://judiciary.house.gov

U.S. GOVERNMENT PRINTING OFFICE

35–605 PDF                    WASHINGTON : 2007

For sale by the Superintendent of Documents, U.S. Government Printing Office
Internet: bookstore.gpo.gov   Phone: toll free (866) 512–1800; DC area (202) 512–1800
Fax: (202) 512–2250   Mail: Stop SSOP, Washington, DC 20402–0001

Ms. LOFGREN. Mr. Goldstein.

## TESTIMONY OF BRUCE GOLDSTEIN, EXECUTIVE DIRECTOR, FARMWORKER JUSTICE, ON BEHALF OF MR. MARCOS CAMACHO, GENERAL COUNSEL, UNITED FARM WORKERS OF AMERICA

Mr. GOLDSTEIN. Thank you to the Chair and to the Members of this Committee for the opportunity to testify on behalf of the United Farm Workers regarding the labor movement and immigration policy.

Agricultural workers have confronted difficulties in immigration policy since the founding of this Nation. Our government policies and enforcement efforts have often contributed to an imbalance in power that has subjected farm workers to poor wages and working conditions. The Bracero program became known for its abusive treatment of Mexican workers despite the existence of protections

for wages and benefits, and was finally ended in 1964. When the farm workers became free to demand better treatment, Cesar Chavez and the United Farm Workers provided a vehicle to dramatically improve the status and treatment of farm workers in this country.

Now we have the H-2A guest worker program, which was created at the same time as the Bracero program, and it is quite similar to it. Generally, our guest worker programs have tied workers to a particular employer. If the job ends, the worker may not look for another job and must leave the United States immediately. The guest worker who wishes for a visa the next year must hope that the employer will request one because the employers control access to visas. Such workers are often fearful of deportation or of not being hired in the following year, and are therefore reluctant to demand improvements. They work very hard for low wages. U.S. workers often recognize that they are not wanted by employers who use the guest worker system. Currently, there are about 50,000 H-2A jobs approved annually out of an agricultural workforce of about 2.5 million.

There are many abuses under the H-2A program, ranging from very minor to very serious trafficking in human beings. Unfortunately, our government has rarely enforced the protections in the H-2A program. Today, on page 3 of The New York Times, there is a report about the visas and the H-2A program, including the murder of an organizer of the Farm Labor Organizing Committee, AFL-CIO, while organizing in Mexico.

In recent years, the United Farm Workers Union and the Farm Labor Organizing Committee have been asked by guest workers from several nations to help them improve conditions at their jobs in Washington State, Hawaii, and North Carolina. We believe that unionization is the best hope that guest workers have for better treatment and the best hope that the government has of removing the H-2A program's reputation for abuse.

Today, we have reached a situation in agriculture that demands urgent action. Between 53 and 70 percent of farm workers are undocumented. In some crops, it is 80 percent. Many employers now hire farm labor contractors in the hope that they can shield themselves from liability for hiring undocumented workers in violation of the immigration law and from liability for labor law violations. In many cases, due to inadequate enforcement of labor laws, employers take advantage of undocumented workers by subjecting them to illegal wages and working conditions.

When the majority of workers in an economic sector are living in the shadows of society, something must be done. The current situation is not good for farm workers who want to be able to work legally and earn a decent living to support their families. It is not good for employers who want to hire people without worrying that they will be raided by the Immigration Service at the peak of their harvest of their perishable fruits and vegetables. It is not good for the government either.

The United Farm Workers Union recognized several years ago that the status quo needed to be remedied. We prevented legislation from being passed that would have transformed agriculture into a harsh guest worker program with no path to citizenship, but

38

we were unable to pass the kind of legislation that we preferred. With the help of Representative Berman and other Members of Congress, we entered into arduous negotiations with key leaders of agricultural employers in the United States and other Members of the Congress. The result was AgJOBS. The "AgJOBS," the Agricultural Job Opportunities, Benefits and Security Act, would provide agricultural employers and the Nation with a legal, stable, productive workforce while ensuring that basic labor protections would apply to farm workers. AgJOBS has two parts.

First, AgJOBS would create an earned adjustment program, allowing many undocumented farm workers to obtain temporary resident status based on past work experience with the possibility of becoming permanent residents through continued agricultural work. Second, it would revise the existing H-2A program. The Earned Legalization program certainly should not be called "amnesty." This is a tough program. Farm work is dangerous, difficult, seasonal, and low-paid. This truly will be an earned legalization. Applicants will have to work 3 to 5 additional more years in agriculture to earn their green cards.

To conclude, we recommend the following. We encourage you to pass AgJOBS. Congress and the Administration should also be vigilant about abuses under guest worker programs. Strong enforcement of labor protections is needed. Congress also needs to adopt protections against abuses associated with foreign labor contracting. The U.S. Government should be looking to the recruitment systems abroad that bring workers into the United States.

Thank you very much for the opportunity to testify today.

Ms. LOFGREN. Thank you very much.

U.S. House of Representatives
Committee on Agriculture

Hearing on the Labor Needs of American Agriculture

October 4, 2007

Bruce Goldstein
Executive Director
Farmworker Justice

Mr. Chairman and Members of the Agriculture Committee, thank you for the opportunity to testify today on the labor needs of American agriculture. My organization, Farmworker Justice, is a 26-year old national advocacy group that seeks to empower migrant and seasonal farmworkers to improve labor rights, immigration policy, and occupational safety and health. We have numerous publications on the issues the Committee is considering; I invite Members to visit our website, www.farmworkerjustice.org, to take advantage of these resources.

Congress needs to address the farm labor problem in this country now. A conflict over policy has been festering since 1995. A remarkable compromise endorsed by farmworker unions, agricultural employers, and a wide array of other constituencies has won substantial support from Republicans and Democrats across the ideological spectrum. The majority of responsible legislators should assert themselves and end the stalemate.

The principal farm labor problem is that the majority of farm workers in the United States are undocumented. Out of about 2.5 million agricultural employees in the U.S., probably 60% or 1.5 million, possibly more, are immigrants who are not authorized to work.

The presence of so many undocumented workers in an occupation translates into weak bargaining power for all farmworkers. Most are too fearful of deportation to challenge unfair or illegal conduct or join a labor union. Even the citizens and authorized immigrants are reluctant to make demands on their employers if they won't have the support of their exploitable co-workers. The consequences of this untenable situation are serious. Farmworkers' incomes are very low, usually less than $13,000 a year. Housing is scarce and often decrepit. Very few farmworkers receive even basic fringe benefits, such as paid sick leave or holidays. Health care is rarely offered to farmworkers by their employers, and the undocumented and even new authorized immigrants to the U.S. are not eligible for Medicaid or other public benefits. Agriculture is ranked among the three most dangerous jobs in the United States. Without a legal immigration status, farmworkers find it difficult to win better job terms or government policy..

Employers who hire farmworkers now face a greater threat of immigration raids, border control and other immigration enforcement that can deprive them of an adequate labor force. Many growers have sought to evade immigration law sanctions by using farm labor contractors to recruit and supervise workers in the fields. Some growers frivolously claim that they are not the "employer" of the farmworkers in their fields and that only the labor contractor is liable for violations of immigration and labor laws.

Of course, agricultural employers should end labor contracting abuses and improve wages and working conditions to attract job applicants and retain them. Congress should end the discrimination in overtime pay, safety and health regulations, and other laws that deprive of farmworkers of needed labor protections that other employees enjoy. The government also needs to increase its labor law enforcement efforts drastically.

The reality is, however, that if we deported a substantial number of undocumented farmworkers there would be a tremendous labor shortage. Robots and other machines are not yet available to replace human beings in harvesting many of the fresh fruits and vegetables we consume.

America needs its farmworkers. We are eating healthier and are buying more fruits and vegetables. In fact, the U.S. Department of Agriculture has good news for us on trade: we are exporting more and more fruits and vegetables to consumers in other nations. The people who create this bounty and place the food on the world's dining tables should be treated with dignity.

We as a nation are concerned about security. We should want to know who is living and working in this country, but we don't really know who is performing more than half the farm work in this country. A responsible solution to this farm labor problem would allow our law enforcement agencies to focus on finding criminals and terrorists, rather than on deporting poor immigrants simply seeking to support their families by producing America's food.

For years, there had been a stalemate in Congress that had three main warring positions. First, we farmworker advocates wanted Congress to follow the precedent of the 1986 immigration law that permitted undocumented farmworkers, after proving their recent agricultural work in the U.S. and complying with other immigration law obligations, to obtain a temporary immigration status and later a permanent status with a path to citizenship. Our argument being that if we need workers in America to perform jobs, we should invite people in as immigrants, rather than as exploitable indentured servants. This country experimented with the massive Bracero guestworker program for 22 years, ending in 1964. Despite significant labor protections in the Bracero program, it was widely recognized as abusive and a national embarrassment. We farmworker advocates had not been successful in our legislative advocacy for a replay of the 1986 legalization program.

Second, many agribusiness groups lobbied heavily in the 1990's for changes to the H-2A agricultural guestworker program. They sought to make it easier for employers to hire guestworkers on temporary work visas with no path to immigration status (or citizenship), lower the program's wage rates dramatically, minimize U.S. workers' opportunities to obtain jobs, weaken housing requirements, prevent guestworkers from obtaining legal aid, and reduce government oversight. The growers sought to transform the farm labor system into a system of exploitable guestworkers and set their wages and other job terms at unconscionably low levels. H-2A workers have little bargaining power: they may not switch employers; they must leave the country when their job ends; if they wish to return the following season they must hope that their employer will apply for a visa for them. Thus, guestworkers lack the economic freedoms and democratic rights that this country prides itself on. The grower groups failed to pass their bill and most eventually began to discuss a compromise. However, some legislators, egged on by

2

some employer organizations and others, have continued efforts to pass similar legislation that also have failed.

Third, there is a group that seeks to do nothing except perhaps allow the problem to worsen as immigration enforcement expands and both farmworkers and employers suffer the consequences.

Doing nothing, in our view, is extraordinarily irresponsible. Congress should end its stalemate. A vocal minority of opponents should not be permitted to perpetuate this absurd status quo. There is a reasonable solution that has widespread support. AgJOBS is the nickname for the Agricultural Job Opportunity, Benefits and Security Act. The United Farm Workers played the leading role in negotiating on behalf of farmworkers with major agribusiness groups to resolve years of harsh conflict. A bipartisan group of legislators in the House and the Senate spent many, many hours ironing out the settlement of hard-fought positions among organizations that had traditionally refused to negotiate with one another.

The bill contains two parts. First, it would create an "earned legalization" program. Applicants could obtain a temporary immigration status by proving that they been employed in U.S. agriculture in the past two years, either as a legal guestworker or as an undocumented worker. If the temporary resident then performs a specified amount of agricultural work, during a three to five year period, he or she could convert to lawful permanent resident status and receive a "green card." Security checks would prevent terrorists, criminals and other unwanted individuals from using the program. During the three to five years of the future work requirement, the participants would be permitted to work for any employer and in any occupation as long as the agricultural work was performed. The farmworker's spouse and minor children also would eventually become eligible to be immigrants. Several hundred thousand current farmworkers would be eligible for this program.

Second, AgJOBS would revise the existing H-2A agricultural guestworker program, which allows employers to hire foreign citizens on temporary, nonimmigrant work visas. The H-2A program's history of abuses made negotiations by farmworker advocates with employers difficult. The reforms would benefit employers by making the program easier and quicker to use and lowering the wage rates. The compromise would retain important wage protections that employers had sought to eliminate. AgJOBS also retains or expands other important labor standards to prevent job losses and wage cuts among U.S. workers (including the participants in the new earned legalization program) and protect foreign workers from exploitation. Regrettably, the compromise would not permit H-2A workers to earn a path to citizenship.

The compromise is win-win-win solution even though (or, perhaps, because) it required painful concessions all around. Farmworkers who earn immigration status would increase their bargaining power with employers. Businesses would obtain a legal, stable labor supply of experienced farmworkers. If labor shortages were to occur in the future, the H-2A program would be available. Moreover, the U.S. government would know who resides within our borders and would be better able to enforce immigration and labor laws in agriculture.

Some object to AgJOBS saying that it's not a good enough deal for agricultural employers; they want the H-2A wage rates lowered even further, the housing requirement stripped out, the

3

elimination of the job preference for U.S. workers, and other changes. These selfish demands were made in earlier legislation and failed. Congress needs to move forward.

Some opponents argue that people who crossed our borders illegally should not be rewarded with an "amnesty." AgJOBS is not an "amnesty." It contains tough, multi-year work requirements, financial costs, and other obstacles to earn immigration status.

The opponents would preserve the current unacceptable situation. They have no reasonable solution. They certainly have no legislation that could pass Congress. In the meantime, farmworkers face terrible choices, employers risk losing their businesses and this nation continues to allow a situation in which a majority of the employees of an entire economic sector lack authorized immigration status.

We need solutions, not hollow rhetoric or more ideological stalemate. AgJOBS is not perfect but it is a responsible, balanced approach to meet the needs of American agriculture.

Thank you for the opportunity to present testimony on behalf of farmworkers.

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED FARM WORKERS                       )
                                          )
        and                    )
                                          )
FARMWORKER JUSTICE,                       )
                                          )    C.A. No.: 07-2241 (HHK)
        Plaintiffs,            )
                                          )
    v.                             )
                                          )
DEPARTMENT OF LABOR,                      )
                                          )
        Defendant.             )
_____ )

**DECLARATION OF VIRGINIA RUIZ**

       I, Virginia Ruiz, declare as follows:

1.      I am an attorney employed by Farmworker Justice and one of the attorneys representing plaintiffs in this case.

2.      On February 29, 2008, DOL produced documents that DOL stated were responsive to plaintiffs' sixth and seventh requests.  According to DOL, it produced 8,297 pages of material responsive to the sixth request.  DOL produced 513 pages of material responsive to the seventh request.  I have reviewed the documents produced by DOL.

3.      Attached to this declaration as Exhibit 1 is a spreadsheet that I created which provides a summary of the documents produced by DOL in response to the sixth and seventh requests.

4.      As shown on Exhibit 1, DOL produced documents relating to 129 H-2A applications. The number of applications produced for each state covered by the sixth and seventh requests is as follows: Florida- 72; Louisiana - 0; Virginia - 46; Hawaii - 11.

5.      I have compared the documents produced by DOL to the OFLC annual report for FY

2007.  As shown in the first column of Exhibit 1, only 7 of the 129 applications are

reflected in the latest OFLC annual report.  All 7 of the applications reflected in the

annual report are for Hawaii.  None of the documents produced in response to the sixth

request are reflected in the OFLC annual report.

6.       Each H-2A application and its related documents is, on average, about 68 pages.

Although no two application files are entirely the same, in general, the file for each

application includes the following categories of documents:

a)      **ETA 750 Form**.  The ETA 750 is the Application for Alien Employment

Certification.  It includes basic information such as the employer name and

address; location of work; type of job; wage rate and work schedule; educational

and experiential requirements; ETA certification date (if applicable); number of

openings; dates of need; description of recruitment efforts; employer certifications

and signature; and agent's name (if applicable).

b)      **ETA Certification or Denial Letter**.  The certification letter grants H-2A

temporary alien labor certification.  The certification letter includes the

employer's name, the number and title of job opportunities certified, the crop and

activity, the area of employment, and the period covered by the certification.  If

certification is denied, the letter outline's the application's deficiencies and the

reasons certification was denied.

c)      **ETA 790 Form and Attachments**.  The ETA 790 is the Agricultural and Food

Processing Clearance Order.  It elaborates on the basic information contained in

2

the ETA 750 and includes location and directions to the work site; location,

directions to and description of the housing; board arrangements; referral

instructions; anticipated hours of work per day; wage rates, special pay

information and deductions, including hourly wage rate or piece rate, bonus

systems, minimum guarantees, and payroll periods; transportation arrangements

and advance subsistence payments; terms for termination; employer furnished

tools and equipment; training and time allowed to reach the production standards,

and other assurances.

d)      **Summary of Insurance Coverage**.

e)      **Correspondence**.  Correspondence between the employer or employer's agent

and DOL or other government agencies and the SWA, often regarding

deficiencies in the job order or H-2A application, information about employer

efforts to recruit U.S. workers interested in the job and DOL's oversight of this

process, and information about housing inspections and DOL's oversight of this

process.

f)      **Housing Inspection Reports and Checklists**.

g)      **Advertising Evidence**.  Documents showing the extent of any employer efforts to

recruit U.S. workers.

h)      **ETA Acceptance Letter**.  The acceptance letter acknowledges receipt of the

initial H-2A application and contains an initial determination to grant certification

subject to certain conditions being met.  The acceptance letter includes the

employer's name, the number of job openings and the job title, and the period

employment, and it lists the requirements that must be met to receive certification.

7.    Attached as Exhibit 2 is a complete file relating to an H-2A application made by

Hawaiian Queen Co.  Exhibit 2 is an example of a typical H-2A application file.

8.    Many of the documents produced by DOL in response to the sixth request have material

redacted.  I estimate that about a quarter of the pages have material redacted.  Attached as

Exhibit 3 is a sample of pages with material redacted.

9.    The documents produced by DOL in response to the sixth request contain no documents

related to H-2A applications in Louisiana.  Based on the history of H-2A certifications for

Louisiana and my review of the most recent OFLC annual report, it is very likely that, at

the time it conducted its search for documents responsive to the sixth request, DOL had

applications seeking certification for H-2A workers in Louisiana that were in effect or

would commence between October 23, 2007 and April 30, 2008.  For example, the FY

2007 OFLC annual report lists about 350 H-2A applications for Louisiana that were in

effect during this period.

10.   I searched the website of the Virginia Workforce Connection to try to locate job orders

related to the H-2A applications produced by DOL.  Three such job announcements are

attached as Exhibit 4.  Although I believe that all three relate to H-2A application files

produced by DOL, I cannot be sure because the employer's name and contact information

is not included in one of the announcements.

4

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.


Dated: April 11, 2008                          _/s/ Virginia Ruiz_____
                                               Virginia Ruiz (DC Bar #483800)
                                               FARMWORKER JUSTICE
                                               1126 16th Street, NW, Suite 270
                                               Washington, DC  20036
                                               (202) 293-5420

5

RUIZ DECLARATION
EXHIBIT 1

| OFLC DB | ETA Case # | Decision date | Status | Begin date | End date | H-2A Applicant | Employer Address | City | State |
|---|---|---|---|---|---|---|---|---|---|
| **Hawaii** | | | | | | | | | |
| yes | C-07065-05115 | 6/7/2007 | certified | 7/9/2007 | 2/15/2008 | Classic Pacific | 74-4820 Mamalahoa Hwy | Holualoa | HI |
| yes | C-07067-05135 | 4/19/2007 | certified | 4/24/2007 | 2/24/2008 | Kona Cold Fish Processors | 73-4460 Queen Kaahumanu Hwy, #103 | Kailua-Kona | HI |
| yes | C-07099-05418 | 4/23/2007 | certified | 7/20/2007 | 4/20/2008 | Kona Coffee & Tea Co | 73-4174 Hulikoa Dr | Kailua-Kona | HI |
| no | C-07102-05495 | 8/9/2007 | withdrawn | 8/15/2007 | 3/15/2008 | Kona Mountain Coffee | 79-7431B Mamalahoa Hwy | Kealakekua | HI |
| no | C-07129-05595 | 5/31/2007 | withdrawn | 6/30/2007 | 4/30/2008 | Coffees of Hawaii | 1630 Farrington Ave | Kualapuu | HI |
| yes | C-07134-05632 | 6/14/2007 | certified | 6/28/2007 | 4/28/2008 | Howard's Nurseries | 2301 Omaopio Rd | Kula | HI |
| yes | C-07141-05670 | 7/2/2007 | certified | 8/1/2007 | 2/1/2008 | Bay View Farm | 83-5249 Painted Church Rd | Captain Cook | HI |
| yes | C-07155-05738 | 7/17/2007 | certified | 7/20/2007 | 5/20/2008 | Coffees of Hawaii | 1630 Farrington Ave | Kualapuu | HI |
| no | C-07163-05790 | 10/2/2007 | certified | 12/20/2007 | 4/1/2008 | BASF Plant Science | 8315 Kekaha Rd, Ste F | Kekaha | HI |
| yes | C-07191-05916 | 9/6/2007 | certified | 10/1/2007 | 7/31/2008 | Hawaiian Queen Co. | 89-941 Hawaii Belt Rd. | Captain Cook | HI |
| no | C-07233-06109 | 10/4/2007 | certified | 11/1/2007 | 9/1/2008 | Kona Coffee & Tea Co | 73-4174 Hulikoa Dr | Kailua-Kona | HI |
| **Florida** | | | | | | | | | |
| no | A-07239-04679 | 10/17/2007 | certified | 11/15/2007 | 6/10/2008 | Mity Mole, Inc. | | Arcadia | FL |
| no | A-07242-04691 | 10/24/2007 | certified | 11/19/2007 | 5/30/2008 | EAM Harvesting | | redacted | FL |
| no | A-07244-04697 | 10/23/2007 | certified | 11/1/2007 | 6/20/2008 | Alejandro Olguin (owner/FLC) | | Arcadia (work | FL |
| no | A-07244-04698 | 10/16/2007 | certified | 11/1/2007 | 5/31/2008 | Fructuoso Olguin | | Arcadia (work | FL |
| no | A-07248-04707 | 10/14/2007 | certified | 11/1/2007 | 6/15/2008 | DeSoto Harvesting, Inc. | | Arcadia | FL |
| no | A-07249-04708 | 10/2/2007 | certified | 10/30/2007 | 6/30/2008 | Nestor Morales, FLC | | Arcadia | FL |
| no | A-07249-04709 | 10/5/2007 | certified | 10/22/2007 | 6/30/2008 | Jacinto Hernandez, FLC | | Arcadia | FL |
| no | A-07253-04716 | 10/9/2007 | certified | 11/1/2007 | 5/30/2008 | Sergio Ramirez | | Arcadia | FL |
| no | A-07254-04721 | 10/15/2007 | certified | 10/26/2007 | 7/15/2008 | Evelio Garcia Harvesting | 1630 Farrington Ave | Labelle | FL |
| no | A-07256-04727 | 10/11/2007 | certified | 10/29/2007 | 3/31/2008 | TKM - Bengard Farms, LLC | | Belle Glade | FL |
| no | A-07256-04728 | 10/15/2007 | certified | 10/28/2007 | 5/31/2008 | Pero Family Frms, LLC | | Delray Beach | FL |
| no | A-07257-04731 | 10/5/2007 | certified | 11/1/2007 | 6/30/2008 | Southern Gardens Growers Corp. | | Clewiston | FL |
| no | A-07257-04732 | 10/3/2007 | certified | 11/1/2007 | 6/7/2008 | Florida Pacific Farms | | Dover | FL |
| no | A-07257-04733 | 10/22/2007 | certified | 11/1/2007 | 6/30/2008 | Consolidated Citrus Ltd Partnership | | Ft Myers | FL |
| no | A-07257-04734 | 10/3/2007 | certified | 11/1/2007 | 7/15/2008 | Sunny South Packing Co | | Arcadia | FL |
| no | A-07257-04736 | 10/3/2007 | certified | 11/1/2007 | 7/15/2008 | Everglades Harvesting & Hauling, Inc. | | Labelle | FL |
| no | A-07259-04741 | 10/15/2007 | certified | 11/8/2007 | 6/20/2008 | Benjamin M Ramirez Harvesting, Inc. | | Arcadia | FL |
| no | A-07259-04743 | 10/18/2007 | certified-65 | 11/8/2007 | 6/20/2008 | J Jesus Moreno Harvesting | | Arcadia | FL |
| no | A-07261-04750 | 10/26/2007 | certified | 11/10/2007 | 5/10/2008 | Toto's Picking Corp. | | Homestead | FL |
| no | A-07263-04757 | 10/23/2007 | withdrawn | 11/19/2007 | 6/30/2008 | Jaime Lopez/ JL Harvesting | | Arcadia | FL |
| no | A-07267-04761 | 10/15/2007 | certified | 11/9/2007 | 6/7/2008 | Orange Blossom Harvesting, Inc. | | Arcadia | FL |
| no | A-07269-04765 | 12/20/2007 | denied | 11/15/2007 | 5/31/2008 | Tradelink International Group, LLC obo | | Mulberry | FL |
| no | A-07269-04766 | 10/18/2007 | part certified- | 11/11/2007 | 7/1/2008 | Spivey Farm | | Plant City | FL |
| no | A-07269-04767 | 10/26/2007 | certified | 11/16/2007 | 5/10/2008 | Toto's Picking Corp. | | Homestead | FL |
| no | A-07270-04772 | 10/17/2007 | certified | 11/12/2007 | 7/6/2008 | Overlook Harvesting Co, LLC | | Winter Haven | FL |
| no | A-07270-04773 | 10/15/2007 | certified | 11/12/2007 | 6/30/2008 | Ernesto Barajas Harvesting | | Arcadia | FL |
| no | A-07270-04774 | 11/15/2007 | certified | 11/12/2007 | 6/30/2008 | Jesus S. Fonseca | | Lake Placid | FL |
| no | A-07270-04775 | 10/15/2007 | certified | 11/12/2007 | 6/30/2008 | Gustavo Cisneros | | Arcadia | FL |
| no | A-07270-04776 | 10/17/2007 | certified | 11/12/2007 | 6/30/2008 | Oasis Harvesting, Inc. | | Lake Placid | FL |
| no | A-07270-04777 | 10/19/2007 | certified | 11/12/2007 | 6/30/2008 | Jesus Bercerra | | Lake Placid | FL |
| no | A-07270-04778 | 11/7/2007 | certified | 11/12/2007 | 6/30/2008 | Rodriguez Citrus Harvesting, Inc. | | Labelle | FL |
| no | A-07270-04779 | 10/15/2007 | certified | 11/12/2007 | 6/30/2008 | Ruiz Harvesting, Inc. | | Okeechobee | FL |
| no | A-07270-04780 | 11/2/2007 | partial | 11/12/2007 | 6/30/2008 | Joel Guzman Harvesting | | Lake Placid | FL |
| no | A-07270-04782 | 10/22/2007 | certified | 11/12/2007 | 4/15/2008 | Triangle Farms Naples, LLC | | Naples | FL |
| no | A-07270-04784 | 10/17/2007 | certified | 11/12/2007 | 7/6/2008 | Bentley Brothers, Inc. | | Winter Haven | FL |
| no | A-07270-04785 | 10/17/2007 | certified | 11/12/2007 | 6/30/2008 | GM Harvesting | | Lake Placid | FL |
| no | A-07270-04786 | 10/17/2007 | certified | 11/15/2007 | 6/10/2008 | Arnulfo Martinez Harvesting | | Frostproof | FL |
| no | A-07271-04789 | 12/5/2007 | denied | 11/30/2007 | 9/30/2008 | Alliance Cattle | | Trenton | FL |
| no | A-07271-04791 | 10/12/2007 | denied | 11/12/2007 | 5/30/2008 | Two Brothers Farm, Inc. | | Ashburn | GA |
| no | A-07271-04793 | 10/16/2007 | certified | 11/15/2007 | 6/30/2008 | Rafael Ayala Harvesting, Inc. | | Okeechobee | FL |
| no | A-07275-04798 | 10/11/2007 | denied | 11/18/2007 | 5/30/2008 | L&J Farm Labor Picking, Inc. | | Miami | FL |
| no | A-07276-04799 | 11/20/2007 | denied | 12/15/2007 | 7/15/2008 | N & R Services of Central Florida, Inc. | | Memphis | TN |
| *no* | *A-07278-04803* | | *denied?* | *11/25/2007* | | *N & R Services of Central Florida, Inc.* | | | *FL* |
| no | A-07288-04818 | 11/20/2007 | denied | 12/3/2007 | 7/15/2008 | Jose M. Ibarra, FLC | | Arcadia | FL |
| no | A-07288-04822 | 10/30/2007 | certified | 11/29/2007 | 3/31/2008 | TKM - Bengard Farms, LLC | | Belle Glade | FL |
| no | A-07289-04826 | 11/13/2007 | certified | 11/30/2007 | 5/20/2008 | Miller Farms | | Lake Placid | FL |
| no | A-07295-04797 | 10/17/2007 | certified | 11/16/2007 | 6/30/2008 | Jose Valdovinos FLC | | Arcadia | FL |
| no | A-07298-04845 | 11/9/2007 | certified | 12/10/2007 | 6/10/2008 | Greene's Farm, Inc. | | Bunnel | FL |
| no | A-07299-04850 | 11/30/2007 | certified | 12/10/2007 | 5/30/2008 | L&J Farm Labor Picking, Inc. | | Miami | FL |
| no | A-07303-04857 | 11/30/2007 | certified | 1/1/2008 | 10/17/2008 | Adena Springs South | | Williston | FL |
| no | A-07306-04876 | 11/30/2007 | part certified | 12/31/2007 | 6/15/2008 | Basil Campbell | | Plant City | FL |
| no | A-07313-04892 | 11/28/2007 | certified-4 | 12/29/2007 | 6/10/2008 | Hyatt Farms | | Lake Wales | FL |
| no | A-07316-04895 | 12/6/2007 | certified | 12/29/2007 | 5/31/2008 | Unique Farm Services, Inc. | | Miami | FL |
| no | A-07317-04899 | 11/28/2007 | certified | 12/29/2007 | 5/31/2008 | Grainger Farms, Inc. | | Myakka City | FL |
| no | A-07318-04902 | 11/29/2007 | certified | 11/30/2007 | 9/30/2008 | Alliance Dairies | | Trenton | FL |
| no | A-07324-04930 | 1/23/2008 | denied | 1/18/2008 | 6/15/2008 | Samuel Barajas | | Arcadia | FL |
| no | A-07334-04969 | 12/12/2007 | partial | 12/14/2007 | 6/10/2008 | N & R Services of Central Florida, Inc. | | Memphis | TN |
| no | A-07338-04994 | | certified | 12/15/2007 | | N & R Services of Central Florida, Inc. | | | FL |
| no | A-07338-04998 | 12/12/2007 | part certified- | 12/3/2007 | 6/14/2008 | N & R Services of Central Florida, Inc. | | Dundee | FL |
| no | A-07338-05001 | 12/12/2007 | certified-15 | 12/15/2007 | 4/15/2008 | N & R Services of Central Florida, Inc. | | Plant City | FL |
| no | A-07338-05002 | 12/12/2007 | part certified- | 12/15/2007 | 8/20/2008 | N & R Services of Central Florida, Inc. | | Lake Wales | FL |
| no | A-07339-05021 | 12/12/2007 | certified-50 | 12/15/2007 | 6/30/2008 | N & R Services of Central Florida, Inc. | | Lake Wales | FL |
| no | A-07347-05069 | 1/14/2008 | certified | 2/1/2008 | 12/1/2008 | Great Hammock Nursery | | Jacksonville | FL |
| no | A-08004-05285 | 1/18/2008 | certified | 2/18/2008 | 7/15/2008 | Everglades Harvesting and Hauling, | | Labelle | FL |
| no | A-08011-05364 | 2/7/2008 | certified | 3/1/2008 | 12/31/2008 | Alliance Dairies | | Trenton | FL |
| no | A-08022-05520 | 12/22/2008 | part certified | 3/11/2008 | 12/15/2008 | Ken Griffin Landscape Contractors | | Gulf Breeze | FL |
| no | A-08031-05681 | 2/15/2008 | certified | 3/16/2008 | 6/30/2008 | Jesus Bercerra | | Lake Placid | FL |
| no | A-08032-05711 | 2/15/2008 | certified (12) | 3/17/2008 | 6/15/2008 | F.C. of Arcadia, Inc. | | Arcadia | FL |
| no | redacted | 10/2/2007 | certified | 11/10/2007 | 6/15/2008 | redacted (FC of Arcadia) | | Arcadia | FL |
| no | redacted | 10/17/2007 | certified | 11/12/2007 | 6/30/2008 | redacted (Alta Citrus) | | Ft Myers | FL |
| no | redacted (A-07256-04730) | 10/30/2007 | certified | 11/29/2007 | 8/29/2008 | redacted (Adena Springs South) | | Williston | FL |
| no | redacted (A-07288-04821) | 11/6/2007 | certified | 1/29/2007 | 6/21/2008 | redacted (Florida Pacific Farms) | | Dover | FL |
| **Virginia** | | | | | | | | | |
| no | A-07302-04852 | 12/10/2007 | part certified- | 1/3/2008 | 11/1/2008 | R. Hart Hudson farms | | South Hill | VA |
| no | A-07317-04900 | 12/14/2007 | part certified-1; | 1/1/2008 | 11/1/2008 | Rosemont Vineyard & Farms, LLC | | LaCrosse | VA |
| no | A-07325-04936 | 12/13/2007 | certified-40 | 1/7/2008 | 11/7/2008 | Oaksworth Partners, LLC | | Chantilly | VA |
| no | A-07333-04950 | | withdrawn | 1/25/2008 | 11/25/2008 | Virginia Growers, Inc. | | Montpelier | VA |
| no | A-07334-04968 | 1/14/2008 | certified | 1/25/2008 | 11/25/2008 | Virginia Growers, Inc. | | Montpelier | VA |
| no | A-07337-04982 | 1/16/2008 | certified | 2/1/2008 | 11/29/2008 | Saunders Brothers, Inc. | | Piney River | VA |
| no | A-07337-04983 | 1/16/2008 | certified | 2/1/2008 | 11/28/2008 | Saunders Brothers, Inc. | | Piney River | VA |
| no | A-07339-05019 | 1/10/2008 | certified | 1/21/2008 | 11/21/2008 | Bremo Trees, LLC | | Bremo Bluff | VA |
| no | A-07344-05051 | 1/24/2008 | certified | 2/19/2008 | 11/21/2008 | Sandy's Plants, Inc. | | Mechanicsville | VA |
| no | A-07351-05094 | 1/14/2008 | certified-2 | 2/1/2008 | 12/1/2008 | Lowfield Farm, LLC | | Palmyra | VA |
| no | A-07352-05115? | 1/16/2008 | certified -24 | 2/15/2008 | 11/13/2008 | Chesterfield Berry Farm, Inc. | | Mosley | VA |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| no | A-07362-05199 | 2/13/2008 certified -6 | 2/15/2008 | 11/15/2008 Southside Nursery (& jnt employer | | Alton | VA |
| no | A-07365-05224 | 1/17/2008 certified | 2/15/2008 | 12/15/2008 Watkins Nurseries, Inc. | | Midlothian | VA |
| no | A-08007-05306 | 2/8/2008 certified -6 | 3/8/2008 | 11/17/2008 Belvedere Plantation, Inc. | | Fredericksburg | VA |
| no | A-08010-05356 | unknown | 3/15/2008 | 12/1/2008 Dianis Brothers | | Emporia | VA |
| no | A-08011-05380 | 2/20/2008 certified | 3/14/2008 | Labor Services Internation obo Gils | | | |
| no | A-08015-05422 | 2/15/2008 certified | 3/17/2008 | 12/1/2008 Barnes Farming | | Stony Creek | VA |
| no | A-08017-05450 | 2/1/2008 certified-72 | 3/1/2008 | 12/6/2008 Virginia Agricultural Growers' Assn - | | multiple | VA |
| no | A-08022-05522 | unknown | 3/21/2008 | 11/1/2008 Manning Farms, Inc. | | South Hill | VA |
| no | A-08024-05560 | 2/12/2008 certified-10 | 3/10/2008 | 12/15/2008 Lewis Nursery, Inc. | | Cascade | VA |
| no | A-08025-05590 | unknown | 3/29/2008 | 12/10/2008 Cloverdale Farm | | Sutherlin | VA |
| no | A-08028-05617 | pending | 4/1/2008 | 10/15/2008 Sycamore Creek Vineyard | | Floyd | VA |
| no | A-08028-05618 | unknown | 3/20/2008 | 11/20/2008 Dan Valley Farms | | Ararat | VA |
| no | A-08028-05628 | unknown | 3/13/2008 | 12/15/2008 Manquin Gardens Nursery | | Aylett | VA |
| no | A-08029-05654 | unknown | 4/1/2008 | 11/1/2008 R. Hart Hudson Farms | | South Hill | VA |
| no | A-08030-05670 | unknown | 3/21/2008 | 11/1/2008 Garner's Produce | | Warsaw | VA |
| no | A-08036-05751 | unknown | 4/5/2008 | 1/5/2009 Over the Grass Farm | | The Plains | VA |
| no | A-08036-05755 | unknown | 4/10/2008 | 12/1/2008 Ricky Horton | | Blackwater | VA |
| no | A-08042-05843 | pending | 4/1/2008 | 11/15/2008 Snake Creek Farms | | Fancy Gap | VA |
| no | A-08042-05850 | unknown | 4/1/2008 | 10/31/2008 Merryvale Farms | | Hardyville | VA |
| no | redacted | 1/18/2008 certified-35 | 2/14/2008 | 11/1/2008 Bryant Orchards, Inc. | | Fincastle | VA |
| no | redacted | 1/16/2008 certified-30 | 2/7/2008 | 12/20/2008 Dodd's Acres Farm | | Mechanicsville | VA |
| no | redacted | 12/21/2007 certified-18 | 1/19/2008 | 11/14/2008 Horton Vineyard, Inc. | | Orange | VA |
| no | redacted | 2/4/2008 certified | 3/3/2008 | 12/31/2008 Keith Tree Farms | | Hillsville | VA |
| no | redacted | 1/10/2008 certified | 2/1/2008 | 12/1/2008 Lancaster Farms, Inc. | | Suffolk | VA |
| no | redacted | | 3/1/2008 | 12/1/2008 Meadowspring Turf, LLC | | | |
| no | redacted | 1/10/2008 certified | 2/1/2008 | 11/1/2008 Mount Juliet Vineyards | | Crozet | VA |
| no | redacted | 1/3/2008 certified | 1/30/2008 | 11/15/2008 Mt. Clifton Fruit Company, LLC | | Timberville | VA |
| no | redacted | 2/20/2008 certified | 3/15/2008 | 11/14/2008 Old Church Sod, LLC | | | |
| no | redacted (***- | 2/13/2008 partial | 3/3/2008 | 12/10/2008 Engel Family Farms | | Hanover | VA |
| no | redacted (A-***- | 1/3/2008 certified -5 | 2/1/2008 | 9/1/2008 Crowder Farms | | Mechanicsville | VA |
| | redacted (A- | | | | | | |
| no | 07339-05018) | 1/10/2008 certified | 2/3/2008 | 10/31/2008 redacted (Barboursville Winery, Inc) | | Barboursville | VA |
| | redacted (A- | | part certified | | | | |
| no | 07351-05099) | 1/30/2008 (32); part | 2/15/2008 | 12/15/2008 Historyland Nursery, Inc. | | Warsaw? | VA |
| | redacted (A- | | | | | | |
| no | 07357-05116?) | | 2/1/2008 | 11/1/2008 Blue Ridge Fish Hatchery | | | VA |
| | redacted (A- | | | | | | |
| no | 07361-05178) | 1/11/2008 certified | 2/11/2008 | 11/1/2008 redacted (Acorn Hill Vineyard, LLC) | | Madison | VA |
| | redacted (A- | | | | | | |
| no | 08016--05442)? | 2/7/2008 certified | 3/1/2008 | 12/15/2008 Francis Barlow, Jr. Farms | | Ruther Glenn | VA |

RUIZ DECLARATION
EXHIBIT 2

U.S. DEPARTMENT OF LABOR
Employment and Training Administration

## APPLICATION
## FOR
## ALIEN EMPLOYMENT CERTIFICATION

OMB Approval No. 44-R1301

IMPORTANT: READ CAREFULLY BEFORE COMPLETING THIS FORM

PRINT legibly in ink or use a typewriter. If you need more space to answer questions in this form, use a separate sheet. Identify each answer with the number of the corresponding question. SIGN AND DATE each sheet in original signature.

To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by $10,000 fine or 5 years in the penitentiary, or both (18 U.S.C. 1001)

### PART A. OFFER OF EMPLOYMENT

| 1. Name of Alien | (Family name in capital letter, First, Middle, Maiden) |
|---|---|

| 2. Present Address of Alien | (Number, Street, City and Town, State ZIP code or Province Country) | 3. Type of Visa (If in U.S.) |
|---|---|---|

The following information is submitted as an offer of employment.

RECEIVED
AUG 10 2007
Foreign Labor Certification
NATIONAL PROCESSING CENTER-CHICAGO

| 4. Name of Employer | (Full name of Organization) | 5. Telephone |
|---|---|---|
| HAWAIIAN QUEEN CO. | | (808) 328-2656 |

| 6. Address | (Number, Street, City and Town, State ZIP code) |
|---|---|
| 89-941 HAWAII BELT ROAD | |
| CAPTAIN COOK          HI          96704 | |

CORRECTION APPROVED BY
NATIONAL PROCESSING CENTER
LW ON 8/13/07
DATE

| 7. Address Where Alien Will Work | (if different from item 6) |
|---|---|

| 8. Nature of Employer's Business Activity | 9. Name of Job Title | 10. Total Hours Per Week | | 11. Work Schedule (Hourly) | 12. Rate of Pay |  |
|---|---|---|---|---|---|---|
| | | a. Basic | b. Overtime | | a. Basic | b. Overtime |
| | BEE WORKER | 40 | 10 | 7 a.m. 4 p.m. | $ 10.32 per Hourly | $10.32 per hour |

13. Describe Fully the job to be Performed    (Duties)

Work as a beekeeper, harvesting queen bees using prescribed techniques, stocking nucleus hives and counting and storing queens harvested daily. Other misc. duties include relocating beehives from one location to another, harvesting honey and feeding and medicating bees.

14. State in detail the MINIMUM education, training, and experience for a worker to perform satisfactorily the job duties described in item 13 above.

| | Grade School | High School | College | College Degree Required (specify) |
|---|---|---|---|---|
| EDU-CATION (Enter number of years) | 0 | 4 | 0 | NOT APPLICABLE |
| | | | | Major Field of Study |
| | | | | NOT APPLICABLE |
| TRAIN-ING | No. Yrs. 0 | No. Mos. 0 | | Type of Training |
| | | | | NOT APPLICABLE |
| EXPERI-ENCE | Job Offered | Related Occupation | | Related Occupation (specify) |
| | Yrs. 0 | Mos. 6 | Number Yrs. 0  Mos. 0 | NOT APPLICABLE |

15. Other Special Requirements

Must have or be able to obtain a valid driver's license. Basic English skills. Able to lift 60 lbs.

| 16. Occupational Title of Person Who Will Be Alien's Immediate Supervisor | OWNER | 17. Number of Employees Alien Will Supervise | 0 |
|---|---|---|---|

ENDORSEMENTS (Make no entry in section - for Government use only)

1. Qualified workers cannot be found in the United States
2. Division of Foreign Labor Certification Policies have been observed.
3. This certification is valid from 10/1/07 through 7/31/08

4/6/07
(Date)

Marie C. Gonzalez
(Certifying Officer)

| Date Forms Received | |
|---|---|
| L.O. | S.O. |
| R.O. 9/9/07 | N.O. |
| Ind. Code | Occ. Code 413.161.010 |
| | Occ. Title BeeKeeper |

Replaces MA 7-50A, B and C (Apr. 1970 edition) which is obsolete.

ETA 750 (Oct. 1979)

ETA Case Number  C-07191-05916

| 18. COMPLETE ITEMS ONLY IF JOB IS TEMPORARY | | | 19. IF JOB IS UNIONIZED (Complete) | | |
|---|---|---|---|---|---|
| a. No. of Open-ings To Be Filed By Aliens Under Job Offer | b. Exact Dates You Expect To Employ Alien | | a. Number of Local | b. Name of Local | |
| | From | To | | | |
| **4** | **10/01/2007** | **07/31/2008** | | c. City and State | |

| 20. STATEMENT FOR LIVE-AT-WORK JOB OFFERS (Complete for Private Household ONLY) | | | | | | | |
|---|---|---|---|---|---|---|---|
| a. Description of Residence | b. No. Persons residing at Place of Employment | | | | c. Will free board and private room not shared with any-one be provided? | | ("X" one) |
| ("X" one) | Number of Rooms | Adults | Children | Ages | | | |
| ☐ House | | | BOYS | | | | ☐ YES ☐ NO |
| ☐ Apartment | | | GIRLS | | | | |

21. DESCRIBE EFFORTS TO RECRUIT U.S. WORKERS AND THE RESULTS (Specify Sources of Recruitment by Name)

WE plan to implement and carry out a positive recruitment plan upon direction of the Department of Labor.

22. Applications require various types of documentation. Please read Part II of the instructions to assure that appropriate supporting documentation is included with your application.

### 23. EMPLOYER CERTIFICATIONS

By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.

a. I have enough funds available to pay the wage or salary offered the alien.

b. The wage offered equals or exceeds the pre-vailing wage and I guarantee that, if a labor certi-fication is granted, the wage paid to the alien when the alien begins work will equal or exceed the pre-vailing wage which is applicable at the time the alien begins work.

c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly, or monthly basis.

d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.

e. The job opportunity does not involve unlawful discri-mination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.

f. The job opportunity is not:

(1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.

(2) At issue in a labor dispute involving a work stoppage.

g. The job opportunity's terms, conditions and occupa-tional environment are not contrary to Federal, State or local law.

h. The job opportunity has been and is clearly open to any qualified U.S. worker.

### 24. DECLARATIONS

| DECLARATION OF EMPLOYER | Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury the foregoing is true and correct. | |
|---|---|---|
| SIGNATURE *Micheal Krones* | | DATE **7·25·07** |
| NAME (Type or Print) **MICHEAL KRONES** | TITLE **PRESIDENT** | |
| AUTHORIZATION OF AGENT OF EMPLOYER | I HEREBY DESIGNATE the agent below to represent me for the purposes of labor certification and I TAKE FULL RESPONSIBILITY for accuracy of any representations made by my agent. | |
| SIGNATURE OF EMPLOYER *Micheal Krones* | | DATE **7·25·07** |
| NAME OF AGENT (Type or Print) **LEISHA VATNSDAL** | ADDRESS OF AGENT (Number, Street, City, State, ZIP code) **112 E LINCOLN AVE.**   **BOX 677** **FERGUS FALLS      MN     56537** | |

ETA Case Number  **C-07191-05916**

U.S. Department Labor    **Employment and Training Administration**
Chicago Processing Center
844 N. Rush Street
12th Floor
Chicago, IL 60611


September 06, 2007

LEISHA VATNSDAL                          Case Number:   C-07191-05916
112 E LINCOLN AVE., BOX 677
FERGUS FALLS, MN 56537

### RE: HAWAIIAN QUEEN CO.


Dear Sir/Madam:

On August 13, 2007, this office accepted for consideration an application from you requesting H-2A temporary alien labor certification for 4 job opportunity(ies). Pursuant to 20 CFR 655.106, it has been determined that a sufficient number of able, willing and qualified U.S. workers have not been identified as being available at the time and place needed to fill all of the job opportunity for which certification has been requested. We are, therefore, granting certification for 4 job opportunity(ies).

### Certification Granted:

A.   Number/Title of job opportunities certified: 4/BEE KEEPER
B.   Crop and Activity:                    Bees
C.   Area of Employment:                  Captain Cook, HI
D.   Period covered by certification:     10/01/2007 - 07/31/2008

We hereby certify that the employment of the H-2A temporary alien agricultural workers in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

As provided by 20 CFR 655.106(c)(1), this certification is granted subject to the conditions and assurances made during the application process and the provisions of 20 CFR 655.106(e).

Consistent with the latter regulation, you must consider for employment all U.S. workers who are referred and will not refuse to hire any available worker for other than lawful job-related reasons until 50% of the contract period has elapsed.

You are reminded that 20 CFR 655.102(b) (11) stipulates that terminations of workers for cause and abandonment of the job by workers are to be reported. You should report terminations and job abandonment to the State Workforce Agency in writing within two (2) business days of the termination or, in the case of abandonment, within two (2) business days of discovering abandonment.

Enclosed is the bill for fees assessed for the H-2A certification. **Include your case number on any correspondence sent to the National Processing Center. Failure to do so may result in a delay in processing your application. Direct inquiries to Lynette Wills at 312-353-5719.**

Upon receipt of this notification, you will need to submit to the US Citizenship and Immigration Service (USCIS) the I-129 Form that is required in conjunction with an H-2A temporary labor certification application to the following location:

> **USCIS California Service Center**
> **Attn: I-129**
> **P.O. Box 10129**
> **Laguna Niguel, CA 92607-1012**

The USCIS application form can be obtained at http://www.uscis.gov.

Sincerely,


Marie C. Gonzalez
Certifying Officer

Enclosure: Invoice for Certifications
CC: HAWAIIAN QUEEN CO.
        Workforce Development Division

Agricultural and Food Processing Clearance Order
Pedido de Empleados para Agricultura y Procesamiento de Alimentos

U.S. Department of Labor
Employment and Training Administration
O.M.B. Approval No. 1205-0134, Expires 08/31/2009

Employer's Name and Address (Number, Street, City, State, Zip Code, and telephone number)
Nombre y Dirección del Empleador (Número, calle, ciudad, código postal y teléfono)

Hawaiian Queen Co.
89-941 Hawaii Belt Rd.
Captain Cook, HI 96704   (808)328-2656

| Industry Code / Código de Industria | Job Order # / No. Orden de Empleo |
|---|---|

Occupational Title and Code /Título Ocupacional y Código

Clearance Order Issue Date / Fecha de Tramite:

Location and Direction to Work Site / Dirección del lugar de trabajo

89-941 Hawaii Belt Road
Captain Cook, HI 96704

See item 2, page 1

(see attachment / para más detalles vea)

Job Order Expiration Date / Fecha de expiración:

6. Anticipated Period of Employment / Periodo Anticipado de Empleo
From/ Desde: 10/1/2007  To /Hasta 7/31/2008

CORRECTION APPROVED BY
NATIONAL PROCESSING CENTER
LW ON 8/15/07
DATE

7. No. of Worker's Requested / No. Trabajadores Pedidos
4

Location and Description of Housing / Dirección y Descripción de la Vivienda

Cabin
89-941 Hawaii Belt Road
Captain Cook, HI 96704
See item 3, page 1

(see attachment / para más detalles vea)

8. Anticipated Hours of Work per Week / Horas
Anticipadas de Trabajo por Semana    Total: 50 40

| | | | |
|---|---|---|---|
| Sunday / Domingo | 5 | Wednesday / Miercoles | 8 |
| Monday / Lunes | 8 | Thursday / Jueves | 8 |
| Tuesday / Martes | 8 | Friday / Viernes | 8 |
| | | Saturday / Sabado | 5 |

9. Collect Calls Accepted/Se Aceptan Llamadas a Cobrar:
Employer / El Empleador    Yes ☐  No ☑
Local Office/Oficina Local    Yes ☐  No ☑

Board Arrangements / Arreglo de Alojamiento

See item 4, page 2

Referral Instructions / Instrucciones para el Referimiento de Candidatos

See item 5, page 2

(see attachment / para más detalles vea)

10. Job Specifications / Descripción del Trabajo [Summary of Material Job Specifications in ENGLISH must be included inside this box]

Work as beekeeper, harvesting queen bees using prescribed techniques, stocking nucleus hives and counting and storing queens harvested daily. Other misc. duties include relocating beehives from one location to another, harvesting honey and feeding and medicating bees. Must have or be able to obtain valid driver's license. Basic English skills. Able to lift 60 lbs.

10 a. Descripción del Trabajo / Job Specifications [Summary of Material Job Specifications in SPANISH must be included inside this box]

(see attachment / para más detalles vea)

(see attachment / para más detalles vea)

ETA 790 (Rev. July 2004)

Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciones (Retiros)

| Activities / Cultivos | Hourly Wage Salario por Hora | Piece Rate / Unit(s) Pago por Pieza / Unidad(es) | Special Pay (bonus, etc.) Pagos Especiales (Bono, ect.) | Deductions / Deducciones | YES SI | NO | Pay Period Periodo de Pago |
|---|---|---|---|---|---|---|---|
| e keeping | $ 10.32 | $ | | Social | ✓ | | Weekly / Semanal |
| | $ | $ | | Federal Tax Impuestos Federales | ✓ | | |
| | $ | $ | | State Tax Impuestos Estatales | ✓ | | Bi-weekly / cada 2 sem. ✓ |
| | $ | $ | | Meals (comidas) | | ✓ | |
| | $ | $ | | Other (specify)/ Otro | | ✓ | Other / Otro |

re Details About the Pay/Más Detalles Sobre el Pago

see page 3, item 11

Transportation Arrangements / Arreglos de Transportación (Please explain)

(see attachment / para más detalles vea ___)

see page 4, item 12

(see attachment / para más detalles vea ___)

Is it the prevailing practice to use Farm Labor Contractors (FLC) to recruit, supervise, transport, house, or pay workers for this (these) crop activity(ies)? Es la costumbre en el area de r Contratistas Agrícolas para reclutar, supervisar, transportar, dar vivienda, ó pagarle a los trabajadores en este/estos tipo(s) de cosecha(s)/sembrado(s)? Yes/Si ☐ No ☒ If you ve checked yes, what is the FLC wage for each activity?/Si contesto "SI," cual es el salario que le paga el Contratista Agrícola para cada actividad?

. Unemployment Insurance provided / Seguro por Desempleo:                                        Yes ☐          No ☒
. Workers' compensation insurance provided / Indemnización por accidente de trabajo:              Yes ☒          No ☐
. Are tools provided at no charge to the workers? / ¿Se le proveen las herramientas de trabajo a los trabajadores sin cargo alguno?  Yes ☒  No ☐
. List any arrangements which have been made with establishment owners or agents for the payment of a commission or other benefits for sales made to workers. (If there are no such angements, enter "None")/Indique todo acuerdo o convenio con los propietarios del establecimiento o sus representantes con respecto al pago de una comisión u otros beneficios por ntas hechas a los trabajadores. (Si no hay ningún acuerdo o convenio, indique "Ninguno")

NONE

. List any strike, work stoppage, slowdown, or interruption of operation by the employees at the place where the workers will be employed. (If there are no such incidents, enter "None")/ umere todo huelga, paro o interrupción de las operaciones por parte de los empleados en el lugar de empleo. (Si no hay, indique "Ninguno")

NONE

| . Address of Order Holding Office (include Telephone number)/Dirección de la Oficina donde Radicó la Oferta (incluya número de teléfono) | 20. Name of Local Office Representative (include direct dial telephone number) / Nombre del Representante de la Oficina Local (Incluya numero de telefono) |
|---|---|
| | Leisha Vansdal 218-739-3241 x 3530 |

. Employer's Certification: This job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job. rtificacion del Empleador: Esta orden de trabajo describe los términos y condiciones de trabajo y contiene todos los materiales, terminus, y condiciones de la job.
mployer's Signature & Title/ Firma y Título del Empleador

*Leisha Vansdal*        7-12-07

EAD CAREFULLY: In view of the statutorily established basic function of the Employment Service as a no-fee labor exchange, that is, as a forum for bringing together employers and job eekers, neither the ETA nor the State agencies are guarantors of the accuracy or truth-fullness of information contained on orders submitted by employers. Nor does any job order ccepted or recruited upon by the One-Stop Career Center constitute a contractual job offer to which the One-Stop Career Center, ETA or a State agency is in any way a party. EASE CUIDADOSAMENTE: En vista de su función básica establecida estatutariamente el Servicio de Empleo es un intercambio gratis de trabajo para juntar los empleadores y rabajadores que buscan empleo, ni ETA ni las agencias del estado pueden garantizar la verdad y certeza de la información contenida en la Orden de Trabajo sometida por el Empleador. ampoco, ninguna orden de trabajo aceptada o reclutada por el Servicio de Empleos constituye una oferta contractual de la cual ETA ni la agencia del Estado son parte

ublic reporting burden for the ETA Form 790 is estimated to be approximately 60 minutes per response, including time for reviewing instructions, searching existing data sources, gathering nd reviewing the collection. Respondents obligacation to reply to these requirements are mandatory by 20 CFR 653.500. Persons are not required to respond to this collection of formation unless it displays a currently valid OMB control number. Comments regarding this burden estimate or any other aspect of this collection, including suggestions for reducing the urden can be sent to the U.S. Department of Labor, Office of Workforce Investment, Room S-4321, Washington, D.C. 20210 (Paperwork Reduction Project 1205-0134).

ETA 790 (Rev. July 2004)

# Attachments to ETA Form 790

**Job Order Number:** _____

## ITEM 2 - LOCATION AND DIRECTION TO WORK SITE:

The work site is located at __89-941 Hawaii Belt Rd, Captain Cook, HI__ in the following county/counties: _____. The directions to the work site are: __From the kona airport, take Hawaii Belt road around the island to mile marker 86.__

## ITEM 3 - LOCATION AND DESCRIPTION OF HOUSING:

Location: Housing is located at __89-941 Hawaii Belt Road Captain Cook, HI__

Directions to housing are __See above__

Description of housing: __Cabin__

Housing will be clean and meet applicable Federal Housing Standards. Workers will be responsible for maintaining housing in a neat, clean manner. Reasonable repair cost of damage, other than that caused by normal wear and tear, will be deducted from the earnings of workers found to have been responsible for damage to housing or furnishings. Housing and utilities are provided at no cost to workers who are unable to return to their place of residence the same day. _If both male and female workers are hired_, separate toilet, shower facilities, _and sleeping rooms_, will be provided by the employer.

**Employer requests conditional access into the Interstate and Intrastate Clearance System and assures that the worker housing will meet the applicable Federal Standards not later than 30 days in advance of the date of need reflected on the attached ETA 790.**

_____    _____
**Signature**                **Date** 7-12-07

RECEIVED
AUG 09 2007
FOREIGN LABOR CERTIFICATION
NATIONAL PROCESSING CENTER-CHICAGO

1

Workers may be reached at the following address and phone number:

ADDRESS: _89-941 Hawaii Belt Rd_ PHONE NUMBER: _808-328-2656_
_Captain Cook, HI 96704_

## ITEM 4 - BOARD ARRANGEMENTS: *(Check Appropriate Item(s))*

____Employer will provide 3 meals per day and will deduct $_____per day.

__✓__Employer will furnish free and convenient cooking and kitchen facilities so workers may prepare their own meals. Employer will provide (on a voluntary basis) transportation to assure workers access to stores where they can purchase groceries.

## ITEM 5 - REFERRAL INSTRUCTIONS: *(Include here who an applicant or State Workforce Agency Representative should contact concerning employment and how that person may be reached)*

_Please contact: Leisha Vamsdal, Agent_
_112 E. Lincoln Ave_
_Fergus Falls, MN 60557_
_218 739-3241 x3630_

Applicants, Workforce Agency Personnel, Walk-ins, Gate Hires, etc. may:
____Call for an interview during normal business hours at the number listed on the ETA 790.
____Report to the farm office or worksite listed on the ETA 790.
__✓__Other (describe) _Please contact above agent_

## ITEM 8 - ANTICIPATED HOURS OF WORK:

__9__hours per day is normal. The worker may be requested but not required to work __5__hours per day and/or on the Sabbath or Federal holidays depending upon the conditions in the fields or orchards, weather and maturity of the crop.

## ITEM 11 - WAGE RATES, SPECIAL PAY INFORMATION AND DEDUCTIONS:

(a) The Adverse Effect Wage Rate of $ 10.32 , the prevailing hourly wage rate or piece rate, or the federal minimum wage rate, whichever is greatest, will be the minimum rate of pay. Employer assures that if a change in the AEWR requires an increase in the guaranteed minimum, such increase will be paid as of the effective date of the increase.   If the worker's piece rate earnings for a pay period result in average hourly earnings of less than the guaranteed minimum, the worker will be provided make-up pay to the guaranteed minimum rate.

This job offer includes the following crop activities and rates of pay per unit: (*Include all crops and activities not listed on ETA 790, Item 9*)

_____

_____

_____

_____

_____

_____

_____

_____

(b) The following deductions will be made:

____✓____ Taxes, if applicable under Federal, State, and local law from U.S. Workers;
_____ ✓ FICA Taxes ___✓ FUTA Taxes _✓ Federal Income Tax Withholding
___✓_____ Advances;
_____ Meals;
____✓____ Willful destruction of property;
_____ Other (Specify) _____.

No deductions will be made which would bring the employee's hourly wage below the Federal Minimum Wage.

(c) The employer will _____, will not___✓___ pay the worker a bonus of $_____, based on Quality Picking _____ End of Season _____ Other_____. Anticipated date by which payments will be made: _____ .

(d) Employer guarantees to offer employment for a minimum of ¾ of the workdays of the total specified period during which the work contract and all extensions thereof are in effect, beginning with the first day after worker arrives at the place of employment and ending on the expiration date specified in the work contract or extensions thereof. In Act of God termination, the ¾ guarantee period ends on the date of termination.

(e) Payroll Periods will be ____Weekly: ___✓___Twice Monthly. Workers will be paid on 1st ✓ 15th (day of the week) each payroll period and will be provided with an earnings statement, which contains at a minimum, the hours actually worked, total

3

earnings, *piece rates/ number of units (if piece rates are used),* and all deductions. The statements will comply with 20CFR 655.102(b)(8).

(f) Employer will provide a worker referred through the interstate clearance system _40_ hours of work for the week beginning with the anticipated date of need, unless employer has amended the date of need by notifying the order holding office no later than 10 days before the date of need. If employer fails to notify the order-holding office, then employer shall pay an eligible worker referred through the clearance system $ _10. 32/hr_, for the first week starting with the originally anticipated date of need. Employer will ____ will not _✓_ require worker to perform alternative work if the guarantee cited in this section is invoked.    Alternate work may be provided if the guarantee cited in this section is invoked. The alternate work and pay will be:

If a worker referred through the interstate clearance system fails to notify the order-holding office of continued interest in the job at least 5 days before the date of need, worker will be disqualified from the above-mentioned assurance.

## ITEM 12 - TRANSPORTATION ARRANGEMENTS:

The employer will provide advance transportation for reasonable (most economical) common carrier or other transportation which conforms to the Interstate Commerce Commission (ICC) inbound transportation **(if it is the prevailing practice).** If not the prevailing practice, the employer will reimburse the worker for transportation costs and subsistence to the employer's work site when the worker completes 50% of the work period.

The employer will also provide **advance** subsistence at a minimum amount of **$ N/A** per 24-hour period of travel from place of recruitment to the place of employment **(if it is the prevailing practice).**

Workers who provide receipts for meals and non-alcoholic beverages in excess of **$ N/A** will be reimbursed during the first pay period, up to the maximum amount of **$ N/A** per 24-hour period of travel from place of recruitment to the place of employment **(if it is the prevailing practice).**

Workers who voluntarily quit or are terminated for cause prior to completing 50% of the contract period will be required to reimburse the employer for the full amounts of transportation and subsistence which **were advanced and/or reimbursed to the worker.**

After worker has completed 50% of the work contract period, employer will reimburse worker for the cost of transportation and subsistence from the place *of recruitment* to the place of employment. Upon completion of the work contract, employer will pay reasonable costs of return transportation and subsistence **(travel reimbursement subsistence will be the minimum amount of $9.80** per 24-hour period of travel and the maximum amount will be **$9.52 AMV**

4

$ 39.00    per day) from the place of employment to the place of recruitment, except when the worker will not be returning to the place of recruitment due to subsequent employment with another employer who agrees to pay such costs, in which case the employer will only pay for the transportation *and subsistence* to the next job. The amount of the transportation payment will be equal to the most economical and reasonable similar common carrier transportation charges for the distance involved.    These arrangements apply only to workers for whom the employer is legally obligated to supply housing.

Free transportation will be provided from the housing location to the work site and return each day.

## ITEM 13 - OTHER CLARIFICATIONS AND ASSURANCES:

TERMINATIONS: The employer may terminate the worker with notification to the Employment Service if the worker: (a) refuses without justified cause to perform work for which the worker was recruited and hired; (b) commits serious acts of misconduct; or (c) fails, after completing any training or break-in period, to reach productions standards when production standards are applicable.

In the event of termination for medical reasons occurring after arrival on the job, or occurring as a result of employment, or in the event of termination resulting from an Act of God, the employer will pay or provide reasonable costs of return transportation and subsistence to the place *of recruitment. Additionally, the employer will* reimburse worker for reasonable costs of transportation and subsistence incurred by the worker to get to the place of employment.

**EMPLOYER FURNISHED TOOLS AND EQUIPMENT: The employer will furnish, without cost, all tools, supplies, or equipment required in the performance of work.**

TRAINING: Training will be provided for _1_ days and workers will be allowed _1_ days to reach the production standards of the activity.

PRODUCTION STANDARDS: Worker will be expected to meet the following production standards after completion of training or break-in period, if applicable: (*List the production standards for each activity if production standards are applicable*):

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

5

INJURIES: The employer will provide Workers Compensation Insurance or equivalent employer provided insurance, at no cost to the worker, covering injury and disease arising out of, and in the course of, the worker's employment. Employer's proof of insurance coverage will be provided to the ETA field office before certification is granted.

EMPLOYER OBLIGATION IF EMPLOYMENT EXTENDED: No extension of employment beyond the period of employment specified in the job order shall relieve the employer from paying the wages already earned, or, if specified in the job order as a term of employment, providing return transportation or paying return transportation expenses to the worker.

TERMS AND CONDITION CHANGES: The employer will expeditiously notify the order-holding office or State agency by telephone immediately upon learning that a crop is maturing earlier or later, or that weather conditions, over-recruitment, or other factors have changed the terms and conditions of employment.

OUTREACH WORKERS: Outreach workers shall have reasonable access to the worker in the conduct of outreach activities pursuant to 20 CFR 653.107 and 20 CFR 653.501.

CONTRACT IMPOSSIBLITY: The employer will terminate the work contract of any worker whose services are no longer required for reasons beyond the control of the employer or an act of God. In the event of such termination, the employer will be bound by the three-fourths guarantee from the first workday after arrival to the date of termination.

PROOF OF CITIZENSHIP: All workers hired under this order will be required to provide documentation attesting to U. S. citizenship or legal status to work in the U. S.

AGRICULTURAL WORK AGREEMENT: A copy of the agricultural work agreement contract or the ETA 790 and attachments will be provided to the worker by the employer no later than on the day the work commences.

NUMBER OF WORKERS: The employer expects the total number of workers to be used in this occupation to be __10 7__, of which __4__ will be H-2A workers for which certification is requested, and the balance will be domestic workers. These numbers are estimates as total workforce needs are dependent upon weather, crop conditions, and worker availability.

OTHER: The employer agrees to abide by the regulations at 20 CFR 655.103, Assurances, and 20 CFR 653.501. The working conditions will comply with applicable Federal and State minimum wage, child labor, social security, health and safety, farm labor contractor registration and other employment-related laws. The employer is an Equal Employment Opportunity employer and will offer U. S workers at least the same opportunities, wages, benefits, and working conditions as those which the employer offers or intends to offer to non-immigrant workers.

6

# SUMMARY OF INSURANCE

**For:**   Hawaiian Queen Co., Inc.
89-941 Hawaii Belt Rd
Captain Cook, HI
96704        808-328-2656

Prepared:   02/07/07
Finance Insurance, Ltd.
1164 Bishop Street, Suite 400
Honolulu, HI
96813        808-522-2040

| Coverage | Amount | Company | Policy No | Eff | Exp | Premium |
|---|---|---|---|---|---|---|
| **Workers Compensation** | | Hawaii Employers Mutual Ins Co | WC10000069332007A | 02/14/07 | 02/14/08 | 7759.00 |
| | | | | | | |
| Named States:  HI | | | | | | |
| Employer's Liability | | | | | | |
| Each Accident | 100,000 | | | | | |
| Disease - Policy Limit | 500,000 | | | | | |
| Disease - Each Employee | 100,000 | | | | | |
| Individual Included/Excluded | | | | | | |
| Michael Krones         INCL     HI | | | | | | |
| Janice Horton          None     HI | | | | | | |
| Additional Coverage/Endorsements | | | | | | |

* See Attached Rating Information

| | | | | | | |
|---|---|---|---|---|---|---|
| **Commercial Application** | | Hawaii Employers Mutual Ins Co | WC10000069332007A | 02/14/07 | 02/14/08 | |

Premise 1
89-941 Hawaii Belt Rd
Captain Cook, HI
96704

Premise 2
TMK:3/9-8-002-039 HI Belt Rd
Punaluu-Pahala, HI

RECEIVED
AUG 09 2007
FOREIGN ... TION
NATIONAL ... CHICAGO

THIS IS ONLY A BRIEF SUMMARY OF COVERAGES.   PLEASE REFER TO YOUR POLICY
FOR DETAILS.

# SUMMARY OF INSURANCE

For:  Hawaiian Queen Co., Inc.
89-941 Hawaii Belt Rd
Captain Cook, HI
96704    808-328-2656

Finance Insurance, Ltd.
1164 Bishop Street, Suite 400
Honolulu, HI
96813    808-522-2040

## Workers Compensation - Rating Information

Policy No. WC10000069332007A

| Address | Class Code | Classifications | # Emps | Remuneration | Rate | Premium |
|---|---|---|---|---|---|---|
| TMK 3-8-9-3-86 Hawaii Belt Rd So Kona, HI | 0034 | Farm:Poultry or Egg | 5 | 74655 | 10.83 | 8085. |
| TMK 3-8-9-3-86 Hawaii Belt Rd So Kona, HI | 8810 | Clerical | 1 | 19245 | .73 | 140. |
| 89-941 Hawaii Belt Rd Capt Cook, HI | | | | | | |
| 88 Mile Market-Hawaii Belt Rd Honomolino Capt Cook, HI | | | | | | |
| TMK:3-9-6-002-039 Hi Belt Rd Punaluu-Pahala, HI | | | | | | |

THIS IS ONLY A BRIEF SUMMARY OF COVERAGES.  PLEASE REFER TO YOUR POLICY FOR DETAILS.



# Communicating for Agriculture Exchange Program

112 East Lincoln Avenue • P.O. Box 677
Fergus Falls, MN 56538-0677
Telephone: 1-218-739-3241 • 1-800-432-3276 (USA Only)
Fax: 1-218-739-3832 • www.selfemployedcountry.org

August 5, 2007

Regional Certifying Office
US Department of Labor
Employment and Training Admin.
National Processing Center
844 N. Rush Street, 12th Floor
Chicago, IL 60611



RECEIVED
AUG 09 2007
FOREIGN LABOR CERTIFICATION
NATIONAL PROCESSING CENTER-CHICAGO

RE: H2A certification request/Hawaiian Queen Co.
Electronically filed case C-07191-05916

Dear Regional Certifying Office,

Enclosed are ETA 750 and ETA 790 with attachments filed on behalf of the above named
employer along with proof of worker's compensation insurance.

I will forward copies to the HI DOL, ALC Unit for housing inspection and recruitment
instructions.

Please contact me if you have any questions.
Leisha Vatnsdal, Agent
112 E. Lincoln Ave.
Fergus Falls, MN. 56538-0677
1-800-432-3276, ext 3530
fax 218-739-3832

Thank you for your attention to this matter.

Sincerely,

Leisha Vatnsdal, Agent

The CA Exchange Program is a program service of the Communicating for Agriculture Scholarship and Education Foundation, a 501(c)3 charitable foundation under the Internal Revenue Service code.
The foundation is a subsidiary of Communicating for Agriculture and the Self-Employed, Inc., a national non-profit rural association based in Fergus Falls, MN.

**U.S. Department of Labor**   Employment and Training Administration

844 N. Rush Street

12th Floor

Chicago, IL 60611



HAWAIIAN QUEEN CO.

89-941 HAWAII BELT ROAD

CAPTAIN COOK, HI 96704

Thank you for using the H-2A Online System to prepare your Application for Alien Employment Certification (ETA Form 750). Please find enclosed a copy of the ETA Form 750. Your H-2A application will not be processed by a DOL Analyst until you have mailed a signed copy of the ETA Form 750, the ETA Form 790 (Agricultural and Food Processing Clearance Order), and all other supporting documentation and attachments to the DOL National Processing Center serving your area of employment. Please keep a copy of all signed ETA Forms (750/790) in your files. To process your H-2A application, mail the application package (ETA Forms 750, 790, and attachments) to the DOL National Processing Center listed below.

U.S. Department of Labor

Employment and Training Administration

844 N. Rush Street

12th Floor

Chicago, IL 60611

Thank you.

Enclosures (ETA 750)



ETA Case Number **C-07191-05916**

**Barbour, Shane - ETA**

| | |
|---|---|
| **From:** | Coleman Farms [colefarm@runestone.net] |
| **Sent:** | Thursday, September 06, 2007 11:10 AM |
| **To:** | Barbour, Shane - ETA |
| **Subject:** | recruitment |

Shane-

We have only received an applicaiton from Ethan Waterman. None of the other 4 applicants has ever contacted me or Hawaiian Queen. I have phone Ethan on several occasions and left a message for him to return my call, but he has not as of this date.

Furthermore, his resume and letter of interest does not indicate 6 months of experience, only reading liturature on bee keeping is indicated.

Thanks,
Leisha Vatnsdal

## Barbour, Shane - ETA

| | |
|---|---|
| **From:** | Lori Sasaki [lsasaki@dlir.state.hi.us] |
| **Sent:** | Thursday, August 30, 2007 8:02 PM |
| **To:** | Wills, Lynette - ETA; Barbour, Shane - ETA |
| **Cc:** | suzanne Okazaki |
| **Subject:** | Re: Hawaiian Queen |

The deficiencies have been corrected. I will fax you the statement from the employer. I am still waiting to hear about the referrals. Thanks. At 12:33 PM 8/30/07 -0400, you wrote:

> Hi Lori,
>
> I will be out of the office next week In the event the employer has not corrected the deficiencies by Friday this week.  Please let Shane know when the housing passes inspection as he will be processing this case in my absence.
>
> Thanks,
>
> Lynette
>
> ---
>
> **From:** Lori Sasaki [mailto:lsasaki@dlir.state.hi.us]
> **Sent:** Monday, August 27, 2007 1:32 PM
> **To:** Wills, Lynette - ETA
> **Subject:** Re: FW: BeeKeeper Ad-Hoc Wage Survey & Housing Inspection Needed - 8/10/07
>
> The housing inspection was conducted by HIOSH on Friday, August 24, 2007. I am awaiting the report in the mail, so hopefully will receive it today or tomorrow and I can advise you of any deficiencies that need to be corrected. Thanks. At 11:33 AM 8/27/07 -0400, you wrote:
>
> > "urn:schemas-microsoft-com:vml" xmlns:o = "urn:schemas-microsoft-com:office:office" xmlns:w = "urn:schemas-microsoft-com:office:word" xmlns:st1 = "urn:schemas-microsoft-com:office:smarttags">
> >
> > Good morning,
> >
> > The Hawaiian Queen request is due for certification on Friday.  Has the housing been inspected?
> >
> > Thanks,

9/6/2007

Lynette

---

**From:** Wills, Lynette - ETA
**Sent:** Friday, August 10, 2007 9:31 AM
**To:** 'Suzanne Okazaki'; 'Lori Sasaki'
**Subject:** BeeKeeper Ad-Hoc Wage Survey & Housing Inspection Needed - 8/10/07
**Importance:** High

Good morning,

Leisha Vatnsdal has filed a request for 4 beekeepers for Hawaiian Queen - Captain Cook. I know that Shane has already requested an ad-hoc wage survey via the e-mail below and now we have the second employer filing for beekeepers. In addition to the ad-hoc survey, we will need current housing inspection and capacity information for this employer.

Thanks,

Lynette

-----Original Message-----
**From:** Barbour, Shane - ETA
**Sent:** Friday, August 10, 2007 9:16 AM
**To:** Wills, Lynette - ETA
**Subject:** FW: Kona Queen Hawaii - wage offer?

-----Original Message-----
**From:** Lori Sasaki [mailto:lsasaki@dlir.state.hi.us]
**Sent:** Monday, August 06, 2007 7:43 PM
**To:** Barbour, Shane - ETA
**Cc:** suzanne Okazaki
**Subject:** Re: Kona Queen Hawaii - wage offer?

okAt 09:29 AM 8/6/07 -0400, you wrote:

Aloha Suzanne and Lori,

I have received the new Kona Queen Hawaii application. Please let me know about any concerns you may have. The job opportunity is for a beekeeper. Hawaii has not had a prevailing wage finding approved since 2004. Can you conduct an Ad hoc survey for bee keepers?

I suggest that each island that has coffee prepare a prevailing wage survey for this

9/6/2007

season.

Thanks
-Shane


Lori Sasaki

Big Island Workplace Connection

Workforce Development Division

lsasaki@dlir.state.hi.us

74-5565 Luhia Street, C-4

Kailua-Kona, HI 96740

(808)327-4797 (direct line)

(808)327-4774 (fax)

(808)327-4770 (WDD office)


NOTICE: This information and attachments are intended only for the use of

the individual or entity to which it is addressed, and may contain

information that is privileged and/or confidential. If the reader of this

message is not the intended recipient, any dissemination, distribution or

copying of this communication is strictly prohibited and may be punishable

under state and federal law. If you have received this communication

and/or attachments in error, please notify the sender via email immediately and
destroy all electronic and paper copies.


Lori Sasaki
Big Island Workplace Connection
Workforce Development Division
lsasaki@dlir.state.hi.us
74-5565 Luhia Street, C-4
Kailua-Kona, HI 96740
(808)327-4797 (direct line)
(808)327-4774 (fax)


9/6/2007

(808)327-4770 (WDD office)

NOTICE: This information and attachments are intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited and may be punishable under state and federal law. If you have received this communication and/or attachments in error, please notify the sender via email immediately and destroy all electronic and paper copies.

Lori Sasaki
Big Island Workplace Connection
Workforce Development Division
lsasaki@dlir.state.hi.us
74-5565 Luhia Street, C-4
Kailua-Kona, HI 96740
(808)327-4797 (direct line)
(808)327-4774 (fax)
(808)327-4770 (WDD office)

NOTICE: This information and attachments are intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited and may be punishable under state and federal law. If you have received this communication and/or attachments in error, please notify the sender via email immediately and destroy all electronic and paper copies.

9/6/2007

**Barbour, Shane - ETA**

| | |
|---|---|
| **From:** | Wills, Lynette - ETA |
| **Sent:** | Friday, August 31, 2007 8:39 AM |
| **To:** | 'Leisha Vatnsdal' |
| **Subject:** | RE: Hawaiian Queen |

Leisha,

We have received guidance from our National Office that any agent who is actively involved in the recruitment process must have a current federal farm labor contractor's license and if applicable a state farm labor contractor's license.

Quite frankly I apparently did not review as closely as I should have the Hawaiian Queen application or I would have been made aware that you are involved in the screening of applicants on behalf of the employer.

Unless you remove your self completely from the recruitment process other than filing the initial paperwork requirements of behalf of the employer, you must obtain the required FLC licenses. What's done is done with the Hawaiian Queen application as it was accepted for further consideration indicating that referrals are to be directed to the agent.

In the future however, if you remain in the referral process, interviewing and screening workers on behalf of the employer, you must provide us with a copy of your federal and state (if applicable) FLC licenses.

In another one of your e-mails you indicated that the only contact you have had thus far is with James Waterman who did not apparently have the required 6 months experience. We will need to know if the other three referrals contacted the employer direct and results of those referrals.

All issues with the housing deficiencies have been corrected. So once the radio and one newspaper ad have been placed and you are able to provide proof of the ad placement along with a copy of the text plus your final recruitment report which advises the results of the 4 referrals we can certify the request.

Thanks,

Lynette

-----Original Message-----
From: Leisha Vatnsdal [mailto:lvats@cainc.org]
Sent: Friday, August 31, 2007 8:12 AM
To: Wills, Lynette - ETA
Subject: RE: Hawaiian Queen

No I do not.

Leisha

-----Original Message-----
From: Wills, Lynette - ETA [mailto:Wills.Lynette@dol.gov]
Sent: Friday, August 31, 2007 8:05 AM
To: Leisha Vatnsdal
Subject: RE: Hawaiian Queen

Leisha,

Do you have a Farm Labor Contractor's License?

Lynette

1

-----Original Message-----
From: Leisha Vatnsdal [mailto:lvats@cainc.org]
Sent: Friday, August 31, 2007 8:06 AM
To: Wills, Lynette - ETA
Cc: Hawaiian Queen Co. Inc.
Subject: RE: Hawaiian Queen

Lynette-
These people are supposed to be referred to me first and then if they meet the
requirements, I send them on to the employer. The only one that I have had any contact
with is James Waterman. I reviewed his application and left a message for him to call me
back last Wednesday. I have not heard from him. Furthermore, according to his resume, he
does not have the 6 months of experience.

Thanks, Leisha

-----Original Message-----
From: Wills, Lynette - ETA [mailto:Wills.Lynette@dol.gov]
Sent: Thursday, August 30, 2007 2:14 PM
To: Leisha Vatnsdal
Cc: Barbour, Shane - ETA
Subject: Hawaiian Queen

Hello again,

The SWA just advised that 4 U.S. workers have been referred to the employer.  They are
Tyler Cisneros, James Waterman, Jose Mejia and Scott Hansen.  You might want to check with
the employer to determine if they have hired any U.S. workers to fill the job
opportunities prior to readvertising.

Thanks,

Lynette

2

**Barbour, Shane - ETA**

| | |
|---|---|
| **From:** | Lori Sasaki [lsasaki@dlir.state.hi.us] |
| **Sent:** | Friday, August 31, 2007 1:39 PM |
| **To:** | Wills, Lynette - ETA; Barbour, Shane - ETA |
| **Subject:** | James Waterman |

Tried checking with the Idaho Dept. of Labor and they don't have any additional information on him other than what we had which is all incorrect. It is doubtful that this applicant has the 6 months of beekeeping experience as he lists that he had 'limited experience working with bees at a parttime summer job in high school. He has taken beekeeping classes via the internet, but doesn't seem to have the actual work experience.
Lori Sasaki
Big Island Workplace Connection
Workforce Development Division
lsasaki@dlir.state.hi.us
74-5565 Luhia Street, C-4
Kailua-Kona, HI 96740
(808)327-4797 (direct line)
(808)327-4774 (fax)
(808)327-4770 (WDD office)

NOTICE: This information and attachments are intended only for the use of the individual or entity to which it is addressed, and may contain information that is privileged and/or confidential. If the reader of this message is not the intended recipient, any dissemination, distribution or copying of this communication is strictly prohibited and may be punishable under state and federal law. If you have received this communication and/or attachments in error, please notify the sender via email immediately and destroy all electronic and paper copies.

**Barbour, Shane - ETA**

| | |
|---|---|
| **From:** | Lori Sasaki [lsasaki@dlir.state.hi.us] |
| **Sent:** | Friday, August 31, 2007 1:28 PM |
| **To:** | Wills, Lynette - ETA; Barbour, Shane - ETA |
| **Cc:** | suzanne Okazaki |
| **Subject:** | Fwd: RE: Hawaiian Queen |

This is the response that I received from Leisha Vatnsdal. I tried to leave a phone message for Waterman, but the number he gave answers with another name. I also tried to contact him via email and that was rejected. I will call the Idaho Dept of Labor and see if they can help track him down. I called Tyler Cisneros and as of today he is still "thinking about it" before he calls. Not sure if he wants to relocate etc.

Subject: RE: Hawaiian Queen
Date: Fri, 31 Aug 2007 08:06:51 -0500
X-MS-Has-Attach:
X-MS-TNEF-Correlator:
Thread-Topic: Hawaiian Queen
thread-index: AcfrOnriulK/udHRSEOHm0J2zV6FQwAlTxng
From: "Leisha Vatnsdal" <lvats@cainc.org>
To: "Lori Sasaki" <lsasaki@dlir.state.hi.us>
X-MIME-Autoconverted: from quoted-printable to 8bit by wddms.dlir.state.hi.us id l7VD66i11269

I have only had contact with James Waterman. I left a message for him to call me back and as of this morning, he has not. The others have not contacted me.

Thanks, Leisha

-----Original Message-----
From: Lori Sasaki [mailto:lsasaki@dlir.state.hi.us]
Sent: Thursday, August 30, 2007 2:13 PM
To: Leisha Vatnsdal
Cc: Wills.Lynette@dol.gov
Subject: Hawaiian Queen

Did Cisneros, Tyler contact you regarding the beekeeper position?

What happened after you contacted James Waterman? Were you able to verify
that he had 6 months of beekeeping work experience?

What about a Jose Mejia and Scott Hansen?
Lori Sasaki
Big Island Workplace Connection
Workforce Development Division
lsasaki@dlir.state.hi.us

9/6/2007

74-5565 Luhia Street, C-4
Kailua-Kona, HI 96740
(808)327-4797 (direct line)
(808)327-4774 (fax)
(808)327-4770 (WDD office)

NOTICE: This information and attachments are intended only for the use of
the individual or entity to which it is addressed, and may contain
information that is privileged and/or confidential. If the reader of
this
message is not the intended recipient, any dissemination, distribution
or
copying of this communication is strictly prohibited and may be
punishable
under state and federal law. If you have received this communication
and/or attachments in error, please notify the sender via email
immediately
and destroy all electronic and paper copies.

Lori Sasaki
Big Island Workplace Connection
Workforce Development Division
lsasaki@dlir.state.hi.us
74-5565 Luhia Street, C-4
Kailua-Kona, HI 96740
(808)327-4797 (direct line)
(808)327-4774 (fax)
(808)327-4770 (WDD office)

NOTICE: This information and attachments are intended only for the use of
the individual or entity to which it is addressed, and may contain
information that is privileged and/or confidential. If the reader of this
message is not the intended recipient, any dissemination, distribution or
copying of this communication is strictly prohibited and may be punishable
under state and federal law. If you have received this communication
and/or attachments in error, please notify the sender via email immediately and destroy all electronic and
paper copies.

9/6/2007

**Wills, Lynette - ETA**

| | |
|---|---|
| From: | Wills, Lynette - ETA |
| Sent: | Friday, August 31, 2007 8:39 AM |
| To: | 'Leisha Vatnsdal' |
| Subject: | RE: Hawaiian Queen |

Leisha,

We have received guidance from our National Office that any agent who is actively involved in the recruitment process must  have a current federal farm labor contractor's license and if applicable a state farm labor contractor's license.

Quite frankly I apparently did not review as closely as I should have the Hawaiian Queen application or I would have been made aware that you are involved in the screening of applicants on behalf of the employer.

Unless you remove your self completely from the recruitment process other than filing the initial paperwork requirements of behalf of the employer, you must obtain the required FLC licenses. What's done is done with the Hawaiian Queen application as it was accepted for further consideration indicating that referrals are to be directed to the agent.

In the future however, if you remain in the referral process, interviewing and screening workers on behalf of the employer, you must provide us with a copy of your federal and state (if applicable) FLC licenses.

In another one of your e-mails you indicated that the only contact you have had thus far is with James Waterman who did not apparently have the required 6 months experience.  We will need to know if the other three referrals contacted the employer direct and results of those referrals.

All issues with the housing deficiencies have been corrected. So once the radio and one newspaper ad have been placed and you are able to provide proof of the ad placement along with a copy of the text plus your final recruitment report which advises the results of the 4 referrals we can certify the request.

Thanks,

Lynette


-----Original Message-----
From: Leisha Vatnsdal [mailto:lvats@cainc.org]
Sent: Friday, August 31, 2007 8:12 AM
To: Wills, Lynette - ETA
Subject: RE: Hawaiian Queen

No I do not.

Leisha

-----Original Message-----
From: Wills, Lynette - ETA [mailto:Wills.Lynette@dol.gov]
Sent: Friday, August 31, 2007 8:05 AM
To: Leisha Vatnsdal
Subject: RE: Hawaiian Queen

Leisha,

Do you have a Farm Labor Contractor's License?

Lynette

1

-----Original Message-----
From: Leisha Vatnsdal [mailto:lvats@cainc.org]
Sent: Friday, August 31, 2007 8:06 AM
To: Wills, Lynette - ETA
Cc: Hawaiian Queen Co. Inc.
Subject: RE: Hawaiian Queen

Lynette-
These people are supposed to be referred to me first and then if they meet the
requirements, I send them on to the employer. The only one that I have had any contact
with is James Waterman. I reviewed his application and left a message for him to call me
back last Wednesday. I have not heard from him. Furthermore, according to his resume, he
does not have the 6 months of experience.

Thanks, Leisha

-----Original Message-----
From: Wills, Lynette - ETA [mailto:Wills.Lynette@dol.gov]
Sent: Thursday, August 30, 2007 2:14 PM
To: Leisha Vatnsdal
Cc: Barbour, Shane - ETA
Subject: Hawaiian Queen

Hello again,

The SWA just advised that 4 U.S. workers have been referred to the employer.  They are
Tyler Cisneros, James Waterman, Jose Mejia and Scott Hansen.  You might want to check with
the employer to determine if they have hired any U.S. workers to fill the job
opportunities prior to readvertising.

Thanks,

Lynette

## Wills, Lynette - ETA

**From:**     Leisha Vatnsdal [lvats@cainc.org]
**Sent:**     Monday, August 13, 2007 10:30 AM
**To:**       Wills, Lynette - ETA
**Subject:** RE: Hawaiian Queen

Lynette,
Please go ahead and make t he necessary changes to ETA 790.

Thanks,
Leisha Vatnsdal
Agent

**From:** Wills, Lynette - ETA [mailto:Wills.Lynette@dol.gov]
**Sent:** Monday, August 13, 2007 8:50 AM
**To:** Leisha Vatnsdal
**Subject:** RE: Hawaiian Queen
**Importance:** High

Hello again,

It order to make Item 8 of the ETA 790 compute correctly the 9 hours should be changed to 8 with no hours showing on Sat and Sun.

Lynette

> -----Original Message-----
> **From:** Leisha Vatnsdal [mailto:lvats@cainc.org]
> **Sent:** Monday, August 13, 2007 7:37 AM
> **To:** Wills, Lynette - ETA
> **Subject:** RE: Hawaiian Queen
>
> Please and thank you.
>
> Leisha

> -----
> **From:** Wills, Lynette - ETA [mailto:Wills.Lynette@dol.gov]
> **Sent:** Monday, August 13, 2007 7:16 AM
> **To:** Leisha Vatnsdal
> **Subject:** RE: Hawaiian Queen
> **Importance:** High
>
> Good morning Leisha,
>
> Do you want be to remove the mandatory 10 hours per week OT?
>
> Thanks,
>
> Lynette
>
> > -----Original Message-----
> > **From:** Leisha Vatnsdal [mailto:lvats@cainc.org]
> > **Sent:** Friday, August 10, 2007 5:06 PM

8/13/2007

## Wills, Lynette - ETA

**From:** Leisha Vatnsdal [lvats@cainc.org]
**Sent:** Monday, August 13, 2007 7:37 AM
**To:** Wills, Lynette - ETA
**Subject:** RE: Hawaiian Queen

Please and thank you.

Leisha

---

**From:** Wills, Lynette - ETA [mailto:Wills.Lynette@dol.gov]
**Sent:** Monday, August 13, 2007 7:16 AM
**To:** Leisha Vatnsdal
**Subject:** RE: Hawaiian Queen
**Importance:** High

Good morning Leisha,

Do you want be to remove the mandatory 10 hours per week OT?

Thanks,

Lynette

-----Original Message-----
**From:** Leisha Vatnsdal [mailto:lvats@cainc.org]
**Sent:** Friday, August 10, 2007 5:06 PM
**To:** Wills, Lynette - ETA
**Subject:** RE: Hawaiian Queen

please base on 40 hour work week.

thanks,
leisha

---

**From:** Wills, Lynette - ETA [mailto:Wills.Lynette@dol.gov]
**Sent:** Fri 8/10/2007 10:09 AM
**To:** Leisha Vatnsdal
**Subject:** Hawaiian Queen

Good morning Leisha,

I will be processing the Hawaiian Queen request for beekeepers. There are several issues to be addressed. Based on prior certifications, the employer had H-2A workers continuously from 2/23/06 to 7/31/07. This involved overlapping dates and established a year-round need. The overlapping dates should never have been allowed. With this current request there will be a break in activity form 7/31/07 to 10/1/07 which means we will be able to process this request.

We have requested HI conduct an ad-hoc wage survey to determine if there is a higher prevailing wage (in the area of intended employment) than

the HI AEWR of $10.32 per hour. If it is determined that a higher wage is required we will notify you immediately.

Item 10 of the ETA 750 states that 40 hours in the norm with 10 hours OT. Item 8 of the ETA 750 states 50 hours. Is there some particular reason the employer wants "to promise" the worker an extra 10 hours of work per pay period? The 3/4 guarantee is based upon the total number of hours in the work contract. The 3/4 guarantee is more difficult to achieve at 50 hours per week required than 40 hour per week. If the employer requires 40 hours per week but offers the workers 50 hours per week, the extra 10 hours each pay period goes toward the 3/4 guarantee.

Our Certifying Officer has issued direction that each item on the ETA 790 be completed with as much information as possible. Information which cannot be provided on the face of the ETA 790 is to be included as part of the ETA 790 attachment. I am not going to send this request back to you but please keep this in mind when you file future applications.

Thanks, please let me know about the total number of hours to be worked.

Lynette

## Wills, Lynette - ETA

| | |
|---|---|
| **From:** | Lori Sasaki [lsasaki@dlir.state.hi.us] |
| **Sent:** | Thursday, August 30, 2007 8:02 PM |
| **To:** | Wills, Lynette - ETA; Barbour, Shane - ETA |
| **Cc:** | suzanne Okazaki |
| **Subject:** | Re: Hawaiian Queen |

The deficiencies have been corrected. I will fax you the statement from the employer. I am still waiting to hear about the referrals. Thanks. At 12:33 PM 8/30/07 -0400, you wrote:

> Hi Lori,
>
> I will be out of the office next week In the event the employer has not corrected the deficiencies by Friday this week.  Please let Shane know when the housing passes inspection as he will be processing this case in my absence.
>
> Thanks,
>
> Lynette

---

**From:** Lori Sasaki [mailto:lsasaki@dlir.state.hi.us]
**Sent:** Monday, August 27, 2007 1:32 PM
**To:** Wills, Lynette - ETA
**Subject:** Re: FW: BeeKeeper Ad-Hoc Wage Survey & Housing Inspection Needed - 8/10/07

The housing inspection was conducted by HIOSH on Friday, August 24, 2007. I am awaiting the report in the mail, so hopefully will receive it today or tomorrow and I can advise you of any deficiencies that need to be corrected. Thanks. At 11:33 AM 8/27/07 -0400, you wrote:

> "urn:schemas-microsoft-com:vml" xmlns:o = "urn:schemas-microsoft-com:office:office" xmlns:w = "urn:schemas-microsoft-com:office:word" xmlns:st1 = "urn:schemas-microsoft-com:office:smarttags">
>
>
> Good morning,
>
>
> The Hawaiian Queen request is due for certification on Friday.  Has the housing been inspected?
>
>
> Thanks,

8/31/2007

Shane Barbour / Lynette Wills (312) 353-3352
m. Lori Sasaki

## H2A Inspection

Company: Hawaiian Queen Company
Date of inspection: 8/24/07
Location: 89-941 Hawaii Belt Rd, Captain Cook, Hi 96704
Inspector: Charles Clark

A pre-occupancy H2A housing inspection was conducted of two separate houses that the employer will use to house 4 migrant workers. The following were the deficiencies noted during the walk around.

Home #1- Bedroom light was inoperable. Employer representative Michael Krones pulled on the on/off chain and the light did not illuminate.
REPAIRED  AUG 28th

Home #2- A- No bed frames were available during the inspection. Michael Krones stated that he would have to get some bed frames.
PURCHASED # INSTALLED AUG 29th

B- No refrigerator was available during the inspection. I was told by Michael Krones that he was going to purchase a new refrigerator.
PURCHASED NEW AUG. 30th

C- No stove was available during the inspection. I was told by Michael Krones that he had the stove in a repair shop for repairs.
PURCHASED NEW AUG 30th

D- Bathroom and shower need to be cleaned. Toilet had green algae growing in the bowl. The floor had dirt and debris that needed to be removed.
CLEANED  AUG. 28th

Measurements:

Home #1- Bedroom- 15' 9" by 11' 6"
         Kitchen - 17' 9" by 15' 6"

Home #2- Bedroom- 15' 4." by 11'
         Kitchen - 13'  by 9' 5"
         Living room - 17'  by 7' 8"

**Wills, Lynette - ETA**

| | |
|---|---|
| **From:** | Wills, Lynette - ETA |
| **Sent:** | Thursday, August 30, 2007 11:29 AM |
| **To:** | 'Leisha Vatnsdal' |
| **Cc:** | Barbour, Shane - ETA |
| **Subject:** | Hawaiian Queen |

**Importance:**       High

Good morning,

We have received your recruitment report and proof of advertising.  In reviewing the ads it appears as if neither the employer's name or the location of employment were provided in the ad which are required to be in the advertisement. I also do not see proof that the employer ran a radio ad as required. The employer must resubmit proof of one newspaper ad which contains the required information along with proof that a radio ad has or will air.

We require (as part of the employer's recruitment report) the employer to provide information as stated in Item # 6 of the acceptance letter regarding contacting former U.S workers. In addition to your statement that no inquiries have been made regarding the job opportunity, the recruitment report must state what efforts the employer has made to contact those former employees.

I understand the employer's housing unit was inspected however there were apparently numerous deficiencies.  The housing cannot pass inspection until the deficiencies have been corrected.  The SWA is working with the employer regarding those deficiencies as will notify the NPC when the housing has passed inspection.

I will be out of the office next week but Shane Barbour will continue to process my cases in my absence.

Thanks,

Lynette

1

## Wills, Lynette - ETA

| | |
|---|---|
| **From:** | Wills, Lynette - ETA |
| **Sent:** | Thursday, August 30, 2007 11:34 AM |
| **To:** | 'Lori Sasaki' |
| **Subject:** | Hawaiian Queen |
| **Importance:** | High |

Hi Lori,

I will be out of the office next week In the event the employer has not corrected the deficiencies by Friday this week.  Please let Shane know when the housing passes inspection as he will be processing this case in my absence.

Thanks,

Lynette

**From:** Lori Sasaki [mailto:lsasaki@dlir.state.hi.us]
**Sent:** Monday, August 27, 2007 1:32 PM
**To:** Wills, Lynette - ETA
**Subject:** Re: FW: BeeKeeper Ad-Hoc Wage Survey & Housing Inspection Needed - 8/10/07

The housing inspection was conducted by HIOSH on Friday, August 24, 2007. I am awaiting the report in the mail, so hopefully will receive it today or tomorrow and I can advise you of any deficiencies that need to be corrected. Thanks. At 11:33 AM 8/27/07 -0400, you wrote:

> "urn:schemas-microsoft-com:vml" xmlns:o = "urn:schemas-microsoft-com:office:office"
> xmlns:w = "urn:schemas-microsoft-com:office:word" xmlns:st1 = "urn:schemas-microsoft-com:office:smarttags">

Good morning,

The Hawaiian Queen request is due for certification on Friday.  Has the housing been inspected?

Thanks,

Lynette

**From:** Wills, Lynette - ETA



# Communicating for Agriculture Exchange Program

112 East Lincoln Avenue • P.O. Box 677
Fergus Falls, MN 56538-0677
Telephone: 1-218-739-3241 • 1-800-432-3276 (USA Only)
Fax: 1-218-739-3832 • www.selfemployedcountry.org

August 29, 2007

Regional Certifying Office
US Department of Labor
Employment and Training Admin.
National Processing Center
844 N. Rush Street, 12th Floor
Chicago, IL 60611

**RECEIVED**
AUG 3 0 2007
FOREIGN LABOR CERTIFICATION
NATIONAL PROCESSING CENTER-CHICAGO

RE: H2A certification request

CASE #C-07191-05916
Hawaiian Queen Co.

Cert Date: 8/31/07

Dear Ms. Wills,

Please note original tear sheets to  via United Parcel Service. Enclosed are the following for employment certification:
1. proof of advertising. I will send tear sheets upon receipt to my office. I was told they were sent from Hawaii on Tuesday, August 28, so they should be here soon.

WE have received no inquiries for the position as of this date.

Please contact me if you have any questions.
Leisha Vatnsdal, Agent
112 E. Lincoln Ave.
Fergus Falls, MN. 56538-0677
1-800-432-3276, ext 3530
fax 218-739-3832

Thank you for your attention to this matter.

Sincerely,

Leisha Vatnsdal, Agent

The CA Exchange Program is a program service of the Communicating for Agriculture Scholarship and Education Foundation, a 501(c)3 charitable foundation under the Internal Revenue Service code. The foundation is a subsidiary of Communicating for Agriculture and the Self-Employed, Inc., a national non-profit rural association based in Fergus Falls, MN.

_advertising invoice_ (handwritten)

_eisha Vatnsdal

**From:**    DVasquez@westhawaiitoday.com
**Sent:**    Wednesday, August 15, 2007 2:30 PM
**To:**    Leisha Vatnsdal
**Subject:** RE: hawaiian queen ad.doc

ianks, Leisha,

awaiian Queen Bee has a cash account set up, which we need payment up front. I've been charging Gus' card. Shall I proceed?

ianks so much!
anielle
)8-930-8637

.eisha Vatnsdal" <lvats@cainc.org>

/15/07 09:13 AM

To  <DVasquez@westhawaiitoday.com>
cc
Subject RE: hawaiian queen ad.doc



iat would be fine. Does Hawaiian Queen have an account set up?

ianks, Leisha

---

om: DVasquez@westhawaiitoday.com [mailto:DVasquez@westhawaiitoday.com]
nt: Wednesday, August 15, 2007 12:57 PM
o: Leisha Vatnsdal
ibject: Re: hawaiian queen ad.doc

i Leisha,

ianks for the email. Would you like to have the two ads running the same days? I can go ahead and schedule this one the same
ays I scheduled the other one.

ianks,
anielle
)8-930-8637

.eisha Vatnsdal" <lvats@cainc.org>

8/29/2007

/15/07 06:38 AM

To  <DVasquez@westhawaiitoday.com>

cc

Subject hawalian queen ad.doc

i!

nother one for you... needs to run 2x, one week apart, 2" x 2" in size with tear sheets sent to me at:

EISHA VATNSDAL

O BOX 677

ERGUS FALLS, MN 56537

his ad will be for Hawaiian Queen and they will be responsible for cost of ad. Please get back to me with cost and run dates.

hanks much!

eisha[attachment "hawaiian queen ad.doc" deleted by Danielle Vasquez/Advertising/West Hawaii Today/stephensmedia]





RECEIVED

AUG 3 0 2007

FOREIGN
NATIONAL

8/29/2007

Bee Workers(4): 10/1/07 to 7/31/08. Raising and caring for queen bees, re-locating hives, harvesting honey.  Must have valid operator license, ability to lift 60 lbs, min. 6 mon. exp.,  $10.32/hr, ¾ wage guarantee, tools &supp., housing to qualified workers, trans. pd up 50% of contract period. Please contact: State Workforce Agency (808)-327-4770, job order #HI1191353

ran   Sun 8/19 : Sun 8/26

LINDA LINGLE
GOVERNOR

DARWIN L.D. CHING
Director

COLLEEN Y. LaCLAIR
Deputy Director

ELAINE YOUNG
Administrator



**STATE OF HAWAII**
DEPARTMENT OF LABOR AND INDUSTRIAL RELATIONS
WORKFORCE DEVELOPMENT DIVISION
74-5565 Luhia St. C-4
Kailua-Kona, Hawaii 96740
8/27/07

To:     Lynette Wills
        Certifying Office
        Chicago Processing Center    (312) 353-3352 .

From:  Lori Sasaki
        Office Manager

Re:     H2A Housing Inspection for Hawaiian Queen Company

Attached please find a copy of the housing inspection for this H2A application. Please note that there are 2 cabins that were inspected, but the original application did not include any mention of an additional cabin that is to be used for housing.

I have requested that the employer correct the deficiencies noted and a letter be submitted to me stating that the deficiencies have been corrected by Friday, August 31, 2007.

Thanks.

## H2A Inspection

Company: Hawaiian Queen Company
Date of inspection: 8/24/07
Location: 89-941 Hawaii Belt Rd, Captain Cook, Hi 96704
Inspector: Charles Clark

A pre-occupancy H2A housing inspection was conducted of two separate houses that the employer will use to house 4 migrant workers. The following were the deficiencies noted during the walk around.

Home #1- Bedroom light was inoperable. Employer representative Michael Krones pulled on the on/off chain and the light did not illuminate.

Home #2- A- No bed frames were available during the inspection. Michael Krones stated that he would have to get some bed frames.

B- No refrigerator was available during the inspection. I was told by Michael Krones that he was going to purchase a new refrigerator.

C- No stove was available during the inspection. I was told by Michael Krones that he had the stove in a repair shop for repairs.

D- Bathroom and shower need to be cleaned. Toilet had green algae growing in the bowl. The floor had dirt and debris that needed to be removed.

Measurements:

Home #1- Bedroom- 15' 9" by 11' 6"
       Kitchen - 17' 9" by 15' 6"

Home #2- Bedroom- 15' 4" by 11'
       Kitchen - 13' by 9' 5"
       Living room - 17' by 7' 8"

- 11 -

## Housing Inspection Checklist (Supplement)
### (20 CFR 654)

Date __8-24-07__     Local Office __Kona District Office__

1. Employer __Hawaiian Queen Co.__ Address __89-941 Hawaii Belt Rd.__
2. Camp Address __Captain Cook, H. 96704__ , County __Hawaii__
3. Expected Duration of Occupancy: From __10/1/07__ To __7/31/57__
4. # of Persons Expected at Peak __4__
5. Dimensions of Sleeping Rooms: _____

| | Length | Width | Height | Rooms | Sq Ft | Cu Ft | Total Sq Ft | Cu Ft | Windows Sq Ft | No. Exits | Code |
|---|---|---|---|---|---|---|---|---|---|---|---|
| when | 15'9" | 11'6" | 12 | 1 | | | | | | | |
| | 7'9" | 15'6" | 12 | 1 | | | | | | | |
| | | | | | | | | | | | |
| | 15'4" | 11' | 12 | | | | | | | | |
| itna | 13' | 9'5" | | | | | | | | | |
| lug 2 | 17' | 7'8" | 9'6" | 1 | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |
| | | | | | | | | | | | |

Code:
1) Sleeping only - single beds - A
2) Sleeping only - double bunks - dormitory - B
3) Combined cooking, eating, sleeping - C

Light bulb fixture not working in bedroom

# HOUSING INSPECTION CHECKLIST
## OSHA MIGRANT HOUSING
### Standard Housing Site

|  | YES | NO |
|---|---|---|

**Housing Site**

1. Is the site itself adequately drained (at least 200 feet from stagnating pools, sink holes, or other surface collections of water)? ☒ ☐

2. Is drainage from and through the site such that it will not endanger the water supply? Where, for example, is the well located? Is it adequately sealed to prevent contamination from entering? ☒ ☐

3. Is the site free from depressions in which water may become a nuisance during wet weather or flash floods? ☒ ☐

4. In single-family housing camps, are the houses adequately spaced apart to prevent overcrowding? ☒ ☐

5. Is the house in which food is prepared and served, and where sleeping quarters are located, at least 500 feet from any area in which livestock is kept? ☒ ☐

6. Is the site around the houses maintained in a clean and sanitary condition free from rubbish, debris, waste paper, garbage, or other refuse? ☒ ☐

7. When the house is closed for the season (or permanently), is the garbage and other refuse collected and disposed of so as to prevent a nuisance? ☒ ☐

8. Are all abandoned privy and garbage pits filled with earth, and the grounds and buildings left in a sanitary condition at the close of the season? **NA** ☐ ☐

9. At the end of occupancy, are the privy buildings locked or otherwise secured to prevent the entrance of rodents and protection from the elements? ☒ ☐

# HOUSING INSPECTION CHECKLIST
## OSHA MIGRANT HOUSING
### Standard Housing Site

|  | YES | NO |
|---|---|---|

**House (or Shelter)**

10. Is the house constructed and maintained in a manner that will provide adequate protection against the elements? Are the roof and walls in good repair? — ☒ ☐

11. Are beds (or cots and bunks if appropriate), clean mattresses, and suitable storage facilities (such as wall lockers for clothing and personal articles) provided in every room used for sleeping purposes? *See Report* — ☐ ☐

12. Are beds at least 36 inches apart from each other and at least 12 inches above the floor? — ☐ ☐

*See Report*

13. If bunk beds are used, are they at least 48 inches apart from other beds? — ☐ ☐

NA

14. Are triple-deck bunks being used? (They are prohibited). — ☐ ☒

15. Are the floors in each house constructed of wood, asphalt or concrete? — ☒ ☐

16. Are floors kept in good repair? (Free from splinters, holes, and nails). — ☒ ☐

17. If floors are wood, are they smooth, of tight construction, and elevated not less than one foot above the ground to prevent dampness and permit free circulation of air beneath? — ☒ ☐

18. Are living quarters provided with windows in each room? (Window area not less than 10 percent of floor space). — ☒ ☐

# HOUSING INSPECTION CHECKLIST
## OSHA MIGRANT HOUSING
### Standard Housing Site

|  | YES | NO |
|---|---|---|
| 19. Are the windows constructed so that at least one-half of each window can be opened for purposes of ventilation (and escape in event of fire)? | ☒ | ☐ |
| 20. Are all windows and outside doors equipped with screens (standard 16 mesh material) and is the screen door equipped with a self-closing spring or similar device? | ☒ | ☐ |
| 21. Does each room used for sleeping purposes contain at least 50 square of feet of floor space for each occupant? | ☒ | ☐ |
| 22. Does the house where workers cook, live, and sleep have a minimum floor space of 100 square feet per person? (and have at least a seven foot ceiling) | ☒ | ☐ |
| 23. Are sanitary facilities for storing and preparing food provided in each family unit? Kitchen, for example, must contain cupboards or shelves, table and chairs, and a working refrigerator. Central feeding facilities must comply with the requirements of the "Food Service Sanitation Ordinance and Code". | ☒ | ☐ |
| 24. Is the heating, cooking, and water-heating equipment installed in accordance with state and local ordinances, codes, and regulations governing such installations? Is the hot water heater vented to the outside? | ☒ | ☐ |
| 25. If the house is used during cold weather, is adequate heating equipment provided? **N A** | ☐ | ☐ |

**Water Supply**

| | YES | NO |
|---|---|---|
| 26. Does each housing site have an adequate and convenient water supply for drinking, cooking, bathing, and laundry purposes? | ☒ | ☐ |
| 27. Has the drinking water supply been approved by the appropriate health authority? | ☒ | ☐ |

# HOUSING INSPECTION CHECKLIST
## OSHA MIGRANT HOUSING
### Standard Housing Site

|  | YES | NO |
|---|---|---|
| 28. If water is not piped into the house, is water available within 100 feet of the house?  NA | ☐ | ☐ |
| 29. If a central water source is used by more than one family, are common drinking cups permitted? (They are prohibited.) | ☒ | ☐ |

**Toilet Facilities**

|  | YES | NO |
|---|---|---|
| 30. Are toilet facilities adequate for the size of the shelter or camp? (One unit for each 15 persons.) | ☒ | ☐ |
| 31. Does each toilet room have a window not less than 6 square feet in area opening directly to the outside area or otherwise satisfactorily ventilated? | ☒ | ☐ |
| 32. Are all ventilation openings on the toilet screened with standard 16-mesh material? | ☒ | ☐ |
| ? 33. Are outdoor toilets located within 200 feet of the shelter but no closer than 100 feet?  Toilet 10' from house | ☐ | ☐ |
| 34. If toilet rooms are shared, such as in multi-family shelters, and in barracks type facilities, are separate toilet facilities provided for each sex? These rooms shall be marked "for men" and "for women".  NA | ☐ | ☐ |
| 35. Is each toilet room or outdoor privy lighted naturally or artificially by a safe type of lighting at all hours of the day and night? (Porch or yard light may be used as artificial lighting for outdoor privy.) | ☒ | ☐ |
| 36. Is toilet paper available in each privy, water closet, or chemical toilet compartment? | ☒ | ☐ |

Aug-27-2007  03:46pm  From-SOH WORKFORCE DEVELOPMENT DIVISION  18063274774  T-123  P.008/010  F-504
ig-22-2007  04:34pm  FROM-SOH WORKFORCE HEALTH...

Case 1:07-cv-02241-HHK  Document 13-7  Filed 04/11/2008  Page 48 of 56

# HOUSING INSPECTION CHECKLIST
## OSHA MIGRANT HOUSING
### Standard Housing Site

| | YES | NO |
|---|---|---|
| 37. Is each privy or toilet room kept in a sanitary condition? (They must be cleaned daily if necessary. **See Report** | ☐ | ☒ |

## Sewage Disposal Facilities

38. If public sewers are available at the site, are all sewer lines and floor drains from the building connected? No sewage seepage shall be permitted on the ground surface.  **NA**  ☐ ☐

## Laundry, Hand Washing and Bathing Facilities

39. Is each house equipped with a hand washbasin or per six persons in shared facilities?  ☒ ☐

40. Is each site equipped with a shower facility (one shower head for each ten persons)?  ☒ ☐

41. Does each site have a laundry tray or tub for every 30 persons?  ☒ ☐

42. Is there a slop sink in each service building used for laundry, hand washing, and bathing?  ☒ ☐

43. Are floors in laundry rooms of smooth finish (but not slippery) and impervious to moisture?  ☒ ☐

44. Are floor drains provided in all shower baths, shower rooms, or laundry rooms to remove wastewater and facilitate cleaning?  ☒ ☐

45. Are junctions between the curbing and the shower floor covered?  ☒ ☐

# HOUSING INSPECTION CHECKLIST
## OSHA MIGRANT HOUSING
### Standard Housing Site

|  | YES | NO |
|---|---|---|
| 46. Are the walls and partitions of shower rooms smooth and impervious to the height of the splash? | ☒ | ☐ |
| 47. Is there an adequate supply of hot and cold running water provided at each site for bathing and laundry purposes? | ☒ | ☐ |
| 48. Does each site have a working stove or facilities for cooking and heating water? Are cooking facilities provided for each family unit? *See Report* | ☐ | ☒ |
| 49. If a central service building is used for laundry or bathing, is it provided with equipment capable of maintaining a temperature of at least 70F during cold weather? | ☒ | ☐ |
| 50. Are facilities (clotheslines or dryer) provided at each site for drying clothes? | ☒ | ☐ |
| 51. Are all service buildings (laundry, shower, etc. ) being kept clean? *See Report* | ☐ | ☒ |

### Lighting

|  | YES | NO |
|---|---|---|
| 52. If electricity is available at the housing site, does each habitable room in the house have at least one ceiling-type light fixture and at least one wall or floor receptacle? | ☒ | ☐ |
| 53. Does each laundry room and bathroom have at least one ceiling or wall-type light fixture and receptacle? | ☒ | ☐ |
| 54. Are garbage cans available at each site, and are they fly-tight and rodent-tight? (Must have lids) | ☒ | ☐ |

# HOUSING INSPECTION CHECKLIST
## OSHA MIGRANT HOUSING
### Standard Housing Site

|  | YES | NO |
|---|---|---|
| 55. Is at least one garbage can or disposal source available for each house and located within 100 feet of the house? Are garbage cans placed on a wooden, metal, or concrete stand? | ☒ | ☐ |
| 56. Are garbage containers kept clean? | ☒ | ☐ |
| 57. Are garbage containers emptied when full, but not less than weekly when in use? | ☒ | ☐ |

**Insect and Rodent Control**

| | | |
|---|---|---|
| 58. Are adequate measures taken to prevent infestation and harborage of insects, rodents, and pests? | ☒ | ☐ |

**First Aid**

| | | |
|---|---|---|
| 59. Is a first aid kit available at the site for the emergency treatment of injured persons? | ☒ | ☐ |

**General**

| | | |
|---|---|---|
| 60. Is the grower aware they are to immediately report to the local health office the name of any individual at the site who is known or suspected of having a communicable disease? | ☒ | ☐ |
| 61. Is the grower aware that any case of suspected food poisoning or an unusual prevalence of fever, diarrhea, sore throat, vomiting, or jaundice is to be reported immediately to the nearest health authority by telegram or telephone? | ☒ | ☐ |

## Wills, Lynette - ETA

| | |
|---|---|
| **From:** | Lori Sasaki [lsasaki@dlir.state.hi.us] |
| **Sent:** | Monday, August 27, 2007 1:32 PM |
| **To:** | Wills, Lynette - ETA |
| **Subject:** | Re: FW: BeeKeeper Ad-Hoc Wage Survey & Housing Inspection Needed - 8/10/07 |

The housing inspection was conducted by HIOSH on Friday, August 24, 2007. I am awaiting the report in the mail, so hopefully will receive it today or tomorrow and I can advise you of any deficiencies that need to be corrected. Thanks. At 11:33 AM 8/27/07 -0400, you wrote:

"urn:schemas-microsoft-com:vml" xmlns:o = "urn:schemas-microsoft-com:office:office"
xmlns:w = "urn:schemas-microsoft-com:office:word" xmlns:st1 = "urn:schemas-microsoft-com:office:smarttags">

Good morning,

The Hawaiian Queen request is due for certification on Friday.  Has the housing been inspected?

Thanks,

Lynette

---

**From:** Wills, Lynette - ETA
**Sent:** Friday, August 10, 2007 9:31 AM
**To:** 'Suzanne Okazaki'; 'Lori Sasaki'
**Subject:** BeeKeeper Ad-Hoc Wage Survey & Housing Inspection Needed - 8/10/07
**Importance:** High

Good morning,

Leisha Vatnsdal has filed a request for 4 beekeepers for Hawaiian Queen - Captain Cook.  I know that Shane has already requested an ad-hoc wage survey via the e-mail below and now we have the second employer filing for beekeepers.  In addition to the ad-hoc survey, we will need current housing inspection and capacity information for this employer.

Thanks,

8/27/2007

U.S. Department Labor    **Employment and Training Administration**
Chicago Processing Center
844 N. Rush Street
12th Floor
Chicago, IL 60611

August 13, 2007

LEISHA VATNSDAL
89-941 HAWAII BELT ROAD
CAPTAIN COOK, HI 96704

No. of Job Openings:  4
Job Title:  BEE KEEPER
Period of Employment:  10/01/2007 - 07/31/2008
Case Number:  C-07191-05916
Determination Date:  August 31, 2007

## RE: HAWAIIAN QUEEN CO.

Dear Sir/Madam,

This is to notify you that the captioned temporary alien agricultural labor certification has been accepted for consideration.

Your application is timely and contains the conditions of employment that will not adversely affect U.S. workers similarly employed. Furthermore, we have reviewed your positive recruitment plan, and find that it is acceptable. In order to receive temporary alien agricultural labor certification determination by August 31, 2007, you are required to:

1. Carry out your positive recruitment plan.

2. Cooperate with the Workforce system in recruiting workers identified through clearance of your job order throughout Hawaii and the nation.

3. Interview all U.S. workers, including Farm Labor Contractors (FLC), if applicable, referred by the State Workforce Agency. Any U.S. worker who has applied to you (or on whose behalf an application has been made), but whom you reject for other than lawful, job-related reasons or whom you have not provided with a lawful, job-related reason for rejection, will be counted as available.

4. Document all referrals, interviews, and results, and, if a worker is not hired, state the reason(s).

5. Place at least two (2) advertisements in a daily local newspaper at least one week apart, and one radio announcement. The newspaper ad should not be less than 2" x 2" in size. The newspaper and radio advertisement must include the following information:
   a. A description of the nature and anticipated duration of the job opportunity;
   b. Employer name and location of employment;
   c. The wage rate, including the adverse effect wage rate;
   d. The 3/4 guarantee;
   e. The work tools, supplies, and equipment are provided without cost to the worker, if applicable;

✓ f.   Free housing is provided to workers who cannot reasonably return to their permanent residence at the end of the work day;

g.     Transportation and subsistence expenses to the worksite will be provided or paid by the employer upon completion of the 50% of the work contract, or earlier, and;

h.     Workers interested in the job should contact the local office of the State Workforce Agency:

Prior to placing the ads and to expedite the processing of your application, the employer should contact **Lori Sasaki at 808-327-4770** to obtain the job order number that must be referenced in the ads.

**Provide documentation that newspaper ads are scheduled to run, and copies of the proposed ads. Original newspaper tear sheets showing the masthead and dates of publication must be submitted when the ads have run.**

6.     Contact former U.S employees, and solicit their return to the job. All actions and responses should be documented.

7.     Report all hires from Workforce Agency referrals as well as any other sources of referral activity to this office and the Workforce Agency by name.

A valid test of the domestic labor market must include sharing the agricultural job order accepted for processing with no fewer than three proximate states, at least one of the traditional labor supply states – Texas, Florida, California or Puerto Rico, and any other states where the State Workforce Agency believes a significant number of U.S. workers would be available for work.

Your application indicates that you intend to operate as the sole employer and/or joint employer with the entities described in the application. If you have already, or at anytime in the future, enter into an arrangement with any other entity which will exercise or share any element of employment including the authority to hire, pay, fire, supervise, or otherwise control the workers for whom certification is being sought and which is not fully disclosed within this application, it is essential that you notify this office immediately. Failure to do so may result in rejection of future H-2A applications. You are also reminded that misrepresentations made to a federal agency may result in potential civil and/or criminal penalties under various federal statutes.

This office must approve any amendments to your original H-2A application, such as change in date of need, number of workers requested, or other minor modifications. A request for such approval must be submitted in writing. No amendment to the application is effective unless approved by this office.

If the request for a change in the date of need is made after the U.S. workers have departed for your place of employment, a change will only be approved upon written verification that all such U.S. workers will be provided free housing and subsistence without charge until work becomes available.

You must advise this office in writing not later than August 30, 2007, of the results of your recruitment efforts, so that we can make a determination on whether to grant or deny the certification thirty (30) days in advance of the stated date of need. At a minimum, the employer must submit proof that advertising has been contracted for the Job Order by submitting the text of the contracted ad. As soon as the tear sheets are received, they should be forwarded to this office.In the event that your report is not received by this date, we may be unable to make the certification determination requested in your application.

If checked, the additional statement(s) listed below apply to your application:

**✓ X**      You are authorized conditional entry into the interstate clearance system based upon your written request and assurances that your housing will meet Department of Labor standards by at least August 31, 2007, which is thirty (30) calendar days before the housing is to be occupied. It is recommended that you schedule the housing inspection 35 days prior to your start date to allow for correction of any possible deficiencies.

_____      In order to receive a labor certification, you must submit evidence that you have obtained workers' compensation coverage for your employees. Such evidence, including the name of the insurance carrier and the policy number or proof of State law coverage, must be received in this office no later than August 30, 2007.

The Fair Labor Standards Act (FLSA) prohibits the employer from taking deductions from a worker's pay or otherwise driving the worker's wages below the FLSA minimum wage by imposing on the worker an expense that is primarily for the benefit of the employer. Under the circumstances of the H-2A program, such employer-benefit expenses ("business expenses") include the costs of travel to the worksite by both U.S. and H-2A employees hired at a distant location, including in particular those employees hired through the State Workforce Agency. Therefore, the employee may not be required to bear the cost of travel expenses to the extent that such expenses would infringe on the employee's receipt of the FLSA minimum wage. The employers' obligation to pay the full FLSA minimum wages for all pay periods is not overridden by the H-2A program's regulation at 20 CFR 655.102(b)(5)(i), under which the employer is required to reimburse the worker's inbound travel expenses once the worker has completed 50% of the work contract originally offered.

Include your case number on any correspondence sent to the national processing center. Failure to do so may result in a delay in processing your application. Direct inquiries to Lynette Wills at 312-353-5719. Please send the requested information to the following address no later than August 30, 2007:

> U.S. Department of Labor
> Employment and Training Administration
> Chicago Processing Center
> 844 N. Rush Street
> 12th Floor
> Chicago, IL 60611

Sincerely,

Marie C. Gonzalez
Certifying Officer

CC: HAWAIIAN QUEEN CO.
       Workforce Development Division

**Nills, Lynette - ETA**

| | |
|---|---|
| From: | Lori Sasaki [lsasaki@dlir.state.hi.us] |
| Sent: | Thursday, August 30, 2007 2:22 PM |
| To: | Wills, Lynette - ETA |
| Subject: | Fwd: Re: Beekeepers |


>X-Mailer: Novell GroupWise Internet Agent 7.0.1
>Date: Thu, 30 Aug 2007 12:12:50 -0700
>From: "Sharon K ROOD" <Sharon.K.Rood@state.or.us>
>To: "Lori Sasaki" <lsasaki@dlir.state.hi.us>
>Subject: Re: Beekeepers
>
>Lori,
>
>I mailed the 3 workers information about the jobs.  Unfortunately I do
>not know if they are currently looking for work.  One was an MSFW whose
>phone was no longer in service so he may not even be still in our state.
>
>Cisneros was the only one I could reach by phone.
>
>I hope he works out!
>
>Sharon K. Rood
>(503) 947-1659
>Oregon Employment Department
>
>*****CONFIDENTIALITY NOTICE*****
>This e-mail may contain information that is confidential, or otherwise
>exempt from disclosure under applicable law. If you are not the
>addressee or it appears from the context or otherwise that you have
>received this e-mail in error, please advise me immediately by reply
>e-mail, keep the contents confidential, and immediately delete the
>message and any attachments from your system.
>*********************************
>
>
> >>> Lori Sasaki <lsasaki@dlir.state.hi.us> 8/30/2007 12:07 PM >>>
>Cisneros applied on the website, but the other 2 have not. Do you have
>any additional information on those two? At 01:47 PM 8/27/07 -0700, you
>wrote:
> >Hi Lori,
> >
> >We just recently had an H-2A listing for Beekeepers.  We have 3
> >qualified applicants that I contacted regarding your job listings
> >1131353 and 1191350.
> >
> >I sent the job seekers your website at www.hirenethawaii.com
> >  and the listing numbers so that they could review the job
>information
> >and apply on your website.
> >
> >If the applicants apply and are hired  please let me know.
> >
> >The applicants are: Tyler Cisneros, Jose Mejia, and Scott Hansen.
> >
> >I am not going to enter the listing in our system.
> >
> >I have sent copies of this email to Mary Glusak, DOL team leader, and
> >to my supervisor, Rod Simmons.
> >
> >If you have questions please contact me at your convenience.

> >
> >Sharon K. Rood
> >(503) 947-1659
> >Oregon Employment Department
> >
> >*****CONFIDENTIALITY NOTICE*****
> >This e-mail may contain information that is confidential, or
>otherwise
> >exempt from disclosure under applicable law. If you are not the
> >addressee or it appears from the context or otherwise that you have
> >received this e-mail in error, please advise me immediately by reply
> >e-mail, keep the contents confidential, and immediately delete the
> >message and any attachments from your system.
> >*********************************
> >
>Lori Sasaki
>Big Island Workplace Connection
>Workforce Development Division
>lsasaki@dlir.state.hi.us
>74-5565 Luhia Street, C-4
>Kailua-Kona, HI 96740
>(808)327-4797 (direct line)
>(808)327-4774 (fax)
>(808)327-4770 (WDD office)
>
>NOTICE: This information and attachments are intended only for the use
>of the individual or entity to which it is addressed, and may contain
>information that is privileged and/or confidential. If the reader of
>this message is not the intended recipient, any dissemination,
>distribution or copying of this communication is strictly prohibited
>and may be punishable under state and federal law. If you have received
>this communication and/or attachments in error, please notify the
>sender via email immediately and destroy all electronic and paper
>copies.

Lori Sasaki
Big Island Workplace Connection
Workforce Development Division
lsasaki@dlir.state.hi.us
74-5565 Luhia Street, C-4
Kailua-Kona, HI 96740
(808)327-4797 (direct line)
(808)327-4774 (fax)
(808)327-4770 (WDD office)

NOTICE: This information and attachments are intended only for the use of the individual
or entity to which it is addressed, and may contain information that is privileged and/or
confidential. If the reader of this message is not the intended recipient, any
dissemination, distribution or copying of this communication is strictly prohibited and
may be punishable under state and federal law. If you have received this communication
and/or attachments in error, please notify the sender via email immediately and destroy
all electronic and paper copies.

RUIZ DECLARATION
EXHIBIT 3

OMB Approval No. 44-R1301

U.S. DEPARTMENT OF LABOR
Employment and Training Administration

**...PLICATION
FOR
ALIEN EMPLOYMENT CERTIFICATION**

**IMPORTANT: READ CAREFULLY BEFORE COMPLETING THIS FORM**
PRINT legibly in ink or use a typewriter. If you need more space to answer questions in this form, use a separate sheet. Identify each answer with the number of the corresponding question. SIGN AND DATE each sheet in original signature.

To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by $10,000 fine or 5 years in the penitentiary, or both (18 U.S.C. 1001).

| PART A. OFFER OF EMPLOYMENT |
|---|

**1. Name of Alien** (Family name in capital letter, First, Middle, Maiden)
Unknown

**2. Present Address of Alien** (Number, Street, City and Town, State ZIP code or Province, Country)
unknown

**3. Type of Visa** (If in U.S.)

The following information is submitted as an offer of employment.

**4. Name of Employer** (Full name of Organization)
Keith Tree Farms

**5. Telephone**

**6. Address** (Number, Street, City and Town, State ZIP code)

**7. Address Where Alien Will Work** (if different from item 6)
...st Jefferson, NC

| 8. Nature of Employer's Business Activity | 9. Name of Job Title | 10. Total Hours Per Week | | 11. Work Schedule (Hourly) | 12. Rate of Pay | |
|---|---|---|---|---|---|---|
| | | a. Basic | b. Overtime | | a. Basic | b. Overtime |
| tree grower/ pumpkin grower | Tree farm worker/ crop farm worker | 40 | 0 | 8 a.m. 5:00 p.m. | $ 9.02 per hour | $ n/a per hour |

**13. Describe Fully the job to be Performed** (Duties)

Planting, cultivating, and harvesting of trees and pumpkins. Remove brush, ferns, and other growth from planted areas using a tractor and various hand tools, brush hook. Worker may scatter fertilizer pellets over planted area by hand. Worker will shear tops and limb tips from trees as specified by supervisor to control growth and improve shape of trees. Worker may select trees for cutting according to markings. will cut trees using a chain saw or ax, then dragging the trees in weights from 50 to 100 pounds, from the cutting area and then lift said trees onto a tree bailer, to be bailed. Will load trees unto trucks for transport. See addendum to form ETA 750.

**14. State in detail the MINIMUM education, training, and experience for a worker to perform satisfactorily the job duties described in item 13 above.**

| | Grade School | High School | College | College Degree Required (specify) |
|---|---|---|---|---|
| **EDU-CATION** (Enter number of years) | 0 | 0 | 0 | n/a |
| | | | | Major Field of Study: n/a |

| **TRAIN-ING** | No. Yrs. 0 | No. Mos. 0 | Type of Training: n/a |
|---|---|---|---|

| | Job Offered | | Related Occupation | | Related Occupation (specify) |
|---|---|---|---|---|---|
| **EXPERI-ENCE** | Yrs. 0 | Mos. 0 | Number Yrs. 0 | Mos. 0 | n/a |

**15. Other Special Requirements**

must be able to work in extreme temperatures ranging from +90 degrees f to -10 degrees f. able to work in steep mountain terrain. able to stand, bend, stoop, cut, pull, lift weights ranging from 50 to 100 pounds for the entire work shift. Worker needs to be physically able to preform the tasks as in the work order.

**16. Occupational Title of Person Who Will Be Alien's Immediate Supervisor**    ➤ Employer

**17. Number of Employees Alien Will Supervise** ➤ 0

| ENDORSEMENTS (Make no entry in section - for Government use only) |  |
|---|---|

1. Qualified workers cannot be found in the United States.
2. Division of Foreign Labor Certification Policies have been observed.
3. This certification is valid from 03/03/08 through 12/31/08

Sep 04 08 (Date)

(Certifying Officer)

| Date Forms Received | |
|---|---|
| L.O. | S.O. |
| R.O. | N.O. |
| Ind. Code | Occ. Code |
| Occ. Title | |

Replaces MA 7-50A, B and C (Apr. 1970 edition) which is obsolete.

ETA 750 (Oct. 1979)

| 18. COMPLETE ITEMS ONLY IF JOB IS TEMPORARY | | | 19. IF JOB IS UNIONIZED (Complete) | |
|---|---|---|---|---|
| a. No. of Openings To Be Filled By Aliens Under Job Offer | b. Exact Dates You Expect To Employ Alien | | a. Number of Local | b. Name of Local |
| | From | To | | n/a |
| 15 | 5/3/08 | 12/31/08 | n/a | c. City and State |
| | | | | n/a |

| 20. STATEMENT FOR LIVE-AT-WORK JOB OFFERS (Complete for Private Household ONLY) | | | | | | |
|---|---|---|---|---|---|---|
| a. Description of Residence | b. No. Persons residing at Place of Employment | | | | c. Will free board and private room not shared with anyone be provided? | ("X" one) |
| ("X" one) | Number of Rooms | Adults | Children | Ages | | |
| ___ House | | | BOYS | N/A | N/A | |
| ___ Apartment | N/A | N/A | GIRLS | N/A | N/A | ___ YES   NO   N/A |

**21. DESCRIBE EFFORTS TO RECRUIT U.S. WORKERS AND THE RESULTS. (Specify Sources of Recruitment by Name)**

Attempt to re contact former employees.
Advertise in the local newspaper.
Advertise by word of mouth.                              See ETA 750 Attachment 1 item 21
Publicize through employment services.
Solicit help through Agriculture extension and Farm Bureau.
Community organizations such as VFW, and the Moose will be made aware of the openings.
Grower will comply with any additional recruitment efforts that the DOL may require upon accepting this job application.
Grower will also accept for consideration US workers, that are referred by any intermediary.

**22.** Applications require various types of documentation. Please read Part II of the Instructions to assure that appropriate supporting documentation is included with your application.

**23. EMPLOYER CERTIFICATIONS**

By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.

a. I have enough funds available to pay the wage or salary offered the alien.

b. The wage offered equals or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.

c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly, or monthly basis.

d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.

e. The job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.

f. The job opportunity is not:

(1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.

(2) At issue in a labor dispute involving a work stoppage.

g. The job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law.

h. The job opportunity has been and is clearly open to any qualified U.S. worker.

**24. DECLARATIONS**

DECLARATION OF EMPLOYER ➤ Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury the foregoing is true and correct.

| SIGNATURE | DATE |
|---|---|
| | 1-15-08 |

| NAME (Type or Print) | TITLE |
|---|---|
| Curtis Keith | Owner |

AUTHORIZATION OF AGENT OF EMPLOYER ➤ I HEREBY DESIGNATE the agent below to represent me for the purposes of labor certification and I TAKE FULL RESPONSIBILITY for accuracy of any representations made by my agent.

| SIGNATURE OF EMPLOYER | DATE |
|---|---|
| | 1-15-08 |

| NAME OF AGENT (Type or Print) | ADDRESS OF AGENT (Number, Street, City, State, ZIP code) |
|---|---|
| Louise Dickens | 2509 Castleton Drive, Sanford, NC 27330 |

Agricultural and Food Processing Clearance Order
Pedido de Empleados para Agricultura y Procesamiento de Alimentos

**U.S. Department of Labor**
**Employment and Training Administration**

O.M.B. Approval No. 1205-0134, Expires 08/31/2009

| | |
|---|---|
| 1. Employer's Name and Address (Number, Street, City, State, Zip Code, and telephone number) Nombre y Dirección del Empleador (Número, calle, ciudad, código postal y teléfono) | Industry Code / Código de Industria | Job Order # / No. Orden de Empleo |

Keith Tree Farms:

Occupational Title and Code / Título Ocupacional y Código
Farm Worker: Pumpkins, Christmas trees (Agri)

2. Location and Direction to Work Site / Dirección del lugar ...
CJ
left (Brick house)
Has ... driveway.

Clearance Order Issue Date / Fecha de Trámite:

Job Order Expiration Date / Fecha de expiración:

6. Anticipated Period of Employment / Período Anticipado de Empleo
From/Desde 3/3/08 To / Hasta 12/31/08

3. Location and Description of Housing / Dirección y Descripción ...
Left on toward Austin ... left on
S... house on left past

7. No. of Worker's Requested / No. de Trabajadores Pedidos   15

| 8. Anticipated Hours of Work per Week / Horas Anticipadas de Trabajo por Semana | | Total: 40 |
|---|---|---|
| Sunday / Domingo | | Wednesday / Miércoles 8 |
| Monday / Lunes 8 | | Thursday / Jueves 8 |
| Tuesday / Martes 8 | | Friday / Viernes 8 |
| | | Saturday / Sábado |

9. Collect Calls Accepted/Se Aceptan Llamadas a Cobrar   Applicants
Employer / El Empleador   Yes ☐ No ☐   call Order Holding
Local Office/Oficina Local   Yes ☐ No ☐   Office

4. Board Arrangements / Arreglo de Alojamiento   Housing provided free to workers unable to return to their residence the same day.  Time for lunch decided by Employer.  Transportation, Utilites, cooking facilities (no charge to worker)

5. Referral Instructions / Instrucciones para el Referimiento de Candidatos
Employer agrees to interview all US workers referred by employment services, local or supply states who have been apprised of terms, conditions, nature of employment: report to Workforce Office

10. Job Specifications ;Descripción del Trabajo [Summary of Material Job Specifications in ENGLISH must be included inside this box]
Workers will ;harvest pumpkins, bend, stoop & carry or drag trees or produce boxes up to 100 pounds

10 a. Descripción del Trabajo / Job Specifications [Summary of Material Job Specifications in SPANISH must be included inside this box]

11. Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciones (Rebajas)

| Crop Activities / Cultivos | Hourly Wage Salario por Hora | Piece Rate / Unit(s) Pago por Pieza / Unidad(es) | Special Pay (bonus, etc.) Pagos Especiales (Bono, ect.) | Deductions / Deducciones | YES SI | NO | Pay Period Período de Pago |
|---|---|---|---|---|---|---|---|
| Christmas Trees | $ 9.02 | $ N/A | | Social | X | | |
| Pumpkins | $ 9.02 | $ N/A | | Federal Tax Impuestos Federales | X | | Weekly / Semanal X |
| | $ | $ | | State Tax Impuestos Estatales | | | Bi-weekly / cada 2 sem. |
| | $ | $ | | Meals (comidas) | | | |
| | $ | $ | | Other (specify) / Otro | | | Other / Otro |

More Details About the Pay/Más Detalles Sobre el Pago   Employee will receive payroll stub each pay period to show hours offered, hours worker, wage rate per hour, starting & quitting time, deductions & net pay

12. Transportation Arrangements / Arreglos de Transportación (Please explain)   Transportation & daily subsistence from place of recruitment made after 50% of contract period (on day of 1sr day after 50% period)

13. Is it the prevailing practice to use Farm Labor Contractors (FLC) to recruit, supervise, transport, house, or pay workers for this (these) crop activity(ies)? Es la costumbre en el area de usar Contratistas Agrícolas para reclutar, supervisar, transportar, dar vivienda, ó pagarle a los trabajadores en este/estos tipo(s) de cosecha(s)/sembrado(s)? Yes/SI ☐ No ☐ If you have checked yes, what is the FLC wage for each activity?/Si contesto "SI", cual es el salario que le paga el Contratista Agrícola para cada actividad?

14. Unemployment Insurance provided / Seguro por Desempleo:

15. Workers' compensation Insurance provided / Indemnización por accidente de trabajo:   Yes ☐   No ☐

16. Are tools provided at no charge to the workers? / ¿Se le proven las herramientas de trabajo a los trabajadores sin cargo alguno?   Yes ☒   No ☐

17. List any arrangements which have been made with establishment owners or agents for the payment of a commission or other benefits for sales made to workers. (If there are no such arrangements, enter "None")/Indique todo acuerdo o convenio con los propietarios o sus representantes con respecto al pago de una comisión u otros beneficios por ventas hechas a los trabajadores. (Si no hay ningún acuerdo o convenio, indique "Ninguno")   None

18. List any strike, work stoppage, slowdown, or interruption of operation by the employees at the place where the workers will be employed. (If there are no such incidents, enter "None")/ Enumere todo huelga, paro o interrupción de las operaciones por parte de los empleados en el lugar de empleo. (Si no hay, indique "Ninguno")   none

19. Address of Order Holding Office (include Telephone number)/Dirección de la Oficina donde se Resguarda la Oferta (Incluya número ...)   192...

20. Name of Local Office Representative (include direct dial telephone number) / Nombre del Representante de la Oficina Local (Incluya numero de teléfono)

21. Employer's Certification: This job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job. Certificación del Empleador: Esta orden de trabajo describe los términos y condiciones de trabajo que ofrezco y contiene todos los materials, terminos, y condiciones ofrecidas.
Employer's Signature & Title / Firma y Título del Empleador   See Agency & indemnity Agreement

READ CAREFULLY: In view of the statutorily established basic function of the Employment Service as a no-fee labor exchange, that is, as a forum for bringing together employers and job seekers, neither the ETA nor the State agencies are guarantors of the accuracy or truthfulness of information contained on job orders submitted by employers. Nor does any job order accepted or recruited upon by the One-Stop Career Center constitute a contractual job offer to which the One-Stop Career Center, ETA or a State agency is in any way a party.
LEASE CUIDADOSAMENTE: En vista de su función básica establecida estatutariamente el Servicio de Empleo es un intercambio gratis de trabajo para juntar a los empleadores y

JAN 18 2008

ETA 790 (Rev. July 2004)



Attachment #

Farmworker, Diversified Crops II (Agriculture)

Item 1: Employers name & address:   Keith's Tree Farms (Curtis Keith)

Item 2: Location of Work site:

1. Trailer is 14' x 80', 3 bedrooms, 2 baths, kitchen, 2 porches
2. Trailer is 12' x 65' 3 bedrooms, bath, kitchen, living room
3. Trailer has 2 bedrooms, 2 baths, kitchen, living room
4. House: 4 bedrooms, 2 baths, kitchen, large living room
5. House with 2 bedrooms, kitchen, 1 bath
6. House with 3 bedrooms, 1500 Sq. Ft. kitchen, 2500 sq. ft. kitchen, living room, 2 baths
7. Grower is in the process of building a bunk house, specifications are unkown at this time.

Item 4: Housing will be provided without charge to those workers who are unable to return to their residence within the same day.  In the event that a female is employed and there are no accommodations on the farm for females, then motel accommodations or the equilvalent will be provided..  Only workers employed by Keith's Tree Farms will be allowed to use the housing. The employer will arrange  transportation from living quarters to the work site each day.  Workers will purchase and prepare their own meals.  Time for lunch will be decided by the employer.  In addition to providing free housing, utilities, cooking and  kitchen facilities, employer will provide transportation to and from the store at least once a week for supplies as needed at no cost to the employee.

Item 5: Employer agrees to interview all U.S. workers referred by the State Employment Services, local or by supply states who have been screened by such employment services offices for:
    (1) Availability for entire season
    (2) Who have been fully apprised by the local employment office of the terms, conditions and nature of employment.
Direct interviews with the employer will be acceptable as long as the employee understands that he must comply with the terms of the agreement.  He must have legal documents to prove he is eligible to work in the USA and be available for the entire contract period.

**U.S. DEPARTMENT OF LABOR**
Employment and Training Administration

**APPLICATION**
**FOR**
**ALIEN EMPLOYMENT CERTIFICATION**

OMB Approval No. 44-R1301

**IMPORTANT: READ CAREFULLY BEFORE COMPLETING THIS FORM**

*PRINT legibly in ink or use a typewriter. If you need more space to answer questions on this form, use a separate sheet. Identify each answer with the number of the corresponding question. SIGN AND DATE each sheet in original signature.*

*To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by $10,000 fine or 5 years in the penitentiary, or both (18 U.S.C. 1001).*

**PART A. OFFER OF EMPLOYMENT**

| 1. Name of Alien *(Family name in capital letter, First, Middle, Maiden)* |
|---|
| Unknown |

| 2. Present Address of Alien *(Number, Street, City and Town, State, ZIP Code or Province, Country)* | 3. Type of Visa *(If in U.S.)* |
|---|---|
| Unknown | N/A |

The following information is submitted as evidence of an offer of employment.

| 4. Name of Employer *(Full name of organization)* | 5. Telephone *(Area Code and Number)* |
|---|---|

| 6. Address *(Number, Street, City or Town, County, State and ZIP Code)* |
|---|
| c/o ~~████████████████████████~~ 837 |

| 7. Address Where Alien Will Work *(If different from Item 6)* |
|---|
| 17~~████████████████████~~ |

| 8. Nature of Employer's Business Activity | 9. Name of Job Title | 10. Total Hours Per Week | | 11. Work Schedule (Hourly) | 12. Rate of Pay | |
|---|---|---|---|---|---|---|
| | | a. Basic | b. Overtime | | a. Basic | b. Overtime |
| Farmer | Farmworker: Grain | 40 | -0- | 7:00a.m. to 3:00p.m. | $9.02 per hour. | $ N/A per |

**13. Describe Fully the Job to be Performed** *(Duties)*

Soybeans, Corn, Wheat, Barley, and Rye:

Workers perform a variety of manual tasks appropriate for grain crops being planted, cultivated and harvested. Workers will help in preparing the land for planting. This may include attaching farm implements, such as a plow, disc, and drill to tractor. May drive a tractor in field to till soil in preparation of planting. Worker may apply various types of fertilizer to the soil and plants. These bags can weigh between 60–75 lbs. Workers may cultivate and thin crops, using a hoe. Removes undesirable and excess growth, such as tassels, suckers, and weeds, by hand. Carries supplies, such as bags and baling wires, to workers in fields. Clears irrigation ditches, using shovel. Workers may husk and shell corn. Loads and unloads trucks. Unloads grain onto conveyors to storage bins or elevators. Cleans and lubricates farm machines.

Tractor Operation During Field Operations

During field operations, workers may be required to drive a tractor pulling a wagon through the field or between fields incidental to the job being performed. Workers will be instructed in the safety and operation of the tractor before driving the tractor. Tractors should be driven in a manner to protect operator, other workers, products, trees, crops, and equipment. Repeated failure to obey safety requirements and operating instructions may result in termination.

**SEE ETA 790 ATTACHMENTS**

| 14. State in detail the MINIMUM education, training, and experience for a worker to perform satisfactorily the job described in Item 13 above. | | | | 15. Other Special Requirements |
|---|---|---|---|---|
| EDUCATION (Enter number of years) | Grade School | High School | College | Able to work in varying temperatures. Able to stand, bend, reach, cut and pull weeds for the entire work period each day. Employees must be able to frequently lift weights ranging from 60 to 75 pounds. Workers are subject to random drug testing. |
| | 0 | 0 | 0 | |
| | | | College Degree Required *(Specify)* | |
| | | | Major Field of Study N/A | |
| TRAINING | No. Yrs. 0 | | No. Mos. 0 | Type of Training None |
| EXPERIENCE | Job offered | Related Occupation | Related Occupation *(Specify)* | |
| | Yrs. Mos. | Number Yrs. Mos. | No | |
| | 0  0 | 0  0 | | |

| 16. Occupational Title of Person Who Will Be Alien's Immediate Supervisor | ➤ ➤ | 17. Number of Employees Alien Will Supervise ➤ |
|---|---|---|

| 1. Qualified workers cannot be found in the United States. | ◄ ENDORSEMENTS *(Make no entry in section - for government use only)* | |
|---|---|---|
| 2. Division of Foreign Labor Certification Policies have been observed. | Date Forms Received | |
| 3. This certification is valid from 03/01/08 through 12/15/08 | L.O. | S.O. |
| 02/05/08 (Date) | R.O. | N.O. |
| | Ind. Code | Occ. Code |
| | Occ. Title | |

Replaces MA 7-50A, B and C (Apr. 1970 edition) which is obsolete.    ETA 750 (Oct. 1979)

| 18. COMPLETE ITEMS ONLY IF JOB IS TEMPORARY | | | 19. IF JOB IS UNIONIZED *(Complete)* | | |
|---|---|---|---|---|---|
| a. No. of Open-ings To Be Filled By Aliens Under Job Offer | b. Exact Dates You Expect To Employ Alien | | a. Number of Local | b. Name of Local | |
| | From | To | | | |
| 2 | 03/01/2008 | 12/15/2008 | | c. City and State | |

**20. STATEMENT FOR LIVE-AT-WORK JOB OFFERS** *(Complete for Private Household Job ONLY)* N/A

| a. Description of Residence | | b. No. Persons Residing at Place of Employment | | | | c. Will free board and private room not shared with any-one be provided? |
|---|---|---|---|---|---|---|
| *("X" one)* | Number of Rooms | Adults | | Children | Ages | |
| L House | | | BOYS | | | *("X" one)* |
| L Apartment | | | GIRLS | | | L Yes    L No |

**21. DESCRIBE EFFORTS TO RECRUIT U.S. WORKERS AND THE RESULTS.** *(Specify Sources of Recruitment by Name)*

Attempt to recontact former workers.
Advertise in local newspaper.
Advertise by word of mouth.
Solicit help through Ag Extension Service and Farm Bureau.
Publicize need through Employment Service.

The Employer will engage in positive recruitment of U.S. workers to the same extent (with respect to both effort and location) no less than that of non H2A Employers of comparable or smaller size in the area of employment in accordance with 655.102(d).

**22.** Applications require various types of documentation. Please read PART II of the Instructions to assure that appropriate supporting documentation is included with your application.

**23. EMPLOYER CERTIFICATIONS**

*By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.*

a. I have enough funds available to pay the wage or salary offered the alien.

b. The wage offered equals or exceeds the pre-vailing wage and I guarantee that, if a labor certi-fication is granted, the wage paid to the alien when the alien begins work will equal or exceed the pre-vailing wage which is applicable at the time the alien begins work.

c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly or monthly basis.

d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.

e. The job opportunity does not involve unlawful discri-mination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.

f. The job opportunity is not:
   (1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.
   (2) At issue in a labor dispute involving a work stoppage.

g. The job opportunity's terms, conditions and occupa-tional environment are not contrary to Federal, State or local law.

h. The job opportunity has been and is clearly open to any qualified U.S. worker.

**24. DECLARATIONS**

DECLARATION OF EMPLOYER ➤ Pursuant to 28 U.S.C 1746, I declare under penalty of perjury the foregoing is true and correct.

| SIGNATURE | DATE |
|---|---|
| | 01/15/2008 |

| NAME (Type or Print) | TITLE |
|---|---|
| Francis M. Barlow | Owner |

AUTHORIZATION OF AGENT OF EMPLOYER ➤ I HEREBY DESIGNATE the agent below to represent me for the purpose of labor certification and I TAKE FULL RESPONSIBILITY for accuracy of any representations made by my agent.

| SIGNATURE OF EMPLOYER | DATE |
|---|---|
| | 01/15/2008 |

NAME OF AGENT (Type or Print)
International Labor Management Corp., Labor Consultant
Sarah E. Farrell, Vice President

**U.S. Department Of Labor**

**Employment and Training Administration**

Atlanta Processing Center
Harris Tower
233 Peachtree Street, Suite 410
Atlanta, GA 30303

February 07, 2008

ILMC - SARAH E. FARRELL

Case Number:

## RE: FRANCIS BARLOW, JR. FARMS

Dear Ms. Farrell:

On January 23, 2008, this office accepted for consideration an application from you requesting H-2A temporary alien labor certification for 2 job opportunity(ies). Pursuant to 20 CFR 655.106, it has been determined that a sufficient number of able, willing and qualified U.S. workers have not been identified as being available at the time and place needed to fill all of the job opportunity for which certification has been requested. We are, therefore, granting certification for 2 job opportunity(ies).

### Certification Granted:

A.  Number/Title of job opportunities certified: 2/FARM WORKER; GRAIN II
B.  Crop and Activity:                                   Barley, Beans, Corn, Farm Machine Operator, Rye, Wheat

C.  Area of Employment:
D.  Period covered by certification:

We hereby certify that the employment of the H-2A temporary alien agricultural workers in such labor or services will not adversely affect the wages and working conditions of workers in the United States similarly employed.

As provided by 20 CFR 655.106(c)(1), this certification is granted subject to the conditions and assurances made during the application process and the provisions of 20 CFR 655.106(e).

Consistent with the latter regulation, you must consider for employment all U.S. workers who are referred and will not refuse to hire any available worker for other than lawful job-related reasons until 50% of the contract period has elapsed.

You are reminded that 20 CFR 655.102(b) (11) stipulates that terminations of workers for cause and abandonment of the job by workers are to be reported. You should report terminations and job abandonment to the State Workforce Agency in writing within two (2) business days of the

termination or, in the case of abandonment, within two (2) business days of discovering abandonment.

Enclosed is the bill for fees assessed for the H-2A certification. **Include your case number on any correspondence sent to the National Processing Center. Failure to do so may result in a delay in processing your application. Direct inquiries to** ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
Upon receipt of this notification, you will need to submit to the US Citizenship and Immigration Service (USCIS) the I-129 Form that is required in conjunction with an H-2A temporary labor certification application.

The USCIS application form can be obtained at http://www.uscis.gov. 

Sincerely,


Renata Jones Adjibodou
Certifying Officer

Enclosure: Invoice for Certifications
CC: FRANCIS BARLOW, JR. FARMS
        VIRGINIA EMPLOYMENT COMMISSION
        RURAL SERVICES DIVISION

Agricultural and Food Processing Clearance Order
Pedido de Empleados para Agricultura y Processamiento de Alimentos

U.S. Department of Labor
Employment and Training Administration



O.M.B. Approval No. 1205-0134 Expires 08/31/2009

| 1. Employer's Name and Address (Number, Street, City, State, Zip Code, and Telephone Number) Nombre y Dirección del Empleador (Número, calle, ciudad, código postal y teléfono) | Industry Code / Código de Industria | Job Order # / No. Orden de Empleo |
|---|---|---|
| Francis Barlow Jr. Farms | | |
| c/o ILMC, Labor Consultant | Occupation: | |
| (210) 245-3837 | Clearance Order Issue Date / Fecha de Trámite: | |

| 2. Location and Direction to Work Site / Dirección del lugar de trabajo | Job Order Expiration Date / Fecha de expiración: |
|---|---|

**6. Anticipated Period of Employment / Periodo Anticipado de Empleo**
From/Desde: **3/01/08**   To/Hasta **12/15/08**

(see attachment / para más detalles vea **2**)

**7. No. of Worker's Requested / No. de Trabajadores Pedidos**   **2**

**3. Location and Description of Housing / Dirección y Descripción de la Vivienda**

Mobile Home

VA

(see attachment / para más detalles vea **3**)

**8. Anticipated Hours of Work per Week / Horas Anticipadas de Trabajo por Semena**   Total: **40**

| Sunday / Domingo | **0** | Wednesday / Miercoles | **7** |
|---|---|---|---|
| Monday / Lunes | **7** | Thursday / Jueves | **7** |
| Tuesday / Martes | **7** | Friday / Viernes | **7** |
| | | Saturday / Sabado | **5** |

**9. Collect Calls Accepted / Se Aceptan Llamadas a Cobrar:**
Employer / El Empleador   Yes___  No **X**
Local Office / Oficina Local   Yes___  No **X**

**4. Board Arrangements / Arreglo de Alojamiento** Housing is provided at no cost to workers who are not reasonably able to return the same day to their place of residence. This paragraph applies to such workers only. Housing is not provided to non-workers. No charge will be made for cooking utensils and similar items furnished to workers to whom housing is provided hereunder unless unlawfully removed or damaged beyond normal wear and tear. Housing will be clean and in compliance with OSHA housing standards when occupied. Housing includes free kitchen facilities. The kitchen and other common areas will be shared. Housing provided will be shared facilities without regard to sex. In the event that a female worker is hired, separate toilet facilities shall be provided by the employer. No tenancy in such housing is created; employer retains possession and control of the housing premises at all times and worker, if provided housing under the terms of this work agreement, shall vacate the housing promptly upon termination of employment with the assigned employer who provides such housing. Workers who reside in such housing agree to be responsible for maintaining the housing in a neat and clean manner. Reasonable repair costs of damage or loss of property, other than that caused by normal wear and tear, will be charged to the worker if he is found to be responsible for damage or loss to housing or furnishings. Workers residing in employer's housing may have mail directed to them at the employer's address. (see attachment / para más detalles vea **4**)

**5. Referral Instructions / Instrucciones para el Referimiento de Candidatos** All local and intrastate (in-state) applicants are to call the employer, between the hours of 9:00 am – 3:00 pm (Eastern Standard Time) Monday – Thursday and 9:00 am – 11:00 am on Fridays. All interstate (out of state) applicants may apply at any State Workforce Agency (SWA) office or by contacting employer, in accordance with the referral instructions above. State employment service agency staff are encouraged to call employer to make a referral if the applicant is at the Job Service office. Interviews will be conducted quickly over the telephone to create less of a burden on the applicant. Participation and monitoring of the interview process by SWA staff guarantees proper disclosure of the terms and conditions and protects the integrity of the interview process. Workers should be fully apprised by the local employment office of the terms, conditions and nature of employment prior to referral. Workers recruited against the Job Offer from within normal commuting distance will not be provided with housing, subsistence and transportation. These that apply direct will be welcomed and accepted. Workers should be fully apprised by the local employment office of the terms, conditions and nature of employment prior to referral. Only workers legally entitled to work in the United States and who possess original identity and employment eligibility documents sufficient to complete IN3 Form I-9, as required by the Immigration and Nationality Act, should report to work. Workers referred against this order should be informed that they must have these documents in their possession when they arrive at the place of employment. Provided that workers complete section 1 of form I-9, workers will have three business days to produce the required documentation to complete section3 of form I-9, as provided inthe Act. Workers not providing this required documentation will not be allowed togo to work on the fourth business day of employment, or any subsequent days until this documentation isprovided, as provided inthe Act. (see attachment / para más detalles vea **5**)

**10. Job Specifications / Descripción del Trabajo** (Summary of Material Job Specifications in ENGLISH must be included inside this box)

Soybeans, Corn, Wheat, Barley, and Rye:
Workers perform a variety of manual tasks appropriate for grain crops being planted, cultivated and harvested. Workers will help in preparing the land for planting. This may include attaching farm implements, such as a plow, disc, and drill to tractor. May drive a tractor in field to till soil in preparation of planting. Worker may apply various types of fertilizer to the soil and plants. These bags can weigh between 60–75 lbs. Workers may cultivate and thin crops, using a hoe. Removes undesirable and excess growth, such as tassels, suckers, and weeds, by hand. Carries supplies, such as bags and baling wires, to workers in fields. Clears irrigation ditches, using shovel. Workers may husk and shell corn. Loads and unloads trucks. Unloads grain onto conveyors to storage bins or elevators. Cleans and lubricates farm machines.

Tractor Operation During Field Operations
During field operations, workers may be required to drive a tractor pulling a wagon through the field or between fields incidental to the job being performed. Workers will be instructed in the safety and operation of the tractor before driving the tractor. Tractors should be driven in a manner to protect operator, other workers, products, trees, crops, and equipment. Repeated failure to obey safety requirements and operating instructions may result in termination.

**SEE ETA 790 ATTACHMENTS**   (see attachment / para más detalles vea **10**)

**10a. Descripción del Trabajo** (Summary of Material Job Specifications in SPANISH must be included inside this box)

JAN 16 2008

(see attachment / para más detalles vea **10**)

ETA 790 (rev. July 2004)

A naon. - or447

**11. Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciones (Rebajas)**

| Crop Activities / Cultivos | Hourly Wage Salario por Hora | Piece Rate / Unit(s) | Special Pay (bonus, etc.) os Especiales (Bono, etc.) | Deductions / Deducciones | YES | NO | Pay Period Periodo de Pago |
|---|---|---|---|---|---|---|---|
| Farm Labor | $ 9.02 | $ | | FICA | *X | | Weekly / |
| | $ | $ | | Federal Tax | *X | | Semi-annual _X_ |
| | $ | $ | | State Tax | *X | | Bi-Weekly / |
| | $ | $ | | Meals (comidas) | | X | cada 2 sem. |
| | $ | $ | | Other (specify) | | X | Other / Otro |

More Details About the Pay / Más Detalles Sobre el Pago  All work will be paid the adverse effect wage rate (AEWR) . In the event DOL promulgates a new AEWR during the recruitment or work contract period which is lower than the current AEWR at the time of application, this lower AEWR becomes the guarantee. In the event the AEWR is eliminated from the H-2A program during the life of this work agreement, either administratively or legislatively, the employer reserves the right to pay the new wage rate under the new guidelines as soon as it becomes effective. The employer will make the following deductions from the Worker's wages: FICA taxes and Federal Income tax as required by law. Cash advances and repayment of loans, repayment of overpayment of wages to the worker, payment for articles which the Worker has voluntarily purchased from the Employer, long-distance telephone charges, recovery of any loss to the Employer due to the Worker's damage (beyond normal wear and tear) or loss of equipment or housing items where it is shown that the Worker is responsible, will be charged to the Worker in writing. No deduction not required by law will be made that brings the worker's hourly earnings below the statutory minimum wage. FICA, State and Federal taxes will not be deducted from those worker's wages that are working under a temporary, agricultural visa.                    (see attachment / para más detalles vea _____ 11 )

**12. Transportation Arrangements / Arreglos de Transportación (Please explain)**
The amount of such transportation payment will be equal to the Worker's actual transportation costs not to exceed the most economical and reasonable common carrier transportation charges for the distance involved. In lieu of the above payments to the workers for transportation, the employers reserve the right to charter or otherwise arrange to provide for transportation at the employer's election. Subsistence reimbursement shall be $9.52 per day, without producing documentation of actual expenses, or will otherwise be paid as per 20 CFR655.102(b)(5) only to those employees who are eligible under the H-2A program regulations for subsistence pay. By way of illustration and not in limitation of the foregoing, the employer will not pay transportation for such worker if he does not have suitable documents to comply with proof of identity and employment eligibility requirements of IRCA, if he is discharged for lawful job-related reasons, if he has knowledge at the place of recruitment that he can not perform the duties of the job as described above, or if he abandons this employment when he is needed by the Grower. Employer will provide transportation and subsistence under this agreement if the worker is terminated because of work related injury caused by this these crop activities and is so certified by a doctor acceptable to employer before leaving employers farm, or termination resulting from an Act of God which makes fulfillment of this contract impossible as provided in paragraph 8C or if the worker is displaced by a U.S. worker under DOL's 50% rule. Employer will offer free transportation for workers living in employer's housing facility both to and from the daily work site. The use of the transportation by the worker is voluntary, no worker will be required as a condition of employment to utilize the transportation offered by the employer. Workers are free to choose their own means of transportation at their own expense.                    (see attachment / para más detalles vea _____ 12 )

**13.** Is it the prevailing practice to use Farm Labor Contractors (FLC) to recruit, supervise, transport, house, or pay workers for this (these) crop activity(ies)? ¿Es la costumbre en el area de usar Contratistas Agrícolas para reclutar, supervisar, transportar, dar vivienda, ó pagarle a los trabajadores en este/estos tipo(s) de cosecha(s) / sembrado(s)? Yes___ No_X_ If you have checked yes, what is the FLC wage for each activity? / Si contestó "Sí", cual es el salario que le paga el Contratista Agrícola para cada actividad?

**14.** Unemployment Insurance provided / Seguro por Desempleo:                    Yes _X_    No __ "If applicable excludes H-2A workers

**15.** Workers compensation insurance provided / Indemnización por accidente de trabajo:    Yes _X_    No ____

**16.** Are tools provided at no charge to the workers? / ¿Se le proveen las herramientas de trabajo a los trabajadores sin cargo alguno?  Yes _X_  No ____

**17.** List any arrangements which have been made with establishment owners or agents for the payment of a commission or other benefits for sales made to workers.  (If there are no such arrangements, enter "None") / Indique todo acuerdo o convenio con los propietarios del establecimiento o sus representantes con respecto al pago de una comisión u otros beneficios por ventas hechas a los trabajadores. (Si no hay ningún acuerdo o convenio, indique "Ninguno")
                                                                    NONE / NINGUNO

**18.** List any strike work stoppage, slowdown, or interruption of operation by the employees at the place where the workers will be employed.  (If there are no such incidents, enter "None") / Enumere toda huelga, paro o interrupción de las operaciones por parte de los empleados en el lugar de empleo. (Si no hay, indique "Ninguno")
                                                                    NONE / NINGUNO

**19.** Address of Order Holding Office (include Telephone number) Dirección de la Oficina donde se Radicó la Oferta (incluya número de teléfono)

Virginia Employment Commission

██████████ ██████675

**20.** Name of Local Office Representative (include direct dial telephone number) / Nombre del Representante de la Oficina Local (incluya numero de teléfono)

**Will Jacobs**    Ph ██████████

**21. Employer's Certification:** This job order describes the actual terms and conditions of the employment being offered by me and ████████████ ...tions of the job. Certificación del Empleador: Esta orden de trabajo describe los términos y condiciones de trabajo y contiene todos los materials, terminus, y condiciones ofrecidos.
Employer's Signature & Title / ████████████

                                                                    **Owner**

READ CAREFULLY: In view of the statutorily established basic function of the employment service as a no-fee labor exchange, that is, as a forum for bringing together employers and job seekers, neither the ETA nor the State agencies are guarantors of the accuracy or truth-fullness of information contained in job orders submitted by employers. Nor does any job order accepted or recruited upon by the One-Stop Career Center constitute a contractual job offer to which the One-Stop Career Center, ETA or a State agency is in any way a party.
LEASE CUIDADOSAMENTE:  En vista de su función básica establecida estatutariamente el Servicio de Empleo es un intercambio gratis de trabajo para juntar a los empleadores y trabajadores que buscan empleo, ni ETA ni las agencias del estado pueden garantizar la verdad y certeza de la información contenida en la Orden de Trabajo sometida por el Empleador. Tampoco, ninguna orden de trabajo aceptada o reclutada por el Servicio de Empleos constituye una oferta contractual de la cual ETA ni la agencia del Estado son parte.

Public reporting burden for the ETA Form 790 is estimated to be approximately 60 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and reviewing the collection. Respondents obligation to reply to these requirements are mandatory by 20 CFR 653.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB number. Comments regarding this burden estimate or any other aspect of this collection, including suggestions for reducing the burden can be sent to the U.S. Department of Labor, Office of Workforce Investment, Room S-4321, Washington DC 20210 (Paperwork Reduction Act of 1995, OMB Control No. 1205-0134).

ETA 790 (rev. July 2004)

OMB Approval No. 44-R1301

U.S. DEPARTMENT OF LABOR
Employment and Training Administration

**APPLICATION**
**FOR**
**ALIEN EMPLOYMENT CERTIFICATION**

**IMPORTANT: READ CAREFULLY BEFORE COMPLETING THIS FORM**
PRINT legibly in ink or use a typewriter. If you need more space to answer questions in this form, use a separate sheet. Identify each answer with the number of the corresponding question. SIGN AND DATE each sheet in original signature.

To knowingly furnish any false information in the preparation of this form and any supplement thereto or to aid, abet, or counsel another to do so is a felony punishable by $10,000 fine or 5 years in the penitentiary, or both (18 U.S.C. 1001).

**PART A. OFFER OF EMPLOYMENT**

| 1. Name of Alien    (Family name in capital letter, First, Middle, Maiden) | | |
|---|---|---|
| 2. Present Address of Alien    (Number, Street, City and Town, State ZIP code or Province, Country) | UNITED STATES | 3. Type of Visa    (if in U.S.)  H-3 |

The following information is submitted as an offer of employment.

| 4. Name of Employer    (Full name of Organization) | 5. Telephone |
|---|---|

| 6. Address    (Number, Street, City and Town, State ZIP code) |
|---|

| 7. Address Where Alien Will Work    (if different from item 6) |
|---|

| 8. Nature of Employer's Business Activity | 9. Name of Job Title | 10. Total Hours Per Week | | 11. Work Schedule (Hourly) | 12. Rate of Pay | |
|---|---|---|---|---|---|---|
| | ANIMAL SPECIALIST | a. Basic 40 | b. Overtime 0 | 8:00 a.m. 5:00 p.m. | a. Basic $ 2400.00 per Monthly | b. Overtime $ 0.00 per hour |

13. Describe Fully the Job to be Performed    (Duties)

**See Attached**

| 14. State in detail the MINIMUM education, training, and experience for a worker to perform satisfactorily the job duties described in item 13 above. | | | | 15. Other Special Requirements |
|---|---|---|---|---|

EDU-CATION (Enter number of years)

| Grade School | High School | College | College Degree Required    (specify) |
|---|---|---|---|
| | | 0 | 0 |
| | | | Major Field of Study |

Job requires at least 2 months experience working with horses.

TRAIN-ING

| No. Yrs. 0 | No. Mos. 0 | Type of Training N/A |
|---|---|---|

EXPERI-ENCE

| Job Offered | | Related Occupation Number | | Related Occupation    (specify) ANIMAL/ EQUINE INDUSTRY |
|---|---|---|---|---|
| Yrs. 0 | Mos. 2 | Yrs. 0 | Mos. 0 | |

| 16. Occupational Title of Person Who Will Be Alien's Immediate Supervisor  ➤  FARM MANAGER | 17. Number of Employees Alien Will Supervise  ➤  0 |
|---|---|

◄ ENDORSEMENTS    (Make no entry in section - for Government use only)

| Date Forms Received | |
|---|---|
| L.O. | S.O. |
| R.O. | N.O. |
| Ind. Code | Occ. Code |
| Occ. Title | |

1. Qualified workers cannot be found in the United States.
2. Division of Foreign Labor Certification Policies have been observed.
3. This certification is valid from 11/29/07 through 08/29/08

10/31/07
(Date)

(Certifying Officer)

Replaces MA 7-50A, B and C (Apr. 1970 edition) which is obsolete.

ETA 750 (Oct. 1979)

ETA Case Number  **A-07256-04730**

| 18. COMPLETE ITEMS ONLY IF JOB IS TEMPORARY | | | 19. IF JOB IS UNIONIZED (Complete) | |
|---|---|---|---|---|
| a. No. of Openings To Be Filled By Aliens Under Job Offer | b. Exact Dates You Expect To Employ Alien | | a. Number of Local | b. Name of Local |
| | From | To | | |
| 1 | 11/29/2007 | 08/29/2008 | | c. City and State |

| 20. STATEMENT FOR LIVE-AT-WORK JOB OFFERS (Complete for Private Household ONLY) | | | | | | |
|---|---|---|---|---|---|---|
| a. Description of Residence | b. No. Persons residing at Place of Employment | | | | | c. Will free board and private room not shared with anyone be provided? ("X" one) |
| ("X" one) | Number of Rooms | Adults | Children | | Ages | |
| ☐ House | | | BOYS | | | ☐ YES   ☐ NO |
| ☐ Apartment | | | GIRLS | | | |

**21. DESCRIBE EFFORTS TO RECRUIT U.S. WORKERS AND THE RESULTS. (Specify Sources of Recruitment by Name)**

Adena Springs South regularly conducts active recruitment to hire U.S. workers and will comply with all recruitment requirements of the H-2A program.

**22. Applications require various types of documentation. Please read Part II of the instructions to assure that appropriate supporting documentation is included with your application.**

**23. EMPLOYER CERTIFICATIONS**

By virtue of my signature below, I HEREBY CERTIFY the following conditions of employment.

a. I have enough funds available to pay the wage or salary offered the alien.

b. The wage offered equals or exceeds the prevailing wage and I guarantee that, if a labor certification is granted, the wage paid to the alien when the alien begins work will equal or exceed the prevailing wage which is applicable at the time the alien begins work.

c. The wage offered is not based on commissions, bonuses, or other incentives, unless I guarantee a wage paid on a weekly, bi-weekly, or monthly basis.

d. I will be able to place the alien on the payroll on or before the date of the alien's proposed entrance into the United States.

e. The job opportunity does not involve unlawful discrimination by race, creed, color, national origin, age, sex, religion, handicap, or citizenship.

f. The job opportunity is not:

(1) Vacant because the former occupant is on strike or is being locked out in the course of a labor dispute involving a work stoppage.

(2) At issue in a labor dispute involving a work stoppage.

g. The job opportunity's terms, conditions and occupational environment are not contrary to Federal, State or local law.

h. The job opportunity has been and is clearly open to any qualified U.S. worker.

**24. DECLARATIONS**

DECLARATION OF EMPLOYER    Pursuant to 28 U.S.C. 1746, I declare under penalty of perjury the foregoing is true and correct.

| SIGNATURE | DATE |
|---|---|
| | 9/20/07 |

| NAME (Type or Print) | TITLE |
|---|---|
| | FARM MANAGER |

AUTHORIZATION OF AGENT OF EMPLOYER    I HEREBY DESIGNATE the agent below to represent me for the purposes of labor certification and I TAKE FULL RESPONSIBILITY for accuracy of any representations made by my agent.

| SIGNATURE OF EMPLOYER | DATE |
|---|---|
| | 9/20/07 |

| NAME OF AGENT (Type or Print) | ADDRESS OF AGENT (Number, Street, City, State, ZIP code) |
|---|---|
| JONATHAN ANDERSON | |

ETA Case Number  **A-07256-04730**

Agricultural and Food Processing Clearanc der
Pedido de Empleados para Agricultura y Procesamiento de Alimentos

**U.S. Department of Labor**
**Employment and Training Administration**
O.M.B. Approval No. 1205-0134, Expires 08/31/2009

| 1. Employer's Name and Address (Number, Street, City, State, Zip Code, and telephone number) Nombre y Dirección del Empleador (Número, calle, ciudad, código postal y teléfono) Alpen House d/b/a Adena Springs South. 15045 NW 141st Ct. Williston, FL 32696 | Industry Code / Código de Industria | Job Order # / No. Orden de Empleo |
|---|---|---|
| | Occupational Title and Code /Título Ocupacional y Código | |
| | Clearance Order Issue Date / Fecha de Tramite: | |

| 2. Location and Direction to Work Site / Dirección del lugar de trabajo Starting in WILLISTON, FL on S MAIN ST go toward N MAIN St.; Turn RIGHT on E NOBLE AVE(US-27); Continue to follow US-27; Bear LEFT on W HWY 316(CR-316) ; Turn LEFT on NW 141ST CT.; Arrive at 15045 NW 141 CT, WILLISTON | Job Order Expiration Date / Fecha de expiración: 6.Anticipated Period of Employment / Periodo Anticipado de Empleo From/ Desde: 11/29/2007   To / Hasta 08/29/2008 |
|---|---|
| (see attachment / para más detalles vea ____ ) | 7. No. of Worker's Requested / No. de Trabajadores Pedidos          ONE |

| 3. Location and Description of Housing / Dirección y Descripción de la Vivienda 15045 NW 141st Ct. Williston, FL 32696- Housing consists of apartment unit with bedroom, bath, kitchen and living area. | 8. Anticipated Hours of Work per Week / Horas Anticipadas de Trabajo por Semena     Total:     40 | | |
|---|---|---|---|
| | Sunday / Domingo | 0 | Wednesday / Miercoles | 8 |
| | Monday / Lunes | 8 | Thursday / Jueves | 8 |
| | Tuesday / Martes | 8 | Friday / Viernes | 8 |
| | | | Saturday / Sabado | 0 |
| (see attachment / para más detalles vea ) | 9. Collect Calls Accepted/Se Aceptan Llamadas a Cobrar: Employer / El Empleador     Yes ☐  No ☒ Local Office/Oficina Local     Yes ☐  No ☒ |

| 4. Board Arrangements / Arreglo de Alojamiento Housing is provided free of charge and meets all applicable standards. |
|---|
| (see attachment / para más detalles vea ____ ) |

| 5. Referral Instructions / Instruciones para el Referimiento de Candidatos Please contact Heather ████████████████ |
|---|
| (see attachment / para más detalles vea ____ ) |

| 10. Job Specifications / Descripción del Trabajo [Summary of Material Job Specifications in ENGLISH must be included inside this box] Review, assess, modify and monitor various aspects of mare management and foaling during the upcoming foaling season, including the care and management of breeding, pregnant and foaling mares as well as maiden and barren mares being prepared for breeding; advise and oversee the techniques for monitoring the health and well-being of foals; assess and advise on the sales preparation process and methods of advertising and marketing to enhance sales results; assess, advise and oversee stallion management, including various duties required during the upcoming breeding season; review, assess and modify the farm's equine nutrition program to best facilitate the 2008 breeding, foaling and sales season; oversee and assist with the judging and selection of thoroughbreds for sales during the 2008 sales seasons. |
|---|
| (see attachment / para más detalles vea ____ ) |

| 10 a.  Descripción del Trabajo / Job Specifications  [Summary of Material Job Specifications in SPANISH must be included inside this box] |
|---|

ETA 790 (Rev. July 2004)

ᴙ - ᴍᴍᴄᴇ - ᴀᴜᴢᴦᴕ

(see attachment / para más detalles vea ___)

| 11. Wage Rates, Special Pay Information and Deductions / Tarifa de Pago, Información Sobre Pagos Especiales y Deducciónes (Rebajas) | | | | | | | |
|---|---|---|---|---|---|---|---|
| Crop Activities / Cultivos | Hourly Wage Salario por Hora | Piece Rate / Unit(s) Pago por Pieza / Unidad(es) | Special Pay (bonus, etc.) Pagos Especiales (Bono, ect.) | Deductions / Deducciónes | YES SI | NO | Pay Period Periodo de Pago |
| | $ 15.00 ($2,400/month) | $ | | Social | x | | Weekly / Semanal |
| | $ | $ | | Federal Tax Impuestos Federales | x | | |
| | $ | $ | | State Tax Impuestos Estatales | x | | Bi-weekly / cada 2 sem.   X |
| | $ | $ | | Meals (comidas) | | x | |
| | $ | $ | | Other (specify)/ Otro | | x | Other / Otro |

More Details About thePay/Más Detalles Sobre el Pago
Compensation is $2,400 per month (which equals $15.00 per hour) paid twice per month plus all housing, meals and certain transportation.

(see attachment / para más detalles vea _____)

12. Transportation Arrangements / Arreglos de Transportación  (Please explain)
See attachment 12

(see attachment / para más detalles vea _____)

13. Is it the prevailing practice to use Farm Labor Contractors (FLC) to recruit, supervise, transport, house, or pay workers for this (these) crop activity(ies)? Es la costumbre en el area de usar Contratistas Agricolas para reclutar, supervisar, transportar, dar vivienda, ó pagarle a los trabajadores en este/estos tipo(s) de cosecha(s)/sembrado(s)? Yes/Si ☐   No ☒   If you have checked yes, what is the FLC  wage for each activity?/Si contesto "SI," cual es el salario que le paga al Contratista Agricola para cada actividad?

14. Unemployment Insurance provided / Seguro por Desempleo:                                                         Yes ☒        No ☐
15. Workers' compensation insurance provided / Indemnización por accidente de trabajo:                         Yes ☒        No ☐
16. Are tools provided at no charge to the workers? / ¿Se le proveen las herramientas de trabajo a los trabajadores sin cargo alguno?   Yes ☒   No ☐
17. List any arrangements which have been made with establishment owners or agents for the payment of a commission or other benefits for sales made to workers.  (If there are no such arrangements, enter "None")/Indique todo acuerdo o convenio con los propietarios del establecimiento o sus representantes con respecto al pago de una comisión u otros beneficios por ventas hechas a los trabajadores. (Si no hay ningún acuerdo o convenio, indique "Ninguno")
NONE.

18. List any strike, work stoppage, slowdown, or interruption of operation by the employees at the place where the workers will be employed.  (If there are no such incidents, enter "None")/ Enumere todo huelga, paro o interrupción de las operaciones por parte de los empleados en el lugar de empleo. (Si no hay, indique "Ninguno")
NONE.

19. Address of Order Holding Office (include Telephone number)/Dirección de la Oficina donde se Radicó la Oferta (incluya número de teléfono)
Florida Agency of Workforce Innovation, Office of Workforce Services, Alien Labor Certification Program, P.O. Box 10869, Tallahassee, FL 32302

20. Name of Local Office Representative (include direct dial telephone number) / Nombre del Representante de la Oficina Local (incluya numero de telefono)
(850) 921-3466 or (850) 921-3830

21. Employer's Certification: This job order describes the actual terms and conditions of the employment being offered by me and contains all the material terms and conditions of the job.
Certificación del Empleador: Esta orden de trabajo describe los términos y condiciones de trabajo y contiene todos los materials, terminus, y condiciones ofrecidos.
Employer's Signature / Firma y Título del Empleador
X

READ CAREFULLY: In view of the statutorily established basic function of the Employment Service as a no-fee labor exchange, that is, as a forum for bringing together employers and job seekers, neither the ETA nor the State agencies are guarantors of the accuracy or truth-fullness of information contained on job orders submitted by employers. Nor does any job order accepted or recruited upon by the One-Stop Career Center constitute a contractual job offer to which the One-Stop Career Center, ETA or a State agency is in any way a party.
LEASE CUIDADOSAMENTE: En vista de su función básica establecida estatutariamente el Servicio de Empleo es un  intercambio gratis de trabajo para juntar a los empleadores y trabajadores que buscan empleo, ni ETA ni las agencias del estado pueden garantizar la verdad y certeza de la información contenida en la Orden de Trabajo sometida por el Empleador. Tampoco, ninguna orden de trabajo aceptada o reclutada por el Servicio de Empleos constituye una oferta contractual de la cual ETA ni la agencia del Estado son parte

Public reporting burden for the ETA Form 790 is estimated to be approximately 60 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and reviewing the collection. Respondents obligación to reply to these requerments are mandatory by 20 CFR 653.500. Persons are not required to respond to this collection of information unless it displays a currently valid OMB control number.  Comments regarding this burden estimate or any other aspect of this collection, including suggestions for reducing the burden can be sent to the U.S. Department of Labor, Office of Workforce Investment, Room S-4321, Washington, D.C. 20210 (Paperwork Reduction Project 1205-0134).

ETA 790 (Rev. July 2004)

# Attachments to ETA Form 790

**Job Order Number:** _____

## ITEM 2 - LOCATION AND DIRECTION TO WORK SITE:

**The work site is located at** _____ ███████████████████
in the following county/counties: ____ ██████ The directions to the work site are:

**Starting in** ██████████████████ go toward ████████; T███████
████████████ Continue to ████████ Bear████████ W H████████
LEFT on ██████████ Arrive at 1████████████████████

## ITEM 3 - LOCATION AND DESCRIPTION OF HOUSING:

**Location: Housing is located at** _____ ████████████████████

_____

_____

Directions to housing are_____    **Same As Above.**_____

_____

_____

Description of housing:    Housing consists of 1 bedroom, 1 bath, living area and kitchen. Housing meets all applicable standards.

Housing will be clean and meet applicable Federal Housing Standards.  Workers will be responsible for maintaining housing in a neat, clean manner.  Reasonable repair cost of damage, other than that caused by normal wear and tear, will be deducted from the earnings of workers found to have been responsible for damage to housing or furnishings.  Housing and utilities are provided at no cost to workers who are unable to return to their place of residence the same day. *If both male and female workers are hired*, separate toilet, shower facilities, *and sleeping rooms, will be provided by the employer.*

**Employer requests conditional access into the Interstate and Intrastate Clearance System and assures that the worker housing will meet the applicable Federal Standards not later than 30 days in advance of the date of need reflected on the attached ETA 790.**

_____          9/20/07
**Signature**                                    **Date**

1

Workers may be reached at the following address and phone number:

**ADDRESS:** ▬▬▬▬▬▬▬▬▬▬▬▬▬▬

**PHONE NUMBER:  (352) 528-1287**

**ITEM 4 - BOARD ARRANGEMENTS:** *(Check Appropriate Item(s))*

_____Employer will provide 3 meals per day and will deduct $_____per day.

__X__Employer will furnish free and convenient cooking and kitchen facilities so workers may prepare their own meals.  Employer will provide (on a voluntary basis) transportation to assure workers access to stores where they can purchase groceries.

**ITEM 5 - REFERRAL INSTRUCTIONS:** *(Include here who an applicant or State Workforce Agency Representative should contact concerning employment and how that person may be reached)*

Contact ▬▬▬▬▬▬▬▬▬▬▬▬

Applicants, Workforce Agency Personnel, Walk-ins, Gate Hires, etc. may:
__X__Call for an interview during normal business hours at the number listed on the ETA 790.
_____Report to the farm office or worksite listed on the ETA 790.
_____Other (describe) _____
_____
_____
_____
_____

**ITEM 8 - ANTICIPATED HOURS OF WORK:**

___**8**_hours per day is normal.  The worker may be requested but not required to work
___**0**_hours per day and/or on the Sabbath or Federal holidays depending upon the conditions in the fields or orchards, weather and maturity of the crop.

**ITEM 11 - WAGE RATES, SPECIAL PAY INFORMATION AND DEDUCTIONS:**

(a) The Adverse Effect Wage Rate of $____**8.56**___, the prevailing hourly wage rate or piece rate, or the federal minimum wage rate, whichever is greatest, will be the minimum rate of pay.  Employer assures that if a change in the AEWR requires an increase in the guaranteed minimum, such increase will be paid as of the effective date of the increase.   If the worker's piece rate

2

RUIZ DECLARATION
EXHIBIT 4



**Virginia.gov**  Online Services | Commonwealth Sites | Help | Governor

**Here are the details for the selected job. If you wish to apply for this job click the**
***Display more information on this job*** **button.**

*For help click the question mark next to each section.*

## Job Information

* Job Order Number:           89711
* Job Order Close Date:        None Specified
* Employer Name:              Not Available
* Job Title:                  FARMWORKER FIELD CROP
* Occupation:                 General Farmworkers
* Job Duration:               Over 150 Days
* Type of Job:                Full Time (Over 30 Hours)
* Special Category:           None Specified
* Job Position(s):            10
* Type of Employer:           Private Sector

## Job Requirements

* Minimum Age:                14
* Reason for age requirement:  Other-Specify in Job Details
* Test Requirement:           No test required
* Description of testing performed: None Specified
* Hiring Requirements:        None Specified
* Education Level:            No High School Diploma or GED
* Experience:                 00 months
* Driver's License Certification  No
  Requirement:
* Job Skills:                 View Employer Skill Requirements

## Compensation and Hours

* Salary Range:               $8.85 - $8.85 Hour
                              View Labor Market Wage Rates

* Pay Comments:               Not Applicable
* Hours per Week:             40
* Shift:                      Not Applicable
* Supplemental Compensation:  Not Applicable



* Benefits:     None - NOT AVAILABLE

**Work Site Location**

* City, State, and Country:     SOUTH HILL, VA US
* Public Transportation Accessible: No

**Job Description**

PLANT BED,PLANT,CULTIVATE,HARVEST,STORE,CURE,BAG,LOADTOB. REMOVE TOPS/SUCKERS-PLANTS. WK IN FIELDS/BARNS, WK-LIGHT RAIN,TEMP. VARY BELOW FREEZ.-100 DEGREESHELP LIFT TO 250 LBS.,OTHER FARM RELATED WK.M-F. 3/26/08 11/1/08 PRIMARY CROP TOBACCO

**Special Skills (degrees, certifications, software, etc.)**

must be physically capable of doing the work

**Additional Information**

None Specified

To display more information including how to apply for this job, click the button below.

| Jobs by Employer | Jobs by Occupation | Occupation Information |
|---|---|---|

There is no additional job information available about this employer.

[ Choose another Job | Print View | Send to a Friend ]

**Select another Job Seeker Service**

[ Home | Services | Site Map | Settings | Log Off ]



**Virginia.gov**    Online Services | Commonwealth Sites | Help | Governor

**Here are the details for the selected job. If you wish to apply for this job click the *Display more information on this job* button.**

*For help click the question mark next to each section.*

### Job Information

| | |
|---|---|
| * Job Order Number: | 92273 |
| * Job Order Close Date: | None Specified |
| * Employer Name: | RICKY HORTON |
| * Job Title: | Agricultural Workers, All Other |
| * Occupation: | Agricultural Workers, All Other |
| * Job Duration: | Over 150 Days |
| * Type of Job: | Full Time (Over 30 Hours) |
| * Special Category: | None Specified |
| * Job Position(s): | 8 |
| * Type of Employer: | Private Sector |

### Job Requirements

| | |
|---|---|
| * Minimum Age: | None Specified |
| * Reason for age requirement: | |
| * Test Requirement: | No test required |
| * Description of testing performed: | None Specified |
| * Hiring Requirements: | None Specified |
| * Education Level: | No High School Diploma or GED |
| * Experience: | 0 months |
| * Driver's License Certification Requirement: | No |
| * Job Skills: | View Employer Skill Requirements |

### Compensation and Hours

| | |
|---|---|
| * Salary Range: | $8.85 Hour (minimum) |
| | View Labor Market Wage Rates |
| * Pay Comments: | Will discuss with applicant |
| * Hours per Week: | 40 |
| * Shift: | Day |
| * Supplemental Compensation: | Not Applicable |



**\* Benefits:**          None - NOT AVAILABLE

## Work Site Location

**\* City, State, and Country:**          BLACKWATER, VA US
**\* Public Transportation Accessible:** No

## Job Description

Period of employment 04/10/2008 to 12/01/2008. Job will include hoeing, operation mowing and trimming equipment. Chopping weeds & trimming and transplanting plants. Workers will carry and haul soil, water and containers. Workers will prepare, load, unload plants during the shipping process. Extensive bending and stooping is required.

## Special Skills (degrees, certifications, software, etc.)

None Specified

## Additional Information

None Specified

To display more information including how to apply for this job, click the button below.

| Jobs by Employer | Jobs by Occupation | Occupation Information |

**Other Job Listings for this Employer**

To view other jobs offered by this employer, click a link below:

Other local job listings for this employer
  Select this option to view other jobs in this system being offered by this employer that are located in Virginia Statewide.

All job listings for this employer
  Select this option to view all of the jobs in this system being offered by this employer.

[ Choose another Job | Print View | Send to a Friend ]

**Select another Job Seeker Service**

[ Home | Services | Site Map | Settings | Log Off ]



**Virginia.gov**   Online Services | Commonwealth Sites | Help | Governor

Here are the details for the selected job. If you wish to apply for this job click the *Display more information on this job* button.

*For help click the question mark next to each section.*

## Job Information

| | |
|---|---|
| * Job Order Number: | 92437 |
| * Job Order Close Date: | None Specified |
| * Employer Name: | SNAKE CREEK FARM |
| * Job Title: | Agricultural Workers, All Other |
| * Occupation: | Agricultural Workers, All Other |
| * Job Duration: | Over 150 Days |
| * Type of Job: | Full Time (Over 30 Hours) |
| * Special Category: | None Specified |
| * Job Position(s): | 8 |
| * Type of Employer: | Private Sector |

## Job Requirements

| | |
|---|---|
| * Minimum Age: | None Specified |
| * Reason for age requirement: | |
| * Test Requirement: | No test required |
| * Description of testing performed: | None Specified |
| * Hiring Requirements: | None Specified |
| * Education Level: | No High School Diploma or GED |
| * Experience: | 0 months |
| * Driver's License Certification Requirement: | No |
| * Job Skills: | View Employer Skill Requirements |

## Compensation and Hours

| | |
|---|---|
| * Salary Range: | $8.85 Hour (minimum) View Labor Market Wage Rates |
| * Pay Comments: | Will discuss with applicant |
| * Hours per Week: | 40 |
| * Shift: | Day |
| * Supplemental Compensation: | Not Applicable |



* Benefits:                    None - NOT AVAILABLE

**Work Site Location**

* City, State, and Country:    HILLSVILLE, VA US
* Public Transportation Accessible: No

**Job Description**

Employment will be available 4/1/2008 to 11/15/2008. Workers will perform all duties associated with the cultivation and harvesting of vegetables. In addition, workers may be required to perform variable tasks such as the following: irrigation, ditching, shoveling, hoeing, hauling,ground preparation, weeding and other tasks related to farming. Stoop labor and long hours of work in the fields will be required. (LOCAL RECRUITMENT ONLY)

**Special Skills (degrees, certifications, software, etc.)**

None Specified

**Additional Information**

None Specified

To display more information including how to apply for this job, click the button below.

| **Jobs by Employer** | **Jobs by Occupation** | **Occupation Information** |

**Other Job Listings for this Employer**

To view other jobs offered by this employer, click a link below:

Other local job listings for this employer
  Select this option to view other jobs in this system being offered by this employer that are located in Virginia Statewide.

All job listings for this employer
  Select this option to view all of the jobs in this system being offered by this employer.

[ Choose another Job | Print View | Send to a Friend ]

**Select another Job Seeker Service**

[ Home | Services | Site Map | Settings | Log Off ]

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED FARM WORKERS | ) | |
| | ) | |
| and | ) | |
| | ) | |
| FARMWORKER JUSTICE, | ) | |
| | ) | C.A. No. 07-2241 (HHK) |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| DEPARTMENT OF LABOR, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## [PROPOSED] ORDER

This matter having come before the Court on Defendant's Motion for Dismissal and for

Summary Judgment, and Plaintiffs' Cross-Motion for Summary Judgment, it is hereby

**ORDERED** that defendant's motion for summary judgment is **DENIED** and plaintiffs'

motion for summary judgment is **GRANTED.**  It is further

**ORDERED** that defendant shall grant plaintiffs a fee waiver and produce without

redaction all materials responsive to plaintiffs' FOIA requests.

**SO ORDERED** on this _____ day of _____, 2008.

_____
HENRY H. KENNEDY
United States District Judge